1  JAMES M. WAGSTAFFE (95535)
   IVO LABAR (203492)
2  **KERR & WAGSTAFFE LLP**
   100 Spear Street, Suite 1800
3  San Francisco, CA 94105–1528
   Telephone: (415) 371-8500
4  Fax: (415) 371-0500

5  Attorneys for Defendant
   Victor Conte

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| SHANE D. MOSLEY, SR., | Case No. C 08-01777 JSW |
|---|---|
| Plaintiff, | **DECLARATION OF VICTOR CONTE IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE COMPLAINT PURSUANT TO CALIFORNIA'S ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION ("SLAPP")** |
| vs. | |
| VICTOR CONTE, | |
| Defendant. | Hearing Date: August 22, 2008<br>Time: 9:00 a.m.<br>Courtroom: 2<br><br>HON. JEFFREY S. WHITE |

# DECLARATION OF VICTOR CONTE

I, VICTOR CONTE, declare:

1. I am the Defendant in the above-captioned action. Unless stated otherwise, I have personal knowledge of the facts stated herein.

2. Approximately twenty-five years ago I founded Bay Area Laboratories Co-Operative ("BALCO"). BALCO was a medical laboratory that analyzed blood and urine samples for athletes.

3. On July 26, 2003, shortly before Plaintiff Shane Mosley, Sr.'s boxing match versus Oscar De La Hoya, Mr. Mosley and Derryl Hudson, Mr. Mosley's trainer at the time, flew from Southern California to the Bay Area to meet with me. After their flight landed at the Oakland airport, a limousine transported them to the BALCO offices in Burlingame where I met with them. Jim Valente, a BALCO employee, was also present.

4. Shortly after Mr. Mosley and Mr. Hudson arrived at the BALCO offices, Jim Valente accompanied them to Peninsula Health Services. At Peninsula Health Services, Mr. Mosley's blood and urine samples were collected for a blood chemistry panel, complete blood count, tests to measure Plaintiff's T3, T4, and TSH, and mineral and trace element analysis.

5. Following the sample collection, Mr. Mosley, Mr. Hudson and Mr. Valente returned to my office at BALCO. I explained the benefits of using three illegal performance enhancing drugs commonly referred to as EPO, The Clear, and The Cream. Specifically, I explained to Mr. Mosley and Mr. Hudson that The Clear was an undetectable anabolic steroid and that The Cream contained testosterone and epitestosterone. I explained that The Cream was primarily to be used as a masking agent. I also explained that EPO increases the production of red blood cells, and therefore Mr. Mosley should take additional dietary supplements that aid in the manufacture of red blood cells, such as iron, vitamin C, vitamin E, folic acid, and vitamin B12. I told Mr. Mosley and Mr. Hudson that in addition to assisting with red blood cell production, EPO enhances oxygen uptake and utilization, which is important in a sport requiring stamina and endurance like boxing. I further explained that EPO's effects would provide Mr. Mosley with an advantage late in the fight with Oscar De La Hoya.

6. I instructed Mr. Mosley and Mr. Hudson on the proper manner in which to draw EPO from the bottle – which was labeled as Procrit brand EPO – with a syringe, how to remove the air from the syringe by flicking it and pushing the plunger up, and how to inject himself in the stomach using a more sophisticated "double-injection" technique. I instructed Mr. Mosley to make a ½ cc subcutaneous injection into the right side of his stomach and then a second ½ cc injection into his left side. I understand from reviewing studies that splitting the dosage and using two injection sites can increase saturation and the effectiveness of the drug compared to using a single 1 cc injection.

7. Mr. Mosley injected his first doses of EPO that day in presence of me, Mr. Hudson, and Jim Valente.

8. I also explained the use of The Clear and The Cream to Mr. Mosley and Mr. Hudson that day. Mr. Mosley then administered his first dose of The Clear under his tongue with a needle-less syringe in the presence of myself, Mr. Hudson, and Mr. Valente.

9. During our meeting, Mr. Mosley had many questions about EPO, The Clear, and The Cream, which I answered.

10. I also wrote out a "doping calendar" for Mr. Mosley which listed codes for the specific drugs for him to use each day up until just before the De La Hoya match when he would taper off the use of the drugs. I instructed Mr. Mosley to use both The Clear and The Cream twice a week, and to inject EPO three days per week for the first two weeks and one day per week thereafter until the week before the De La Hoya match.

11. The cost of the drug program was $1,850 (i.e. $900 for the EPO, $600 for The Clear and The Cream, $150 for blood work, and $200 for transportation from the airport). Before Mr. Mosley and Mr. Hudson left BALCO, Mr. Mosley paid me a partial payment of $500 in cash. Mr. Mosley later sent me a personal check for $1,350. Mr. Mosley, Mr. Hudson and I agreed that Mr. Mosley and Mr. Hudson should not carry the drugs on the airplane flight back to Southern California, so I shipped them via Federal Express to Mr. Hudson.

12. I later received and reviewed Mr. Mosley's July 26, 2003 test results from the blood and urine collection at Peninsula Health Services. These test results revealed that Mr.

1  Mosley's hematocrit level (i.e. the percentage of red blood cells compared to the whole blood
2  volume) was towards the low-end of the normal range.  From my experience, research and
3  review of medical studies, I understand that the normal hematocrit range is forty to fifty-three
4  percent.
5       13.    Approximately two weeks after Mr. Mosley's July 26, 2003 meeting with me, he
6  had more blood samples collected at the Bear Valley Family Health Center while training in Big
7  Bear, California.  I received and reviewed these test results which showed that Mr. Mosley's
8  hematocrit level had increased to the high-end of the normal range.
9       14.    I was approached by journalists from the New York Daily News, USA Today, and
10 Sports Illustrated and asked to respond to Mr. Mosley's false public comments that I had
11 deceived him about the nature of the performance enhancing drugs.  I made the statements that
12 are the subject of this action in response to Mr. Mosley's comments.  There is no question that I
13 informed Mr. Mosley that he was taking the three banned performance enhancing drugs
14 described above.
15      I declare under penalty of perjury under the laws of the United States that the foregoing is
16 true and correct.  Executed on May 30, 2008 at Burlingame, California.

          __/s Victor Conte_____
          VICTOR CONTE