JUDD BURSTEIN, P.C.
Judd Burstein (Admitted *pro hac vice*)
1790 Broadway, Suite 1501
New York, New York 10019
Tel (212) 974-2400 Fax (212) 974-2944
E-mail jburstein@burlaw.com

LONG & LEVITT LLP
Kim O. Dincel, Esq. (SBN 131563)
465 California Street 5th Floor
San Francisco, California 94104
Tel (415) 397-2222 Fax (415) 397-6392
E-mail kdincel@longlevit.com

*Attorneys for Plaintiff,*
SHANE D. MOSLEY, SR.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHANE D. MOSLEY, SR., <br><br> *Plaintiff,* <br><br> vs. <br><br> VICTOR CONTE, <br><br> *Defendant.* | 08-Civ-1777 (JSW) <br><br> **DECLARATION OF SHANE D. MOSLEY, SR.** <br><br> Date:     August 22, 2008 <br> Time:    9:00 a.m. <br> Courtroom: 2, 17th Floor <br><br> Hon. Jeffrey S. White |

SHANE D. MOSLEY, SR., hereby declares under penalty of perjury:

1. I am the Plaintiff in this action.

2. I submit this Declaration to demonstrate why Defendant Victor Conte's ("Conte" or "Defendant") motion to strike the complaint has no merit. The purpose of this Declaration is to place before the Court factual information relevant to the opposition to Defendant's motion.

DECLARATION OF SHANE D. MOSLEY, SR.
- 1 -

3. I am a professional boxer, and I have been defamed by Defendant, the infamous principal of the Bay Area Laboratory Co-operative ("BALCO"), on multiple occasions.

4. Derryl Hudson ("Hudson") was my strength and conditioning coach in and around July 2003.

5. In or about July of 2003, on the suggestion and recommendation of Hudson, Hudson and I traveled to BALCO's offices to meet with Conte.

6. Hudson told me that he knew BALCO through his work as a track and field coach.

7. At the time, Hudson informed me that Conte was very knowledgeable when it came to various vitamins and nutritional supplements. Hudson said to me, in sum or substance, that if I were to use the various vitamins and nutritional supplements, it would be the "icing on the cake" for my training.

8. I met with Conte at Conte's business, BALCO, for the purpose of obtaining legal supplements to aid my training. At this meeting with Conte, samples of my blood were taken and analyzed. Conte then recommended a regimen of products that he told me would help with my endurance.

9. This was the only trip I ever made to BALCO and the only time I ever spoke with Mr. Conte.

10. Further, at the meeting with Conte, I specifically asked Conte for assurances that everything that he was recommending was both legal and healthy. Conte specifically gave me that assurance. His public claims to the contrary, in which he explained to me that he was recommending illegal substances and procedures, are a lie.

11. Significantly, I have never denied taking the products recommended to me by Conte. Indeed, I forthrightly testified about them before the Grand Jury. However, I have always denied that Conte ever told me, or that I knew, that I was taking anything that was illegal or in any way barred by the rules of my sport.

12. I purchased and received the following supplements from BALCO: "The Cream", "The Clear", and Erythropoietin (EPO). I admitted to the Grand Jury that I had made these purchases. However, at no time was I ever told, by Conte or anyone associated with BALCO or Hudson, that these products were steroids or illegal or banned performance enhancing drugs. In other words, Conte never told me, in sum or substance, that the supplements provided to me by or on behalf of Conte or BALCO were undetectable steroids or other banned substances that would not show up in a drug test. To the contrary, I explicitly sought and received Conte's assurance that everything he was recommending was entirely legal and authorized for use in my sport.

13. I did not take any supplements with me when we left BALCO's offices. Rather, a package was subsequently sent to Hudson, who thereafter administered a variety of supplements to me.

14. From the inception of my dealings with Conte, I was assured by both Hudson and Conte that everything that Conte was recommending was legal, healthy, and not in any way barred by the rules of my sport. Both Conte and Hudson specifically gave such assurances.

15. Contrary to Hudson's declaration dated May 21, 2008, I never "admitted to [Mr. Hudson, or anyone for that matter,] that [I] knew the drugs provided to [me] by Mr. Conte were illegal performance enhancing drugs." Nor did Hudson ever tell me that such drugs were illegal

or barred by the rules of my sport. Moreover, I never discussed with Hudson, either before we went to BALCO or after, that we were securing any such drugs.

16. In stark contrast to Hudson's assertions, and as set forth above, I have always denied that Conte ever told me, or that I knew, that I was taking anything that was illegal or in any way barred by the rules of my sport. Indeed, in January of 2004, I submitted a declaration to the Nevada State Athletic Commission affirming that I was told, *inter alia*, that the supplements were completely legal. *See* Exhibit A hereto, a true and accurate copy of my January 13, 2004 declaration, with exhibits.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of June 2008.

_____
SHANE D. MOSLEY, SR.

# EXHIBIT A

JAN 1 3 2004

## DECLARATION UNDER PENALTY OF PERJURY

**SHANE MOSLEY** hereby declares under penalty of perjury:

1. In the Summer of 2003, as I was training for my September 13, 2003 bout with Oscar De La Hoya, it was suggested to me by my conditioning coach that I purchase various vitamins and nutritional supplements from Balco Laboratories. I was told that Balco worked with many world-class athletes.

