1 | JAMES M. WAGSTAFFE (95535)
IVO LABAR (203492)

2 | **KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800

3 | San Francisco, CA 94105–1528
Telephone: (415) 371-8500

4 | Fax: (415) 371-0500

5 |

6 | Attorneys for Defendant
VICTOR CONTE

7 |

8 |

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA**

11 | SHANE D. MOSLEY, SR.,                Case No. C 08-01777 JSW

12 |         Plaintiff,                **DECLARATION OF IVO LABAR IN
SUPPORT OF MOTION FOR

13 |    vs.                **SANCTIONS AND ATTORNEYS' FEES
(C.C.P. § 425.16(c))**

14 | VICTOR CONTE,

15 |         Defendant.                Hearing Date: December 24, 2008
Time:  9:00 a.m.

16 |                Courtroom: 2

17 |                HON. JEFFREY S. WHITE

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

KERR
&
WAGSTAFFE
LLP

I, Ivo Labar, hereby declare:

1.    I am an attorney licensed to practice before all courts in the State of California, and am a partner of the law firm of Kerr & Wagstaffe LLP, attorneys of record for Defendant Victor Conte ("Conte") in this action.  I have personal knowledge of the facts stated herein, and, if called as a witness, could and would competently testify to them under oath.

2.    Attached hereto as **Exhibit A** is a true and correct copy of the complaint filed December 15, 2004 in the matter of *Marion Jones v. Victor Conte*, case No. 3:04-cv-05312-SI.

3.    Attached hereto as **Exhibit B** is a true and correct copy of an Associated Press article published October 5, 2007 entitled "Jones pleads guilty, admits lying about steroids."

4.    Attached hereto as **Exhibit C** is a true and correct copy of a San Francisco Chronicle article published November 2006 entitled "Track coach Trevor Graham indicted."

5.    In order to ascertain the truth about Plaintiff Shane Mosley's claimed citizenship, I took Mosley's deposition on July 9, 2008 in Los Angeles, California and also undertook other informal discovery efforts to acquire information about the same.  Attached hereto as **Exhibit D** is a true and correct copy of the deposition transcript of Plaintiff Shane D. Mosley, taken July 9, 2008.

6.    Shortly after Mosley's deposition, I presented Plaintiff's counsel with a draft motion to dismiss for lack of subject matter jurisdiction.  After Defendant evidenced his intent to file the motion to dismiss for lack of subject matter jurisdiction, Plaintiff voluntarily dismissed his complaint with the SLAPP motion pending.  On the same day that Plaintiff dismissed his complaint, he re-filed his case in New York, a state that does not have a comparable anti-SLAPP statute.

7.    Attached hereto as **Exhibit E** is a true and correct copy of exhibit 4 (Declaration of Shane D. Mosley, Sr.) from the deposition of Plaintiff Shane D. Mosley, taken July 9, 2008, at which I deposed Mr. Mosley.

8.    Attached hereto as **Exhibit F** is a true and correct copy of the complaint in the matter *Mosley v. Cedric Kushner Promotions, Ltd.*, Los Angeles Superior Court Case No. BC290412, filed February 14, 2003.

– 1 –

KERR
&
WAGSTAFFE
LLP

9.      Attached hereto as **Exhibit G** is a true and correct copy of the First Amended Cross-Complaint in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549, filed July 7, 2008 by Shane Mosley.

10.     Attached hereto as **Exhibit H** is a true and correct copy of the Complaint in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549, filed May 4, 2008.

11.     Attached hereto as **Exhibit I** is a true and correct copy of the Minutes entered for the trial held on July 7, 2008 in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549.

12.     Attached hereto as **Exhibit J** is a true and correct copy of exhibit 3 (document bates labeled SM176) from the deposition of Plaintiff Shane D. Mosley, taken July 9, 2008.

13.     Attached hereto as **Exhibit K** is a true and correct copy of a document bates labeled SM31, produced July 1, 2008 in response to Defendant Victor Conte's First Set of Requests for the Production of Documents.

14.     Attached hereto as **Exhibit L** is a true and correct copy of a document bates labeled SM45, produced July 1, 2008 in response to Defendant Victor Conte's First Set of Requests for the Production of Documents.

9.      Attached hereto as **Exhibit M** is a true and correct copy of a letter from Jeremy Attie to me dated May 28, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 28, 2008 at San Francisco, California.


_____/s/_____

Ivo Labar

EXHIBIT A

1  Craig W. Budner (admission *pro hac vice* pending)
2  Beth W. Bivans (admission *pro hac vice* pending)
   Hughes & Luce, LLP
   1717 Main Street, Suite 2800
3  Dallas, Texas 75201
   Phone: (214) 939-5500
4  Fax: (214) 939-6100

5  Joseph M. Burton (SB No. 142105)
   Gregory G. Iskander (SB No. 200215)
6  Duane Morris LLP
   One Market, Spear Tower, Suite 2000
7  San Francisco, California 94105-1104
   Phone: (415) 371-2200
8  Fax: (415) 317-2201

9  Attorneys For Plaintiff
   MARION JONES
10

11              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13  MARION JONES,                         Case No. C 04 5312

14       Plaintiff,

15  v.                                    COMPLAINT FOR DEFAMATION
                                          AND TORTIOUS INTERFERENCE
16  VICTOR CONTE,                         WITH BUSINESS RELATIONS

17       Defendant.                       DEMAND FOR JURY TRIAL

18

19       Plaintiff Marion Jones ("Jones" or "Plaintiff") in support of her Complaint and Demand

20  for Jury Trial against Defendant Victor Conte ("Conte" or "Defendant") alleges:

21                         SUMMARY OF CLAIMS

22       1.      Marion Jones is an Olympic gold medalist, a world champion track and field star,

23  and one of the best known sports figures of all time.  Victor Conte is under federal indictment,

24  and stands accused of drug trafficking, tax evasion and money laundering.  Conte has falsely and

25  maliciously accused Jones of taking banned performance enhancing drugs and of being a "drug

26  cheat" during an approximately one-year period beginning six weeks before the 2000 Olympic

27

28  <u>COMPLAINT</u> – Page 1

                                          953000.01372:879927.05

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 3 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 6 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 2 of 16

1   Games.  Conte's statements, made during an interview on ABC News's 20/20, in an article

2   published in ESPN The Magazine and on ESPN.com, are absolutely false.

3          2.      Jones has never taken banned performance enhancing drugs.  Indeed, in the last

4   five years, including during the time period Conte falsely alleges that Jones used banned drugs,

5   Jones was one of the most drug-tested athletes in all of sports.  Jones took and passed over 160

6   separate drug tests, including five different drug tests at the 2000 Olympic Games.  In public

7   statements, Jones' doctor, coaches, co-athletes and others have steadfastly confirmed that Jones

8   never used banned performance enhancing substances.    Attorneys for Trevor Graham

9   ("Graham"), Jones' coach during the time Conte alleges Jones used drugs, have publicly stated

10  that Graham never gave performance enhancing substances to any of his athletes, including

11  Jones.  Jones has passed a lie detector test, administered by a well-known and respected

12  polygrapher who spent his career working with the FBI.  Jones has never exhibited the tell-tale

13  physiological signs of drug use, such as weight gain, bulkiness, voice change, and excessive

14  acne.  Moreover, the monthly calendars that Conte alleges documented Jones' drug regimen

15  reference men's race times that are not Jones'.  Also, interestingly, Jones' actual 100-meter race

16  times slowed during the time Conte falsely alleges she was taking performance enhancing drugs

17  to supposedly make her run faster.

18         3.      Meanwhile, Conte's credibility and motives have long been questioned.  Conte's

19  public statements regarding Jones and others are rife with inconsistencies and contradictions.

20  For example, in early 2004, Conte's attorneys issued a public statement emphasizing that Conte

21  never provided drugs to Jones.  His sudden "about-face" on the issue, just four months before his

22  criminal trial is anticipated, appears motivated by a desire to curry favor with prosecutors, garner

23  sensationalized media attention, bolster Conte's own financial and other self-interests, and harm

24  an individual against whom Conte has a long-standing grudge.  In Conte's own words, this was

25  and continues to be a "turf war," and Conte is trying desperately to win.

26

27

28  <u>COMPLAINT</u> – Page 2

953000.01372:879927.05

4.    Conte's vendetta against Jones has its roots in Conte's repeatedly unsuccessful efforts to develop a professional relationship with Jones. Conte wanted Jones to enter into an agreement to endorse his legal dietary supplement known as "ZMA." After repeated urgings from her then-husband CJ Hunter ("Hunter"), Jones reluctantly agreed to meet with Conte for a one-time promotion of ZMA at a Flex Magazine photo shoot. Subsequently, Jones rebuffed Conte's repeated efforts to expand his involvement with Jones. Conte grew increasingly impatient. Through Conte's ubiquitous presence at track and field events and his relationship with Hunter, Conte continued his relentless quest to get to Jones. Conte would repeatedly call their home, roam through athlete hotel lobbies at track meets hoping to see Jones, and scour the elite athletes' warm-up area at competitions in hopes of making contact with Jones. Conte's efforts were unsuccessful.

5.    After Jones separated from Hunter in early 2001, Conte unsuccessfully attempted to get to Jones through her coach, Graham. Again snubbed, Conte's frustrations grew. Conte's animosity toward Jones continued to grow after Jones became associated with world class sprinter Tim Montgomery ("Montgomery"). Conte's animus with Montgomery is no secret. Unbeknownst to Jones, Conte's self-professed "turf-war" with Jones reached a pinnacle when in 2003, according to Conte, Jones' then-former coach Graham sent in a syringe containing a banned substance to the U.S. Anti-Doping Agency. The ensuing investigation led to Conte's criminal indictment.

6.    Conte's self-admitted "competitive" drive and desire to "make history" apparently still motivates Conte. Driven by his long-standing vendetta with Jones, Conte seems willing to do and say whatever it takes to destroy her career and her reputation. Meanwhile, Conte seeks to take full credit for all of her past successes, falsely asserting that Jones' five Olympic medals in 2000 were the product of his illegal drug regimen instead of Jones' true talent. Conte's statements are false and malicious.

COMPLAINT – Page 3

953080.01372:879927.05

Case 3:08-cv-01777-JSW   Document 70-2   Filed 08/28/2008   Page 5 of 25
Case 3:08-cv-01777-JSW   Document 30   Filed 05/16/2008   Page 8 of 42

Case 3:04-cv-05312-SI   Document 1   Filed 12/15/2004   Page 4 of 16

**THE PARTIES**

7.     Plaintiff Marion Jones is a citizen of the State of North Carolina and resides in the City of Chapel Hill.

8.     Defendant Victor Conte is a citizen of the State of California and resides at 345 California Drive, Burlingame, CA 94010.

**JURISDICTION**

9.     This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.

10.     This court has personal jurisdiction over Conte because he resides in this state and because Jones' claims against him are based on statements made, in whole or in part, in the State of California.

**VENUE**

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part, if not all, of the events giving rise to Jones' claims occurred in this district. Conte resides in this district and made the statements complained of herein in this district. Conte's criminal indictment is also pending in this district.

**INTRADISTRICT ASSIGNMENT**

12.     Venue is proper in the San Francisco division of this district because a substantial part, if not all, of the events giving rise to Jones' claims occurred in San Mateo County.

**FACTUAL BACKGROUND**

13.     Marion Jones is one of the most celebrated and recognizable female sports figures of all time. Jones is an Olympic gold medalist and world champion track and field star. She remains the only woman ever to win five medals in track and field in one Olympic Games.

COMPLAINT – Page 4

953000.01372:879927.05

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 6 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 9 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 5 of 16

1    Jones' accomplishments have landed her on the cover of Time, Sports Illustrated, and Vogue and

2    have made her a well-known figure worldwide.

3        14.    As with many public figures, Jones' notoriety has also made her a target. Like

4    many athletes at the top of their field, Jones lives under the constant scrutiny of those who wish

5    to take credit for her successes, question her accomplishments, and topple her from the heights

6    she has achieved. One such individual is Victor Conte. On December 3, 2004, Conte

7    participated in a grossly sensationalized interview that aired on ABC News' 20/20 (the

8    "Interview"). In the Interview, Conte made numerous false and defamatory statements about

9    Jones, suggesting that she had used banned performance enhancing drugs and had cheated her

10    way to Olympic glory.

11        15.    Conte's false accusations did not stop there. On December 3, 2004, Conte also

12    co-authored an article that appeared in the December 20, 2004 edition of ESPN The Magazine

13    and was posted on the internet at ESPN.com (the "Article"). In the Article, Conte repeated many

14    of the same false accusations about Jones and made other false statements.

15        16.    In the mid-1980s, Conte founded BALCO (the "Bay Area Laboratory Co-

16    Operative"), a drug laboratory and distributor in San Francisco. BALCO and its subsidiary

17    SNAC Systems manufacture and supply legal dietary and nutritional supplements to the general

18    public and to many of the world's premier athletes. To promote BALCO's products, Conte

19    became a constant fixture on the track and field circuit and at other sporting events. Conte

20    regularly could be found in and around track and field meets promoting his supplements,

21    handing out hats and T-shirts, and seeking athlete endorsements. Conte was constantly trying to

22    get closer to world-class athletes to publicize his products.

23        17.    In late 1999, Conte began supplying Hunter – a world-champion shot-putter –

24    with BALCO supplements. At the time, Conte hoped to gain access to Jones and obtain her

25    endorsement of a BALCO product known as "ZMA"—a legal Zinc-Magnesium supplement.

26    Conte tried for years – without success – to develop a professional relationship with Jones.

27

28    COMPLAINT – Page 5

953000.01372:879927.05

Case 3:08-cv-01777-JSW   Document 70-2   Filed 08/28/2008   Page 7 of 25
Case 3:08-cv-01777-JSW   Document 30   Filed 05/16/2008   Page 10 of 42

Case 3:04-cv-05312-SI   Document 1   Filed 12/15/2004   Page 6 of 16

1    Jones, however, rebuffed Conte. Jones agreed, after repeated urgings from Hunter, to actually

2    meet with Conte for a one-time promotion of ZMA at a Flex Magazine photo shoot set up by

3    Hunter.

4         18.    At the 2000 Olympic Games, after Hunter was accused of failing a drug test,

5    Conte came to Hunter's defense. Conte unequivocally stated that he had never supplied Hunter

6    with any performance enhancing drug. By early 2001, Hunter and Jones had separated and were

7    in the midst of divorcing. Conte, however, continued his unsuccessful efforts to get closer to

8    Jones. Jones continued to snub Conte. Conte's resentment and sense of rejection apparently

9    grew with each rejection. By mid-2002, Jones was dating Olympic athlete Tim Montgomery,

10   with whom Conte had certain business disputes, and for whom Conte harbors great animosity.

11   Jones' relationship with Montgomery added fuel to the fire, and her continued rejection of Conte

12   led to a vendetta and grudge that apparently still motivate Conte.

13        19.    In September 2003, BACLO's offices were raided by federal law enforcement, in

14   a search for evidence of illegal drug distribution. Conte makes no secret of the fact that he

15   blames Jones' ex-coach Trevor Graham for providing the U.S. Anti-Doping Agency with a

16   syringe containing a banned performance enhancing substance manufactured by BALCO and

17   referred to as "The Clear." As a result of the ensuing investigation, Conte now faces a federal

18   indictment alleging 35 counts against him for distribution of illegal performance enhancing

19   drugs, tax evasion and money laundering activities.

20        20.    Despite his pending federal indictment, Conte was more than willing not only to

21   admit his own crimes on national television and on the internet, but to "finger" others allegedly

22   involved in the drug scandal. Conte's specific allegations in both the Interview and the Article

23   focused primarily on Jones.

24        21.    In the Interview, Conte accused Jones of taking performance enhancing drugs,

25   claiming he had "devised a program" for Jones to take certain drugs. These allegations were

26   false. Specifically, Conte falsely stated:

27

28   COMPLAINT – Page 6

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 8 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 11 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 7 of 16

a. Jones was taking four different performance enhancing drugs, known as The Clear, EPO, growth hormone and insulin;

b. Jones gave herself an injection of growth hormone while Conte was "sitting right next to her";

c. Jones wanted to do "whatever it took" to win Olympic medals, including taking banned performance enhancing drugs;

d. Conte "devised a program" for Jones on a calendar, detailing when to take each of the four performance enhancing drugs;

e. Jones was a "drug cheat";

f. Conte instructed Jones on how to use the needle to inject herself with growth hormone;

g. Jones injected herself in the quadriceps;

h. Conte supplied performance enhancing drugs to Jones for over a year; and

i. Jones "lied" to a federal grand jury when she testified she didn't use performance enhancing drugs.

22.   Each of these statements by Conte was utterly false and defamatory. Conte made these statements with actual knowledge of their falsity.

23.   Likewise, in the Article, Conte falsely stated the following:

a. "On April 21, 2001, I was sitting in an Embassy Suites hotel room in Covina, Calif., about a foot away from Marion Jones";

b. Conte had "arranged for [Jones] to receive various performance enhancers, including 'The Clear,' a steroid that later became famous as THG";

c. Jones was "on" THG at the 2000 Games in Sydney, when she won three gold medals and two bronzes;

d. Jones went to Conte's hotel room;

e. Conte taught Jones how to use the NovoPen injector;

COMPLAINT – Page 7

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 9 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 12 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 8 of 16

f.  Jones "pulled the spandex of her bicycle shorts above her right thigh. She dialed up a does of four-and-a-half units of growth hormone and injected it into her quadriceps";

g.  Conte provided Jones with "insulin, growth hormone, EPO, and 'The Clear'";

h.  Conte "had to reprimand" Jones for leaving cartridge injectors in a hotel room in Edmonton in May 2001, and in Eugene, Oregon a few days later;

i.  Jones told Conte "she'd put [the injector] in a sneaker and lean the sneaker against the refrigerator so she wouldn't forget it"; and

j.  Conte ended his "relationship" with Jones because he couldn't afford to risk her leaving an injector in a hotel room.

24.    Each of these statements by Conte was utterly false and defamatory. Conte made these statements with actual knowledge of their falsity.

25.    During the Interview and in the Article, Conte falsely gave the impression that he was intimately involved in Jones' training schedule. Conte stated that he had developed a calendar for Jones, which specified the drug regimen she should follow. Despite falsely accusing Jones of being a "drug cheat," Conte claimed his "program" was responsible for Jones' medal-winning performances during the 2000 Olympic games in Sydney. In truth, Conte was never involved in any aspect of Jones' training, never provided any banned performance enhancing substances to Jones, and was never asked by Jones to develop any calendars or programs for her. Until the federal investigation into BALCO began, Jones had never seen the calendars that Conte falsely alleges he developed for her. Indeed, the calendars that Conte alleges to reflect Jones' training regimen contain men's race times that are clearly not Jones'. In no place does Jones' name appear on the calendars.

26.    Conte admits in the Article that he was motivated by a desire to "make history." Conte wanted "one of his athletes" to win Olympic gold or become the world's fastest human.

COMPLAINT – Page 8

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 10 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 13 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 9 of 16

1    Conte's statements in the Article and the Interview, intentionally give the false impression that

2    Conte is responsible for Jones' record-setting successes, including her five medals at the 2000

3    Olympic Games. Conte falsely asserts that Jones was "one of his athletes" and that her successes

4    are his own.

5         27.    To lend credibility to his otherwise false statements and to insure it was

6    sensationalized in the media, Conte fabricated the story that he witnessed Jones injecting herself

7    in front of him. Conte's fabricated "eye-witness" testimony formed the basis for a highly

8    sensationalized story that has received significant press attention. Conte's false accusations

9    regarding Jones were made during television's ratings "sweeps" week and were calculated to

10   maximize Conte's own pecuniary and personal self-interests. Conte has clearly used the media

11   attention to shamelessly promote his supplement ZMA, wearing ZMA hats and T-shirts during

12   photo shoots for ESPN's story and during portions of the 20/20 Interview.

13        28.    Conte has never made it a secret that he holds a long-standing grudge against

14   Jones. Jones repeatedly rebuffed Conte's efforts to get Jones to further endorse ZMA and to

15   otherwise associate with Conte. Conte admits in the Article that he was working with Jones'

16   "rivals" and that a "turf war" ensued. Conte's personal ill-will toward Jones has apparently, in

17   part, motivated Conte to make these outrageously false accusations against her.

18        29.    Conte made these false and defamatory statements knowing that the statements

19   could cause Jones significant financial and emotional damage. Indeed, in the world of

20   professional sports, there is perhaps nothing more damaging than the accusation that an athlete

21   has used banned performance enhancing drugs.

22        30.    The false and defamatory statements made regarding Jones have resulted in the

23   loss of significant financial benefits from lucrative competitions, promotional appearances, and

24   sponsorship contract opportunities, which losses are likely to exceed $25 million. More

25   importantly to Jones, Conte's false statements have now resulted in an International Olympic

26   Committee ("IOC") investigation that could impact Jones' ability to participate in future

27

28   COMPLAINT – Page 9

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 11 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 14 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 10 of 16

1  competitions and, potentially, have negative consequences on her past achievements. For an

2  athlete competing on an international level – and for Jones, in particular – there is no worse

3  consequence.

4      31.    These consequences are the direct product of the false and misleading statements

5  of Conte – an individual who has a long record of inconsistent statements on a range of issues; an

6  individual with a vendetta against Jones. In contrast, Jones is one of America's most decorated

7  female athletes, who has passed every drug test ever given to her, who has taken and passed a lie

8  detector test, and whose denials of Conte's allegations has been backed up by her doctor,

9  coaches and others. Simply put, Conte's statements are false and defamatory.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION: DEFAMATION

12     32.    Jones realleges the allegations in all of the preceding paragraphs, and incorporates

13  those paragraphs herein by reference.

14     33.    On Friday, December 3, 2004, ABC broadcast various statements made by Conte

15  in a segment entitled "Catch Me If You Can" on its weekly television program 20/20 and ESPN

16  posted an article co-authored by Conte on its website. In addition, ESPN The Magazine

17  published Conte's article in its weekly print magazine. Conte made certain statements (the

18  "Statements") about Jones in the Interview and Article. The Statements were broadcast by ABC,

19  printed in the December 20, 2004 edition of ESPN The Magazine, and posted by ESPN.com

20  throughout the United States and the world.