2. When Balco was contacted by telephone, they advised that I should travel to Balco's offices so that blood work could be performed, and a detailed plan for me could be prepared. It was explained that the blood work would identify specific mineral and vitamin deficiencies so that Balco could address them.

3. A few days thereafter, I traveled to Balco's offices with my conditioning coach. This was the only trip I ever made to Balco and the only time I ever spoke with Mr. Conte. We met briefly at Balco's offices with Mr. Conte and another individual, and then went to a nearby hospital for blood to be drawn. Thereafter we went to lunch and then returned to Balco's laboratories. Mr. Conte told me that, based upon my blood work, he would prepare a program for me. During this meeting, I specifically told him that I wanted to be sure that he would not give me anything that was illegal or banned. I did this for two reasons. First, and foremost, I did not want to take anything that could do harm to me. Second, I was aware of the problems that Fernando Vargas had after his fight with Oscar De La Hoya, and wanted to be 100% sure that I would not have similar problems. Mr. Conte assured us that everything he would send me was 100% legal and proper. I was told that these completely legal supplements would increase my stamina and my recovery time in training.

4. I did not take anything with me when we left Balco's offices. Rather, a package was subsequently sent to my conditioning coach, who thereafter administered a variety of supplements

to me. Having been assured by Mr. Conte, who I knew supplied many other famous athletes, that he would only give me supplements that were completely legal, I did not focus in any way on what I was taking.

5. In late September of 2003, I learned of the investigation into Balco. Thereafter, on October 2, 2003, I submitted to a lie detector test in Las Vegas. The results of that test are annexed hereto.

Dated: January 13, 2004

*[signature]*
SHANE MOSLEY

2

# W.E.K. SECURITY & POLYGRAPHS
## 284 COLONY STREET
## WEST HEMPSTEAD, NEW YORK 11552

Judd Burstein
Attorney @ Law
1790 Broadway
New York, New York 10019

Mr. Burstein:                                                   October 6, 2003

On October 2, 2003 I met with you and your client, Mr. Shane Mosley. You explained to me that there are some allegations concerning Mr. Mosley and the use of steroids. You advised me that Mr. Mosley is a professional fighter and recently fought against Oscar DeLaHoya. Although a drug test subsequent to the fight was negative concerning illegal substances in Mr. Mosley's body, Mr. Mosley wanted to take a polygraph concerning his belief that he never, knowingly, took any illegal substances.

I interviewed Mr. Mosley, explained the polygraph to him and reviewed the test questions with him prior to the test. I asked Mr. Mosley the following relevant questions during the test:

1) Did you visit Balco Labs only once?
   Answer: Yes

2) Did you tell your conditioning coach, Darryl, that you wanted only legal supplements used?
   Answer: Yes

3) Did you tell Victor Conte that you only wanted legal supplements?
   Answer: Yes

4) As of the date of the DeLaHoya bout in September, 2003 did you believe you had taken any illegal substances?
   Answer: No

It is the opinion of the polygrapher, based on the polygraph charts, that no deception is indicated when Mr. Mosley answered these questions.

Respectfully submitted:

William E. Kelly
Member, National Polygraph Association

RECEIVED
OCT - 9 2003
JUDD BURSTEIN, P.C.

02/13/2008  15:33   7024852577         NSAC                         PAGE  05
10/01/2003  16:13   516-481  22                                     PAGE  02

# WILLIAM E. KELLY, C.P.P.
### 284 Colony Street
### West Hempstead, NY 11552
### (516) 481-1222

**Professional Experience:**

| | |
|---|---|
| 1995-present | W.E.K. Security & Polygraphs Inc. |
| 1992-1995 | New York Post<br>Director of Security/Fire Safety |
| 1989-1992 | Manhattan East Suite Hotels<br>Director of Security/Fire Safety |
| 1988-1989 | PLE/Division of Business Risks International -<br>N.E. Regional Director- Corporate Drug Programs |
| 1987-1988 | Peter's Bag Corporation/Owner<br>Chairman/President-Luggage Company |
| 1963-1987 | Federal Bureau of Investigation (24 years)<br>Birmingham, Alabama; Los Angeles, CA; Detroit, Michigan; New York City (20 years)<br><br>Supervisory Agent - responsible for Agent firearm training program, police training programs, and liaison activities with law enforcement agencies and private industry within the New York City metropolitan area. Guided, directed and monitored investigative activities of assigned agents in the investigation of major property crimes.<br><br>Special Agent - worked criminal and espionage cases; received in excess of 30 commendations from the Director, FBI; Police Instructor from 1966; successful completion of Management Aptitude Program in 1978 (rating of 4); National Academy Counselor, 1975; _Polygraph Examiner since 1974._ |
| 1960-1963 | Metropolitan Life Insurance Company, NYC<br>Advanced Management Training Program |
| 1957-1960 | St. Vincent's Hospital, NYC<br>Reiss Pavilion Psychiatric Technician |

**Associations:**  National Polygraph Association
American Society for Industrial Security
FBI National Academy Associates (Counselor 1975)
Chairman-Former FBI Agent's Association (1992)
President-National Law Enforcement Assoc.(1999)

**Education:**  C.P.P.-Certified Protection Professional (1991)
MBA-Human Resources; May 1986; Adelphi University, Garden City, New York
FBI Academy, Quantico, Virginia, 1963
BA-Psychology; June 1960; Fordham University, Bronx, New York