21     34.    The Statements were of and concerning Plaintiff Marion Jones.

22     35.    The Statements included, but were not limited to:

23         a.  Jones was taking four different performance enhancing drugs, known as The

24             Clear, EPO, growth hormone and insulin;

25         b.  Jones gave herself an injection of growth hormone while Conte was "sitting

26             right next to her";

COMPLAINT – Page 10

953000.01372:879927.05

Case 3:08-cv-01777-JSW     Document 70-2     Filed 08/28/2008     Page 12 of 25
Case 3:08-cv-01777-JSW     Document 30     Filed 05/16/2008     Page 15 of 42

Case 3:04-cv-05312-SI     Document 1     Filed 12/15/2004     Page 11 of 16

c. Jones wanted to do "whatever it took" to win Olympic medals, including taking illegal performance enhancing drugs;

d. Conte "devised a program" for Jones on a calendar, detailing when to take each of the four performance enhancing drugs;

e. Jones was a "drug cheat";

f. Conte instructed Jones on how to use the needle to inject herself with growth hormone;

g. Jones injected herself in the quadriceps;

h. Conte supplied performance enhancing drugs to Jones for over a year;

i. Jones "lied" to a federal grand jury when she testified she didn't use performance enhancing drugs;

j. "On April 21, 2001, I was sitting in an Embassy Suites hotel room in Covina, Calif., about a foot away from Marion Jones";

k. Conte had "arranged for [Jones] to receive various performance enhancers, including 'The Clear,' a steroid that later became famous as THG";

l. Jones was "on" THG at the 2000 Games in Sydney, when she won three gold medals and two bronzes;

m. Jones went to Conte's hotel room;

n. Conte taught Jones how to use the NovoPen injector;

o. Jones "pulled the spandex of her bicycle shorts above her right thigh. She dialed up a does of four-and-a-half units of growth hormone and injected it into her quadriceps";

p. Conte provided Jones with "insulin, growth hormone, EPO, and 'The Clear'";

q. Conte "had to reprimand" Jones for leaving cartridge injectors in a hotel room in Edmonton in May 2001, and in Eugene, Oregon a few days later;

COMPLAINT – Page 11

953000.01372:879927.05

Case 3:08-cv-01777-JSW    Document 70-2    Filed 08/28/2008    Page 13 of 25
Case 3:08-cv-01777-JSW    Document 30    Filed 05/16/2008    Page 16 of 42

Case 3:04-cv-05312-SI    Document 1    Filed 12/15/2004    Page 12 of 16

r.  Jones told Conte "she'd put [the injector] in a sneaker and lean the sneaker against the refrigerator so she wouldn't forget it"; and

s.  Conte ended his "relationship" with Jones because he couldn't afford to risk her leaving an injector in a hotel room.

36.    The Statements were false and defamatory.

37.    At the time, Conte made the defamatory Statements detailed above, he knew that they were false or failed to take the proper steps to ascertain their accuracy.

38.    In making the Statements, Conte acted knowingly and/or recklessly with respect to the Statements' false and defamatory nature.

39.    By reason of Conte's Statements, Jones was greatly injured in her character and reputation; her existing sponsorship contracts were put at risk; she suffered the loss of potential business and competitive sports endorsements and sponsorship opportunities, and she has endured great pain and mental anguish, to her damage in an amount in excess of the minimum jurisdictional limits of this Court and likely in excess of $25 million.

40.    Conte defamed Jones with malice, with intent to injure Jones in her character and reputation as one of the greatest female athletes of all time, thereby justifying an award of punitive damages against Conte in an amount appropriate to punish Conte for his wrongful conduct and to deter others from engaging in such conduct.

### SECOND CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

41.    Jones realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

42.    Jones has valid sponsorship/endorsement contracts, through which she is a paid endorser of products in various print and television advertisements.

43.    Jones also competes as an elite athlete in domestic and international competitions as a member of USA Track and Field ("USATF"), a national governing body of the United

COMPLAINT – Page 12

1  States Olympic Committee ("USOC").    Through this membership, Jones is afforded the

2  opportunity to represent the United States in various competitions, including the World

3  Championships and the Olympic Games.

4       44.    Prior to the world-wide dissemination of Conte's statements, Jones had a very

5  strong likelihood of entering into relationships with additional sponsors and finding other

6  endorsement and competition opportunities, as well as having the option to renew her existing

7  relationships with sponsors and track and field organizations in the future.

8       45.    Defendant Conte intentionally interfered with Jones' existing and prospective

9  relations in committing the independent tort of defamation, by making slanderous and libelous

10  Statements depicting Jones as a drug user, liar and cheat.

11       46.    At the time Defendant made the Statements, he knew the potential impact such

12  Statements would have on Jones' reputation and eligibility as an elite athlete, as well as her

13  ability to maintain and create professional relationships.

14       47.    Conte's tortious conduct has put at risk Jones' existing contractual relationships.

15  Conte's tortious conduct has now resulted in an International Olympic Committee ("IOC")

16  investigation that could impact Jones' ability to participate in future competitions and,

17  potentially, have negative consequences on her past achievements.

18       48.    Conte's tortious conduct has affected future opportunities for Jones, as

19  Defendants' defamatory Statements have so tarnished Jones' character and reputation as to make

20  it improbable that sponsors and other business prospects would enter into relationships with an

21  accused drug user, liar and cheat.

22       49.    As a result of Conte's tortious interference with existing and prospective business

23  relations, Jones has suffered actual damages in excess of the jurisdictional limits of this Court,

24  and likely in excess of $25 million, including potential loss of benefits from existing and new

25  sponsors, the potential loss of eligibility to compete, and the potential loss of her five Olympic

26  medals.

27

28  COMPLAINT -- Page 13

953000.01372:879927.05

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Marion Jones requests that this Court grant her judgment against the Defendant and award to Jones:

a.   all applicable and appropriate actual, consequential, statutory and exemplary damages permitted by law;

b.   her attorneys' fees and costs as allowed by law, including any appellate costs allowed;

c.   pre-judgment and post-judgment interest at the maximum rate(s) permitted by law; and

d.   all other relief, at law or in equity, to which Jones is justly entitled.

Dated: December 15, 2004

Respectfully submitted,

**HUGHES & LUCE, L.L.P.**

Craig W. Budner
Beth W. Bivans
Ashley C. Vaught

**DUANE MORRIS LLP**

Joseph M. Burton
Gregory G. Iskander

**ATTORNEYS FOR PLAINTIFF
MARION JONES**

## DEMAND FOR JURY TRIAL

COMPLAINT – Page 14

953000.01372:879927.05

Case 3:08-cv-01777-JSW     Document 70-2     Filed 08/28/2008     Page 16 of 25
Case 3:08-cv-01777-JSW     Document 30     Filed 05/16/2008     Page 19 of 42

Case 3:04-cv-05312-SI     Document 1     Filed 12/15/2004     Page 15 of 16

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and United States District Court for the Northern District of California Local Rule 3-6, Plaintiff Marion Jones hereby demands a jury trial of all triable issues.

Dated: December 15, 2004

HUGHES & LUCE, L.L.P.

Craig W. Budner
Beth W. Bivans
Ashley C. Vaught

DUANE MORRIS LLP

Joseph M. Burton
Gregory G. Iskander

ATTORNEYS FOR PLAINTIFF
MARION JONES

COMPLAINT – Page 15

953000.01372:879927.05

Case 3:08-cv-01777-JSW     Document 70-2     Filed 08/28/2008     Page 17 of 25
Case 3:08-cv-01777-JSW     Document 30     Filed 05/16/2008     Page 20 of 42

Case 3:04-cv-05312-SI     Document 1     Filed 12/15/2004     Page 16 of 16

## CERTIFICATION OF INTERESTED ENTITIES OR PARTIES

Civil L.R. 3-16 requires that the undersigned certify whether, other than the named parties, there are persons, associations of persons, firms, partnerships, corporations (including parent corporations) or other entities that: (i) have a financial interest in the subject matter in controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be substantially affected by the outcome of this proceeding.

The undersigned certifies that as of this date, there is no such interest to report.

Dated: December 15, 2004

HUGHES & LUCE, L.L.P.

Craig W. Budner
Beth W. Bivans
Ashley C. Vaught

DUANE MORRIS LLP

Joseph M. Burton
Gregory G. Iskander

ATTORNEYS FOR PLAINTIFF
MARION JONES

COMPLAINT – Page 16

953000.01372:879927.05

EXHIBIT B



W HOTELS WORLDWIDE — WHO KEEPS YOU PLUGGED IN?

search site

featuring   Golf on NBC     NHL on NBC     Poker     Fantasy   Olympics

## Sports   Other sports

Scores
NBA
Baseball
NFL
NHL
Horse racing
Golf
Motor sports
College football
College hoops
Tennis
MMA
Soccer
Other sports
Fan zone

More features
Mobile
Rumors
Blogs
Message boards
TV listings

On msnbc.com
U.S. news
Politics
World news
Business
Entertainment
Health
Tech & science
Travel
Weather

Disable Fly-out

# Jones pleads guilty, admits lying about steroids
## Olympic track star says she took banned drugs from 2000 to 2001

Associated Press
updated 2:40 p.m. PT, Fri., Oct. 5, 2007

WHITE PLAINS, N.Y. - Marion Jones' voice never
wavered, her reserve never faltered as the words
rang out in the silent, stately federal courtroom.

She was a liar and a cheat, she told the judge,
her eyes never straying from his face.

And so ended years of angry denials by one of
the world's most celebrated athletes.

**Story continues below ↓**

advertisement



W HOTELS WORLDWIDE — WHO KEEPS YOU PLUGGED IN?

MSNBC video



Launch

**Jones: 'I have betrayed your trust'**
Oct. 5: An emotional Marion Jones says, "I have let my
country down," after pleading guilty to lying to federal
investigators when she denied using performance-
enhancing drugs.
MSNBC

### Inside NBCSports.com

Rumors                    Sports odds
Scores, schedules         Game matchups
Message boards            Team pages
Fantasy sports            Week in Pictures
Whine of the Week         JT The Brick
Trash Talk                Agree or Disagree

The owner of three Olympic golds and two bronze
medals, Jones came clean Friday and admitted
she used steroids. She pleaded guilty to lying to
federal investigators when she denied using performance-enhancing
drugs, then announced her retirement in a tearful apology outside the
U.S. District Court.

"It's with a great amount of shame that I stand before you and tell you
that I have betrayed your trust," Jones said, her voice cracking as her
mother stood behind her, a strong and supportive hand on her shoulder.

"I have been dishonest and you have the right to be angry with me. I
have let (my family) down. I have let my country down, and I have let
myself down," she said, pausing frequently to regain her composure. "I
recognize that by saying I'm deeply sorry, it might not be enough and
sufficient to address the pain and hurt that I've caused you.

"Therefore, I want to ask for your forgiveness for my actions, and I
hope you can find it in your heart to forgive me."

The calm strength she'd displayed in the courtroom was gone, washed
away by a flood of tears. She embraced her mother, who told her
daughter, "Good job." The two then climbed into a black limousine with
one of Jones' attorneys and drove away, not taking any questions.

NBC video                              Jones was released on

Sponsored links

Hugh Downs Reports:
Little-known heart attack
symptom many people
tragically ignore.
www.heartresearch.com

Official Site: AMBIEN CR™
(zolpidem tartrate extended
release) CIV Get Free 7-Night
trial.
www.AmbienCR.com

Prepare To Be Shocked
Amazing Chinese Weight Loss
Secret As Seen On CNN,
NBC, CBS & Fox
www.Wu-YiSource.com

Why Are Celebrities Using
Wu-Yi?
Wu-Yi Ancient Organic
Chinese Diet - Try a Free 15
day trial!
wu-yisource.com

Lose Fat While Erasing 10
Yrs In 10 Wks!
As Seen On ABC, CBS, CNN
and Time
livelean.com



Jersey Shop
NFL Jerseys
Women's Jerseys
College Jerseys
NHL Jerseys



Launch

Sports' fallen heroes
Oct. 5: What is it about
competition that fuels
the temptation to cheat?
NBC's Ann Thompson
reports.
Nightly News

her own recognizance
and was due back in
court Jan. 11 for
sentencing.

"It's bittersweet," said
Travis Tygart, chief
executive officer of the

U.S. Anti-Doping Agency. "Any time a potential American hero admits to
cheating us sports fans, people who watch Olympic games, it's
bittersweet."

Indeed, Friday marked a stunning fall from grace for the 31-year-old
Jones, once the symbol for everything that was right about women in
sports. She was powerful, captivating the country with the audacious
goal of winning an unprecedented five gold medals at the Sydney
Olympics. But she was beautiful and feminine, too, gracing the cover of
Vogue with the poise of a supermodel.

Though she fell short in
Sydney — only three of
her five medals were
gold, the other two
bronze — her winsome
smile and charming
personality made her a star. Seven years later, she is broke, her
reputation is ruined and she is looking at prison time.



Sports blog
OPEN MIKE
BCS officials fumble yet another chance

Jones also pleaded guilty to a second count of lying to investigators
about her association with a check-fraud scheme.

"You're vindicated, but it doesn't make you feel any happier this is going
on," said Dick Pound, chairman of the World Anti-Doping Agency. "The
fact that she was using the performance-enhancing drugs is not a
surprise. People suspected strongly or knew, but couldn't prove the use.

Marion Jones comes clean

Jones pleads guilty, admits lying about steroids
Olympic officials set to strip track star medals
Open Mike: She's just another cheater | Liar
NBC Sports: Lies hurt teammates | No excuses
Jones admits lying to feds in check-fraud scam
Her statement | Reactions | Your thoughts?
Key figures in BALCO steroids scandal

"When something seems
too good to be true, it
probably is."

Jones is the biggest
name to be brought
down so far in the Bay
Area Laboratory Co-
Operative scandal. But
home run king Barry
Bonds also has been

linked to BALCO, and a grand jury is still investigating whether he lied
to federal investigators.

Bonds denied ever knowingly taking performance-enhancing drugs. In
testimony before a grand jury in 2003, Bonds said he believed a clear
substance and a cream given to him by his trainer were flaxseed oil and
an arthritis balm.

"The federal government
will vigorously prosecute
individuals who provide
false statements to its
agents," said Scott N.
Schools, the U.S.
Attorney for the
Northern District of
California.

Slide show



Launch

Week in Sports
Pictures
Leaping LeBron, riled-
up refs, jumbled jockeys
and more in this week's
edition.

Suspicions and doping
allegations had dogged Jones for years. Her ex-husband, C.J. Hunter,
was busted for doping, and Tim Montgomery, the father of her son
Monty, was stripped of his world record in the 100 meters in connection
with the BALCO case.

Jones herself was one of the athletes who testified before a grand jury
in 2003 in the BALCO investigation. In August 2006, one of her urine

samples tested positive for EPO, but she was cleared when a backup sample tested negative.

CONTINUED: "I have never used performance-enhancing drugs"

1 | 2 | Next >

Rate this story    Low ☆☆☆☆☆ High
Current rating: 4 by 461 users

🖨 Print this    ✉ Email this    💬 Blog this    IM this

MORE FROM OTHER SPORTS

[Next →] Other sports Section Front

Tim Montgomery sentenced to 4 years in prison

**Top NBCSports.com stories**

Tim Montgomery sentenced to 4 years in prison

Double amputee ruled eligible for Beijing Olympics

AL Central should get edge in interleague play

Mets' Santana tries to keep Yankees in cellar

A-Rod gives a 'thumb's up' on his right quad

**NBC Sports videos**

The fitness of horses

The safety of horseracing

Amputee gets his shot at Beijing

Clean slate for Game 7

Pittsburgh misses major opportunity

SPONSORED LINKS                                              Get listed here
Six Sigma Certification
100% Online-Six Sigma Certificate From Villanova -Find Out More Now!
www.Villanova.U.com

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.countrywide.com

Top MBA Programs
Get Your Dream Job With An MBA. 100% Online. No GMAT Required!
www.floridatechonline.com

Notre Dame Certificates
Earn an Executive Certificate from Notre Dame - Online! Enroll Now.
www.NotreDameOnline.com

Wachovia Free Checking
No monthly fee, No minimum balance, direct deposit, Check Card & More.
www.Wachovia.com

| Sports | NFL   College Football   MLB   NBA   NHL   College Basketball | Go Local | TV Listings | Go Mobile |
|--------|------|---------|--------|
| | NASCAR/Motors   Golf   Tennis   MMA   Horses   Soccer   Poker | | | |
| | Other Sports | | | |
| Features | Fan Zone   Fantasy   All-Madden   Notre Dame   Golf on NBC   NHL on NBC | RSS Feeds | Fantasy Games | Shop |
| | Dew Tour   GORR   Jeep World | | | |
| About Us | Get Local   RSS Feeds   Alerts   Mobile   TV Listings   Contact Us   Careers | | | |
| | Terms & Conditions | | | |

EXHIBIT C



COMMUNITY    VIDEO    PODCASTS    PHOTOS    DATA CENTER    NEWSLETTERS    MOBILE

home of the

Home Delivery | Today's Paper | Ads

[SEARCH]  SFGate  Web Search by YAHOO!  | Advanced Search                Sign In | Register

Don't Miss: Wine: Four Star Beer    Same-Sex Marriage Ruling    Pets: The Dawg Father    New Homes Sold In Bay Area    Weird: Refusing To Fuel Up

# Track coach Trevor Graham indicted

Mark Fainaru-Wade and Lance Williams, Chronicle Staff Writer
Thursday, November 2, 2006

SHARE    COMMENTS (0)    FONT | SIZE |



(11-02) 16:03 PST -- A track coach whose clients have
included some of the world's greatest sprinters -- such as
U.S. Olympic champions Marion Jones and Justin Gatlin --
was indicted Thursday for lying to federal agents when he
told them he had never provided his athletes with
performance-enhancing drugs in connection with the BALCO steroids case.

Trevor Graham, who has portrayed himself as a whistle blower for giving authorities
the steroid-laced syringe that helped propel the BALCO probe in 2003, was indicted by
a federal grand jury in San Francisco on three counts of making false statements to
government agents.

Graham's indictment was another blow to American track and field, which has labored
unsuccessfully to put the BALCO steroids scandal behind it. In the past two years, 14
track and field stars with ties to BALCO -- including Tim Montgomery, former world
record holder in the 100 meters and a former Graham client -- have been disciplined
for doping offenses. In July, Gatlin, a Graham protege, was suspended after testing
positive for steroids.

Neither Graham nor his attorney, Joseph Zeszotarski, could be reached for comment.

The grand jury that indicted Graham for his statements in a 2004 interview with
federal agents is also investigating whether Giants slugger Barry Bonds committed
perjury for denying under oath that he knowingly used banned drugs from BALCO.
There was no indication Thursday when or whether the grand jury might complete its
probe of Bonds.

Graham is the coach of the elite Sprint Capitol organization in North Carolina. Several
of his athletes have tested positive for steroids, but he has repeatedly denied
distributing the drugs.

However, at least three people connected with BALCO have told the government that
Graham was a steroid dealer. Both BALCO ringleader Victor Conte and shot-putter
C.J. Hunter told federal agents the coach distributed the drugs to his athletes, and
Montgomery testified before a grand jury that Graham provided his athletes with
steroids he had received through a "connection" in Mexico.

Thursday's indictment alleged that Graham lied to special agents from the Internal
Revenue Service's Criminal Investigations unit when he told them he had never set up
any of his athletes with performance-enhancing drugs from an unidentified source.

The indictment also alleged that Graham lied when he said he had never met the
unidentified source, referred to as "Source A," in person. The third count against the
coach claimed that he lied when stating his last contact with "Source A" had been a
phone conversation in 1997.

Based on a reading of Graham's statement -- which was obtained and previously
reported on by The Chronicle -- the unidentified source is Angel Guillermo Heredia,
known throughout the BALCO case as "Memo." In his 2004 interview, Graham said



Sale Extended!                        Upgrade to
                                      BRITISH AIRWAYS

2 nights in London    FREE
when you fly from only  $339

Book by 5/22 at ba.com

MOST READ    MOST E-MAILED    TOP STORIES

1. Bike to Work Day accident claims life of bicyclist
2. Court approves evil gay agenda Satan's plan to make uptight straight...
3. Marriage ruling a victory for Newsom
4. Bay Area swelters as temperature records fall
5. Dennis Richmond on 40 years broadcasting news
6. S.F. woman's death not a clear bridge suicide
7. Stabbed man dies in S.F. after car crash



TopHomes            Current Offers
                    from LendingTree
From
Pacific Union

NOB HILL, CATHEDRAL HILL
3 BR / 3 BA
$1,200,000

SUNSET, GOLDEN GATE HEIGHTS
4 BR / 3 BA
$1,149,000

CIVIC CENTER, TENDERLOIN
2 BR / 2 BA
$825,000

NOB HILL, CATHEDRAL HILL
2 BR / 2 BA
$1,195,000

JOSHUA TREE
2 BR / 2 BA
$599,000

NOB HILL, CATHEDRAL HILL
1 BR / 1 BA
$585,000

NOB HILL, CATHEDRAL HILL
2 BR / 2 BA
$879,000

OUTER RICHMOND, SEACLIFF AND LAKE
3 BR / 2 BA
$850,000

DALY CITY
3 BR / 2 BA
$828,000

NOB HILL, CATHEDRAL HILL
5 BR / 5 BA
$3,000,000

LendingTree
Start Now
Terms & Conditions Apply

ADVERTISERS
Kids Fly to Hawaii this
Summer for $130!

Memo was a shot-putter from Laredo, Texas. According to the statement, Graham said he was not aware of any of his athletes obtaining drugs from Mexico; he had no connections with a Mexican lab; he only had spoken with Memo by phone, and hadn't talked with him since 1997.

The New York Times previously reported that Heredia told the grand jury in San Francisco that he provided steroids, human growth hormone and other performance enhancing drugs to Graham and his athletes between 1996 and 2000.

The indictment alleges that Graham met Source A in person for the first time in 1996 or 1997 and thereafter referred "numerous athletes coached by Graham to Source A to obtain illegal performance-enhancing drugs from Source A." The indictment also charged that Source A provided performance-enhancers to Graham and his athletes between the time of their first meeting and the 2004 interview with agents. Some of the athletes, the indictment, alleged, were associated with BALCO.

"Today's charges demonstrate this office's ongoing commitment to investigate and prosecute not only those involved in the illegal doping of our nation's athletes, but also those who lie to federal agents involved in a criminal investigation," said U.S. Attorney Kevin Ryan.

In June 2004, four months after four men were indicted in what the government termed a conspiracy to distribute performance-enhancing drugs to elite athletes, investigators interviewed Graham for nearly three-and-a-half hours with his lawyer present in Raleigh, N.C.

During the interview, Graham acknowledged he was the man who sent the now-famous, steroid-laced syringe to the U.S. Anti-Doping Agency in the summer of 2003 to expose Conte and BALCO. Graham also admitted he attended a meeting at BALCO in late 2003, where Conte hatched what became known as "Project World Record," a plan devised to turn Montgomery into the world's fastest man. Also at the meeting were sprint coach Charlie Francis -- the man who coached steroid cheat Ben Johnson -- and Milos Sarcev -- a bodybuilder and self-described anabolic expert.

Graham, however, insisted to the agents that he had never provided any illegal or banned performance-enhancing drugs to his athletes. For example, he stated the only things he had ever given Marion Jones were "Gatorade, protein and potassium for cramps," according to a copy of his statement. Graham told the investigators that as a coach he believed he had always "done the right things."

However, Hunter, the shot-putter and ex-husband of Jones, told agents Graham had provided Jones with the endurance-boosting drug EPO in the lead-up to the 2000 Sydney Games, where she won five medals, three of them gold.

At the Summer Olympics in Athens in 2004, Graham said he was the person who had sent the needle-less syringe with traces of a steroid in it to the U.S. Anti-Doping Agency in Colorado Springs. He said he was "just a coach doing the right thing."

However, many others connected to the BALCO probe have characterized Graham's action much more a result of a turf war between his athletes and those aligned with Conte, who he named as the originator of the steroid in the syringe.

The same day Graham sent the syringe to USADA, Conte drafted a letter to the anti-doping group and to the international governing body for track and field detailing allegations of Graham doping his athletes with "oral testosterone undeconate." Conte offered details about how Graham's athletes were avoiding being Conte, and, at the end of the letter, he named four sprinters he said were cheating. Among those was Gatlin, who currently shares the 100-meter world record. Conte ultimately didn't send the letter, but it was found in his trash by the lead BALCO investigator.

After Gatlin was caught cheating this summer -- adding to a list of nearly a dozen of Graham's current or former clients who either tested positive or were implicated for doping -- the coach lost his contract with Nike and was banned from U.S. Olympic Committee training centers.

Pleasant Holidays

New book! The Working Cook Fast Fresh Meals for Busy People

GREENBRAE / KENTFIELD
4 BR / 3 BA
$2,895,000

PRESIDIO HEIGHTS,
LAUREL HEIGHTS, JORDAN
PARK
3 BR / 2 BA
$1,595,000

EXCELSIOR, INGLESIDE,
WESTWOOD PARK, ST.
MARA'S PARK
3 BR / 2 BA
$699,000

PRESIDIO HEIGHTS,
LAUREL HEIGHTS, JORDAN
PARK
3 BR / 2.5 BA
$1,995,000

NOB HILL, CATHEDRAL
HILL
1 BR / 1 BA
$985,000

See more from this broker



PACIFIC UNION
G M A C  Real Estate

About Top Homes

*E-mail the writers at mfainaru-wada@sfchronicle.com and hwilliams@sfchronicle.com*

SHARE

**(0)** View Comments »

**Be the first to share your thoughts on this story.**

**Add Your Comment**

You must be signed in to add a comment. Sign In | Register

Submit

Ads by Yahoo!

**Graham**
Stocking distributor for all your Graham needs.
(www.southgateprocess.com)

**Graham, NC Mobile Home**
Search Free Real Estate Listing by Price, Size, Location, & More.
(www.Realtor.com/mobilehome)

**Grahams Funeral Home Flowers**
Local florist delivery to Grahams Funeral Home.
(www.aflowergate.com)

Get The Chronicle for up to 40% off

Home   News   Sports   Business   Entertainment   Food   Living   Travel   Blogs   Classifieds   Jobs   Homes   Cars   Site Index                    [return to top]

**Advertising Services:** Place a Classified   Advertise in Print   Advertise Online   Media Kit   Today's Print Ads   Public Notices
**Reader Services:** Home Delivery   Subscribers   Today's Paper   RSS Feeds   Newsletters   Join Community   Feedback   Buy Photos   FAQ   Corrections
**Company Info:** Contact Us   Hearst Corp.   Privacy Policy   Terms and Conditions   Work for Us   Chronicle in Education   Events & Promotions   Submissions

© 2008 Hearst Communications Inc.

HEARST newspapers

EXHIBIT D

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4    SHANE D. MOSLEY, SR.,              )
                                        )
5                    Plaintiff,         )
                                        )
6              vs.                      ) No. C 08-01777 JSW
                                        )
7    VICTOR CONTE,                      )
                                        )
8                    Defendant.         )
     _____)
9

10

11

12

13              DEPOSITION OF SHANE D. MOSLEY

14                 Wednesday, July 9, 2008

15                 Los Angeles, California

16

17

18

19

20

21

22

23

24   Reported by:
     PAMELA J. FELTEN
25   CSR No. 5189

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3

 4    SHANE D. MOSLEY, SR.,            )
                                       )
 5                     Plaintiff,      )
                                       )
 6              vs.                    ) No. C 08-01777 JSW
                                       )
 7    VICTOR CONTE,                    )
                                       )
 8                     Defendant.      )
      _____)
 9

10

11

12           Deposition of SHANE D. MOSLEY, taken

13           on behalf of Defendant, at 1900

14           Avenue of the Stars, Suite 2100,

15           Los Angeles, California, beginning

16           at 9:47 a.m. and ending at 10:50 a.m.

17           on Wednesday, July 9, 2008, before

18           PAMELA J. FELTEN, Certified Shorthand

19           Reporter No. 5189.

20

21

22

23

24

25
```

Page 3

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4            JUDD BURSTEIN P.C.
              BY:  JUDD BURSTEIN
 5            Attorney at Law
              1790 Broadway
 6            Suite 1501
              New York, NY  10019
 7            (212) 974-2400
              Jburstein@burlaw.com
 8

 9

10    For Defendant:

11
              KERR & WAGSTAFFE, LLP
12            BY:  IVO LABAR
              Attorney at Law
13            100 Spear Street
              Suite 1800
14            San Francisco, California  94105
              (415) 371-8500
15            Labar@kerrwagstaffe.com

16

17    Also Present:

18
              DANIELLE ARTEAGA, Attorney at Law
19            DAVID MARCHIANO

20

21

22

23

24

25
```

```
 1                        INDEX
    WITNESS:                              EXAMINATION
 2
    SHANE D. MOSLEY
 3

 4
                    BY MR. LABAR           5, 57, 60
 5
                    BY MR. BURSTEIN       55, 58, 61
 6

 7

 8

 9                      EXHIBITS

10  DEFENDANT'S                                PAGE

11  1          2005, 2006 and 2007 tax forms      49

12  2          Affidavit of Shane Mosley notarized
               on August 16, 2002                 49
13
    3          DirecTV bill for service at 5212
14             Clayton Court, La Verne, California  50

15  4          Declaration of Shane D. Mosley, Sr.
               filed 5/23/2008                     52
16

17

18

19

20              INFORMATION REQUESTED

21                  Page    Line

22                   20      16

23

24

25
```

```
 1              Los Angeles, California, Wednesday, July 9, 2008

 2                        9:47 a.m. - 10:50 a.m.

 3

 4                        SHANE D. MOSLEY

 5    having been first administered an oath, was examined and

 6    testified as follows:

 7

 8                        EXAMINATION

 9    BY MR. LABAR:

10         Q    Good morning.  Please state and spell your name

11    for the record.

12         A    Shane Mosley.  S-h-a-n-e.  And then

13    M-o-s-l-e-y, last name.

14         Q    Have you had your deposition taken before?

15         A    Yes.

16         Q    Okay.  How many times?

17         A    That I don't know.

18         Q    Okay.  Can you give me an approximate number?

19    Less than five times?

20         A    About that many.  About four.  Four or five

21    times.

22         Q    Do you recall how long ago these other

23    depositions were?  The first one of the four?

24         A    Um, it's been a while.  Maybe 2000 -- I don't

25    know.  1999, 2000.
```

```
 1        Q    Okay.

 2        A    I'm not sure.

 3        Q    Was your deposition taken in 1999 in connection

 4   with a lawsuit?

 5        A    Um, maybe against another attorney that was --

 6        Q    Okay.  Do you know if you were suing the

 7   attorney or if the attorney was suing you?

 8        A    I believe the attorney was suing me.

 9        Q    Okay.  And do you know what county or state

10   that lawsuit was happening in?

11        A    It might have been L.A. County.

12        Q    And do you know the name of that attorney?

13        A    Was it Wendell Wright.

14        Q    Wendell Wright?

15        A    Yeah.  Wendell Wright.

16        Q    Wright like W-r-i-g-h-t?

17        A    Yes.

18        Q    And was he your attorney at some point?

19        A    He was my attorney, yes.

20        Q    Okay.  And was that the first time you were

21   ever deposed?

22        A    Um, no.  I mean I've been to court a couple

23   more times.

24        Q    Okay.  Let me just try and focus your attention

25   on the depositions that you've had previously, then I'll
```

1  ask you about your court appearances later.  Okay?

2      A   Uh-huh.

3      Q   That case involving Mr. Wright, you were

4  deposed in that case, correct?

5      A   I was deposed, yes.

6      Q   And was there another deposition that occurred

7  after that in a different case?

8      A   Um, I'm not sure.  I'm pretty sure there was a

9  couple of more, but I'm not sure around the time.  It's

10  been a long time ago so --

11      Q   Sure.  Okay.

12      A   -- I don't know.

13      Q   Do you have any memory at all of the other

14  depositions you've had?

15      A   The only one I can think of was the Wendell

16  Wright one.  The other depositions they were like real

17  small -- I don't -- I can't remember, you know -- oh,

18  there was one with Patrick Ortiz or Ringside Ticket and

19  that was like 1995 maybe or --

20      Q   Okay.

21      A   -- you know --

22      Q   The company was called Ringside Tickets?

23      A   Uh-huh.

24      Q   And what was the other name you mentioned?

25      A   Ringside Ticket, that's on -- it was Patrick

1    Ortiz.  That was -- he was the promoter.  He was my first

2    promoter.

3        Q    Patrick Ortiz?

4        A    Yeah.

5        Q    And in that case, were you being sued or were

6    you suing someone else?

7        A    I was being sued.

8        Q    And do you recall what county or state that

9    lawsuit was pending in?

10       A    I think that was -- had to be L.A. County.

11       Q    Okay.  Before I ask you about any other

12   lawsuits, I just want to make sure you understand the

13   rules of this proceeding.  You've taken an oath to tell

14   the truth.  Do you understand that?

15       A    True.

16       Q    And that's the same type of oath that you would

17   take in a court of law.  Do you understand that?

18       A    True.

19       Q    As you're doing now, please continue to give us

20   audible responses so that our court reporter can take

21   everything down accurately.  All right?

22       A    Okay.

23       Q    Thank you.  If you don't understand --

24       A    I'm doing -- yeah, I'm doing this.  So I

25   don't --

1        Q    You're doing an excellent job.    Thank you.

2        A    Okay.

3        Q    If you don't understand my questions, please

4    tell me.    All right?

5        A    Definitely.

6        Q    Okay.    And if you respond to my question, I'll

7    assume that you understood me, heard me properly, and

8    gave me a truthful response.    All right?

9        A    True.

10        Q    Great.    If at any time you have any questions

11    about anything I'm asking you, please tell me so I can

12    clarify.    Okay?

13        A    Okay.

14        Q    Let me ask you -- go back to the topic of the

15    lawsuits that you've been involved with.    You told me

16    about a lawsuit involving a gentleman named Mr. Wendell

17    Wright and another lawsuit involving an entity called

18    Ringside Tickets and a gentleman named Patrick Ortiz.

19        A    Yes.

20        Q    Can you recall any other lawsuits that you've

21    been a party to?

22        A    No.

23        Q    Do you think there have been more and you just

24    can't remember any of the details of them or do you think

25    there haven't been any more than the two you've told me

```
 1   about?

 2        A   Those are the -- the big lawsuits that stand

 3   out, but other than that, I can't really recall.

 4        Q   Okay.  You say those are the two big ones that

 5   you -- that stand out.  Can you recall any small ones?

 6        A   I mean those are -- that's really all I can

 7   recall at this point is those lawsuits.  I mean that's

 8   it.

 9        Q   So you can't remember the details or the

10   general nature of any other lawsuits you've been a party

11   to?

12        A   Those two I can remember some of the details of

13   what happened in the lawsuits.

14        Q   Okay.  No others?

15        A   Not to my -- to my knowledge.

16        Q   Okay.  Let me ask you about other testimony you

17   may have given in other types of proceedings.  You've

18   testified before a Grand Jury in California, correct?

19        A   Yes.

20        Q   Have you testified before any other Grand

21   Juries at any time other than that one?

22        A   No.

23        Q   Have you given any testimony to any athletic

24   organizations that you may be a member of?

25        A   I don't --
```

1                MR. BURSTEIN:  Do you mean sworn testimony?

2                MR. LABAR:  Testimony of any kind.

3                MR. BURSTEIN:  Then I object on vague and

4  ambiguous.  Because I'm not sure what testimony means,

5  but . . .

6                MR. LABAR:  Okay.

7                THE WITNESS:  And I'm not even -- I don't --

8  BY MR. LABAR:

9      Q   You don't understand my question?

10     A   Say it again or something.

11     Q   Sure.

12     A   I don't understand.

13     Q   Sure.  I'll ask it a different way.

14         Have you ever given any testimony before any

15  athletic organizations, like boxing groups that you may

16  be a party of -- a member of?

17     A   Not that I can think -- no.  Just . . .

18     Q   The deposition we're taking today, just so I

19  make sure you understand, is limited in nature.  I'm just

20  going to be asking you questions about your domicile, in

21  other words, where you live and where you reside.

22     A   Uh-huh.

23     Q   Do you understand that?

24         Okay.  I'm not going to be asking you anything

25  about the merits of the case that you brought against

1    Mr. Conte.  Okay?

2         A    Okay.

3         Q    Where were you born, sir?

4         A    I was born in Lynwood, California.

5         Q    Inglewood?

6         A    Lynwood.

7         Q    Lynwood.  Okay.

8              MR. BURSTEIN:  Shane, try and keep your voice

9    up.

10             THE WITNESS:  Oh.  I'm sorry.  Yeah.

11             MR. LABAR:  Can you hear him okay?

12             THE REPORTER:  Yes.

13             MR. BURSTEIN:  Great.  Okay.

14    BY MR. LABAR:

15         Q    What year were you born, sir?

16         A    9-7-71.

17         Q    And where did you grow up?  In Lynwood?

18         A    I grew up in Pomona.

19         Q    In Pomona.  All right.  And did you attend high

20    school in Pomona?

21         A    Yeah.

22         Q    And which high school?

23         A    Pomona High.

24         Q    And did you graduate from Pomona High?

25         A    Yes.

1      Q    And what year was that?

2      A    '89.

3      Q    Okay.  And after you graduated from Pomona High

4  School, did you continue living in California?

5      A    Yes.

6      Q    Okay.  And you began a career as a boxer after

7  high school; is that correct?

8      A    No.  I boxed since I was eight years old.

9      Q    And when did you become a professional boxer?

10     A    In '93 -- 1993.

11     Q    Okay.  All right.  And where did you live from,

12 say, 1990 to 1995?  What state?

13     A    Pomona.

14     Q    Okay.  And from 1995 to the year 2000, where

15 did you live?

16     A    The year 2000?  That had to be Pomona.

17     Q    And where were you living in Pomona?

18     A    Well, actually, I'm sorry.

19     Q    Sure.

20     A    La Verne.

21     Q    La Verne.  Okay.  And what year did you move

22 from Pomona to La Verne?

23     A    I believe that was in 19- -- maybe 1997.  I'm

24 not sure.

25     Q    And you are currently married, correct?

```
 1        A    Yes.

 2        Q    And what's your wife's name?

 3        A    Jin Mosley.

 4             MR. BURSTEIN:  That's J-i-n.

 5             THE WITNESS:  J-i-n.

 6   BY MR. LABAR:

 7        Q    And you have children, correct?

 8        A    Yes.

 9        Q    How many children do you have?

10        A    I have four biologically and one stepson.

11        Q    And do all your children live with your wife

12   and you?

13        A    They all live with me and, yeah, my wife.

14        Q    Okay.  And your wife lives at the address on

15   La Verne -- in La Verne?

16        A    In La Verne, yes.

17        Q    Okay.  Let me ask you about some addresses that

18   I've seen on some documents.  Are you familiar with an

19   address 174 Waverly in Medford, New York?

20        A    Yes.

21        Q    What is that address?

22        A    That is the address to my CPA.

23        Q    Okay.

24        A    Well, my ex-CPA.

25        Q    Okay.  Is that gentleman's name Salvador
```

```
 1    Alessi?

 2         A    Yes.

 3         Q    All right.  And how long was he your CPA for?

 4         A    Maybe a year and a half.

 5         Q    So you don't have any home or other kind of --

 6    type of residence in New York; is that correct?

 7         A    No.

 8         Q    So this 174 Waverly address is only relevant to

 9    you because it was the address for your former CPA,

10    correct?

11         A    Yes.

12         Q    Okay.  Let me ask you about another address.

13    1230 or 1226 Loma Vista in Pomona, California, are you

14    familiar with that address?

15         A    I am familiar with that one, yeah.

16         Q    What was 1230 Loma Vista in Pomona?  Was that

17    your home?

18         A    That was my old home in -- yeah, my old home.

19         Q    And what was 1226 Loma Vista?

20         A    1226 was a house that I bought next door

21    because I was going to rebuild everything.  I was going

22    to rebuild both structures.

23         Q    What year did you buy the 1230 address?

24         A    It was probably -- I don't know.  1998.  Maybe

25    I can get the records.
```

```
 1        Q    Approximately 1998?

 2        A    Probably.  I don't know.  Yeah.

 3        Q    And what year did you sell it?

 4        A    I must have sold it in either '99 or 2000.

 5        Q    Okay.  And when you sold that -- those homes in

 6   2000 -- did you sell them both in 2000?

 7        A    I sold both of them, yes.

 8        Q    Is that when you moved to the La Verne address?

 9        A    Yes.

10        Q    And is that address 5212 Clayton Court?

11        A    Yes.

12        Q    And that's where your wife and children

13   currently live?

14        A    Yes.

15        Q    And so you owned the 5212 Clayton Court address

16   for approximately eight years or so?

17        A    About seven years.

18        Q    Seven years.  Let me ask you about another

19   possible address.  Do you actually also own a home in Big

20   Bear, California?

21        A    Yes.

22        Q    And what's the address of the home in Big Bear?

23        A    That's 715 Thrush Street.

24        Q    Thrush like the bird, T-r-h --

25        A    Thrush, T-h-r --
```

1    Q    -u-s-h?

2    A    -u-s-h.

3    Q    Do you know the ZIP code there?

4    A    I believe it's 92315.

5    Q    Thank you.  Do you know -- is it actually in

6    the town of Big Bear or is it in one of the small

7    villages around Big Bear?

8    A    It's right by the Snow Summit.

9    Q    So that's actually in the town of Big Bear?  Do

10   you know?

11   A    I think it would be considered Big Bear Lake.

12   Q    And how long have you owned that property?

13   A    Approximately seven years.

14   Q    And do you own that property with anyone else

15   or are you the sole owner?

16   A    I'm the sole owner.

17   Q    Okay.  Let me ask you about a few other

18   addresses.

19        Are you familiar with the address 6745 Jackson

20   Junction in Las Vegas, Nevada?

21   A    Yes.

22   Q    What is that address?

23   A    That's my home address.

24   Q    Okay.

25   A    One of them.  One of my houses, I should say.

Page 18

```
1          Q    Okay.   And how long have you owned that
2    property?
3          A    I would say 2004 maybe.   Somewhere -- 2004.
4          Q    And that's a residential home?
5          A    It is, yes.
6          Q    Let me ask you about another property address.
7    3695 Calico Brook in Las Vegas, Nevada, are you familiar
8    with that address?
9          A    Yes.
10         Q    And what is that address?
11         A    That's the actual home address.
12         Q    Could you repeat that?
13         A    That is the actual home address.
14         Q    Okay.   What do you mean when you say actual
15   home address?
16         A    That's where I stay most of the time, you know,
17   when I'm in Vegas.   Well, I'm always in Vegas, but my --
18   you know -- in Vegas.   It's the central home.
19         Q    All right.   So that's obviously a different
20   physical location than the Jackson Junction address,
21   right?
22         A    Yes.
23         Q    And who lives in the Jackson Junction address
24   most of the time, if anyone?
25         A    Actually, at this point, it's been rented out.
```

```
 1        Q    How long has it been rented out?

 2        A    Maybe a year and a half, maybe a year.  Maybe

 3   it was longer than that.  Could be two years.

 4        Q    When was the Calico Brook property purchased?

 5        A    I believe in '05, I believe.

 6        Q    Okay.  And when you stay there, do you stay

 7   there alone?

 8        A    Yeah.

 9        Q    And at your address at the home -- oh, I'm

10   sorry.  The address in La Verne, California, is that a

11   residential home?

12        A    It is a residential, yes.

13        Q    Okay.  And do you keep -- obviously your wife

14   and children are there, so you have cable television

15   there?

16        A    I do.

17        Q    And when you're there, you watch that cable

18   television sometimes?

19        A    At the house in La Verne, yes.

20        Q    And, obviously, there's gas and electric and

21   power there, right?

22        A    Yes.

23        Q    Okay.  And you have a home phone there?

24        A    Yes.

25        Q    Do you receive mail there?
```

1          A    Uh, actually, the mail -- I shouldn't

2    receive -- the mail actually goes to a different address,

3    which should be -- it used to go to 174 Waverly, but now

4    it's been transferred over to the business that we have

5    now, which is the -- the -- what's his name -- Bob Keys,

6    the money management people.

7          Q    Okay.  Bob Keys is sort of a financial manager

8    for you?

9          A    Yes.

10          Q    Does his firm have a name or does he just call

11    it after himself?

12          A    His firm has a name.  I'm trying to -- UBS.

13               MR. BURSTEIN:  Want to leave a blank and we can

14    fill it in?

15               MR. LABAR:  Sure.

16               (Information requested: _____

17    _____

18    _____.)

19    BY MR. LABAR:

20          Q    Is it UBS Warburg?

21          A    UBS is the money marketing people, but it's a

22    different money management.  They knew -- they're

23    basically the same thing.  They knew each other, but it's

24    a different name.  Money management is Bob Keys and money

25    management corporation.

1        Q    Okay.  I appreciate that.

2             Where is Bob Keys' office at when you go see

3    Bob Keys?

4        A    Well, actually, I haven't went to his actual

5    office yet, but I believe it's in L.A.

6        Q    So any conversations you've had with him have

7    been over the phone so far?

8        A    Yes.

9        Q    Okay.  Do you keep clothing at the La Verne

10   address?

11       A    Yes.

12       Q    Okay.  And you have enough clothes there so

13   that you could stay there for some period of time?

14       A    Yes.

15       Q    Do you keep training gear for your boxing

16   regimen at the La Verne address?

17       A    I have training gear there, too, yes.

18       Q    Okay.  When you're at the La Verne address, do

19   you have access to transportation?

20       A    Yes.

21       Q    Do you have your own car there?

22       A    Yes.

23       Q    What type of car do you have there?

24       A    Well, actually, the car is not registered in

25   California, but the car that I use is an Escalade EXT,

```
 1    which is -- which is my car basically in Vegas.  It's

 2    registered in Vegas.  All my -- all my cars that I drive

 3    are registered in Vegas.

 4         Q    I appreciate that.  I asked a slightly --

 5              MR. BURSTEIN:  Answer the question --

 6              THE WITNESS:  Oh.

 7              MR. BURSTEIN:  -- as opposed to --

 8              THE WITNESS:  Okay.

 9              MR. BURSTEIN:  Okay?

10    BY MR. LABAR:

11         Q    You might have misunderstood me.  I asked a

12    slightly different question.

13              When you're at the La Verne house, do you have

14    access to a car?

15         A    Yes.

16         Q    Which car do you drive?

17         A    The Escalade.  The EXT.

18         Q    And that's the Escalade EXT that you just

19    referred to that's registered in Nevada?

20         A    Yes.

21         Q    Okay.  So you drive the car from Nevada to Los

22    Angeles; is that correct?

23         A    Yes.

24         Q    Okay.  And you never use any other car when

25    you're at the La Verne address?
```

1      A    That's my car.  Yeah.

2      Q    Okay.  So when you come back and forth from

3   Nevada and California, you always drive?

4      A    I drive, yes.

5      Q    And you never fly?

6      A    Um, very rarely.

7      Q    Okay.  Do you ever use any other car other

8   than -- or have you ever used any other car other than

9   the Escalade when staying at the La Verne home?

10     A    The EVX -- EVS Escalade, which is, you know, an

11  Escalade, as well, but it's a big one.

12     Q    Is that the car that's used by your wife on a

13  day-to-day basis?

14     A    Would you say again?

15     Q    Is that the car that's used by your wife on a

16  day-to-day basis?

17     A    Actually, no.

18     Q    Okay.  What car does your wife drive normally

19  on a day-to-day basis?

20     A    She actually uses the -- the 5 -- it's the

21  G-Wagon Mercedes.

22     Q    Okay.  And to your knowledge, is that car

23  registered in California?

24     A    Uh, yes, I believe so.

25     Q    And do you ever drive that car?

1       A    Maybe to get it washed or something, you know.

2       Q    So from time to time when you're in California

3  at the La Verne address, you may drive the G-Wagon?

4       A    Yeah.

5       Q    Okay.  And do you have cars up in Big Bear, as

6  well?

7       A    No.

8       Q    Okay.  And do you keep cable and satellite at

9  the Big Bear home?

10      A    Yes.

11      Q    Okay.  And, obviously, you have gas and

12 electric there as well, right?

13      A    Yes.

14      Q    And you have a phone there?

15      A    Yes.

16      Q    And do you receive any mail there?

17      A    No.

18      Q    And do you keep clothing and training gear at

19 the house in Big Bear?

20      A    Yes.

21      Q    All right.  Let me ask you about any personal

22 items you might keep at the house in La Verne.  Other

23 than clothing, do you keep other personal items like

24 photos and things like that at the house in La Verne?

25      A    Yes.

1    Q    Okay.  Are your -- for example, family

2    portraits, do you have those at your house in La Verne?

3    A    Yes.

4    Q    Your wedding pictures, are those at the house

5    in La Verne?

6    A    Yes.

7    Q    What about personal financial records, do you

8    have things like that in your house in La Verne?

9    A    I believe there's some financial stuff there,

10   yes.

11   Q    Does your wife -- does your spouse work, sir?

12   A    Yes.

13   Q    Okay.

14   A    Well, she works basically for me.

15   Q    Okay.

16   A    So --

17   Q    And which business of yours does your wife work

18   for?

19   A    The boxing business.

20   Q    What is that called?

21   A    Well, my company would be Sugar Shane, Inc.

22   Q    I'll ask you more about your businesses later.

23        Does she have a title with that business?

24   A    No, not really on -- on record, but she just

25   handles the day-to-day, you know, the phone -- some of

Page 26

1    the phone calls and stuff for me.

2         Q   And she then primarily works for that business

3    from La Verne; is that correct?  Or Los Angeles area?

4         A   Uh, yeah.

5         Q   And does she go to an office to do that job or

6    does she work from home or can you explain that for me?

7         A   She just works at the house.

8         Q   I believe you told me you have five children;

9    is that right?

10        A   Yes.  Yes.

11        Q   Can you give me their ages?

12        A   My first son is 17, Shane, Jr.  Norman Bell is

13   14.  Najee will be seven or is seven.  And Tai is six.

14   And Mee-Yon is four.

15        Q   Okay.  So of your children that are school age,

16   are they all enrolled in school?

17        A   Yes.

18        Q   And are they all enrolled in school in

19   California?

20        A   Yes.

21        Q   Okay.  And let me ask you about your other

22   family.  Is your mother and father alive?

23        A   Yes.

24        Q   And where do they live?

25        A   Pomona.

Page 27

```
 1        Q    And where are your -- do you have any other
 2   relatives?  Uncles, aunts, things like that?
 3        A    My sister.
 4        Q    Where does your sister live?
 5        A    Pomona.
 6        Q    When you were married, sir, were you married in
 7   California?
 8        A    No.
 9        Q    Where were you married?
10        A    In Vegas.
11        Q    Okay.  What year was that?
12             I'm sorry for putting you on the spot.
13             MR. BURSTEIN:  Better hide this thing from his
14   wife.
15             MS. ARTEAGA:  More important to remember the
16   date.
17             THE WITNESS:  It was --
18   BY MR. LABAR:
19        Q    Approximate year.
20        A    It was actually after the Oscar, Fernando
21   Vargas fight when we got married.
22        Q    2000?
23        A    Yeah, 2002, probably.
24        Q    All right.
25        A    So . . .
```

1              MR. BURSTEIN:  Could we just mark that part

2   confidential.  Enter into an anti-disclosure agreement.

3              (Laughter.)

4   BY MR. LABAR:

5         Q    Let me ask you.  Have you ever had any arrests

6   or convictions in the State of California?

7         A    No.

8         Q    Sir, as a professional boxer, I would assume

9   you have sports trainers and boxing trainers, right?

10        A    Only had one trainer really.  It was my father

11  was my boxing trainer.

12        Q    And your father has been your primary trainer

13  off and on over the years?

14        A    Pretty much he's been my primary trainer, you

15  know, since I was eight.

16        Q    Let me focus your attention on this year, 2008.

17  For all of this year, has your father been your primary

18  trainer?

19        A    Yes.

20        Q    Okay.  Where does your father live?

21        A    In -- he lives in Pomona.

22        Q    And is he at the -- well, strike that.

23             Do you have any other trainers that assist your

24  father in training you?

25        A    Um, I wouldn't say assist, but no, not really.

1    He's really the trainer.  Everybody has their own job.

2    They might give advice here and there, but they're not

3    the trainer.  There is only one trainer.

4        Q    Can you describe the -- those other jobs that

5    you were describing these other people do?

6        A    You might have a cut man.

7        Q    Okay.

8        A    Might get advice for different things.  And

9    actually my -- my bodyguard, which is -- he's a trainer

10   in New York --

11       Q    Okay.

12       A    -- but -- and a bodyguard.  So he gives input,

13   too, as well.

14       Q    And for this past -- you were training for a

15   fight that was supposed to happen in May, right, of this

16   year?

17       A    Yes.

18       Q    And during that -- in the preparation for that

19   fight, your father was your trainer, right?

20       A    Yes.

21       Q    And who was your cut man?

22       A    It was going to be Jimmy Glenn.

23       Q    And was Mr. Glenn working regularly with you in

24   preparation for that fight?

25       A    No.

```
 1        Q    And how about your bodyguard, was he working
 2   regularly?
 3        A    He was -- he was with me, yes.
 4        Q    So he was working regularly with you in
 5   preparation for that fight?
 6        A    Yes, he was with me.
 7        Q    And what's that gentleman's name?
 8        A    Alexander Nobel.
 9        Q    Noble like N-o-b-e-l.
10        A    Nobel, yeah.
11        Q    And do you have any medical doctors -- strike
12   that.
13             Let me ask a different question.  Where is
14   Mr. Nobel -- where was he living for 2008 in preparation
15   for this fight?
16        A    He lives in New York, but when he was -- he was
17   in camp with me in Big Bear.
18        Q    Okay.  So in preparation for the fight you were
19   going to have in May of 2008, you were training in Big
20   Bear?
21        A    Yes.
22        Q    And you were living at the Big Bear home?
23        A    Yes, I was staying in the Big Bear home.
24        Q    And where were you training at?  Was there a
25   specific sports facility or boxing gym you were using up
```

```
 1   there?
 2         A   It's a house that I -- basically the house I
 3   built, I put a gym in that house.  So . . .
 4         Q   Okay.  And when did you begin preparing for
 5   that fight that was to happen in May of 2008?
 6         A   May -- I believe March.  March, April, May,
 7   yeah.  Maybe March.
 8         Q   And were you in training continuously from
 9   March of 2008 up until --
10         A   Actually, it might have been late March, early
11   April.  Yeah.
12         Q   Okay.  And were you in training pretty much
13   continuously from that time period you just described up
14   until the fight was cancelled?
15         A   Yes.
16         Q   And that fight was cancelled in mid May
17   sometimes.
18         A   Maybe two weeks before the fight, yeah.
19         Q   So you were living and training in Big Bear,
20   California during that time?
21         A   Yes.
22         Q   Let me ask you about any other professionals
23   you may work with and for your career.  Do you have a
24   medical doctor that you regularly see?
25         A   I really don't have a doctor -- any medical
```

```
 1    person I regularly see, no.  But I have a lot of -- I
 2    have doctor friends.  You know, but nobody -- not --
 3    nobody, you know.
 4           Q    So you don't have a primary care physician?
 5           A    No.  I kind of --
 6                MR. BURSTEIN:  Just answer the questions.
 7                THE WITNESS:  No.
 8    BY MR. LABAR:
 9           Q    Okay.  And do you -- last time you went to the
10    doctor for any kind of medical treatment, where was that
11    doctor located?
12           A    That had to be Dr. Gluckman, who was just a
13    boxing doctor.
14           Q    And where did you see him?
15           A    In San Pedro.
16           Q    Okay.  That's where I'm from.
17                All right.  And do you have -- what do you
18    recall when that occurred?
19           A    What did you say again?
20           Q    Do you recall when that occurred?
21           A    Had to be when they signed the fight.  So March
22    maybe.
23           Q    March 2008?
24           A    Yeah.
25           Q    Do you have a dentist?
```

1        A    No, I don't really have a dentist.

2        Q    Do you recall the last time you went to a

3   dentist?

4        A    Last time I went to the dentist was in Big

5   Bear.

6        Q    Do you recall when that was?

7        A    The last fight.  So whenever the last fight

8   was.  Not this fight, but the last one.

9        Q    Right.

10       A    So whenever that was.

11       Q    So 2007?

12       A    2007 probably.

13       Q    Do you have -- do you work with any

14   chiropractors or any people in that field?

15       A    No.

16       Q    Okay.  What about professional massage

17   therapists or anything like that?

18       A    I don't have a -- well, actually, I have --

19   well, for one fight I had a massage therapist, and he was

20   out of San Diego.

21       Q    And was that for this fight that was just

22   cancelled or a prior one?

23       A    A prior one.

24       Q    Okay.  When you're in training for a bout, in

25   preparation for a bout, do you keep any kind of training

1    log where you log what was happening on that given day?

2         A    No, I don't really keep a training log, no.

3         Q    Do you know if any of your -- if your father or

4    any of your associates keep training logs so they can

5    chart your progress?

6         A    We don't -- well, we watch films.

7         Q    Okay.  Other than the home gym that you have in

8    Big Bear, where else do you train at?

9         A    As far as boxing is concerned?

10        Q    Yeah.

11        A    I trained in New York and Long Island for a

12   period of time.  I also trained at a gym in Las Vegas.

13   Couple of gyms actually.  Basically Big Bear.  When I'm

14   in -- when I'm in California, I train -- most of my

15   training is in Big Bear.  I don't train -- you said

16   training outside.  I just left with Texas.  I trained

17   there for a couple of weeks or a week.  When I'm in

18   Houston, Texas, I'll train, picking up fighters and

19   stuff.  So I'll train wherever -- wherever I'm at.

20        Q    And which gyms do you train at when you're in

21   the Las Vegas area?

22        A    Pound For Pound, a boxing gym that's right by

23   my house.  The other gym -- I can't think of the name

24   of, but Kevin Kelly actually is a boxer and I train at

25   his gym.  We'll work out together a lot.  So . . .

1      Q    Okay.  And when you're in -- sorry.  Did you

2  finish your answer?

3      A    Go ahead.

4      Q    When you're in La Verne, California, are there

5  any gyms there that you train at?

6      A    No, there is no gyms in La Verne.

7      Q    And do you have a home gym in La Verne?

8      A    No.

9      Q    Let me ask you:  Have you ever voted in an

10  election?

11      A    It's been a long time.

12      Q    Do you recall the last time you voted?

13           Don't feel bad.  I'm guilty of this myself.

14           MR. BURSTEIN:  You know, you both should be

15  ashamed of yourselves.  It's disgraceful.

16           THE WITNESS:  I don't think I -- my mother

17  forced me to vote probably when I got out of high school,

18  but I'm not sure I voted after that.

19  BY MR. LABAR:

20           Q    Okay.  And when you voted --

21      A    Probably 20 years old probably.

22      Q    Okay.

23      A    18 years ago.

24      Q    When you voted at that time, was that in

25  California?

1    A    That was in California.

2    Q    Okay.

3    A    Pomona.

4    Q    How many cell phones do you use?

5    A    I have -- I have one that I use.

6    Q    Is that a -- what Area Code is that number?

7    A    702.

8    Q    Do you have -- when was the last time you had a

9    cell phone with a California number?

10    A    It's been a while.  Maybe 2005 or something

11    like that.

12    Q    Okay.  But you maintain home phones in your

13    California residences?

14    A    Yeah.  The same number.

15    Q    As everyone knows, you're a famous and well

16    renown professional boxer, but let me ask you about other

17    business activities you're engaged in.  Do you have any

18    businesses that you are operating or a partner in?

19    A    I'm a partner in Golden Boy Promotions.

20    Q    And that's Mr. De La Hoya's company?

21    A    Yeah.

22         MR. BURSTEIN:  Object to the form.  It's also

23    his company.

24         MR. LABAR:  That's right.  Correction.

25    Q    It's your and Mr. De La Hoya's company?

1      A   Me, De La Hoya and Bernard Hopkins.

2      Q   Okay.

3      A   Yeah.

4      Q   And is Golden Boy -- they mostly do their

5  business in California; is that right?  I mean strike

6  that.

7      A   No.

8      Q   Let me ask a better question.

9          Their offices are in California; is that right?

10     A   Yes.

11     Q   And they're in Los Angeles?

12     A   Yes.

13     Q   And do you work out of those offices from time

14  to time?

15     A   No.

16     Q   Have you ever worked in those offices?

17     A   Never.

18     Q   Okay.  And what role do you play with Golden

19  Boy?

20     A   Recruiting fighters.

21     Q   So I would imagine that's a job that's

22  nationwide in scope?

23     A   I'm pretty much everywhere.

24     Q   Other than Golden Boy, are you involved in any

25  other companies?  You mentioned one early, your own Sugar

```
 1   Shane Productions; is that right?
 2        A   Well, Sugar Shane, Inc. that was a company that
 3   was formed by me for -- I was going to -- before I went
 4   with Golden Boy, I was going to try to manage and promote
 5   fighters.
 6        Q   And so is Sugar Shane, Inc. is that still in
 7   operation or has it sort of been subsumed by your work in
 8   Golden Boy?
 9        A   No.  It's still in operation.
10        Q   Okay.  What about a company called Mosley and
11   Mosley Real Estate, have you ever heard that before?
12        A   Yes.
13        Q   What is that?
14        A   That's my father's company.
15        Q   Okay.  And were you involved in that company at
16   all?
17        A   Mosley and Mosley, no.  I wasn't involved in
18   that company.
19        Q   So other that Sugar Shane, Inc. and Golden Boy,
20   are you involved in any other businesses?
21        A   No.  My other businesses was Pound For -- Pound
22   For Pound.
23        Q   What was Pound For Pound?
24        A   That was -- that was actually promotional and
25   the Sugar Shane was the management company.
```

```
 1        Q    Did Pound For Pound have offices?

 2        A    No.

 3        Q    Okay.  Did you run that business out of your

 4   home?

 5        A    That would be out of my home, yeah.

 6        Q    And that would have been out of La Verne,

 7   California?

 8        A    No.

 9        Q    Where would it have been?

10        A    That -- well, it really wouldn't have been

11   La Verne or anyplace.  It was -- it was just a company

12   that was set up.  So it wasn't ran like out of La Verne

13   or -- actually, it's a Nevada Corp. so . . .

14        Q    So it would be run out of wherever you happened

15   to be --

16        A    Right.

17        Q    -- at the time?

18        A    Yeah.

19        Q    Okay.  What states are you licensed to box in?

20        A    Most of the time, I box in Nevada, but Nevada,

21   I think -- am I licensed in California?  I'm not even

22   licensed in California right now.  I'm thinking from -- I

23   mean New York.  So I know actually right now actually New

24   York and Nevada.  That's the two -- yeah.  That would be

25   the two.  Because I haven't fought in California for a
```

1    while.

2              MR. BURSTEIN:   Just answer the questions.

3              THE WITNESS:   Oh.

4    BY MR. LABAR:

5         Q    Okay.  Let me ask you about where you've been

6    spending time recently.   For the year 2008, correct me if

7    I'm wrong, I think you told me that since late March 2008

8    till approximately mid May, you were training in Big

9    Bear; is that right?

10        A    Yes.

11        Q    Okay.  And where were you in January and

12   February and early March of 2008?   Where were you

13   spending your time?

14        A    Um, that I don't know -- where was I in

15   January?  I was in California.   I was in Nevada.   I'm

16   trying to figure out.   I was in Arizona, too.

17        Q    Okay.  Can you give me an estimate of how much

18   time you were spending in California during that period?

19        A    I couldn't tell you.   Maybe two, three weeks.

20   I don't know.

21        Q    Okay.  So of the first three months of 2008,

22   you spent approximately two to three weeks in California?

23        A    The first what?   Say it again.

24        Q    The first three months of 2008, you spent

25   approximately two to three weeks in California; is that

1    correct?

2         A    Approximately, yeah.

3         Q    And how much time did you spend in Arizona?

4         A    Not long.  Maybe two, three days.

5         Q    And the rest of the time you spent in Nevada?

6         A    Nevada, I spend about -- I don't know, like

7    two, three weeks in Nevada.  I go back and forth so I'm

8    always hopping around.  There was a fight in Arizona that

9    I was out there with, and there was a fight in Nevada and

10   I stay out there for weeks at a time for promotional

11   stuff, fights.  I don't know.

12        Q    About how many times do you think you went back

13   and forth from California and Nevada in the first three

14   months of the year?

15        A    I couldn't tell you.  I go back -- back and

16   forth a lot.

17        Q    Would you say -- can you give me an estimate?

18   Was it more than ten times?

19        A    It could be about that.  About ten, yeah.

20        Q    Possibly more?

21        A    About that.  I don't know.  About ten.

22        Q    I know you were planning to have this fight in

23   late May that many of us were anxious to watch.  After

24   that fight was over, where did you plan to go?

25        A    Actually, I planned to go to New York.

1     Q    Did you have a vacation planned?

2     A    Yeah, kind of.  We wanted to go to New York,

3   but we ended up staying in Vegas.  So we're actually all

4   in Vegas right now.  The whole family.  So I drove back

5   here for this.

6     Q    Okay.  But after your fight, did you plan on

7   returning to California to be with your family?

8     A    After the fight?

9     Q    After the fight that was planned for late May,

10  did you plan on returning to California to be with your

11  family?

12    A    Actually, we planned on going to New York, the

13  whole family.

14    Q    And at some point, does your family plan on

15  returning to California after your trip to New York?

16    A    After the summer, yeah.

17    Q    And did you attend -- intend to come back to

18  California with them?

19    A    Yeah.  If there was a -- yeah.  Yes.

20    Q    Let me ask you about the year 2007.  How many

21  fights did you have -- professional fights did you have

22  in 2007?

23    A    Two.  There may be a record.

24    Q    I'm sorry?

25    A    There might be record.  I don't know.  I

Page 43

```
 1    believe it was two, though.

 2         Q    Do you recall who you fought?

 3         A    Who did I fight in '07? Vargas.  No.  Cotto.

 4    For Cotto.

 5         Q    Cotto?

 6         A    Cotto.  Who did I fight before that?  I don't

 7    know.

 8         Q    So you basically had two fights in 2007?

 9         A    I believe so, yeah.

10         Q    And did you train for those fights in Big Bear

11    as well?

12         A    Yes.

13         Q    And do you intend to keep training for your

14    fights in Big Bear?

15         A    Big Bear is, yeah, the training spot, yeah.

16         Q    And you intend to keep seeing your family

17    obviously and your wife in California, right?

18         A    Yes.

19         Q    And you intend to keep doing business with

20    Golden Boy in California, correct?

21         A    Um, the business is in Nevada, but, yeah.  We

22    do our business at the MGM, Mandalay Bay, you know.  It's

23    Nevada.  But mostly Nevada, but some California.

24         Q    And your children that are school age, they're

25    going to finish school in California; is that correct?
```

Page 44

1      A    Only my son, the oldest son, I would like him

2   to finish school in California because he's a junior now

3   and he's going to be a senior next year.  Then we plan

4   on -- well, I plan on, you know, moving them out to, you

5   know, Nevada after that.

6      Q    Is your house in La Verne currently for sale?

7      A    No.

8      Q    Was it for sale in April of 2008?

9      A    No.

10     Q    And has your house in Big Bear been for sale at

11  all this year?

12     A    No.

13     Q    And do you intend to sell your house in Big

14  Bear?

15     A    Not at the moment, no.

16     Q    And for the time being, you don't intend to

17  sell your house in La Verne either, correct?

18     A    Well, yeah.  We do have plans to -- to do that

19  and we did have a realtor put it up -- well, getting

20  ready to put it up for sale I think in 2006 or '-7.  It's

21  a local realtor.

22     Q    And the house did not sell?

23     A    It's kind of hard to sell a house like that.

24     Q    But it was not for sale in 2008; is that

25  correct?

1       A    No.

2       Q    And the current plan is to have your children

3  stay at the La Verne house with your wife until at least

4  your oldest son graduates; is that correct?

5       A    Yes.  He's been in the system -- school system

6  for a long time.

7       Q    You mentioned that Mr. Alessi was your CPA for

8  about a year and a half; is that correct?

9       A    Yes.

10       Q    Who was your CPA prior to Mr. Alessi?

11       A    Actually, I didn't have a CPA prior to him.

12       Q    Who handled your financial affairs or did you

13  handle them yourself?

14       A    My mother actually helped me with them.

15       Q    Does your mother handle the filing of your tax

16  returns?

17       A    No.  It was actually my auntee.

18       Q    Okay.

19       A    She did that.

20       Q    And what was auntee's name?

21       A    Travee.

22       Q    Could you spell that for me?

23       A    Travee, T-r-a-v-e-e.

24       Q    And was she a Mosley, as well?

25       A    No.  Monday, M-o-n-d- -- like Monday.

1       Q    Okay.  Okay.  M-o-n-d-a-y?

2       A    Yeah.  Monday.

3       Q    Okay.  And was she a CPA or have any kind of

4  certification of any type?

5       A    She was -- a certificate maybe in -- and

6  generally the taxes, like that.

7       Q    Was she located in California?

8       A    Yes.

9       Q    Do you know what town?

10      A    Los Angeles.

11      Q    And do you recall what year she handled your

12  tax returns for?

13      A    That might have been like from '94 maybe to --

14      Q    Till Mr. Alessi took over?

15      A    Until pretty much, yeah, Alessi.

16      Q    And correct me if I'm wrong, but is Mr. Keys

17  handling that for you now?

18      A    Bob Keys is, yes.

19      Q    Have you ever had a California driver's

20  license?

21      A    Yes.

22      Q    Do you still have one?

23      A    No.

24      Q    And when did you give that up?

25      A    I believe in 2000 -- either 2005, I believe,

1   '-4 or '-5.

2        Q    And what were the circumstances of you giving

3   that up?  Did it just expire and you didn't renew it or

4   was there some other situation?

5        A    No.  Because I had plans to move to -- to Vegas

6   even back then and -- permanently.  And so I got a

7   license and house and everything.

8        Q    Okay.  And so can you tell me right now if you

9   have a valid California driver's license?

10       A    No.

11       Q    And so you don't have a California driver's

12  license in your wallet right now, for example?

13       A    For example, right now I have a Nevada license

14  and it says -- has, you know --

15            MR. BURSTEIN:  Why don't you -- just answer the

16  question.

17            THE WITNESS:  All right.

18  BY MR. LABAR:

19       Q    So no, you don't --

20            MR. BURSTEIN:  If you want to see, you can give

21  him that --

22            THE WITNESS:  Yeah, I have it.

23            MR. LABAR:  No, no.  That's fine.  I think I

24  have a copy of it.

25       Q    But you don't have a California driver's

Page 48

```
 1    license in your wallet, correct?

 2         A    No.

 3         Q    Okay.  Do you have one in your possession

 4    anywhere?  Did you keep it?

 5         A    No.

 6         Q    Okay.  Which banks do you do your personal

 7    banking with?

 8         A    My personal banking is in Nevada.

 9         Q    What's the name of the bank?

10         A    Bank of America.

11         Q    Okay.  And when you're in California, you can

12    use the Bank of America branches that are in California,

13    correct?

14         A    Yes.

15         Q    I asked you about some automobiles and you said

16    you had some cars registered in Nevada, right?

17         A    Two, yes.

18         Q    And you have some cars -- or your wife has some

19    cars registered in California that you use from time to

20    time?

21         A    I think only -- only one.

22         Q    Do you own any boats?

23         A    No.

24         Q    Helicopters?  G5?  Anything like that?  No?

25              MR. BURSTEIN:  I wish.  I wouldn't have to fly
```

1    commercial.

2    BY MR. LABAR:

3        Q    Motorcycles?

4        A    No.

5        Q    Okay.  Let me ask you what -- we'll mark as

6    Exhibit 1, a group Exhibit 1.  I just want to ask you

7    about an address.

8            (Defendant's Exhibit 1 was marked for

9            identification by the court reporter.)

10   BY MR. LABAR:

11       Q    The court reporter has marked as group

12   Exhibit 1 a document.  On the first page has a Bates

13   stamp listing of SM23.  Do you see that in the lower

14   right-hand corner?

15       A    Oh, yeah.  SM23, yeah.

16       Q    I just want to ask you about the address on

17   this.  There is an address of Shane Mosley, care of WTAS,

18   633 West Fifth Street.  Do you see that?

19       A    Yes.

20       Q    Is that Mr. Keys' address?

21       A    Yes.

22       Q    Okay.  Thank you.

23           Let me show you what we'll mark as Exhibit 2.

24           (Defendant's Exhibit 2 was marked for

25           identification by the court reporter.)

1   BY MR. LABAR:

2       Q    And Exhibit 2 is a document that has Bates

3   stamp numbers SM46 and 47 on two pages.  Do you see that?

4       A    Uh-huh.  SM46, yeah.

5       Q    If you could turn to the second page, is that

6   your signature on the top of the page?

7       A    Uh, yes.

8       Q    Okay.  Thank you very much.  That's the only

9   questions I have about that.

10           Show you a document we'll mark as Exhibit 3.

11           (Defendant's Exhibit 3 was marked for

12           identification by the court reporter.)

13  BY MR. LABAR:

14      Q    Exhibit 3 is a document Bates stamp numbered

15  SM176.  Do you recognize this document?

16      A    That was -- that's -- let's see.

17           MR. BURSTEIN:  He's asking if you recognize it.

18           THE WITNESS:  Recognize that?  I don't

19  recognize it.

20           MR. BURSTEIN:  If you've seen it.

21           THE WITNESS:  I mean, I don't -- I don't know.

22           MR. LABAR:  Sure.  Let me help.

23      Q    This appears to be some kind of bill from

24  Direct television, satellite TV provider, correct?

25      A    Um, yeah.  DirecTV.

1    Q    Okay.  It shows that this service was billed to

2  your name at the Clayton Court, La Verne, California

3  address, correct?

4           MR. BURSTEIN:  Object to the characterization.

5  BY MR. LABAR:

6    Q    Is that correct, was this billed to your name

7  at the La Verne address?

8    A    Yeah.

9    Q    Okay.  And is it fair to say that you have

10  other bills in your name that go to the Clayton Court,

11  La Verne address?  For example, for water and power and

12  things like that?

13    A    Um, maybe.  I'm not sure because the CPA does

14  that.  So usually he pays the bills for me.

15           MR. BURSTEIN:  Can we go off the record for a

16  second?

17           MR. LABAR:  Sure.

18           (Discussion held off the record.)

19  BY MR. LABAR:

20    Q    This bill appears to state there's service at

21  your name -- in your name for DirecTV at the Clayton

22  Court address, correct?

23    A    Yes.

24    Q    And you have other services in your name at the

25  Clayton Court, La Verne address such as utilities, right?

1        A    Yes.

2              MR. LABAR:  Okay.  Let me show you what we'll

3    mark as the next exhibit in order.

4              (Defendant's Exhibit 4 was marked for

5              identification by the court reporter.)

6              (Discussion held off the record.)

7    BY MR. LABAR:

8        Q    Do you recognize Exhibit 4, sir, as a

9    declaration that you signed in this matter?

10       A    Um, I don't see a signature on here.

11       Q    Okay.

12             MR. BURSTEIN:  I'll represent that this is the

13   signature -- he did sign this.

14             THE WITNESS:  Okay.

15   BY MR. LABAR:

16       Q    Just so you know, the reason why is because

17   this is the one that went electronically to the Court and

18   we don't have real signatures on those documents.  Just

19   so you know where it's coming from.  This was a document

20   filed with the Court.  Okay?

21       A    Okay.

22       Q    Let me ask you to turn to page 3 of this

23   declaration.  In paragraph 11, you mention two companies

24   that you are involved in; is that correct?

25       A    Um, yeah.

```
 1        Q    Okay.  Other than you -- that is, other than

 2   you and your wife, does the Sugar Shane Incorporated have

 3   any other employees?

 4        A    No.

 5        Q    Okay.  And other than you, does Pound For Pound

 6   Promotions have any other employees?

 7        A    No.

 8        Q    Paragraph 14 says that, "Since at least 2005, I

 9   have filed tax returns as a resident of Nevada."  Do you

10   see that?

11        A    Paragraph what again?

12        Q    Paragraph 14.

13        A    14.  Yes.

14        Q    Okay.  Do you recall exactly when you stopped

15   filing tax returns as a resident of California?

16        A    Um, I can't really recall.

17        Q    And let me ask you as of, say, April 2008, this

18   year, it was your plan and intention to have your family

19   remain in California and your son complete school in

20   California; is that right?

21        A    As of April?

22        Q    Right.

23        A    Um, I would say yeah.  We were going to stay in

24   California, but was going to leave California after the

25   fight, which was May, for a period of time.
```

Page 54

1      Q    Right.  And you were going to return to

2   California to allow your child to finish school, right?

3      A    To finish school.

4           MR. BURSTEIN:  Object to the form of the

5   question.

6           MR. LABAR:  All right.  Thanks.  Let me just

7   check my notes here and I think we may be done.

8           MR. BURSTEIN:  I may have a couple of

9   questions.

10          MR. LABAR:  That's fine.

11          I do have a question.  Back on?

12     Q    Do you have a passport?

13     A    Yeah.

14     Q    Okay.  And is there any reason why you couldn't

15  provide a copy of that to your attorney?

16     A    Because I didn't have it.

17     Q    Okay.  Where was it located?

18     A    I don't know.  I can't -- I couldn't find it.

19  I'm still looking for it right now.

20     Q    Okay.  Thank you.

21          MR. BURSTEIN:  You better find it soon because

22  you're going to Australia.

23          THE WITNESS:  I know.  I'm going to Australia.

24  I have to get a new one.

25          MR. LABAR:  Takes a long time to get them.

```
 1              I don't have any further questions.

 2              MR. BURSTEIN:  I have a couple of questions.

 3

 4                        EXAMINATION

 5    BY MR. BURSTEIN:

 6         Q    Where is your family residing right now?

 7         A    My family is residing in California.

 8         Q    Where are they physically located right now?

 9         A    Oh, physically located right now?  They're in

10    Las Vegas.

11         Q    And have they been in Las Vegas since the end

12    of the school year?

13         A    Yes.

14         Q    When do you plan to have the family come back

15    to California?

16         A    When school year starts.

17         Q    Okay.  Even when the kids are in school, do you

18    spend time in Las Vegas?

19         A    Yes.

20         Q    All right.  What do you do when you're in Las

21    Vegas?  I mean is there a reason why you stay in Las

22    Vegas other than the fact that you stay at your home?

23         A    Well, a lot of times I'm in Vegas because of

24    all of the big events and fights that -- you know, part

25    of the promotion of Golden Boy, and most of the fights
```

1    are in Vegas.  So either I'm at the Mandalay Bay, the

2    MGM, Caesars Palace, or wherever.

3         Q    And what grade is your oldest son in school?

4         A    He's a junior, but he's going to be a senior

5    next year.

6         Q    And this fall he's going to be a senior?

7         A    This fall he's going to be a senior.

8         Q    All right.  And after the fall of this year, is

9    it your intention to have Nevada as your exclusive

10   residence?

11        A    It is my intention, yes, to have -- to move the

12   family to Nevada.

13        Q    And how long do you continue to fight -- do you

14   expect to continue to fight?

15        A    Um, I don't -- maybe -- not that long.  I'm not

16   sure how long, whether it be a year or two.

17        Q    Okay.  And do you -- will you be using the Big

18   Bear training facility after you retire?

19        A    I won't personally be using it.  But, like I

20   say, I have other fighters that may be using it, you

21   know.

22        Q    Okay.  And do you have plans -- what do you

23   plan to do with your California home after June of 2009?

24        A    Well, I plan to put it up for sale and move

25   into something in Vegas.

1      Q   Okay.

2      A   With my family.

3      Q   Okay.  And aside from -- do you spend time in

4  Las Vegas alone?

5      A   A lot of times I do.  I spend time alone.

6      Q   And where does your family spend time during

7  the holidays?  Like school vacations?

8      A   Well, they would either go to -- most of the

9  time they're in Vegas.  They'll come to Vegas to see me.

10       MR. BURSTEIN:  Okay.  I have nothing else.

11       MR. LABAR:  Just a couple questions.

12

13              FURTHER EXAMINATION

14  BY MR. LABAR:

15      Q   From time to time when your children are not in

16  school and living in La Verne, do they also come to see

17  you in Big Bear?

18      A   Actually, from time to time, but not really,

19  no.

20      Q   Okay.  And can you give me any percentage of

21  how much time you spent in California versus Nevada in

22  the year 2007?

23      A   I couldn't -- I couldn't tell you.  I mean it

24  could be equally as much because I'm in Nevada or, you

25  know, I'm all over the place.  I'm not just in California

1    and Nevada.  I'm everywhere.  Wherever the promotion

2    needs me to go, I go.

3         Q    Okay.  And just one last question.  Throughout

4    this time period, 2007 through 2008, you never intended

5    to remain apart from your family, right?

6         A    In 2007 and 2008?

7         Q    Right.

8              MR. BURSTEIN:  Object to the form of question,

9    but you can answer.

10             THE WITNESS:  Wait.  Could you --

11             MR. LABAR:  Sure.

12             THE WITNESS:  -- say again?

13   BY MR. LABAR:

14        Q    You've never intended to remain apart from your

15   family, right?

16        A    No, I don't want to be apart from the family.

17             MR. LABAR:  All right.  Thank you.  I have no

18   further questions.

19             MR. BURSTEIN:  One more question.

20

21                      FURTHER EXAMINATION

22   BY MR. BURSTEIN:

23        Q    When Mr. Labar asked you about apart from your

24   family, are you physically apart from them at times?

25        A    At -- a lot of times I'm physically apart from

1    them, yeah.

2         Q    So what did you understand Mr. Labar to be

3    asking you when -- whether you wanted to be apart?

4         A    Do I want to be apart -- he asked did I want to

5    be, but, you know, I don't want to be, but, you know, I

6    am sometimes.

7         Q    And also you were asked some questions -- I

8    mean I think I forgot to ask you.

9              Golden Boy's offices are in California, right?

10        A    Right.

11        Q    Do you do any work out of their offices in

12   California?

13        A    No.

14        Q    What is the kind of work that you do for Golden

15   Boy?

16        A    The kind of work that I do, I'm -- I recruit

17   fighters.  That's --

18        Q    And anything else?  Do you go attend events?

19        A    Oh, I attend events, yeah.  I -- I recruit

20   fighters, I attend numerous events, and most of the

21   events are done in Vegas.

22        Q    And say a fight is on a Saturday night.  How

23   much time do you spend in Vegas in connection with the

24   promotion of that fight during the week before?

25        A    I will spend the whole week from Monday to --

1  from actually Monday to Saturday and sometimes a little

2  bit longer after the fight.

3      Q   And does your son have any plans on -- your

4  oldest son have any boxing plans in his future?

5      A   He does.  He's actually an amateur boxer right

6  now.  He's 3 and 0.  And he actually has plans of being a

7  professional fighter, yes.

8      Q   And do you plan on -- on training him?

9      A   Definitely.

10     Q   And where do you plan on training him?

11     A   I plan on training him in Las Vegas.

12     Q   And why is that?

13     A   Because that's where we'll be moving.

14     Q   All right.  And is there any -- is there any

15  place in particular in Las Vegas that you'd be training

16  in?

17     A   Well, there's a gym that's next to my house in

18  Vegas and that's called the Pound For Pound gym.

19         MR. BURSTEIN:  Okay.  Nothing further.

20         MR. LABAR:  Just one last question.

21

22                    FURTHER EXAMINATION

23  BY MR. LABAR:

24     Q   Throughout the period of 2007 to 2008, did you

25  train with your son?

1          A    2007 to -- I didn't really train with him

2     because I was actually doing my training, but sometimes

3     he would go to -- up to Big Bear and train as much as he

4     could, and then he had to leave and go back down

5     so . . .

6          Q    And let me just ask this question again and

7     I'll try to be clearer.

8               Throughout the period of time up to -- from

9     2007 to 2008 up to the present, you've always intended to

10    remain with your family as a family unit, right?

11         A    Yes.  I want to remain with my family, yes.

12              MR. LABAR:  Okay.  No further questions.

13              MR. BURSTEIN:  I'm sorry.  You raised another

14    good question.

15

16                    FURTHER EXAMINATION

17    BY MR. BURSTEIN:

18         Q    After you retire, which you said is in a year

19    or two, will you still be -- do you still intend to be

20    spending months at a time at Big Bear?

21         A    After I retire, I probably wouldn't spend

22    months at a time unless -- I'll probably be more -- I'll

23    be more in Vegas, but this is for some of the fighters,

24    Golden Boy fighters, you know, that I recruited.  Like --

25    like right now I have to leave to go to Australia for a

1    fighter that I've signed to Golden Boy and stay there for

2    maybe a couple of weeks.

3              MR. BURSTEIN:  Okay.  Nothing further.

4              MR. LABAR:  Okay.  Mr. Mosley, you've knocked

5    me out.  Thank you for your time.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF CALIFORNIA      )
                            ) ss
2  COUNTY OF LOS ANGELES    )

3

4      I, PAMELA J. FELTEN, a Certified Shorthand

5  Reporter, do hereby certify:

6      That prior to being examined, the witness in

7  the foregoing proceedings was by me duly sworn to

8  testify to the truth, the whole truth, and nothing

9  but the truth;

10     That said proceedings were taken before me at

11 the time and place therein set forth and were taken

12 down by me in shorthand and thereafter transcribed

13 into typewriting under my direction and supervision;

14     I further certify that I am neither counsel

15 for, nor related to, any party to said proceedings,

16 nor in anywise interested in the outcome thereof.

17     In witness whereof, I have hereunto subscribed

18 my name.

19

20 Dated:  **JUL 1 8 2008**

21

22          *Pamela J. Felten*

23 _____
   PAMELA J. FELTEN
   CSR No. 5189

24

25

EXHIBIT E

1   Kim O. Dincel, Esq. (SBN 131563)
2   Long & Levit LLP
    465 California Street 5th Floor
3   San Francisco, California 94104
    Tel (415) 397-2222 Fax (415) 397-6392
4   E-mail kdincel@longlevit.com

5
    JUDD BURSTEIN, P.C.
6   Judd Burstein (Admitted *pro hac vice*)
    1790 Broadway, Suite 1501
7   New York, New York 10019
    Tel (212) 974-2400 Fax (212) 974-2944
8   E-mail jburstein@burlaw.com

9
    *Attorneys for Plaintiff,*
10  SHANE D. MOSLEY, SR.

11

12                  UNITED STATES DISTRICT COURT

13          FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                    SAN FRANCISCO DIVISION

15  SHANE D. MOSLEY, SR.,              )
16          *Plaintiff,*              )    08-Civ-1777 (JSW)
                                       )
17      vs.                           )    **DECLARATION OF SHANE D.**
                                       )    **MOSLEY, SR.**
18  VICTOR CONTE,                     )
19          *Defendant.*             )    Date:      May 30, 2008
                                       )    Time:      1:30 p.m.
20                                     )    Courtroom: 2, 17th Floor
                                       )
21  ─────────────────────────         )    Hon. Jeffrey S. White

22

23      **SHANE D. MOSLEY, SR.,** hereby declares under penalty of perjury:

24      1.      I am the Plaintiff in this action.

25
        2.      I submit this Declaration to demonstrate why Defendant Victor Conte's ("Conte"
26
    or "Defendant") anticipated motion to dismiss the complaint has no merit.  The purpose of this
27
    Declaration is to place before the Court factual information relevant to my anticipated opposition
28

△π EXHIBIT 4
5Ars
Deponent MOSLEY
Date 7-9-08 Rptr Felten
WWW.DEPOBOOK.COM

to Defendant's motion.  In addition, I explain why a prompt resolution of this case is so important to me.

## THE MERITS OF MY CLAIM

3.     I am a professional boxer, and I have been defamed by Defendant, the infamous principal of the Bay Area Laboratory Co-operative ("Balco"), on multiple occasions.

4.     In or about July of 2003, I met with Conte at Conte's business, Balco, for the purpose of obtaining **legal** supplements to aid my training.  At this meeting with Conte, samples of my blood were taken and analyzed.  Conte then recommended a regimen of products that he told me would help with my endurance.

5.     Further, at the meeting with Conte, I specifically asked Conte for assurances that everything that he was recommending was both legal and healthy.  Conte specifically gave me that assurance.  His public claims that he explained to me that he was recommending illegal substances and procedures are also a lie.

6.     Significantly, I have never denied taking the products recommended to me by Conte.  Indeed, I forthrightly testified about them before the Grand Jury.  However, I have always denied that Conte ever told me, or that I knew, that I was taking anything that was illegal or in any way barred by the rules of my sport.

7.     I purchased and received the following supplements from Balco: "the cream", "the clear", and Erythropoietin (EPO).  I admitted to the Grand Jury that I had made these purchases.  However, at no time was I ever told, by Conte or anyone associated with Balco, that these products were steroids or illegal or banned performance enhancing drugs.  In other words, Conte never told me, in sum or substance, that the supplements provided to me by or on behalf of Conte or Balco were undetectable steroids or other banned substances that would not show up in

1    a drug test. To the contrary, I explicitly sought and received Conte's assurance that everything

2    he was recommending was entirely legal and authorized for use in my sport.

3    **MY NEVADA CITIZENSHIP**

4

5          8.      Conte has also claimed that I am not a citizen of Nevada. This is also not true.

6          9.      I own two homes in Las Vegas, Nevada, the first of which was purchased in 2002

7    or 2003.

8          10.      I have a Las Vegas cell phone number, which I began using well before this

9

10   action began.

11          11.      The companies I own, and through which I conduct my boxing career - Sugar

12   Shane, Inc. and Pound for Pound Promotions, Inc. - are Nevada Corporations organized in 2001

13   and 2002 respectively. The principal places of business of these corporations were, until

14   recently, New York and, prior to commencement of this action, Nevada.

15

16          12.      I have not maintained bank accounts in California for at least the last five years.

17   Rather, all of my bank accounts have been maintained in either Nevada or New York.

18          13.      Since at least 2005, I have maintained a Nevada driver's license and all of my cars

19   have been registered in the State of Nevada.

20

21          14.      Since at least 2005, I have filed tax returns as a resident of Nevada.

22          15.      None of my earned income from my career as a professional boxer has been

23   earned from fights in California since June 17, 2000. Rather, since that date, I have fought in

24   Las Vegas 11 out of 15 times, with the other bouts taking place in either New York or

25   Indianapolis.

26

27          16.      It is true that I jointly own a home in La Verne, California with my wife and also

28   own a home in Big Bear where I have done some of my training. However, I do not live with

my wife full time for a number of reasons, including the demands of my career, and consider Las Vegas to be my primary residence.   More importantly, we have maintained the home in California because one of my children was in school at the time of my move to Nevada, and we did not want to upset his schedule.   Nonetheless, virtually all of the time when the children are not in school is spent outside of California, and we ultimately do not intend to maintain a residence in California.   Further, even during the school year, I spend much of my time in Las Vegas while my wife remains in California.

## THE NEED FOR A SPEEDY TRIAL

17.     I cannot begin to explain how devastating Conte's false allegations have been to me.  I have been a professional athlete my entire adult life, and I believe that I have carved out an important place for myself in the sport's history.   All of my life's work is at risk because of Conte's lies.

18.     Further, the next phase of my economic life, after retirement from the sport in the next few years, will be based upon my career in the ring.  I have a brand based upon the highest reputation for sportsmanship, and that brand is being irreparably tarnished by Conte.

19.    Worse still, if the trial of this case is not completed prior to publication of Mr. Conte's book so that I can secure an injunction, I will be forced to suffer through a likely international television and print publicity tour and an internationally published book in which Mr. Conte will further seek to destroy my reputation with his lies.   If this occurs, even a subsequent victory at trial will not make me completely whole – regardless of how much of a damages award I win – because my name will have already been linked to the use of illegal drugs to such a great degree that it will not be fixable.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 22nd day of May 2008.


                                    /S
                                    SHANE D. MOSLEY, SR.

EXHIBIT F

1   Marc T. Little, Esq. (State Bar No. 174132)
    LAW OFFICES OF MARC T. LITTLE
2   A Professional Law Corporation
    445 South Figueroa, 26th Floor
3   Los Angeles, California 90071
    Telephone:    213/612-7754
4   Facsimile:    213/612-7797

5   Attorney for Plaintiff

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 1 4 2003

JOHN A. CLARKE, CLERK
BY STEPHANIE SIANEZ, DEPUTY

*Case assigned JUDGE James Chafant*

6

7                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                         FOR THE COUNTY OF LOS ANGELES

9

10  SHANE D. MOSLEY, SR., an individual,          )   Case No.    **BC290412**
                                                  )
11               Plaintiff,                       )
                                                  )   **COMPLAINT FOR DAMAGES**
12      vs.                                       )
                                                  )   **[ACCOUNT STATED]**
13                                                )
    CEDRIC KUSHNER PROMOTIONS, LTD, a             )   **[Amount Exceeds $25,000]**
14  New York Corporation,                         )
                                                  )
15               Defendant.                       )   **[Unlimited Civil Case]**
                                                  )
16  ────────────────────────────────────

17

18      For a cause of action against Cedric Kushner Promotions, Inc., a New York Corporation

19  ("CKP"), Shane D. Mosley, Sr., an individual ("Mosley") alleges as follows:

    **GENERAL ALLEGATIONS**
20

21      1.      Shane D. Mosley, Sr. is an individual residing in the County of Los Angeles, State of

22  California.

23      2.      Cedric Kushner Promotions, Ltd. is a New York Corporation duly organized and

24  existing under the laws of the State of New York with its principal place of business

25  Southampton, State of New York.

26

27  ────────────────────────────────────

28                         COMPLAINT FOR DAMAGES
                                      1

## FIRST CAUSE OF ACTION

### [Account Stated]

3.      Mosley realleges and incorporates by reference the allegations contained in paragraphs 1 through 2 above as if fully set forth herein.

4.      On or about October 13, 1998, as amended by letter agreements dated August 2, 1999 and September 18, 2000, Mosley entered into a multi-fight agreement whereby he contracted with CKP to render his personal services as a professional fighter.

5.      On or about October 31, 2001, Mosley and CKP entered into a Separation Agreement whereby the multi-fight agreement was terminated. However, Mosley was obligated to render his services in connection with one additional fight. That fight was "Sugar" Shane Mosley vs. Vernon Forrest which was held at Madison Square Garden in New York on January 26, 2002.

6.      Mosley fulfilled his obligation under the written agreement and received compensation from the broadcast licensing fee due under the multi-fight agreement from CKP in the amount of $1,244,000.00.

7.      On or about January 25, 2001, CKP agreed in writing to account and pay Mosley his 80% share of the net profits within 30 days after the fight. Revenues would be derived from foreign broadcast licensing fees, sponsorship revenue and ticket sales ("Ancillary Revenue").

8.      On or about March 10, 2001, at Los Angeles, California, an account was stated in writing by and between Mosley and CKP and on such statement a balance of $660,359.30 was due to Mosley from CKP. CKP agreed to pay to Mosley said balance. [A copy of the account is attached hereto as Exhibit A and made a part hereof.]

9.      On or about June 1, 2002, CKP paid Mosley $50,000.00 toward his share of the net profits.

10.     Although demanded by Mosley from CKP, the agreed upon balance has not been paid in full.

11.     There is now due, owing, and unpaid from CKP to Mosley the sum of $610,359.30,

1  together with interest thereon from and after March 10, 2001.

2       WHEREFORE, Mosley prays judgment as follows:

3       1.      For the sum of $610,359.30.

4       2.      For interest on such sum at the legal rate per year from and after March 10, 2001.

5       3.      For attorney fees in an amount to be determined at trial.

6       4.      For costs of suit herein incurred.

7       5.      For such other and further relief as the court may deem proper.

8  Dated: February 14, 2003                    LAW OFFICES OF MARC T. LITTLE, P.C.

9

10                                             _____
                                               MARC T. LITTLE, ESQ.
11                                             Attorney for Plaintiff
                                               Shane D. Mosley, Sr.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                 COMPLAINT FOR DAMAGES
                                              3



## INCOME

| | PAYOR | $AMOUNT |
|---|---|---|
| TV Rights Fee (Domestic) | HBO | $4,100,000.00 |
| TV Rights Fee (Foreign) | HBO | $240,000.00 |
| Sponsorship | Anheuser Busch | $75,000.00 |
| Box Office | Madison Square Garden | $503,523.05 |
| | TOTAL INCOME: | $4,918,523.05 |

## EXPENSES

| | PAYEE | MEMO | $AMOUNT |
|---|---|---|---|
| Agent/Booking/Consultants | Henry Olgesby | Booking Smith | $500.00 |
| | Bobby Hitz | Booking Drake | $500.00 |
| | Robert Mittleman | Booking Curiel | $500.00 |
| License Fees | WBC | Sanctioning fees | $21,150.00 |
| | NABO | Sanctioning fees | $3,800.00 |
| Purse/Boxer | Vernon Forrest | Purse | $1,250,000.00 |
| | Al Cole | Partial Purse | $5,500.00 |
| | Bulldog Boxing | Balance Purse | $3,500.00 |
| | Henry Foster | Williams Purse | $6,500.00 |
| | PAC Promotions | Acevado Purse | $4,500.00 |
| | Marvin Smith | Purse | $3,600.00 |
| | Tokunbo Olajide | Purse | $7,500.00 |
| | Jason Gethers | Purse | $1,000.00 |
| | Israel Garcia | Purse | $1,000.00 |
| | Fred Curiel | Purse | $7,500.00 |
| | Kenito Drake | Purse | $3,500.00 |
| | Jose Celaya* includes sanctioning fee | Purse | $12,500.00 |
| Television Production Costs | Audio + Video | Dubbing | $11.93 |
| | Audio + Video | Dubbing | $11.93 |
| | HBO | Tech Costs | $6,500.00 |
| | NY State | TV Taxes | $33,971.00 |
| Travel -Airfare | Your Ticket Travel | Forrest | $3,325.00 |
| | Austin Travel | Tickets on account | $28,756.41 |
| | Haymon Delevlopement | Forrest | $4,365.00 |
| Ground Transportation | Live Star Entertainment | Boxers to/from hotel | $6,621.00 |

020126                  Shane Mosley vs. Vernon Forrest          Madison Square Garden

|  |  |  |  |
|---|---|---|---|
|  | Henry Olesby | Smith Travel | $400.00 |
|  | Marc Neels |  | $50.00 |
|  | Masada Limo |  | $4,462.50 |
|  | LF Van Putten |  | $417 |
|  | Tom Kaczmarek |  | $189.20 |
|  | Haymon Development | Forrest | $1,500.00 |
| Lodging | Flatotel |  | $39,843.85 |
|  | Edison Hotel |  | $8,425.96 |
|  | Rego Royal |  | $5,860.40 |
| Meals | Henry Foster |  | $80.00 |
|  | Marc Neels |  | $120.00 |
|  | Haymon Development |  | $1,750.00 |
|  | Food Per Diem |  | $2,000.00 |
|  | Mosley |  | $2,750.00 |
| Doctors & Medicals | Bill Latham | Fee | $500.00 |
|  | Bill Latham | Ringside Meds | $100.00 |
|  | Gerard Verlotta | Fee | $500.00 |
|  | Gerard Verlotta | Ringside Meds | $125.00 |
|  | Robert Hirsch | Ambulence | $350.00 |
|  | Henry Foster | William Meds | $175.00 |
|  | John Taylor | Meds | $337.00 |
|  | Steve Gelfard | Fee | $500.00 |
|  | Steve Gelfard | Ringside Meds | $75.00 |
| Judges/Refs/ Officials/Staffing | WBC | Officials Fee | $12,750.00 |
|  | Jim Smith | Referee | $800.00 |
|  | Mike Ortega | Referee | $800.00 |
|  | Luis Rivera | Judge | $500.00 |
|  | Tony Paolillo | Judge | $500.00 |
|  | Steve Weisfeld | Judge | $500.00 |
|  | Don Ackerman | Judge | $500.00 |
|  | Cathy Paolillo | Timekeeper | $250.00 |
|  | Marc Neels | Supervisor | $250.00 |
|  | Buffer Enterprises | Ring Announcer | $5,829.50 |
|  | LF Van Putten | Supervisor | $500.00 |
|  | New York Starte | Temp Work Permits | $40.00 |
|  | Ron Squire |  | $150.00 |
|  | Aaron Silver |  | $175.00 |

TOTAL EXPENSES:    $1,510,667.68

Case 3:08-cv-01777-JSW    Document 70-3    Filed 08/28/2008    Page 77 of 117

020126    Shane Mosley vs. Vernon Forrest    Madison Square Garden

| | |
|---|---|
| TOTAL PROFIT: | $3,407,855.37 |
| 20%CKP: | $681,571.07 |
| 80%MOSLEY | $2,726,284.30 |
| Less Tickets: | ($5,925.00) |
| Less Sanctioning Fee: | ($60,000.00) |
| Less Purse paid: | ($1,244,000.00) |
| Less Management fee paid: | ($756,000.00) |
| TOTAL MOSLEY SHARE: | $660,359.30 |

982.2(b)(1)

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Marc T. Little<br>445 S. Figueroa St., Ste. 2600<br>Los Angeles, CA 90071 | **FILED**<br>LOS ANGELES SUPERIOR COURT<br><br>FEB 1 4 2003<br><br>JOHN A. CLARKE, CLERK<br>BY STEPHANIE SIANEZ, DEPUTY |

TELEPHONE NO.: 213-612-7754    FAX NO.: 213-612-7797
ATTORNEY FOR (Name): Plaintiff, Shane D. Mosley, Sr.

INSERT NAME OF COURT, JUDICIAL DISTRICT, AND BRANCH COURT, IF ANY:
LOS ANGELES SUPERIOR COURT
CENTRAL DISTRICT

CASE NAME: MOSLEY vs. CEDRIC KUSHNER PROMOTIONS

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☐ Limited  ☑ Unlimited | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 1811) | ASSIGNED JUDGE: **BC 290412** |

*Please complete all five (5) items below.*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (e.g., discrimination, false arrest) (08)
- ☐ Defamation (e.g., slander, libel) (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (e.g., legal malpractice) (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☑ Breach of contract/warranty (06)
- ☐ Collections (e.g., money owed, open book accounts) (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (e.g., quiet title) (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)

- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Claims involving mass tort (40)
- ☐ Securities litigation (28)
- ☐ Toxic tort/Environmental (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (e.g., sister state, foreign, out-of-county abstracts) (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition (not specified above) (43)

2. This case ☐ is ☑ is not complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence   f. ☐ Substantial post-disposition judicial disposition

3. Type of remedies sought (check all that apply):
   a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive

4. Number of causes of action (specify): one

5. This case ☐ is ☑ is not a class action suit.

Date: February 14, 2003

Marc T. Little
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 982.2.)
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 982.2, 1800–1812;
Standards of Judicial Administration, § 19

www.accesslaw.com

| SHORT TITLE: Mosley v Cedric Kushner Prom. | CASE NUMBER BC290412 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required in all new civil case filings in the Los Angeles Superior Court**

I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☒ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL _2_ ☐ HOURS/ ☒ DAYS.

II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to No. III, Pg. 4):

**1** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **1**, the Civil Case Cover Sheet case type you selected.

**2** Check **one** Superior Court type of action in Column **2** below which best describes the nature of this case.

**3** In Column **3**, circle the reason for the court location choice that applies to the type of action you have checked.

| Applicable Reasons for Choosing Courthouse Location (See Column 3 below) |
|---|

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Inj/Prop.Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**4** Fill in the information requested on page 4 in item III; complete item IV. Sign the certificate.

| | -1-<br>Civil Case Cover Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Dam./Wrongful Death<br>Is this an uninsured motorist case? ☐ Yes ☐ No | 1., 2., 4. |
| **Other PI/PD/WD Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestosis - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other PI/PD/WD (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7271  Negligent Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Dam./Wrongful Death | 1., 2., 4. |
| **Non-PI/PD/WD Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | ☐ A6016  Intellectual Property | 2., 3. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**   LASC Rule 2.0

CIV 109  04-02   *Martin Dean's Essential Forms™*   Page 1 of 4

| SHORT TITLE: Mosley v Cedra Kushner Prom. | CASE NUMBER |
|---|---|

| | -1-<br>Civil Case Cover Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-PI/PD/WD Tort** | Prof. Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| **Employment** | Wrongful Termination<br>(35) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment<br>(15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/<br>Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not UD or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff(no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☑ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5. |
| | Collections<br>(09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage<br>(18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract<br>(37) | ☐ A6009  Contractural Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Emnt Dom/Inv. Cond.<br>(14) | ☐ A7300  Eminent Domain/Condemnation Number of parcels_____ | 2. |
| | Wrongful Eviction<br>(33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property<br>(26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property(not em. domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-<br>Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-<br>Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-<br>Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration<br>Award (11) | ☐ A6115  Petition to Compel/Confirm Arbitration | 2., 5. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**    LASC Rule 2.0

| SHORT TITLE: Mosley v Cedric Kushner Prom | CASE NUMBER |
|---|---|

| | -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Oth. Jud. Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litig.** | Antitrust/Trade Reg.<br>(03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect<br>(10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litig. (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Tox. Tort/Envronm<br>(30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Ins Covrage Clms<br>from Complex Case<br>(41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Misc. Civ. Cmplts** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Misc. Civil Petitions** | Partnership/Corp.<br>Governance(21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9 |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**    LASC Rule 2.0

CIV 109  04-02   *Martin Dean's Essential Forms™*                                    Page 3 of 4

| SHORT TITLE: Mosley v Cedric Kushner Prom. | CASE NUMBER |
|---|---|

-4-

III. Statement of Location: Enter the address of the accident, party residence or place of business, performance, or other circumstance indicated in No. II., item **3** on Page 1 as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER ITEM -3- WHICH APPLIES IN THIS CASE | ADDRESS: |
|---|---|
| ☐1.☒2.☐3.☐4.☐5.☐6.☐7.☐8.☐9.☐10. | 445 S. Figueroa St, Ste 2600 |
| CITY: LA | STATE: CA | ZIP CODE: 90071 |

IV. Certificate/Declaration of Assignment: The undersigned hereby certifies and declares that the above entitled matter is properly filed for assignment to the ___Los Angeles___ courthouse in the ___Central___ District of the Los Angeles Superior Court under Section 392 et seq., Code of Civil Procedure and Rule 2(b), (c) and (d) of this court for the reason checked above. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on ___2/14/03___ at ___Los Angeles___ California.
(date)    (city)

_(signature)_
(SIGNATURE OF ATTORNEY/FILING PARTY)

## New Civil Case Filing Instructions

This addendum form is required so that the court can assign your case to the correct courthouse location in the proper district for filing and hearing. It satisfies the requirement for a certificate as to reasons for authorizing filing in the courthouse location, as set forth in Los Angeles Superior Court Local Rule 2.0. It must be completed and submitted to the court along with the Civil Case Cover Sheet and the original Complaint or Petition in **ALL** civil cases filed in any district (including the Central District) of the Los Angeles County Superior Court. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

---

### PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

---

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk (Summons forms available at the Forms Counter.).

3. Civil Case Cover Sheet form required by California Rule of Court 982.2(b)(1), completely filled out (Cover Sheet forms available at the Forms Counter).

4. This "Addendum to Civil Case Cover Sheet form [Superior Court Form Number 982.2(b)(1)A, revised 7/99], completely filled out (Item II. does not apply in limited civil cases) and submitted with the Civil Case Cover Sheet.*

5. Payment in full of the filing fee (unless filing on behalf of state or local government or no fee is due for the type of case being filed) or an Order of the Court waiving payment of filing fees in forma pauperis (fee waiver application forms available at the Filing Window).

6. In case of a plaintiff or petitioner who is a minor under 18 years of age, an Order of the Court appointing an adult as a guardian ad litem to act on behalf of the minor (Guardian ad Litem Application and Order forms available at the Forms Counter).

7. Additional copies of documents presented for endorsement by the Clerk and return to you.

* With the exception of unlimited civil cases concerning property damage, bodily injury or wrongful death occurring in this County, Labor Commissioner Appeals, and those types of actions required to be filed in the Central District by Local Court Rule 2(b), all unlimited jurisdiction civil actions may be optionally filed either in the Central District or in whichever other court location the rule would allow them to be filed. When a party elects to file an unlimited jurisdiction civil action in Central District that would also be eligible for filing in one or more of the other court locations, this form must still be submitted with location and assignment information completed.

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**    LASC Rule 2.0
CIV 109  04-02   *Martin Deen's Essential Forms™*    Page 4 of 4

EXHIBIT G

1  Hartford O. Brown, Esq. , SBN 190507
Michael J. Riley, Esq., SBN 170006
2  KLINEDINST PC
777 S. Figueroa St., 47th Floor
3  Los Angeles, California  90017
(213) 607-2115/FAX (213) 607-2116
4

5  Attorneys for Defendants and Cross-
Complainants
6  SHANE MOSLEY AND JIN MOSLEY

7

**FILED**
LOS ANGELES SUPERIOR COURT

JUL 07 2008

JOHN A. CLARKE, CLERK

BY D. LLOYD, DEPUTY

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF LOS ANGELES

10

11  TERRIER CORP., a Colorado                Case No.  KC050549
Corporation d/b/a PLAYGROUND
12  WAREHOUSE,                               **FIRST AMENDED CROSS-COMPLAINT OF
                                             DEFENDANT/CROSS-COMPLAINANT
13            Plaintiff,                     SHANE MOSELY**

14       v.                                  1.  **Factual Allegations Common to All Causes
                                                 of Action.**
15  SHANE MOSLEY, an individual, JIN         2.  **Breach of Contract**
MOSLEY, an individual; and DOES 1            3.  **Negligence**
16  through 50, inclusive,                   4.  **Fraudulent Misrepresentation**
                                             5.  **Money Had and Received and Unjust
17            Defendants.                         Enrichment**

18
                                             Trial Date     July 7, 2008
19                                           Dept:          R
                                             Judge:         Honorable Robert A. Dukes
20                                           Complaint Filed:

21

22       Cross-Complainants JIN MOSLEY and SHANE MOSLEY, (collectively the "Mosleys")

23  by their attorneys, KLINEDINST PC, as and for their Cross-Complaint against Cross-Defendant

24  TERRIER CORP., a Colorado corporation, d/b/a PLAYGROUND WAREHOUSE ("Terrier"),

25  allege as follows:

26                                **INTRODUCTION**

27       1.       Pursuant to Business and Professions Code Section 7031 (b), Cross-Complainants

28  request leave to file a First Amended Cross-Complaint setting forth a Cause of Action for return

*(left margin vertical text)* KLINEDINST PC  777 S. FIGUEROA ST., 47TH FLOOR  LOS ANGELES, CALIFORNIA 90017

- 1 -
AMENDED CROSS-COMPLAINT OF DEFENDANT/CROSS-COMPLAINANT SHANE MOSELY

1  of all compensation paid to Cross-Defendants, who did not have a valid contractors license.

2      2.      Cross-Complainant JIN MOSLEY along with her husband, Cross-Complainant

3  SHANE MOSLEY, purchased a luxury playground set from Terrier. The Mosleys agreed to

4  purchase the playground set upon receiving Terrier's promises to properly install and deliver it.

5      3.      Terrier represented to the Mosleys that it could install and deliver the playground

6  set in perfect condition and in a timely manner as the playground set was the central focus of an

7  upcoming birthday party that the Mosleys had planned for their son.

8      4.      Upon the installation of the playground set, Terrier caused severe damage to the

9  Mosleys' premises through its gross negligence. Simply put, Terrier damaged the Mosleys'

10  sprinkler system, caused severe water damage to the yard, failed to deliver in a timely manner,

11  and failed to deliver all the materials that the Mosleys had ordered. The damage to the premises

12  would never have happened had Terrier properly performed the installation.

13      5.      To date, the Mosleys have not been compensated for the damages they suffered as

14  a direct result of Terrier's negligence, fraudulent misrepresentations, and breach of contract.

15                              **THE PARTIES**

16      6.      Cross-Complainant JIN MOSLEY along with her husband, Cross-Complainant

17  SHANE MOSLEY, are individuals residing in the City of La Verne, County of Los Angeles,

18  California.

19      7.      On information and belief, Terrier is a Colorado corporation doing business in the

20  County of Los Angeles, California.

21                          **FACTUAL ALLEGATIONS**

22                      **COMMON TO ALL CAUSES OF ACTION**

23      8.      On or about March 27, 2006, the Mosleys sought to purchase a playground set for

24  their children.

25      9.      The Mosleys inquired about and sought information from Terrier regarding

26  various playground sets that it advertised and sold.

27      10.     The Mosleys had certain prerequisites that needed to be met before they were

28  willing to purchase a playground set from Terrier.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 2 -

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1       11.    Prior to purchase, the Mosleys required confirmation from Terrier that it could

2  guarantee the following:

3                i.    The playground set would be delivered and installed prior to

4                      Saturday, May 27, 2006, as the Mosleys had planned a birthday

5                      party for their son in their backyard on that day;

6                ii.    Terrier would properly level the ground surrounding the

7                      playground set, as the landscape in the Mosleys'= backyard

8                      necessitated same;

9              iii.    The installation would be done at a specific location and placed

10                     at a specific angle in the Mosleys' backyard, so as to conform

11                     with the Mosleys' homeowners association guidelines;

12              iv.    The installation of the playground set would not interfere with the

13                     Mosleys' backyard, apart from the space needed to place the

14                     playground set, as they had invested significant time and money

15                     on the areas of the backyard not implicated in the installation of

16                     the playground set;

17               v.    The installation of the playground set would not interfere with the

18                     Mosleys'= sprinkler system; and

19              vi.    To the extent necessary, Terrier would remove bushes, plants,

20                     trees, and flowers which impeded the installation of the

21                     playground set and replant same in an aesthetically pleasing

22                     manner.

23       12.    The Mosleys would not have purchased the playground set, but for Terrier's

24  promise to guarantee performance on all items referenced in Paragraph 10 herein.

25       13.    Accordingly, the Mosleys specifically requested assurances from Terrier that the

26  guarantees referenced in Paragraph 10 herein would be performed by Terrier.

27       14.    Terrier assured the Mosleys that it would:

28  Deliver and install the playground set significantly prior to Saturday, May 27, 2006;

- 3 -

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

2.   Level the ground surrounding the playground set to the extent necessary in order to install the playground set and have it function in a safe manner;

3.   Install the playground set pursuant to the Mosleys' direction, and install the playground set in a location in conformance with the Mosleys' homeowners association guidelines;

4.   Install the playground set without interfering with the Mosleys' backyard, apart from the space needed to place the playground set;

5.   Install the playground set without damaging the Mosleys' sprinkler system; and

6.   Remove bushes, plants, trees, and flowers to install the playground set, and replant same in an aesthetically pleasing manner.

15.   The Mosleys reasonably relied upon Terrier's promises, guarantees, and assurances.

16.   In reliance upon Terrier's promises, guarantees, and assurances, the Mosleys entered into an agreement with Terrier to purchase the playground set and additional rubber mulch.  The Mosleys and Terrier also agreed that Terrier would deliver and install same.

17.   However, at the time that Terrier made the promises, guarantees, and assurances as set forth in Paragraph 13 above, Terrier knew that it could not live up to those promises, guarantees, and assurances.  In short, Terrier made material, false representations to the Mosleys in order to induce them to agree to purchase the playground set.

18.   Additionally, the Mosleys have learned that additional statements made by Terrier in a further effort to induce the Mosleys into purchasing the playground set were false, and, upon information and belief, were made with the specific intention of misleading the Mosleys.  In particular, Terrier falsely represented to the Mosleys that John Travolta and other celebrities had recently purchased the same playground set.

19.   The Mosleys reasonably relied upon these representations in agreeing to purchase the playground set from Terrier.

20.   Although the Mosleys had requested immediate delivery, Terrier did not begin to

- 4 -

FIRST AMENDED CROSS-COMPLAINT OF DEFENDANT/CROSS-COMPLAINANT SHANE MOSELY

1    deliver the playground until Monday, May 22, 2006, after the Mosleys placed numerous

2    telephone calls to Terrier demanding reassurances that the installation would be completed prior

3    to May 27, 2006.

4         21.    Upon delivery, Terrier began to install the playground in a manner that was

5    directly contrary to the Mosleys' instructions, as Terrier placed it in an area of the backyard that

6    was not in conformance with the Mosleys' homeowners association guidelines.

7         22.    Furthermore, Terrier began installing the playground set at an incorrect angle,

8    which also failed to comply with the Mosleys' home owners association guidelines and the

9    parties' prior agreement.

10         23.    The Mosleys demanded that Terrier either remove the playground set completely

11    and accept its return, or re-install the playground set at the previously agreed upon location and

12    angle.

13         24.    Terrier agreed to re-install the playground set at the agreed upon location and

14    angle.

15         25.    However, Terrier failed to properly level the grounds surrounding the playground

16    set, despite its prior promise, guarantee, and assurances that it would do so.

17         26.    The Mosleys complained to Terrier that the playground was not level.

18         27.    Although Terrier had promised, guaranteed, and assured the Mosleys that it would

19    be able to install the playground set on a hill and level the landscape on the hill to the extent

20    necessary for a safe installation, Terrier's employees only brought shovels to perform this work,

21    which were insufficient to safely install the playground on a hill as it had agreed to do.

22         28.    Because it was unable to do so, Terrier asked the Mosleys to obtain a plow truck

23    to excavate the hill, and advised the Mosleys that they would supervise the excavation.

24         29.    Accordingly, the Mosleys obtained a plow truck to perform the excavation work

25    under the direct supervision of Terrier.

26         30.    Terrier agreed to pay for this additional excavation work.

27         31.    In the course of the installation, Terrier negligently broke one of the Mosleys'

28    sprinkler heads in their backyard.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 5 -

32.    The broken sprinkler head caused severe flooding in the yard which was foreseeable.

33.    In the course of the installation, Terrier also negligently installed the playground set on top of another sprinkler head.

34.    The negligent installation caused severe water damage to the Mosleys' yard and a massive amount of flooding underneath the playground set.

35.    As a direct result of Terrier's gross negligence and other breaches, the Mosleys were required to hire an individual to dig under the playground set and retrieve the sprinkler, as the playground set and the yard were flooding.

36.    The water damage caused by Terrier's gross negligence and other breaches forced the Mosleys to cancel the birthday party planned for their son.

37.    When Terrier made the representations referenced in Paragraphs 13 and 17 above, it knew them to be false and made those representations with the intent to deceive and defraud the Mosleys, and to induce the Mosleys to act in reliance upon those representations in the manner alleged herein, or with the expectation that the Mosleys would so act.

38.    At the time these representations were made by Terrier and at the time the Mosleys took the actions herein alleged, the Mosleys were justifiably ignorant of the falsity of Terrier's representations and believed them to be true.  In reliance upon these representations, the Mosleys were induced to enter into the false and unconscionable agreement, and order the playground set along with the rubber mulch.  Had the Mosleys known these representations to be false, they would not have taken such action.  The Mosleys' reliance upon Terrier's representations was justified.

39.    As a proximate result of Terrier's fraudulent conduct, the Mosleys were required to pay at least $10,000 for repairs.

40.    The aforementioned conduct of Terrier amounts to intentional misrepresentations, known by Terrier to be false, and made with the intention of depriving the Mosleys of property, money, and legal rights, or otherwise causing injury to the Mosleys, and was despicable conduct that subjected the Mosleys to a cruel and unjust hardship in conscious disregard of the Mosleys'

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

FIRST AMENDED CROSS-COMPLAINT OF DEFENDANT/CROSS-COMPLAINANT SHANE MOSELY

1    rights, so as to justify an award of exemplary and punitive damages.

2        41.      In addition to the playground set, the Mosleys purchased, inter alia, seven (7) bags

3    of rubber mulch to cover the area around and under the playground set.

4        42.      Terrier only delivered three (3) bags of rubber mulch, and so the Mosleys are still

5    owed four (4) bags of rubber mulch pursuant to their agreement with Terrier.

6 **FIRST CAUSE OF ACTION**

7 **BREACH OF CONTRACT**

8        43.      The Mosleys repeat and reallege the allegations contained in all preceding

9    Paragraphs as if fully and completely set forth herein.

10        44.      The Mosleys entered into a contract with Terrier on or about March 27, 2006.

11        45.      The essential terms of the agreement called for Terrier to provide, inter alia, a

12    playground set with wood roofs, seven (7) bags of rubber mulch, and to deliver and install the

13    playground set prior to May 27, 2006 in the manner agreed upon between the Mosleys and

14    Terrier.

15        46.      Terrier breached the agreement by, inter alia, failing to satisfactorily install the

16    playground set in the manner agreed upon between the Mosleys and Terrier, and by not

17    providing the requisite amount of mulch.

18        47.      The Mosleys performed all obligations to Terrier except those obligations that the

19    Mosleys were excused from performing.

20        48.      The Mosleys suffered damages caused by Terrier's breach of the agreement.

21        49.      Based upon the foregoing breach of contract, Terrier is liable to the Mosleys in an

22    amount to be determined at trial, but in no event less than $10,000.

23        50.      The Mosleys are entitled to attorneys fees incurred in enforcing the foregoing

24    agreement. The Mosleys have retained KLINEDINST PC, to represent their interests.

25 **SECOND CAUSE OF ACTION**

26 **NEGLIGENCE**

27        51.      The Mosleys repeat and reallege the allegations contained in all preceding

28    Paragraphs as if fully and completely set forth herein.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 7 -

52.   Terrier owed a duty to the Mosleys to exercise ordinary or reasonable care in the delivery and installation of the playground set.

53.   Terrier failed to exercise ordinary or reasonable care in the installation of the playground set.

54.   Terrier's failure to exercise ordinary or reasonable care in the installation of the playground set was the proximate cause of, inter alia, water damage and flooding to the Mosleys' yard.

55.   Based upon the foregoing negligence, Terrier is liable to the Mosleys in an amount to be determined at trial, but in no event less than $10,000.

### THIRD CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION

56.   The Mosleys repeat and reallege the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

57.   Based upon the foregoing fraud, Terrier is liable to the Mosleys in an amount to be determined at trial, but in no event less than $10,000.

58.   The Mosleys are also entitled to punitive damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### MONEY HAD AND RECEIVED AND UNJUST ENRICHMENT

59.   Cross-Complainants incorporate the allegations of all the foregoing paragraphs by reference, as if fully set forth herein.

60.   Cross-Defendant, by the actions alleged above, have collected Twenty Thousand Dollars ($20,000.00) from Cross-Complainants for installation of a structure, for which they were required to have a Contractor's License.

61.   Cross-Defendants did not, and do not, have a valid contractor's license or specialty contractor's license, which is required by Business and Professions Code Section 7026.

62.   As a result of Cross-Defendants violations of the Business and Professions Code, it has unjustly enriched itself at the expense of Cross-Complainants.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 8 -

63.     Cross-Defendant's retention of money gained through their unlawful practice is unjust.  In addition, Business and Professions Code Section 7031 (b) authorizes an action against an unlicensed contractor to "recover all compensation paid to the unlicensed contractor for performance of any act or contract."

64.     Cross-Complainants are therefore entitled by statute to the return of the deposit paid to Cross-Defendant.

65.     To prevent unjust enrichment, defendants should be required to identify, account for, fully refund, and provide restitution of its ill-gotten gains including interest collected to Cross-Complainants.  Cross-Defendant should be ordered to refund all sums paid by Cross-Complainants to them, together with interest thereon.

WHEREFORE, the Mosleys demand judgment against Terrier as follows on all Causes of Action:

1.     Compensatory damages according to proof at trial, but in no event less than $10,000;

2.     Punitive damages on the Mosleys'= cause of action for fraud;

3.     Attorneys fees;

4.     Return of the deposit and interest thereon, pursuant to Business and Professions Code Section 7031 (b);

5.     Costs of suit; and

6.     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

KLINEDINST PC

DATED: July 3, 2008                          By: _____
                                             HARTFORD O. BROWN
                                             MICHAEL J. RILEY
                                             Attorneys for Defendants/Cross-Complainants
                                             SHANE MOSLEY and JIN MOSLEY

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

FIRST AMENDED CROSS-COMPLAINT OF DEFENDANT/CROSS-COMPLAINANT SHANE MOSELY

EXHIBIT H

1 | JOHN M. HARMATA SBN 131668
HARMATA & ASSOCIATES, APLC
2 | 550 West "C" Street, Suite 1960
San Diego, CA 92101
3 | Tel:    (619) 233-4711
Fax:    (619) 231-1389

# FILED

LOS ANGELES SUPERIOR COURT

MAY 0 4 2007

JOHN A. CLARKE, CLERK

BY E. LEON, DEPUTY

5 | Attorney for Plaintiff.

## SUMMONS ISSUED & FILED

### SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

#### EAST DISTRICT

TERRIER CORP., a Colorado corporation dba
PLAYGROUND WAREHOUSE,

    Plaintiff,

v.

SHANE MOSLEY, an individual; JIN MOSLEY, an
individual; and DOES 1 through 50, inclusive,

    Defendants.

CASE NO: **KC050549 R**

**COMPLAINT FOR BREACH OF
CONTRACT**

**[Amount    Demanded    Exceeds
$10,000.00]**

**CASE ASSIGNED FOR
ALL PURPOSES TO
JUDGE ROBERT A. DUKES
DEPT. R**

## I.
## INTRODUCTORY ALLEGATIONS

### Jurisdiction and Venue

1.    This is a complaint for money damages over $10,000 exclusive of costs and interest. This court has jurisdiction over this action and venue is proper because Defendants, and each of them, reside in the City of La Verne, County of Los Angeles, California.

2.    Plaintiff is a Colorado corporation doing business in the County of Los Angeles, California.

3.    Plaintiff alleges that Defendants SHANE MOSLEY and JIN MOSLEY are individuals who reside in the City of La Verne, County of Los Angeles, California.

1

HARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

Printed on Recycled Paper

1  /////

2  /////

3      4.    Plaintiff is unaware of the true names and capacities of the defendants named herein

4  as DOES 1 through 50 inclusive, and therefore sues them pursuant to California Code of Civil

5  Procedure Section 474 and alleges on information and belief that each such fictitiously named

6  defendant was legally responsible for Plaintiff's damages as alleged in this complaint.

7      5.    Plaintiff alleges on information and belief that each of the defendants, including

8  DOES 1 through 50 inclusive, at all pertinent times:

9          a. Was the employee or agent of each defendant;

10          b. Acted within the scope of such employment or agency with the complete

11          knowledge, consent and authority of the defendants; and

12          c. Was responsible in some way for Plaintiff's damages.

13      6.    Plaintiff alleges on information and belief that each of defendants DOES 1 through

14  50 inclusive at all pertinent times was the partner, joint-venturer, principal or owner of the named

15  defendants.

## II.
## FIRST CAUSE OF ACTION

### (BREACH OF WRITTEN CONTRACT against all Defendants)

16

17

18

19      7.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though

20  fully set forth herein.

21      8.    On or about May 15, 2006, Defendants, and each of them, and Plaintiff reached a

22  written agreement, whereby Defendants, and each of them, agreed to purchase a playground set, and

23  the delivery and installation thereof, from Plaintiff. Plaintiff delivered and installed said playground

24  set. Despite Plaintiff's demands, Defendants, and each of them, refused and failed to  tender the

25  agreed purchase price to Plaintiff for the playground set, and delivery and installation thereof,

26  thereby breaching the agreement.

27      9.    Plaintiff performed all things required of it by the contract except where performance

28

HARMATA & ASSOCIATES
850 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4731

Printed on Recycled Paper

2

1  /////

2  /////

3  was prevented or excused.

4      10.    As a legal result of this breach, Plaintiff has been damaged in an amount in excess

5  of $45,000.00 according to proof.

6      11.    Pursuant to the terms of said agreement, Plaintiff is entitled to attorney's fees incurred

7  in enforcing the foregoing agreement.  Plaintiff has retained Harmata & Associates, A Professional

8  Law Corporation, to represent its interests.

9

10                                III.
                        SECOND CAUSE OF ACTION

11  (REASONABLE VALUE FOR GOODS OR SERVICES RENDERED against all Defendants)

12

13      12.    Plaintiff realleges and incorporates by reference paragraphs 1 through 6 inclusive

14  as though fully set forth herein.

15      13.    Within four years last past, on or about May 15, 2006, Defendants, and each of

16  them, became indebted to Plaintiff for merchandise, goods and/or services rendered to

17  Defendants, and each of them.  The reasonable value of said goods and/or services is in the sum

18  of $50,000.00 according to proof.

19      WHEREFORE, Plaintiff prays judgment as follows:

20      On the First Cause of Action for Breach of Contract:

21      1.    For damages in excess of $45,000 in a sum according to proof;

22      2.    For attorney fees incurred herein;

23      3.    For costs of suit incurred herein; and

24      4.    For such other and further relief as the court deems proper.

25      On the Second Cause of Action for Reasonable Value of Goods Sold or Services

26  Rendered:

27      1.    For damages in excess of $45,000 in a sum according to proof;

28      2.    For attorney fees incurred herein;

HARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

Printed on Recycled Paper

3

(1)Z:\Client-Matters\LITIGATION\Playground Warehose (v. Mosley)\COMPLAINT.frm                COMPLAINT - TERRIER CORP. v. MOSLEY et al.

1    /////

2    /////

3        3.       For costs of suit incurred herein; and

4        4.       For such other and further relief as the court deems proper.

5

6                           HARMATA & ASSOCIATES, APLC

7

8    Dated:  May 2, 2007       By:

9                          John M. Harmata
                           Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

Printed on Recycled Paper

4

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SHANE MOSLEY, an individual; JIN MOSLEY, an individual; and
DOES 1 through 50, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
TERRIER CORP., a Colorado corporation dba PLAYGROUND
WAREHOUSE

**FILED**
LOS ANGELES SUPERIOR COURT

MAY 0 4 2007

JOHN A. CLARKE, CLERK

BY E. LEON, DEPUTY

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Los Angeles Superior Court, Pomona Courthouse South 400 Civic Center Plaza Pomona, CA 91766 | CASE ASSIGNED FOR ALL PURPOSES CASE NUMBER: *(Número del Caso):* **KC050549 R** JUDGE ROBERT A. DUKES DEPT. R |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
John M. Harmata, Harmata & Associates, APLC        Phone: 619-233-4711
550 West "C" Street, Suite 1960, San Diego, CA 92101

| DATE: *(Fecha):* MAY 0 4 2007 **JOHN A. CLARKE** | Clerk, by *(Secretario)* **E. LEON** | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. [✓] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
John M. Harmata, SBN 131668
Harmata & Associates, APLC
550 West "C" Street, Suite 1960
San Diego, CA 92101
TELEPHONE NO.: 619-233-4711    FAX NO.: 619-231-1389
ATTORNEY FOR (Name): Plaintiff

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 400 Civic Center Plaza
MAILING ADDRESS: 400 Civic Center Plaza
CITY AND ZIP CODE: Pomona, CA 91766
BRANCH NAME: East District, Pomona Courthouse South

CASE NAME:
TERRIER CORP. v. SHANE MOSLEY, et al.

**FOR COURT USE ONLY**

# FILED
LOS ANGELES SUPERIOR COURT

MAY 0 4 2007

JOHN A. CLARKE, CLERK

BY E. LEON, DEPUTY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder | KC050549 |

Filed with first appearance by defendant
(Cal. Rules of Court, rule 3.402)

JUDGE:
DEPT:

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☑ Breach of contract/warranty (06)
☐ Collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is   ☑ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
   a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☐ punitive

4. Number of causes of action (specify): 2

5. This case ☐ is   ☑ is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: May 2, 2007
John M. Harmata
(TYPE OR PRINT NAME)          ► (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2007]

**CIVIL CASE COVER SHEET**

American LegalNet, Inc.
www.FormsWorkflow.com

Cal. Rules of Court, rules 3.220, 3.400–3.403;
Standards of Judicial Administration, § 19
www.courtinfo.ca.gov

| SHORT TITLE: | CASE NUMBER |
|---|---|
| TERRIER CORP. dba PLAYGROUND WAREHOUSE v. MOSLEY et al. | KC050549 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES    CLASS ACTION? ☐ YES    LIMITED CASE? ☐ YES    TIME ESTIMATED FOR TRIAL 03    ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|
| 1. Class Actions must be filed in the County Courthouse, Central District. |
| 2. May be filed in Central (Other county, or no Bodily Injury/Property Damage). |
| 3. Location where cause of action arose. |
| 4. Location where bodily injury, death or damage occurred. |
| 5. Location where performance required or defendant resides. |
| 6. Location of property or permanently garaged vehicle. |
| 7. Location where petitioner resides. |
| 8. Location wherein defendant/respondent functions wholly. |
| 9. Location where one or more of the parties reside. |
| 10. Location of Labor Commissioner Office. |

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos  (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4.<br>1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 3.<br>1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort  (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

LACIV 109  (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4

| SHORT TITLE: | | CASE NUMBER |
|---|---|---|
| TERRIER CORP. dba PLAYGROUND WAREHOUSE v. MOSLEY et al. | | |

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction)<br>☑ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation     Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 2 of 4

| SHORT TITLE:<br>TERRIER CORP. dba PLAYGROUND WAREHOUSE v. MOSLEY et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br><br>(02) | ☐ A6151   Writ - Administrative Mandamus<br>☐ A6152   Writ - Mandamus on Limited Court Case Matter<br>☐ A6153   Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review<br>(39) | ☐ A6150   Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003   Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007   Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006   Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035   Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental  (30) | ☐ A6036   Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014   Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br><br>(20) | ☐ A6141   Sister State Judgment<br>☐ A6160   Abstract of Judgment<br>☐ A6107   Confession of Judgment (non-domestic relations)<br>☐ A6140   Administrative Agency Award (not unpaid taxes)<br>☐ A6114   Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112   Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033   Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ A6030   Declaratory Relief Only<br>☐ A6040   Injunctive Relief Only (not domestic/harassment)<br>☐ A6011   Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000   Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance(21) | ☐ A6113   Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ A6121   Civil Harassment<br>☐ A6123   Workplace Harassment<br>☐ A6124   Elder/Dependent Adult Abuse Case<br>☐ A6190   Election Contest<br>☐ A6110   Petition for Change of Name<br>☐ A6170   Petition for Relief from Late Claim Law<br>☐ A6100   Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE:<br>TERRIER CORP. dba PLAYGROUND WAREHOUSE v. MOSELY et al. | CASE NUMBER |
| --- | --- |

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C<br>WHICH APPLIES IN THIS CASE<br><br>☐1. ☐2. ☐3. ☐4. ☑5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>5212 Clayton Court |
| --- | --- |
| CITY:<br>La Verne | STATE:<br>CA | ZIP CODE:<br>91750 | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the __Pomona South__ courthouse in the __East__ District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: __May 2, 2007__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

| PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE: |
| --- |

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev. 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# EXHIBIT I

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| ATE: 07/07/08 | | DEPT. EA R |
|---|---|---|
| ONORABLE ROBERT A. DUKES | JUDGE | D. LLOYD — DEPUTY CLERK |
| ONORABLE | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| 0 | | |
| M. GARZA | Deputy Sheriff | D. PINEDA — Reporter |

| 9:00 am | KC050549 | Plaintiff Counsel | JOHN M. HARMATA (X) |
|---|---|---|---|
| | TERRIER CORP. VS SHANE MOSLEY (X) JIN MOSLEY (X) | Defendant Counsel | MICHAEL J. RILEY (X) |
| | 5-4-07 AO | | |

**NATURE OF PROCEEDINGS:**

COURT TRIAL

Cause is called for trial.

Defendant/Cross-Complainant's motion for leave to
file First Amended Cross-Complaint, filed this date,
is argued and granted.  First Amended Cross-Complaint,
adding Cause of Action for unjust enrichment (attached
to the moving papers as Exhibit A), is filed this
date.  Denial is deemed entered on behalf of
Plaintiff/Cross-Defendant.

The Court has read and considered the Trial Briefs
submitted by both sides.

Opening Statement is made by Plaintiff/Cross-
Defendant.

Defendant/Cross-Complainant's motion for non-suit
is argued and denied without prejudice.

Opening statement is made by Defendant/Cross-
Complainant.

Samuel D. Morrison is sworn and testifies for the
Plaintiff/Cross-Defendant.

The following Plaintiff/Cross-Defendant's Exhibits
are marked for identification only:

Page   1 of  4   DEPT. EA R

MINUTES ENTERED
07/07/08
COUNTY CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| ATE: 07/07/08 | | DEPT. EA R |
|---|---|---|
| ONORABLE ROBERT A. DUKES | JUDGE | D. LLOYD  DEPUTY CLERK |
| ONORABLE .0 | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| M. GARZA | Deputy Sheriff | D. PINEDA    Reporter |

| 9:00 am | KC050549 | Plaintiff Counsel | JOHN M. HARMATA (X) |
|---|---|---|---|
| | TERRIER CORP. VS SHANE MOSLEY (X) JIN MOSLEY (X) | Defendant Counsel | MICHAEL J. RILEY (X) |
| | 5-4-07 AO | | |

**NATURE OF PROCEEDINGS:**

1. Terrier Corp. Warehouse invoice No. 00090301.
2. Terrier Corp. Warehouse invoice No. 00090530.
3. Customer Order Form bearing sales date 5-15-06.
4A. Customer Quote Forms bearing sales date 5-9-06.
4B. Customer Quote Forms bearing sales date 5-15-06.

Jin Mosley is sworn and examined by Plaintiff/Cross-
Defendant pursuant to Section 776 Evidence Code.

The following Defendant/Cross-Complainant's Exhibits
are marked for identification only:
102. Invoice of Jack Ramirez and Son.
103. Invoices of Marsan Turf & Irrigation Supply Inc.
104. Receipts from Home Depot.
105. Invoices from Foothill Building Materials Inc.
106. Invoices from John Deere Landscapes.

Shane Mosley is sworn and examined by Plaintiff/Cross-
Defendant pursuant to Section 776 Evidence Code.

Lisa Alexander is sworn and testifies for the
Plaintiff-Cross-Defendant.

Plaintiff/Cross-Defendant's Exhibits 1, 2, 3, 4A, and
4B, previously marked for identification only, are
admitted in evidence.

Plaintiff/Cross-Defendant rests.

Page    2 of    4    DEPT. EA R

MINUTES ENTERED
07/07/08
COUNTY CLERK

# SUPERIOR COUR . OF CALIFORNIA, COUNTY L. LOS ANGELES

| | | | DEPT. EA R |
|---|---|---|---|
| ATE: 07/07/08 | | | |
| ONORABLE ROBERT A. DUKES | JUDGE | D. LLOYD | DEPUTY CLERK |
| ONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| .0 | | | |
| M. GARZA | Deputy Sheriff | D. PINEDA | Reporter |

| 9:00 am | KC050549 | Plaintiff | |
|---|---|---|---|
| | | Counsel | JOHN M. HARMATA (X) |
| | TERRIER CORP. | | |
| | VS | Defendant | |
| | SHANE MOSLEY (X) | Counsel | MICHAEL J. RILEY (X) |
| | JIN MOSLEY (X) | | |
| | 5-4-07 AO | | |

**NATURE OF PROCEEDINGS:**

Defendant/Cross-Complainant's Exhibits 102, 103, 104, 105, and 106, previously marked for identification only, are admitted in evidence.

The following Defendant/Cross-Complainant's Exhibits are admitted in evidence:
101. Invoice of Jose Salgado.
107. Invoices and Customer Quote Forms from Playground Warehouse.
108. Photographs of playground set.

Both sides rest.

The cause is argued.

The Court finds that Plaintiff/Cross-Defendant falls within the exception of Business & Professions Code 7045 and does not need to be a licensed contractor for purposes of assembling a play structure that is not fixed to the ground.

The Court does not find Plaintiff/Cross-Defendant to be in breach of contract.

The Court does not find that Defendant/Cross-Complainant sustained its burden of proof re damages to ground.  No fraud was committed by Plaintiff/Cross-Defendant.

Page    3 of  4    DEPT. EA R

MINUTES ENTERED
07/07/08
COUNTY CLERK

# EXHIBIT J



**DIRECTV**

| ACCOUNT NUMBER | DATE DUE | AMOUNT DUE |
|---|---|---|
| 21755307 | No Payment Due | No Payment Due |



**Go Green** and save

Enroll in Auto Bill Pay, email updates
and paperless billing.

Get a one-time bill credit on your
DIRECTV bill.

**It's that simple.**

Visit directv.com/gogreen

Goodbye Paper. Hello Green.

## Summary

**Statement Date:** 06/11/08
*Page 1 of 1 for:*
SHANE MOSLEY
**For Service at:**
5212 CLAYTON CT
LA VERNE, CA 91750-5919

Previous Balance
Payments
Current Charges & Fees
Adjustments & Credits
Taxes
Credit Balance

## Activity

| Start | End | Description | Amount |
|---|---|---|---|
| | | Previous Balance | |
| | | Payment | |
| | | **Current Charges for Service Period 06/10/08 - 07/09/08** | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/08 | | | |
| 06/10 | | | |
| | | **Fees** | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| | | **Sales Tax** | |
| | | **CREDIT BALANCE** | |

To contact us call 1-800-531-5000

**No payment is due at this time.**
This statement is for your information only.

Watch your favorite team all season!
Order MLB EXTRA INNINGS® today.
Choose from up to 80 games per week. Just 4
payments of $49.75. Offer ends 7/13/08.
Visit directv.com/mlb.

**Life is Hard, PPV is Easy!**
No driving, no lines, no hassle! Go to
channels 125-199 and order with your
remote, for as low as $3.99/movie.
See what's on at directv.com/movies.

**Getting new neighbors?** Keep your old
friends with the DIRECTV MOVERS
CONNECTION™. Bring the best in TV
entertainment to your new home! Call now
and ask about our special offers for Movers:
877-616-MOVE

---

**DIRECTV**

| | DATE DUE | ACCOUNT NUMBER | AMOUNT DUE | PAYMENT ENCLOSED |
|---|---|---|---|---|
| | No Payment Due | | No Payment Due | |

☐ Note my change of address on reverse side.
**DO NOT WRITE OTHER COMMENTS ON THIS FORM**

To sign up for Auto Pay Service, See Reverse.

Do not send cash. Make check or money order payable to:

#BWNHPWR
#PBAGEECPG2#
AT 01 040676 09580B159 A**3DGT
ATTN: JULIE C LIN

633 W 5TH ST
LOS ANGELES CA 90071-2005

DIRECTV
PO BOX 54000
LOS ANGELES CA 90054-1000

π EXHIBIT __3__
Deponent MOSLEY
Date 7-9-08 Rptr Felten
WWW.DEPOBOOK.COM

SM176

EXHIBIT K

CHASE 

Undeliverable Mail Only - CI
P.O. Box 260161
Baton Rouge LA  70826-0161

SHANE MOSLEY
5212 CLAYTON COURT
LA VERNE CA  91750-5919

Apr. 26 through May 26, 2007
Page 1 of 4

**To Contact Us**

By Phone:           1-800-836-5656
Para Espanol:       1-800-800-5626
Hearing Impaired: 1-800-582-0542
Internet:           WWW.CHASE.COM

BEGINNING IN JUNE OF 2007, ANY CHECKS YOU SEND TO THE ADDRESS
BELOW MAY BE CONVERTED INTO A ONE TIME ELECTRONIC FUNDS TRANSFER
FROM THE ACCOUNT NUMBER ON YOUR CHECK. YOUR BANK ACCOUNT MAY
BE DEBITED AS SOON AS THE SAME DAY WE RECEIVE YOUR PAYMENT. IF
YOU HAVE ANY QUESTIONS, PLEASE CALL 800-836-5656.

## Home Equity Line of Credit Account Summary

NO PAYMENT REQUIRED

| | | | |
|---|---|---|---|
| Payment due date | | Beginning principal balance 04-26-07 | |
| Minimum payment due | | Principal balance as of 05-26-07 | |
| Credit limit | | | |
| Available credit | | Beginning total balance | |
| End of draw (advance) period | | Advances/debits | |
| | | Payments/credits | |
| Year to date interest paid | | Total balance as of 05-26-07 | |

Transactions

| Post Date Description | Payments/ Credits (-) | Advances/ Debits (+) | Principal Balance After Transaction |
|---|---|---|---|
| 04-26-07   Balance Forward | | | |
| 04-26-07 | | | |
| Daily Periodic Rate | | | |
| 05-26-07   FINANCE CHARGE Accrued This Period | | | |
| **Total** | | | |

CHASE PAYMENT ASSURANCE IS AN OPTIONAL PAYMENT PROTECTION
PLAN THAT MAY CANCEL YOUR PAYMENT OF PRINCIPAL AND INTEREST
WHILE REDUCING YOUR LOAN BALANCE IN CASE OF AN ACCIDENTAL
DEATH, DISABILITY, INVOLUNTARY UNEMPLOYMENT OR LEAVE OF ABSENCE.
FOR MORE INFORMATION, CALL 1-800-530-8260.

LOOKING FOR A DREAM HOME? TALK TO CHASE FIRST. WE OFFER A FULL
RANGE OF MORTGAGE PRODUCTS TO MEET YOUR NEEDS. CALL US AT
866-818-7033 OR VISIT WWW.CHASE.COM/PURCHASE SUBJECT TO CREDIT
AND PROPERTY APPROVAL. NOT ALL PRODUCTS AVAILABLE IN ALL STATES.

*continues*

SM31

EXHIBIT L



Your Account Number

SHANE D MOSLEY
5212 CLAYTON CT
LA VERNE CA 91750-5919

More phone numbers
and info on back of bill

24-Hour Service and Info:

(800) 427-2200 (English)
(800) 342-4545 (Español)

A Sempra Energy utility

P.O. Box C
Monterey Park, CA 91756
www.socalgas.com

Date Mailed   Jun 06, 2008

| Rate | Climate Zone | Cycle | The Gas Company's Gas Commodity Charges per therm |
| --- | --- | --- | --- |

| Billing Period | | Meter | Readings | | Difference | Billing | |
| From | To | Number | Prev | Pres | =CCF   × | Factor =  Therms | |

Next Meter Reading Date on or about: Jul 03 2008

**Summary of Charges**                                                 **Amount**

Customer Charge                          Days        ×
Baseline                                 Therms      ×
Over Baseline                            Therms      ×
Gas Charges

State Regulatory Fee                     Therms      ×
Public Purpose Surcharge                 Therms      ×
LOS ANGELES County Users Tax
Taxes & Fees on Gas Charges

**Total Gas Charges Including Taxes and Fees**

Last Payment

Total Current Gas Charges
Previous Balance

Total Amount

***Special Discount*** You may be eligible for the California Alternate Rates for Energy (CARE) program. For more information and to request an application, please call 1-800-772-5050.

***Descuento Especial*** Usted podría ser elegible para el programa de Tarifas Alternativas para Energía en California (CARE). Para más información y para pedir una solicitud, por favor llame al 1-800-772-5050.

| Energy Comparison | This Year Days | Therms | Daily Average | Last Year Days | Therms | Daily Average |
| --- | --- | --- | --- | --- | --- | --- |
| Jun | | | | | | |
| May | | | | | | |
| Apr | | | | | | |

Date Mailed
Jun 06, 2008          Please bring entire bill if payment is made in person or return stub with your payment by mail

Total Amount Due

Please Do Not Pay

Save paper & postage: Pay online at www.socalgas.com

Make Payment To:

The Gas Company
P O Box C
Mont Pk Ca 91756

SHANE D MOSLEY
633 W 5TH ST
STE 2700
LOS ANGELES CA 90071-2061

Your Account Number

SM45

EXHIBIT M

## JUDD BURSTEIN, P.C.
### ATTORNEYS AT LAW

JUDD BURSTEIN
PETER B. SCHALK*

MATTHEW G. DeOREO
ALEXANDER M. LEVY
JEREMY M. ATTIE

*ALSO ADMITTED IN NEW JERSEY

1790 BROADWAY
NEW YORK, NEW YORK 10019
(212) 974-2400
FAX: (212) 974-2944

May 28, 2008

**BY E-MAIL AND FEDEX**

Ivo Labar, Esq.
Kerr & Wagstaffe LLP
100 Spear Street, Suite 1800
San Francisco, California 94105

      Re:    *Mosley v. Conte / Case No.* 08-cv-1777 (JSW)

Dear Ivo:

      Pursuant to Judd Burstein, Esq.'s Declaration, dated May 23, 2008, I am writing to provide you with the enclosed list of all of Plaintiff Shane D. Mosley Sr.'s health care providers for the period from January 1, 2002 to the present[1]. Additionally, the contact information for Mr. Mosley's former trainers is as follows: Jack Mosley, c/o Judd Burstein, P.C., 1790 Broadway, Suite 1501, New York, New York 10019, Tel. 212-974-2400 and Joe Goosen, Tel. 818-730-8885.[2]

      Separately, enclosed please also find Plaintiff's Request for Production of Documents, Set Two.

Very truly yours,

Jeremy M. Attie

Enclosures
cc:   Kim O. Dincel, Esq. (via e-mail)

---

[1]     HIPAA Authorizations for the Health Care Providers will be provided shortly.

[2]     Plaintiff reserves all rights to supplement this list if and when additional information becomes available. Furthermore, by providing this list of Health Care Providers and Trainers, Plaintiff does not waive any privilege, including the attorney-client privilege, the work product doctrine, or any right of privacy, and expressly reserves these privileges, protections and rights. Plaintiff does not in any way waive or intend to waive, but rather is preserving and intends to preserve all objections as to competency, authenticity, relevancy, materiality and admissibility and all rights to object on any grounds to the use in any subsequent proceedings of any of the information contained herein, including, but not limited to, the right to object at the trial of this or any other action.

# MEMORANDUM
## PRIVILEGED AND CONFIDENTIAL

TO:        Ivo Labar, Esq.

FROM:      Jeremy Attie, Esq.

SUBJECT:   *Mosley v. Conte / Case No.* 08-cv-1777 (JSW)

RE:        HEALTH CARE PROVIDERS FOR SHANE D. MOSLEY, SR.
           FOR THE PERIOD FROM JANUARY 1, 2002 TO THE PRESENT

DATE:      May 28, 2008

---

Plaintiff reserves all rights to supplement this list if and when additional information becomes available. Furthermore, by providing this list of Health Care Providers, Plaintiff does not waive any privilege, including the attorney-client privilege, the work product doctrine, or any right of privacy, and expressly reserves these privileges, protections and rights. Plaintiff does not in any way waive or intend to waive, but rather is preserving and intends to preserve all objections as to competency, authenticity, relevancy, materiality and admissibility and all rights to object on any grounds to the use in any subsequent proceedings of any of the information contained herein, including, but not limited to, the right to object at the trial of this or any other action.

**Dr. Robert Olvera**
MD Bristol Park Medical Group
1212 W 17th Street
Santa Ana, CA 92706
Tel. (714) 954-0432

**Dr. Leo Rizzi**
355 E Foothill Blvd
Pomona, CA 91767
Tel. (909) 593-6553

**Dr. Robert D Milne**
Milne Medical Center
2110 Pinto Lane
Las Vegas, NV 89106
Tel. (702) 385-1393

**Dr. Austin Moody**
3121 S Maryland Pkwy Ste 408
Las Vegas, Nevada 89109

Tel. (702) 733-8018

**Dr. James G., Williams**
202 W College
St Covina, CA 91723
Tel. (626) 966 2111

**Dr. John L Oakley**
1433 W Merced Ave #206
West Covina, 91790,
Tel. (949) 588-2190

**Dr. Robert M. Karns**
8920 Wilshire Blvd. #321
Beverly Hills, CA 90211
Tel. 310-652-8084
Fax: 310-652-2269

**Dr. Warren Line, Jr**
Otolaryngologist services

MEMORANDUM
Privileged and Confidential
Ivo Labar, Esq.
May 28, 2008
Page 2


4418 Vineland Ave Ste 202
Tel. (818) 763-7366

**Dr. Steven M. Knapik**
41870 Garstin Drive, BBL
PO Box 1649,
Big Bear Lake, CA 92315
Tel. (909) 866-6501

**Dr. Terry Scott**
1111 South Grand Avenue #E
Diamond Bar, CA 91765
Tel. (909) 860-7712

**Dr. Ray Padilla**
14650 Aviation Blvd. Suite 150
Manhattan Beach, CA 90250
Tel. (310) 536-0710

**Dr. Boxer Wachler**
465 N. Roxbury Dr. Suite 902
Beverly Hills, CA. 90210
Tel. (310) 860-1900

**Dr. Margaret Goodman**
8551 W Lake Mead Blvd Ste 250
Headache Center Of Southern NV
Las Vegas, NV 89128-7649

**Dr. Sara Soulati**
633 Aerick St,
Inglewood, CA 90301-1978
Tel. (310) 412-8181

**Doctor Ghali** - has worked with or consulted
with Dr. Sara Soulati - we have been unable to
locate Dr. Ghali to date and will furnish you
with additional information when it becomes
available.

**Dr. Dan Vasile**
7777 Milliken Avenue
Rancho Cucamonga, CA 91730

**Dr. Dand**
I Care Medical Supply
500 W Big Bear Blvd
Big Bear City, CA
Tel. (909) 584-7660

**Dr. Richard S Gluckman**
1360 W 6th St Ste 350
San Pedro, CA 90732-3535
Tel. (310) 632-6428