JAMES M. WAGSTAFFE (95535)
IVO LABAR (203492)
**KERR & WAGSTAFFE LLP**
100 Spear Street, Suite 1800
San Francisco, CA 94105–1528
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Defendant
VICTOR CONTE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHANE D. MOSLEY, SR.,

Plaintiff,

vs.

VICTOR CONTE,

Defendant.

Case No. C 08-01777 JSW

**DECLARATION OF IVO LABAR IN SUPPORT OF MOTION FOR SANCTIONS UNDER THE COURT'S INHERENT AUTHORITY, OR IN THE ALTERNATIVE, ATTORNEYS' FEES PURSUANT TO C.C.P. § 425.16(c)**

Hearing Date: December 19, 2008
Time: 9:00 a.m.
Courtroom: 2

HON. JEFFREY S. WHITE

I, Ivo Labar, hereby declare:

1. I am an attorney licensed to practice before all courts in the State of California, and am a partner of the law firm of Kerr & Wagstaffe LLP, attorneys of record for Defendant Victor Conte ("Conte") in this action. I have personal knowledge of the facts stated herein, and, if called as a witness, could and would competently testify to them under oath.

2. Attached hereto as **Exhibit A** is a true and correct copy of the complaint filed December 15, 2004 in the matter of *Marion Jones v. Victor Conte*, case No. 3:04-cv-05312-SI.

3. Attached hereto as **Exhibit B** is a true and correct copy of an Associated Press article published October 5, 2007 entitled "Jones pleads guilty, admits lying about steroids."

4. Attached hereto as **Exhibit C** is a true and correct copy of a San Francisco Chronicle article published November 2006 entitled "Track coach Trevor Graham indicted."

5. In order to ascertain the truth about Plaintiff Shane Mosley's claimed citizenship, I took Mosley's deposition on July 9, 2008 in Los Angeles, California and also undertook other informal discovery efforts to acquire information about the same. Attached hereto as **Exhibit D** is a true and correct copy of the deposition transcript of Plaintiff Shane D. Mosley, taken July 9, 2008.

6. Shortly after Mosley's deposition, I presented Plaintiff's counsel with a draft motion to dismiss for lack of subject matter jurisdiction. After Defendant evidenced his intent to file the motion to dismiss for lack of subject matter jurisdiction, Plaintiff voluntarily dismissed his complaint with the SLAPP motion pending. On the same day that Plaintiff dismissed his complaint, he re-filed his case in New York, a state that does not have a comparable anti-SLAPP statute.

7. Attached hereto as **Exhibit E** is a true and correct copy of exhibit 4 (Declaration of Shane D. Mosley, Sr.) from the deposition of Plaintiff Shane D. Mosley, taken July 9, 2008, at which I deposed Mr. Mosley.

8. Attached hereto as **Exhibit F** is a true and correct copy of the complaint in the matter *Mosley v. Cedric Kushner Promotions, Ltd.*, Los Angeles Superior Court Case No. BC290412, filed February 14, 2003.

9. Attached hereto as **Exhibit G** is a true and correct copy of the First Amended Cross-Complaint in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549, filed July 7, 2008 by Shane Mosley.

10. Attached hereto as **Exhibit H** is a true and correct copy of the Complaint in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549, filed May 4, 2008.

11. Attached hereto as **Exhibit I** is a true and correct copy of the Answer to the Complaint in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549, filed July 13, 2007.

11. Attached hereto as **Exhibit J** is a true and correct copy of the Minutes entered for the trial held on July 7, 2008 in the matter *Terrier Corp. v. Mosley*, Los Angeles Superior Court Case No. KC050549.

12. Attached hereto as **Exhibit K** is a true and correct copy of exhibit 3 (document bates labeled SM176) from the deposition of Plaintiff Shane D. Mosley, taken July 9, 2008.

13. Attached hereto as **Exhibit L** is a true and correct copy of a document bates labeled SM31, produced July 1, 2008 in response to Defendant Victor Conte's First Set of Requests for the Production of Documents.

14. Attached hereto as **Exhibit M** is a true and correct copy of a document bates labeled SM45, produced July 1, 2008 in response to Defendant Victor Conte's First Set of Requests for the Production of Documents.

15. Attached hereto as **Exhibit N** is a true and correct copy of a letter from Jeremy Attie to me dated May 28, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 29, 2008 at San Francisco, California.

/s/

Ivo Labar

# EXHIBIT A

04 DEC 15 PM 1:11
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Craig W. Budner (admission *pro hac vice* pending)
Beth W. Bivans (admission *pro hac vice* pending)
Hughes & Luce, LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: (214) 939-5500
Fax: (214) 939-6100

Joseph M. Burton (SB No. 142105)
Gregory G. Iskander (SB No. 200215)
Duane Morris LLP
One Market, Spear Tower, Suite 2000
San Francisco, California 94105-1104
Phone: (415) 371-2200
Fax: (415) 317-2201

Attorneys For Plaintiff
MARION JONES

E-filing

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CW
ARB

| | | |
|---|---|---|
| **MARION JONES,**<br>**Plaintiff,**<br>v.<br>**VICTOR CONTE,**<br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. C 04 5312<br><br>**COMPLAINT FOR DEFAMATION AND TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Marion Jones ("Jones" or "Plaintiff") in support of her Complaint and Demand for Jury Trial against Defendant Victor Conte ("Conte" or "Defendant") alleges:

## SUMMARY OF CLAIMS

1. Marion Jones is an Olympic gold medalist, a world champion track and field star, and one of the best known sports figures of all time. Victor Conte is under federal indictment, and stands accused of drug trafficking, tax evasion and money laundering. Conte has falsely and maliciously accused Jones of taking banned performance enhancing drugs and of being a "drug cheat" during an approximately one-year period beginning six weeks before the 2000 Olympic

Games. Conte's statements, made during an interview on ABC News's 20/20, in an article published in ESPN The Magazine and on ESPN.com, are absolutely false.

2. Jones has never taken banned performance enhancing drugs. Indeed, in the last five years, including during the time period Conte falsely alleges that Jones used banned drugs, Jones was one of the most drug-tested athletes in all of sports. Jones took and passed over 160 separate drug tests, including five different drug tests at the 2000 Olympic Games. In public statements, Jones' doctor, coaches, co-athletes and others have steadfastly confirmed that Jones never used banned performance enhancing substances. Attorneys for Trevor Graham ("Graham"), Jones' coach during the time Conte alleges Jones used drugs, have publicly stated that Graham never gave performance enhancing substances to any of his athletes, including Jones. Jones has passed a lie detector test, administered by a well-known and respected polygrapher who spent his career working with the FBI. Jones has never exhibited the tell-tale physiological signs of drug use, such as weight gain, bulkiness, voice change, and excessive acne. Moreover, the monthly calendars that Conte alleges documented Jones' drug regimen reference men's race times that are not Jones'. Also, interestingly, Jones' actual 100-meter race times slowed during the time Conte falsely alleges she was taking performance enhancing drugs to supposedly make her run faster.

3. Meanwhile, Conte's credibility and motives have long been questioned. Conte's public statements regarding Jones and others are rife with inconsistencies and contradictions. For example, in early 2004, Conte's attorneys issued a public statement emphasizing that Conte never provided drugs to Jones. His sudden "about-face" on the issue, just four months before his criminal trial is anticipated, appears motivated by a desire to curry favor with prosecutors, garner sensationalized media attention, bolster Conte's own financial and other self-interests, and harm an individual against whom Conte has a long-standing grudge. In Conte's own words, this was and continues to be a "turf war," and Conte is trying desperately to win.

4. Conte's vendetta against Jones has its roots in Conte's repeatedly unsuccessful efforts to develop a professional relationship with Jones. Conte wanted Jones to enter into an agreement to endorse his legal dietary supplement known as "ZMA." After repeated urgings from her then-husband CJ Hunter ("Hunter"), Jones reluctantly agreed to meet with Conte for a one-time promotion of ZMA at a Flex Magazine photo shoot. Subsequently, Jones rebuffed Conte's repeated efforts to expand his involvement with Jones. Conte grew increasingly impatient. Through Conte's ubiquitous presence at track and field events and his relationship with Hunter, Conte continued his relentless quest to get to Jones. Conte would repeatedly call their home, roam through athlete hotel lobbies at track meets hoping to see Jones, and scour the elite athletes' warm-up area at competitions in hopes of making contact with Jones. Conte's efforts were unsuccessful.

5. After Jones separated from Hunter in early 2001, Conte unsuccessfully attempted to get to Jones through her coach, Graham. Again snubbed, Conte's frustrations grew. Conte's animosity toward Jones continued to grow after Jones became associated with world class sprinter Tim Montgomery ("Montgomery"). Conte's animus with Montgomery is no secret. Unbeknownst to Jones, Conte's self-professed "turf-war" with Jones reached a pinnacle when in 2003, according to Conte, Jones' then-former coach Graham sent in a syringe containing a banned substance to the U.S. Anti-Doping Agency. The ensuing investigation led to Conte's criminal indictment.

6. Conte's self-admitted "competitive" drive and desire to "make history" apparently still motivates Conte. Driven by his long-standing vendetta with Jones, Conte seems willing to do and say whatever it takes to destroy her career and her reputation. Meanwhile, Conte seeks to take full credit for all of her past successes, falsely asserting that Jones' five Olympic medals in 2000 were the product of his illegal drug regimen instead of Jones' true talent. Conte's statements are false and malicious.

## THE PARTIES

7. Plaintiff Marion Jones is a citizen of the State of North Carolina and resides in the City of Chapel Hill.

8. Defendant Victor Conte is a citizen of the State of California and resides at 345 California Drive, Burlingame, CA 94010.

## JURISDICTION

9. This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.

10. This court has personal jurisdiction over Conte because he resides in this state and because Jones' claims against him are based on statements made, in whole or in part, in the State of California.

## VENUE

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part, if not all, of the events giving rise to Jones' claims occurred in this district. Conte resides in this district and made the statements complained of herein in this district. Conte's criminal indictment is also pending in this district.

## INTRADISTRICT ASSIGNMENT

12. Venue is proper in the San Francisco division of this district because a substantial part, if not all, of the events giving rise to Jones' claims occurred in San Mateo County.

## FACTUAL BACKGROUND

13. Marion Jones is one of the most celebrated and recognizable female sports figures of all time. Jones is an Olympic gold medalist and world champion track and field star. She remains the only woman ever to win five medals in track and field in one Olympic Games.

Jones' accomplishments have landed her on the cover of Time, Sports Illustrated, and Vogue and have made her a well-known figure worldwide.

14. As with many public figures, Jones' notoriety has also made her a target. Like many athletes at the top of their field, Jones lives under the constant scrutiny of those who wish to take credit for her successes, question her accomplishments, and topple her from the heights she has achieved. One such individual is Victor Conte. On December 3, 2004, Conte participated in a grossly sensationalized interview that aired on ABC News' 20/20 (the "Interview"). In the Interview, Conte made numerous false and defamatory statements about Jones, suggesting that she had used banned performance enhancing drugs and had cheated her way to Olympic glory.

15. Conte's false accusations did not stop there. On December 3, 2004, Conte also co-authored an article that appeared in the December 20, 2004 edition of ESPN The Magazine and was posted on the internet at ESPN.com (the "Article"). In the Article, Conte repeated many of the same false accusations about Jones and made other false statements.

16. In the mid-1980s, Conte founded BALCO (the "Bay Area Laboratory Co-Operative"), a drug laboratory and distributor in San Francisco. BALCO and its subsidiary SNAC Systems manufacture and supply legal dietary and nutritional supplements to the general public and to many of the world's premier athletes. To promote BALCO's products, Conte became a constant fixture on the track and field circuit and at other sporting events. Conte regularly could be found in and around track and field meets promoting his supplements, handing out hats and T-shirts, and seeking athlete endorsements. Conte was constantly trying to get closer to world-class athletes to publicize his products.

17. In late 1999, Conte began supplying Hunter – a world-champion shot-putter – with BALCO supplements. At the time, Conte hoped to gain access to Jones and obtain her endorsement of a BALCO product known as "ZMA"—a legal Zinc-Magnesium supplement. Conte tried for years – without success – to develop a professional relationship with Jones.

Jones, however, rebuffed Conte. Jones agreed, after repeated urgings from Hunter, to actually meet with Conte for a one-time promotion of ZMA at a Flex Magazine photo shoot set up by Hunter.

18. At the 2000 Olympic Games, after Hunter was accused of failing a drug test, Conte came to Hunter's defense. Conte unequivocally stated that he had never supplied Hunter with any performance enhancing drug. By early 2001, Hunter and Jones had separated and were in the midst of divorcing. Conte, however, continued his unsuccessful efforts to get closer to Jones. Jones continued to snub Conte. Conte's resentment and sense of rejection apparently grew with each rejection. By mid-2002, Jones was dating Olympic athlete Tim Montgomery, with whom Conte had certain business disputes, and for whom Conte harbors great animosity. Jones' relationship with Montgomery added fuel to the fire, and her continued rejection of Conte led to a vendetta and grudge that apparently still motivate Conte.

19. In September 2003, BACLO's offices were raided by federal law enforcement, in a search for evidence of illegal drug distribution. Conte makes no secret of the fact that he blames Jones' ex-coach Trevor Graham for providing the U.S. Anti-Doping Agency with a syringe containing a banned performance enhancing substance manufactured by BALCO and referred to as "The Clear." As a result of the ensuing investigation, Conte now faces a federal indictment alleging 35 counts against him for distribution of illegal performance enhancing drugs, tax evasion and money laundering activities.

20. Despite his pending federal indictment, Conte was more than willing not only to admit his own crimes on national television and on the internet, but to "finger" others allegedly involved in the drug scandal. Conte's specific allegations in both the Interview and the Article focused primarily on Jones.

21. In the Interview, Conte accused Jones of taking performance enhancing drugs, claiming he had "devised a program" for Jones to take certain drugs. These allegations were false. Specifically, Conte falsely stated:

a. Jones was taking four different performance enhancing drugs, known as The Clear, EPO, growth hormone and insulin;

b. Jones gave herself an injection of growth hormone while Conte was "sitting right next to her";

c. Jones wanted to do "whatever it took" to win Olympic medals, including taking banned performance enhancing drugs;

d. Conte "devised a program" for Jones on a calendar, detailing when to take each of the four performance enhancing drugs;

e. Jones was a "drug cheat";

f. Conte instructed Jones on how to use the needle to inject herself with growth hormone;

g. Jones injected herself in the quadriceps;

h. Conte supplied performance enhancing drugs to Jones for over a year; and

i. Jones "lied" to a federal grand jury when she testified she didn't use performance enhancing drugs.

22. Each of these statements by Conte was utterly false and defamatory. Conte made these statements with actual knowledge of their falsity.

23. Likewise, in the Article, Conte falsely stated the following:

a. "On April 21, 2001, I was sitting in an Embassy Suites hotel room in Covina, Calif., about a foot away from Marion Jones";

b. Conte had "arranged for [Jones] to receive various performance enhancers, including 'The Clear,' a steroid that later became famous as THG";

c. Jones was "on" THG at the 2000 Games in Sydney, when she won three gold medals and two bronzes;

d. Jones went to Conte's hotel room;

e. Conte taught Jones how to use the NovoPen injector;

f. Jones "pulled the spandex of her bicycle shorts above her right thigh. She dialed up a does of four-and-a-half units of growth hormone and injected it into her quadriceps";

g. Conte provided Jones with "insulin, growth hormone, EPO, and 'The Clear'";

h. Conte "had to reprimand" Jones for leaving cartridge injectors in a hotel room in Edmonton in May 2001, and in Eugene, Oregon a few days later;

i. Jones told Conte "she'd put [the injector] in a sneaker and lean the sneaker against the refrigerator so she wouldn't forget it"; and

j. Conte ended his "relationship" with Jones because he couldn't afford to risk her leaving an injector in a hotel room.

24. Each of these statements by Conte was utterly false and defamatory. Conte made these statements with actual knowledge of their falsity.

25. During the Interview and in the Article, Conte falsely gave the impression that he was intimately involved in Jones' training schedule. Conte stated that he had developed a calendar for Jones, which specified the drug regimen she should follow. Despite falsely accusing Jones of being a "drug cheat," Conte claimed his "program" was responsible for Jones' medal-winning performances during the 2000 Olympic games in Sydney. In truth, Conte was never involved in any aspect of Jones' training, never provided any banned performance enhancing substances to Jones, and was never asked by Jones to develop any calendars or programs for her. Until the federal investigation into BALCO began, Jones had never seen the calendars that Conte falsely alleges he developed for her. Indeed, the calendars that Conte alleges to reflect Jones' training regimen contain men's race times that are clearly not Jones'. In no place does Jones' name appear on the calendars.

26. Conte admits in the Article that he was motivated by a desire to "make history." Conte wanted "one of his athletes" to win Olympic gold or become the world's fastest human.

Conte's statements in the Article and the Interview, intentionally give the false impression that Conte is responsible for Jones' record-setting successes, including her five medals at the 2000 Olympic Games. Conte falsely asserts that Jones was "one of his athletes" and that her successes are his own.

27. To lend credibility to his otherwise false statements and to insure it was sensationalized in the media, Conte fabricated the story that he witnessed Jones injecting herself in front of him. Conte's fabricated "eye-witness" testimony formed the basis for a highly sensationalized story that has received significant press attention. Conte's false accusations regarding Jones were made during television's ratings "sweeps" week and were calculated to maximize Conte's own pecuniary and personal self-interests. Conte has clearly used the media attention to shamelessly promote his supplement ZMA, wearing ZMA hats and T-shirts during photo shoots for ESPN's story and during portions of the 20/20 Interview.

28. Conte has never made it a secret that he holds a long-standing grudge against Jones. Jones repeatedly rebuffed Conte's efforts to get Jones to further endorse ZMA and to otherwise associate with Conte. Conte admits in the Article that he was working with Jones' "rivals" and that a "turf war" ensued. Conte's personal ill-will toward Jones has apparently, in part, motivated Conte to make these outrageously false accusations against her.

29. Conte made these false and defamatory statements knowing that the statements could cause Jones significant financial and emotional damage. Indeed, in the world of professional sports, there is perhaps nothing more damaging than the accusation that an athlete has used banned performance enhancing drugs.

30. The false and defamatory statements made regarding Jones have resulted in the loss of significant financial benefits from lucrative competitions, promotional appearances, and sponsorship contract opportunities, which losses are likely to exceed $25 million. More importantly to Jones, Conte's false statements have now resulted in an International Olympic Committee ("IOC") investigation that could impact Jones' ability to participate in future

competitions and, potentially, have negative consequences on her past achievements. For an athlete competing on an international level – and for Jones, in particular – there is no worse consequence.

31. These consequences are the direct product of the false and misleading statements of Conte – an individual who has a long record of inconsistent statements on a range of issues; an individual with a vendetta against Jones. In contrast, Jones is one of America's most decorated female athletes, who has passed every drug test ever given to her, who has taken and passed a lie detector test, and whose denials of Conte's allegations has been backed up by her doctor, coaches and others. Simply put, Conte's statements are false and defamatory.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: DEFAMATION

32. Jones realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

33. On Friday, December 3, 2004, ABC broadcast various statements made by Conte in a segment entitled "Catch Me If You Can" on its weekly television program 20/20 and ESPN posted an article co-authored by Conte on its website. In addition, ESPN The Magazine published Conte's article in its weekly print magazine. Conte made certain statements (the "Statements") about Jones in the Interview and Article. The Statements were broadcast by ABC, printed in the December 20, 2004 edition of ESPN The Magazine, and posted by ESPN.com throughout the United States and the world.

34. The Statements were of and concerning Plaintiff Marion Jones.

35. The Statements included, but were not limited to:

a. Jones was taking four different performance enhancing drugs, known as The Clear, EPO, growth hormone and insulin;

b. Jones gave herself an injection of growth hormone while Conte was "sitting right next to her";

c. Jones wanted to do "whatever it took" to win Olympic medals, including taking illegal performance enhancing drugs;

d. Conte "devised a program" for Jones on a calendar, detailing when to take each of the four performance enhancing drugs;

e. Jones was a "drug cheat";

f. Conte instructed Jones on how to use the needle to inject herself with growth hormone;

g. Jones injected herself in the quadriceps;

h. Conte supplied performance enhancing drugs to Jones for over a year;

i. Jones "lied" to a federal grand jury when she testified she didn't use performance enhancing drugs;

j. "On April 21, 2001, I was sitting in an Embassy Suites hotel room in Covina, Calif., about a foot away from Marion Jones";

k. Conte had "arranged for [Jones] to receive various performance enhancers, including 'The Clear,' a steroid that later became famous as THG";

l. Jones was "on" THG at the 2000 Games in Sydney, when she won three gold medals and two bronzes;

m. Jones went to Conte's hotel room;

n. Conte taught Jones how to use the NovoPen injector;

o. Jones "pulled the spandex of her bicycle shorts above her right thigh. She dialed up a does of four-and-a-half units of growth hormone and injected it into her quadriceps";

p. Conte provided Jones with "insulin, growth hormone, EPO, and 'The Clear'";

q. Conte "had to reprimand" Jones for leaving cartridge injectors in a hotel room in Edmonton in May 2001, and in Eugene, Oregon a few days later;

r. Jones told Conte "she'd put [the injector] in a sneaker and lean the sneaker against the refrigerator so she wouldn't forget it"; and

s. Conte ended his "relationship" with Jones because he couldn't afford to risk her leaving an injector in a hotel room.

36. The Statements were false and defamatory.

37. At the time, Conte made the defamatory Statements detailed above, he knew that they were false or failed to take the proper steps to ascertain their accuracy.

38. In making the Statements, Conte acted knowingly and/or recklessly with respect to the Statements' false and defamatory nature.

39. By reason of Conte's Statements, Jones was greatly injured in her character and reputation; her existing sponsorship contracts were put at risk; she suffered the loss of potential business and competitive sports endorsements and sponsorship opportunities, and she has endured great pain and mental anguish, to her damage in an amount in excess of the minimum jurisdictional limits of this Court and likely in excess of $25 million.

40. Conte defamed Jones with malice, with intent to injure Jones in her character and reputation as one of the greatest female athletes of all time, thereby justifying an award of punitive damages against Conte in an amount appropriate to punish Conte for his wrongful conduct and to deter others from engaging in such conduct.

**SECOND CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS**

41. Jones realleges the allegations in all of the preceding paragraphs, and incorporates those paragraphs herein by reference.

42. Jones has valid sponsorship/endorsement contracts, through which she is a paid endorser of products in various print and television advertisements.

43. Jones also competes as an elite athlete in domestic and international competitions as a member of USA Track and Field ("USATF"), a national governing body of the United

States Olympic Committee ("USOC"). Through this membership, Jones is afforded the opportunity to represent the United States in various competitions, including the World Championships and the Olympic Games.

44. Prior to the world-wide dissemination of Conte's statements, Jones had a very strong likelihood of entering into relationships with additional sponsors and finding other endorsement and competition opportunities, as well as having the option to renew her existing relationships with sponsors and track and field organizations in the future.

45. Defendant Conte intentionally interfered with Jones' existing and prospective relations in committing the independent tort of defamation, by making slanderous and libelous Statements depicting Jones as a drug user, liar and cheat.

46. At the time Defendant made the Statements, he knew the potential impact such Statements would have on Jones' reputation and eligibility as an elite athlete, as well as her ability to maintain and create professional relationships.

47. Conte's tortious conduct has put at risk Jones' existing contractual relationships. Conte's tortious conduct has now resulted in an International Olympic Committee ("IOC") investigation that could impact Jones' ability to participate in future competitions and, potentially, have negative consequences on her past achievements.

48. Conte's tortious conduct has affected future opportunities for Jones, as Defendants' defamatory Statements have so tarnished Jones' character and reputation as to make it improbable that sponsors and other business prospects would enter into relationships with an accused drug user, liar and cheat.

49. As a result of Conte's tortious interference with existing and prospective business relations, Jones has suffered actual damages in excess of the jurisdictional limits of this Court, and likely in excess of $25 million, including potential loss of benefits from existing and new sponsors, the potential loss of eligibility to compete, and the potential loss of her five Olympic medals.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Marion Jones requests that this Court grant her judgment against the Defendant and award to Jones:

a. all applicable and appropriate actual, consequential, statutory and exemplary damages permitted by law;

b. her attorneys' fees and costs as allowed by law, including any appellate costs allowed;

c. pre-judgment and post-judgment interest at the maximum rate(s) permitted by law; and

d. all other relief, at law or in equity, to which Jones is justly entitled.

Dated: December 15, 2004

Respectfully submitted,

**HUGHES & LUCE, L.L.P.**

Craig W. Budner
Beth W. Bivans
Ashley C. Vaught

**DUANE MORRIS LLP**

Joseph M. Burton
Gregory G. Iskander

**ATTORNEYS FOR PLAINTIFF MARION JONES**

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and United States District Court for the Northern District of California Local Rule 3-6, Plaintiff Marion Jones hereby demands a jury trial of all triable issues.

Dated: December 15, 2004

**HUGHES & LUCE, L.L.P.**

Craig W. Budner
Beth W. Bivans
Ashley C. Vaught

**DUANE MORRIS LLP**

Joseph M. Burton
Gregory G. Iskander

**ATTORNEYS FOR PLAINTIFF MARION JONES**

**CERTIFICATION OF INTERESTED ENTITIES OR PARTIES**

Civil L.R. 3-16 requires that the undersigned certify whether, other than the named parties, there are persons, associations of persons, firms, partnerships, corporations (including parent corporations) or other entities that: (i) have a financial interest in the subject matter in controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be substantially affected by the outcome of this proceeding.

The undersigned certifies that as of this date, there is no such interest to report.

Dated: December 15, 2004

**HUGHES & LUCE, L.L.P.**

Craig W. Budner
Beth W. Bivans
Ashley C. Vaught

**DUANE MORRIS LLP**

Joseph M. Burton
Gregory G. Iskander

**ATTORNEYS FOR PLAINTIFF MARION JONES**

# EXHIBIT B


W HOTELS WORLDWIDE WHO KEEPS YOU PLUGGED IN?

search site

featuring Golf on NBC NHL on NBC Poker Fantasy Olympics

Sports Other sports

Scores
NBA
Baseball
NFL
NHL
Horse racing
Golf
Motor sports
College football
College hoops
Tennis
MMA
Soccer
Other sports
Fan zone

More features
Mobile
Rumors
Blogs
Message boards
TV listings

On msnbc.com
U.S. news
Politics
World news
Business
Entertainment
Health
Tech & science
Travel
Weather

Disable Fly-out

# Jones pleads guilty, admits lying about steroids

**Olympic track star says she took banned drugs from 2000 to 2001**

Associated Press
updated 2:40 p.m. PT, Fri., Oct. 5, 2007

WHITE PLAINS, N.Y. - Marion Jones' voice never wavered, her reserve never faltered as the words rang out in the silent, stately federal courtroom.

She was a liar and a cheat, she told the judge, her eyes never straying from his face.

And so ended years of angry denials by one of the world's most celebrated athletes.

Story continues below

advertisement

W
HOTELS
WORLDWIDE
WHO KEEPS YOU PLUGGED IN?

MSNBC video

Launch

Jones: 'I have betrayed your trust'
Oct. 5: An emotional Marion Jones says, "I have let my country down," after pleading guilty to lying to federal investigators when she denied using performance-enhancing drugs.
MSNBC

Inside NBCSports.com

Rumors
Scores, schedules
Message boards
Fantasy sports
Whine of the Week
Trash Talk
Sports odds
Game matchups
Team pages
Week in Pictures
JT The Brick
Agree or Disagree

Sponsored links

Hugh Downs Reports:
Little-known heart attack symptom many people tragically ignore.
www.healthsecrets.com

Official Site: AMBIEN CR™
(zolpidem tartrate extended release) CIV Get Free 7-Night Invite
www.AmbienCR.com

Prepare To Be Shocked
Amazing Chinese Weight Loss Secret - As Seen On CNN, NBC, CBS & Fox
www.Wu-YiSource.com

Why Are Celebrities Using Wu-Yi?
Wu-Yi: Ancient Organic Chinese Diet - Try a Free 15 day trial!
wu-yisource.com

Lose Fat While Erasing 10 Yrs In 10 Wks!
As Seen On ABC, CBS, CNN and Time
fivelean.com

The owner of three Olympic golds and two bronze medals, Jones came clean Friday and admitted she used steroids. She pleaded guilty to lying to federal investigators when she denied using performance-enhancing drugs, then announced her retirement in a tearful apology outside the U.S. District Court.

"It's with a great amount of shame that I stand before you and tell you that I have betrayed your trust," Jones said, her voice cracking as her mother stood behind her, a strong and supportive hand on her shoulder.

"I have been dishonest and you have the right to be angry with me. I have let (my family) down. I have let my country down, and I have let myself down," she said, pausing frequently to regain her composure. "I recognize that by saying I'm deeply sorry, it might not be enough and sufficient to address the pain and hurt that I've caused you.

"Therefore, I want to ask for your forgiveness for my actions, and I hope you can find it in your heart to forgive me."

The calm strength she'd displayed in the courtroom was gone, washed away by a flood of tears. She embraced her mother, who told her daughter, "Good job." The two then climbed into a black limousine with one of Jones' attorneys and drove away, not taking any questions.

NBC video

Jones was released on





Case 3:08-cv-01777-JSW Document 30 Filed 05/16/2008 Page 30 of 42

**Sports' fallen heroes**
Oct. 5: What is it about competition that fuels the temptation to cheat? NBC's Ann Thompson reports.
Nightly News

Launch

her own recognizance and was due back in court Jan. 11 for sentencing.

"It's bittersweet," said Travis Tygart, chief executive officer of the U.S. Anti-Doping Agency. "Any time a potential American hero admits to cheating us sports fans, people who watch Olympic games, it's bittersweet."

Indeed, Friday marked a stunning fall from grace for the 31-year-old Jones, once the symbol for everything that was right about women in sports. She was powerful, captivating the country with the audacious goal of winning an unprecedented five gold medals at the Sydney Olympics. But she was beautiful and feminine, too, gracing the cover of Vogue with the poise of a supermodel.

Sports blog

BCS officials fumble yet another chance

Though she fell short in Sydney — only three of her five medals were gold, the other two bronze — her winsome smile and charming personality made her a star. Seven years later, she is broke, her reputation is ruined and she is looking at prison time.

Jones also pleaded guilty to a second count of lying to investigators about her association with a check-fraud scheme.

"You're vindicated, but it doesn't make you feel any happier this is going on," said Dick Pound, chairman of the World Anti-Doping Agency. "The fact that she was using the performance-enhancing drugs is not a surprise. People suspected strongly or knew, but couldn't prove the use.

Marion Jones comes clean

- Jones pleads guilty, admits lying about steroids
- Olympic officials set to strip track star medals
- Open Mike: She's just another cheater | Liar
- NBC Sports: Lies hurt teammates | No excuses
- Jones admits lying to feds in check-fraud scam
- Her statement | Reactions | Your thoughts?
- Key figures in BALCO steroids scandal

"When something seems too good to be true, it probably is."

Jones is the biggest name to be brought down so far in the Bay Area Laboratory Co-Operative scandal. But home run king Barry Bonds also has been linked to BALCO, and a grand jury is still investigating whether he lied to federal investigators.

Bonds denied ever knowingly taking performance-enhancing drugs. In testimony before a grand jury in 2003, Bonds said he believed a clear substance and a cream given to him by his trainer were flaxseed oil and an arthritis balm.

Slide show

**Week in Sports Pictures**
Leaping LeBron, riled-up refs, jumbled jockeys and more in this week's edition.

Launch

"The federal government will vigorously prosecute individuals who provide false statements to its agents," said Scott N. Schools, the U.S. Attorney for the Northern District of California.

Suspicions and doping allegations had dogged Jones for years. Her ex-husband, C.J. Hunter, was busted for doping, and Tim Montgomery, the father of her son Monty, was stripped of his world record in the 100 meters in connection with the BALCO case.

Jones herself was one of the athletes who testified before a grand jury in 2003 in the BALCO investigation. In August 2006, one of her urine

samples tested positive for EPO, but she was cleared when a backup sample tested negative.

CONTINUED: "I have never used performance-enhancing drugs"

1 | 2 | Next >

**Rate this story** Low High

Current rating: **4** by **461** users

Print this Email this Blog this IM this

MORE FROM OTHER SPORTS

Next → Other sports Section Front

Tim Montgomery sentenced to 4 years in prison

Top NBCSports.com stories

Tim Montgomery sentenced to 4 years in prison

Double amputee ruled eligible for Beijing Olympics

AL Central should get edge in interleague play

Mets' Santana tries to keep Yankees in cellar

A-Rod gives a 'thumb's up' on his right quad

NBC Sports videos

The fitness of horses

The safety of horseracing

Amputee gets his shot at Beijing

Clean slate for Game 7

Pittsburgh misses major opportunity

SPONSORED LINKS Get listed here

**Six Sigma Certification**
100% Online-Six Sigma Certificate From Villanova -Find Out More Now!
www.VillanovaU.com

**Countrywide® Home Loans**
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.countrywide.com

**Top MBA Programs**
Get Your Dream Job With An MBA. 100% Online. No GMAT Required!
www.floridatechonline.com

**Notre Dame Certificates**
Earn an Executive Certificate from Notre Dame - Online! Enroll Now.
www.NotreDameOnline.com

**Wachovia Free Checking**
No monthly fee, No minimum balance, direct deposit, Check Card & More.
www.Wachovia.com

Sports NFL College Football MLB NBA NHL College Basketball NASCAR/Motors Golf Tennis MMA Horses Soccer Poker Other Sports

Features Fan Zone Fantasy All-Madden Notre Dame Golf on NBC NHL on NBC Dew Tour CORR Jeep World

About Us Get Local RSS Feeds Alerts Mobile TV Listings Contact Us Careers Terms & Conditions

Go Local TV Listings Go Mobile RSS Feeds Fantasy Games Shop

# EXHIBIT C

COMMUNITY VIDEO PODCASTS PHOTOS DATA CENTER NEWSLETTERS MOBILE

home of the

Home Delivery | Today's Paper | Ads

SEARCH SFGate Web Search by YAHOO! | Advanced Search Sign In | Register

Don't Miss: Wine: Four Star Beer Same-Sex Marriage Ruling Pets: The Dawg Father New Homes Sold In Bay Area Weird: Refusing To Fuel Up

AWARD-WINNING. FUEL EFFICIENT. TEST-DRIVE READY.

# Track coach Trevor Graham indicted

Mark Fainaru-Wada and Lance Williams, Chronicle Staff Writer
Thursday, November 2, 2006

SHARE COMMENTS (0) FONT | SIZE:

**(11-02) 16:03 PST** -- A track coach whose clients have included some of the world's greatest sprinters -- such as U.S. Olympic champions Marion Jones and Justin Gatlin -- was indicted Thursday for lying to federal agents when he told them he had never provided his athletes with performance-enhancing drugs in connection with the BALCO steroids case.

Trevor Graham, who has portrayed himself as a whistle blower for giving authorities the steroid-laced syringe that helped propel the BALCO probe in 2003, was indicted by a federal grand jury in San Francisco on three counts of making false statements to government agents.

Graham's indictment was another blow to American track and field, which has labored unsuccessfully to put the BALCO steroids scandal behind it. In the past two years, 14 track and field stars with ties to BALCO -- including Tim Montgomery, former world record holder in the 100 meters and a former Graham client -- have been disciplined for doping offenses. In July, Gatlin, a Graham protege, was suspended after testing positive for steroids.

Neither Graham nor his attorney, Joseph Zeszotarski, could be reached for comment.

The grand jury that indicted Graham for his statements in a 2004 interview with federal agents is also investigating whether Giants slugger Barry Bonds committed perjury for denying under oath that he knowingly used banned drugs from BALCO. There was no indication Thursday when or whether the grand jury might complete its probe of Bonds.

Graham is the coach of the elite Sprint Capitol organization in North Carolina. Several of his athletes have tested positive for steroids, but he has repeatedly denied distributing the drugs.

However, at least three people connected with BALCO have told the government that Graham was a steroid dealer. Both BALCO ringleader Victor Conte and shot-putter C.J. Hunter told federal agents the coach distributed the drugs to his athletes, and Montgomery testified before a grand jury that Graham provided his athletes with steroids he had received through a "connection" in Mexico.

Thursday's indictment alleged that Graham lied to special agents from the Internal Revenue Service's Criminal Investigations unit when he told them he had never set up any of his athletes with performance-enhancing drugs from an unidentified source.

The indictment also alleged that Graham lied when he said he had never met the unidentified source, referred to as "Source A," in person. The third count against the coach claimed that he lied when stating his last contact with "Source A" had been a phone conversation in 1997.

Based on a reading of Graham's statement -- which was obtained and previously reported on by The Chronicle -- the unidentified source is Angel Guillermo Heredia, known throughout the BALCO case as "Memo." In his 2004 interview, Graham said

Sale Extended!
Upgrade to BRITISH AIRWAYS
2 nights in London FREE
when you fly from only $339
Book by 5/22 at ba.com

MOST READ MOST E-MAILED TOP STORIES

1. Bike to Work Day accident claims life of bicyclist
2. Court approves evil gay agenda Satan's plan to make uptight straight...
3. Marriage ruling a victory for Newsom
4. Bay Area swelters as temperature records fall
5. Dennis Richmond on 40 years broadcasting news
6. S.F. woman's death not a clear bridge suicide
7. Stabbed man dies in S.F. after car crash

TopHomes
From Pacific Union

NOB HILL, CATHEDRAL HILL
3 BR / 3 BA
$1,200,000

SUNSET, GOLDEN GATE HEIGHTS
4 BR / 3 BA
$1,149,000

CIVIC CENTER, TENDERLOIN
2 BR / 2 BA
$825,000

NOB HILL, CATHEDRAL HILL
2 BR / 2 BA
$1,195,000

JOSHUA TREE
2 BR / 2 BA
$599,000

NOB HILL, CATHEDRAL HILL
1 BR / 1 BA
$585,000

NOB HILL, CATHEDRAL HILL
2 BR / 2 BA
$879,000

OUTER RICHMOND, SEACLIFF AND LAKE
2 BR / 1 BA
$850,000

DALY CITY
3 BR / 2 BA
$828,000

NOB HILL, CATHEDRAL HILL
5 BR / 5 BA
$3,000,000

Current Offers from LendingTree
LendingTree
Start Now
Terms & Conditions Apply

ADVERTISERS

Kids Fly to Hawaii this Summer for $130!




Case 3:08-cv-01777-JSW Document 30 Filed 05/16/2008 Page 34 of 42

Memo was a shot-putter from Laredo, Texas. According to the statement, Graham said he was not aware of any of his athletes obtaining drugs from Mexico; he had no connections with a Mexican lab; he only had spoken with Memo by phone, and hadn't talked with him since 1997.

The New York Times previously reported that Heredia told the grand jury in San Francisco that he provided steroids, human growth hormone and other performance enhancing drugs to Graham and his athletes between 1996 and 2000.

The indictment alleges that Graham met Source A in person for the first time in 1996 or 1997 and thereafter referred "numerous athletes coached by Graham to Source A to obtain illegal performance-enhancing drugs from Source A." The indictment also charged that Source A provided performance-enhancers to Graham and his athletes between the time of their first meeting and the 2004 interview with agents. Some of the athletes, the indictment, alleged, were associated with BALCO.

"Today's charges demonstrate this office's ongoing commitment to investigate and prosecute not only those involved in the illegal doping of our nation's athletes, but also those who lie to federal agents involved in a criminal investigation," said U.S. Attorney Kevin Ryan.

In June 2004, four months after four men were indicted in what the government termed a conspiracy to distribute performance-enhancing drugs to elite athletes, investigators interviewed Graham for nearly three-and-a-half hours with his lawyer present in Raleigh, N.C.

During the interview, Graham acknowledged he was the man who sent the now-famous, steroid-laced syringe to the U.S. Anti-Doping Agency in the summer of 2003 to expose Conte and BALCO. Graham also admitted he attended a meeting at BALCO in late 2003, where Conte hatched what became known as "Project World Record," a plan devised to turn Montgomery into the world's fastest man. Also at the meeting were sprint coach Charlie Francis -- the man who coached steroid cheat Ben Johnson -- and Milos Sarcev -- a bodybuilder and self-described anabolic expert.

Graham, however, insisted to the agents that he had never provided any illegal or banned performance-enhancing drugs to his athletes. For example, he stated the only things he had ever given Marion Jones were "Gatorade, protein and potassium for cramps," according to a copy of his statement. Graham told the investigators that as a coach he believed he had always "done the right things."

However, Hunter, the shot-putter and ex-husband of Jones, told agents Graham had provided Jones with the endurance-boosting drug EPO in the lead-up to the 2000 Sydney Games, where she won five medals, three of them gold.

At the Summer Olympics in Athens in 2004, Graham said he was the person who had sent the needle-less syringe with traces of a steroid in it to the U.S. Anti-Doping Agency in Colorado Springs. He said he was "just a coach doing the right thing."

However, many others connected to the BALCO probe have characterized Graham's action much more a result of a turf war between his athletes and those aligned with Conte, who he named as the originator of the steroid in the syringe.

The same day Graham sent the syringe to USADA, Conte drafted a letter to the anti-doping group and to the international governing body for track and field detailing allegations of Graham doping his athletes with "oral testosterone undeconate." Conte offered details about how Graham's athletes were avoiding being Conte, and, at the end of the letter, he named four sprinters he said were cheating. Among those was Gatlin, who currently shares the 100-meter world record. Conte ultimately didn't send the letter, but it was found in his trash by the lead BALCO investigator.

After Gatlin was caught cheating this summer -- adding to a list of nearly a dozen of Graham's current or former clients who either tested positive or were implicated for doping -- the coach lost his contract with Nike and was banned from U.S. Olympic Committee training centers.

GREENBRAE / KENTFIELD
4 BR / 3 BA
$2,895,000

PRESIDIO HEIGHTS, LAUREL HEIGHTS, JORDAN PARK
3 BR / 2 BA
$1,595,000

EXCELSIOR, INGLESIDE, WESTWOOD PARK, ST. MARÂ'S PARK
3 BR / 2 BA
$899,000

PRESIDIO HEIGHTS, LAUREL HEIGHTS, JORDAN PARK
3 BR / 2.5 BA
$1,995,000

NOB HILL, CATHEDRAL HILL
1 BR / 1 BA
$985,000

See more from this broker

About Top Homes

Pleasant Holidays

New book! The Working Cook Fast Fresh Meals for Busy People

*E-mail the writers at mfainaru-wada@sfchronicle.com and lwilliams@sfchronicle.com*

SHARE

(0) View Comments »

**Be the first to share your thoughts on this story.**

**Add Your Comment**

You must be signed in to add a comment. Sign In | Register

Submit

Ads by Yahoo!

**Graham**
Stocking distributor for all your Graham needs.
(www.southgateprocess.com)

**Graham, NC Mobile Home**
Search Free Real Estate Listing by Price, Size, Location, & More.
(www.Realtor.com/mobilehome)

**Grahams Funeral Home Flowers**
Local florist delivery to Grahams Funeral Home.
(www.aflowersale.com)

Get The Chronicle for up to 40% off

Home News Sports Business Entertainment Food Living Travel Blogs Classifieds Jobs Homes Cars Site Index [return to top]

**Advertising Services:** Place a Classified Advertise in Print Advertise Online Media Kit Today's Print Ads Public Notices
**Reader Services:** Home Delivery Subscribers Today's Paper RSS Feeds Newsletters Join Community Feedback Buy Photos FAQ Corrections
**Company Info:** Contact Us Hearst Corp. Privacy Policy Terms and Conditions Work for Us Chronicle in Education Events & Promotions Submissions

© 2008 Hearst Communications Inc.
HEARST *newspapers*

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHANE D. MOSLEY, SR., Plaintiff,

vs.

VICTOR CONTE, Defendant.

No. C 08-01777 JSW

DEPOSITION OF SHANE D. MOSLEY

Wednesday, July 9, 2008

Los Angeles, California

Reported by:
PAMELA J. FELTEN
CSR No. 5189

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE D. MOSLEY, SR., Plaintiff, vs. VICTOR CONTE, Defendant. | No. C 08-01777 JSW |

Deposition of SHANE D. MOSLEY, taken on behalf of Defendant, at 1900 Avenue of the Stars, Suite 2100, Los Angeles, California, beginning at 9:47 a.m. and ending at 10:50 a.m. on Wednesday, July 9, 2008, before PAMELA J. FELTEN, Certified Shorthand Reporter No. 5189.

APPEARANCES:

For Plaintiff:

JUDD BURSTEIN P.C.
BY: JUDD BURSTEIN
Attorney at Law
1790 Broadway
Suite 1501
New York, NY 10019
(212) 974-2400
Jburstein@burlaw.com

For Defendant:

KERR & WAGSTAFFE, LLP
BY: IVO LABAR
Attorney at Law
100 Spear Street
Suite 1800
San Francisco, California 94105
(415) 371-8500
Labar@kerrwagstaffe.com

Also Present:

DANIELLE ARTEAGA, Attorney at Law
DAVID MARCHIANO

INDEX

| WITNESS: | | EXAMINATION |
|---|---|---|
| SHANE D. MOSLEY | | |
| | BY MR. LABAR | 5, 57, 60 |
| | BY MR. BURSTEIN | 55, 58, 61 |

EXHIBITS

| DEFENDANT'S | | PAGE |
|---|---|---|
| 1 | 2005, 2006 and 2007 tax forms | 49 |
| 2 | Affidavit of Shane Mosley notarized on August 16, 2002 | 49 |
| 3 | DirecTV bill for service at 5212 Clayton Court, La Verne, California | 50 |
| 4 | Declaration of Shane D. Mosley, Sr. filed 5/23/2008 | 52 |

INFORMATION REQUESTED

| Page | Line |
|---|---|
| 20 | 16 |

Los Angeles, California, Wednesday, July 9, 2008

9:47 a.m. - 10:50 a.m.

SHANE D. MOSLEY

having been first administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. LABAR:

Q Good morning. Please state and spell your name for the record.

A Shane Mosley. S-h-a-n-e. And then M-o-s-l-e-y, last name.

Q Have you had your deposition taken before?

A Yes.

Q Okay. How many times?

A That I don't know.

Q Okay. Can you give me an approximate number? Less than five times?

A About that many. About four. Four or five times.

Q Do you recall how long ago these other depositions were? The first one of the four?

A Um, it's been a while. Maybe 2000 -- I don't know. 1999, 2000.

Q Okay.

A I'm not sure.

Q Was your deposition taken in 1999 in connection with a lawsuit?

A Um, maybe against another attorney that was --

Q Okay. Do you know if you were suing the attorney or if the attorney was suing you?

A I believe the attorney was suing me.

Q Okay. And do you know what county or state that lawsuit was happening in?

A It might have been L.A. County.

Q And do you know the name of that attorney?

A Was it Wendell Wright.

Q Wendell Wright?

A Yeah. Wendell Wright.

Q Wright like W-r-i-g-h-t?

A Yes.

Q And was he your attorney at some point?

A He was my attorney, yes.

Q Okay. And was that the first time you were ever deposed?

A Um, no. I mean I've been to court a couple more times.

Q Okay. Let me just try and focus your attention on the depositions that you've had previously, then I'll

ask you about your court appearances later. Okay?

A Uh-huh.

Q That case involving Mr. Wright, you were deposed in that case, correct?

A I was deposed, yes.

Q And was there another deposition that occurred after that in a different case?

A Um, I'm not sure. I'm pretty sure there was a couple of more, but I'm not sure around the time. It's been a long time ago so --

Q Sure. Okay.

A -- I don't know.

Q Do you have any memory at all of the other depositions you've had?

A The only one I can think of was the Wendell Wright one. The other depositions they were like real small -- I don't -- I can't remember, you know -- oh, there was one with Patrick Ortiz or Ringside Ticket and that was like 1995 maybe or --

Q Okay.

A -- you know --

Q The company was called Ringside Tickets?

A Uh-huh.

Q And what was the other name you mentioned?

A Ringside Ticket, that's on -- it was Patrick

Ortiz. That was -- he was the promoter. He was my first promoter.

Q Patrick Ortiz?

A Yeah.

Q And in that case, were you being sued or were you suing someone else?

A I was being sued.

Q And do you recall what county or state that lawsuit was pending in?

A I think that was -- had to be L.A. County.

Q Okay. Before I ask you about any other lawsuits, I just want to make sure you understand the rules of this proceeding. You've taken an oath to tell the truth. Do you understand that?

A True.

Q And that's the same type of oath that you would take in a court of law. Do you understand that?

A True.

Q As you're doing now, please continue to give us audible responses so that our court reporter can take everything down accurately. All right?

A Okay.

Q Thank you. If you don't understand --

A I'm doing -- yeah, I'm doing this. So I don't --

Q You're doing an excellent job. Thank you.

A Okay.

Q If you don't understand my questions, please tell me. All right?

A Definitely.

Q Okay. And if you respond to my question, I'll assume that you understood me, heard me properly, and gave me a truthful response. All right?

A True.

Q Great. If at any time you have any questions about anything I'm asking you, please tell me so I can clarify. Okay?

A Okay.

Q Let me ask you -- go back to the topic of the lawsuits that you've been involved with. You told me about a lawsuit involving a gentleman named Mr. Wendell Wright and another lawsuit involving an entity called Ringside Tickets and a gentleman named Patrick Ortiz.

A Yes.

Q Can you recall any other lawsuits that you've been a party to?

A No.

Q Do you think there have been more and you just can't remember any of the details of them or do you think there haven't been any more than the two you've told me

about?

A Those are the -- the big lawsuits that stand out, but other than that, I can't really recall.

Q Okay. You say those are the two big ones that you -- that stand out. Can you recall any small ones?

A I mean those are -- that's really all I can recall at this point is those lawsuits. I mean that's it.

Q So you can't remember the details or the general nature of any other lawsuits you've been a party to?

A Those two I can remember some of the details of what happened in the lawsuits.

Q Okay. No others?

A Not to my -- to my knowledge.

Q Okay. Let me ask you about other testimony you may have given in other types of proceedings. You've testified before a Grand Jury in California, correct?

A Yes.

Q Have you testified before any other Grand Juries at any time other than that one?

A No.

Q Have you given any testimony to any athletic organizations that you may be a member of?

A I don't --

MR. BURSTEIN: Do you mean sworn testimony?

MR. LABAR: Testimony of any kind.

MR. BURSTEIN: Then I object on vague and ambiguous. Because I'm not sure what testimony means, but . . .

MR. LABAR: Okay.

THE WITNESS: And I'm not even -- I don't --

BY MR. LABAR:

Q You don't understand my question?

A Say it again or something.

Q Sure.

A I don't understand.

Q Sure. I'll ask it a different way.

Have you ever given any testimony before any athletic organizations, like boxing groups that you may be a party of -- a member of?

A Not that I can think -- no. Just . . .

Q The deposition we're taking today, just so I make sure you understand, is limited in nature. I'm just going to be asking you questions about your domicile, in other words, where you live and where you reside.

A Uh-huh.

Q Do you understand that?

Okay. I'm not going to be asking you anything about the merits of the case that you brought against

Mr. Conte. Okay?

A Okay.

Q Where were you born, sir?

A I was born in Lynwood, California.

Q Inglewood?

A Lynwood.

Q Lynwood. Okay.

MR. BURSTEIN: Shane, try and keep your voice up.

THE WITNESS: Oh. I'm sorry. Yeah.

MR. LABAR: Can you hear him okay?

THE REPORTER: Yes.

MR. BURSTEIN: Great. Okay.

BY MR. LABAR:

Q What year were you born, sir?

A 9-7-71.

Q And where did you grow up? In Lynwood?

A I grew up in Pomona.

Q In Pomona. All right. And did you attend high school in Pomona?

A Yeah.

Q And which high school?

A Pomona High.

Q And did you graduate from Pomona High?

A Yes.

Q And what year was that?

A '89.

Q Okay. And after you graduated from Pomona High School, did you continue living in California?

A Yes.

Q Okay. And you began a career as a boxer after high school; is that correct?

A No. I boxed since I was eight years old.

Q And when did you become a professional boxer?

A In '93 -- 1993.

Q Okay. All right. And where did you live from, say, 1990 to 1995? What state?

A Pomona.

Q Okay. And from 1995 to the year 2000, where did you live?

A The year 2000? That had to be Pomona.

Q And where were you living in Pomona?

A Well, actually, I'm sorry.

Q Sure.

A La Verne.

Q La Verne. Okay. And what year did you move from Pomona to La Verne?

A I believe that was in 19- -- maybe 1997. I'm not sure.

Q And you are currently married, correct?

A Yes.

Q And what's your wife's name?

A Jin Mosley.

MR. BURSTEIN: That's J-i-n.

THE WITNESS: J-i-n.

BY MR. LABAR:

Q And you have children, correct?

A Yes.

Q How many children do you have?

A I have four biologically and one stepson.

Q And do all your children live with your wife and you?

A They all live with me and, yeah, my wife.

Q Okay. And your wife lives at the address on La Verne -- in La Verne?

A In La Verne, yes.

Q Okay. Let me ask you about some addresses that I've seen on some documents. Are you familiar with an address 174 Waverly in Medford, New York?

A Yes.

Q What is that address?

A That is the address to my CPA.

Q Okay.

A Well, my ex-CPA.

Q Okay. Is that gentleman's name Salvador

Alessi?

A Yes.

Q All right. And how long was he your CPA for?

A Maybe a year and a half.]

Q So you don't have any home or other kind of -- type of residence in New York; is that correct?

A No.

Q So this 174 Waverly address is only relevant to you because it was the address for your former CPA, correct?

A Yes.

Q Okay. Let me ask you about another address. 1230 or 1226 Loma Vista in Pomona, California, are you familiar with that address?

A I am familiar with that one, yeah.

Q What was 1230 Loma Vista in Pomona? Was that your home?

A That was my old home in -- yeah, my old home.

Q And what was 1226 Loma Vista?

A 1226 was a house that I bought next door because I was going to rebuild everything. I was going to rebuild both structures.

Q What year did you buy the 1230 address?

A It was probably -- I don't know. 1998. Maybe I can get the records.

Q Approximately 1998?
A Probably. I don't know. Yeah.
Q And what year did you sell it?
A I must have sold it in either '99 or 2000.
Q Okay. And when you sold that -- those homes in 2000 -- did you sell them both in 2000?
A I sold both of them, yes.
Q Is that when you moved to the La Verne address?
A Yes.
Q And is that address 5212 Clayton Court?
A Yes.
Q And that's where your wife and children currently live?
A Yes.
Q And so you owned the 5212 Clayton Court address for approximately eight years or so?
A About seven years.
Q Seven years. Let me ask you about another possible address. Do you actually also own a home in Big Bear, California?
A Yes.
Q And what's the address of the home in Big Bear?
A That's 715 Thrush Street.
Q Thrush like the bird, T-r-h --
A Thrush, T-h-r --

Q -u-s-h?

A -u-s-h.

Q Do you know the ZIP code there?

A I believe it's 92315.

Q Thank you. Do you know -- is it actually in the town of Big Bear or is it in one of the small villages around Big Bear?

A It's right by the Snow Summit.

Q So that's actually in the town of Big Bear? Do you know?

A I think it would be considered Big Bear Lake.

Q And how long have you owned that property?

A Approximately seven years.

Q And do you own that property with anyone else or are you the sole owner?

A I'm the sole owner.

Q Okay. Let me ask you about a few other addresses.

Are you familiar with the address 6745 Jackson Junction in Las Vegas, Nevada?

A Yes.

Q What is that address?

A That's my home address.

Q Okay.

A One of them. One of my houses, I should say.

Q Okay. And how long have you owned that property?

A I would say 2004 maybe. Somewhere -- 2004.

Q And that's a residential home?

A It is, yes.

Q Let me ask you about another property address. 3695 Calico Brook in Las Vegas, Nevada, are you familiar with that address?

A Yes.

Q And what is that address?

A That's the actual home address.

Q Could you repeat that?

A That is the actual home address.

Q Okay. What do you mean when you say actual home address?

A That's where I stay most of the time, you know, when I'm in Vegas. Well, I'm always in Vegas, but my -- you know -- in Vegas. It's the central home.

Q All right. So that's obviously a different physical location than the Jackson Junction address, right?

A Yes.

Q And who lives in the Jackson Junction address most of the time, if anyone?

A Actually, at this point, it's been rented out.

Q How long has it been rented out?
A Maybe a year and a half, maybe a year. Maybe it was longer than that. Could be two years.
Q When was the Calico Brook property purchased?
A I believe in '05, I believe.
Q Okay. And when you stay there, do you stay there alone?
A Yeah.
Q And at your address at the home -- oh, I'm sorry. The address in La Verne, California, is that a residential home?
A It is a residential, yes.
Q Okay. And do you keep -- obviously your wife and children are there, so you have cable television there?
A I do.
Q And when you're there, you watch that cable television sometimes?
A At the house in La Verne, yes.
Q And, obviously, there's gas and electric and power there, right?
A Yes.
Q Okay. And you have a home phone there?
A Yes.
Q Do you receive mail there?

A Uh, actually, the mail -- I shouldn't receive -- the mail actually goes to a different address, which should be -- it used to go to 174 Waverly, but now it's been transferred over to the business that we have now, which is the -- the -- what's his name -- Bob Keys, the money management people.

Q Okay. Bob Keys is sort of a financial manager for you?

A Yes.

Q Does his firm have a name or does he just call it after himself?

A His firm has a name. I'm trying to -- UBS.

MR. BURSTEIN: Want to leave a blank and we can fill it in?

MR. LABAR: Sure.

(Information requested: ______________________

______________________________________________

______________________________________________.)

BY MR. LABAR:

Q Is it UBS Warburg?

A UBS is the money marketing people, but it's a different money management. They knew -- they're basically the same thing. They knew each other, but it's a different name. Money management is Bob Keys and money management corporation.

Q Okay. I appreciate that.

Where is Bob Keys' office at when you go see Bob Keys?

A Well, actually, I haven't went to his actual office yet, but I believe it's in L.A.

Q So any conversations you've had with him have been over the phone so far?

A Yes.

Q Okay. Do you keep clothing at the La Verne address?

A Yes.

Q Okay. And you have enough clothes there so that you could stay there for some period of time?

A Yes.

Q Do you keep training gear for your boxing regimen at the La Verne address?

A I have training gear there, too, yes.

Q Okay. When you're at the La Verne address, do you have access to transportation?

A Yes.

Q Do you have your own car there?

A Yes.

Q What type of car do you have there?

A Well, actually, the car is not registered in California, but the car that I use is an Escalade EXT,

which is -- which is my car basically in Vegas. It's registered in Vegas. All my -- all my cars that I drive are registered in Vegas.

Q I appreciate that. I asked a slightly --

MR. BURSTEIN: Answer the question --

THE WITNESS: Oh.

MR. BURSTEIN: -- as opposed to --

THE WITNESS: Okay.

MR. BURSTEIN: Okay?

BY MR. LABAR:

Q You might have misunderstood me. I asked a slightly different question.

When you're at the La Verne house, do you have access to a car?

A Yes.

Q Which car do you drive?

A The Escalade. The EXT.

Q And that's the Escalade EXT that you just referred to that's registered in Nevada?

A Yes.

Q Okay. So you drive the car from Nevada to Los Angeles; is that correct?

A Yes.

Q Okay. And you never use any other car when you're at the La Verne address?

A That's my car. Yeah.

Q Okay. So when you come back and forth from Nevada and California, you always drive?

A I drive, yes.

Q And you never fly?

A Um, very rarely.

Q Okay. Do you ever use any other car other than -- or have you ever used any other car other than the Escalade when staying at the La Verne home?

A The EVX -- EVS Escalade, which is, you know, an Escalade, as well, but it's a big one.

Q Is that the car that's used by your wife on a day-to-day basis?

A Would you say again?

Q Is that the car that's used by your wife on a day-to-day basis?

A Actually, no.

Q Okay. What car does your wife drive normally on a day-to-day basis?

A She actually uses the -- the 5 -- it's the G-Wagon Mercedes.

Q Okay. And to your knowledge, is that car registered in California?

A Uh, yes, I believe so.

Q And do you ever drive that car?

A Maybe to get it washed or something, you know.

Q So from time to time when you're in California at the La Verne address, you may drive the G-Wagon?

A Yeah.

Q Okay. And do you have cars up in Big Bear, as well?

A No.

Q Okay. And do you keep cable and satellite at the Big Bear home?

A Yes.

Q Okay. And, obviously, you have gas and electric there as well, right?

A Yes.

Q And you have a phone there?

A Yes.

Q And do you receive any mail there?

A No.

Q And do you keep clothing and training gear at the house in Big Bear?

A Yes.

Q All right. Let me ask you about any personal items you might keep at the house in La Verne. Other than clothing, do you keep other personal items like photos and things like that at the house in La Verne?

A Yes.

Q Okay. Are your -- for example, family portraits, do you have those at your house in La Verne?

A Yes.

Q Your wedding pictures, are those at the house in La Verne?

A Yes.

Q What about personal financial records, do you have things like that in your house in La Verne?

A I believe there's some financial stuff there, yes.

Q Does your wife -- does your spouse work, sir?

A Yes.

Q Okay.

A Well, she works basically for me.

Q Okay.

A So --

Q And which business of yours does your wife work for?

A The boxing business.

Q What is that called?

A Well, my company would be Sugar Shane, Inc.

Q I'll ask you more about your businesses later.

Does she have a title with that business?

A No, not really on -- on record, but she just handles the day-to-day, you know, the phone -- some of

the phone calls and stuff for me.

Q And she then primarily works for that business from La Verne; is that correct? Or Los Angeles area?

A Uh, yeah.

Q And does she go to an office to do that job or does she work from home or can you explain that for me?

A She just works at the house.]

[Q I believe you told me you have five children; is that right?

A Yes. Yes.

Q Can you give me their ages?

A My first son is 17, Shane, Jr. Norman Bell is 14. Najee will be seven or is seven. And Tai is six. And Mee-Yon is four.

Q Okay. So of your children that are school age, are they all enrolled in school?

A Yes.

Q And are they all enrolled in school in California?

A Yes.]

[Q Okay. And let me ask you about your other family. Is your mother and father alive?

A Yes.

Q And where do they live?

A Pomona.

Q And where are your -- do you have any other relatives? Uncles, aunts, things like that?

A My sister.

Q Where does your sister live?

A Pomona.

Q When you were married, sir, were you married in California?

A No.

Q Where were you married?

A In Vegas.

Q Okay. What year was that?

I'm sorry for putting you on the spot.

MR. BURSTEIN: Better hide this thing from his wife.

MS. ARTEAGA: More important to remember the date.

THE WITNESS: It was --

BY MR. LABAR:

Q Approximate year.

A It was actually after the Oscar, Fernando Vargas fight when we got married.

Q 2000?

A Yeah, 2002, probably.

Q All right.

A So . . .

MR. BURSTEIN: Could we just mark that part confidential. Enter into an anti-disclosure agreement.

(Laughter.)

BY MR. LABAR:

Q Let me ask you. Have you ever had any arrests or convictions in the State of California?

A No.

Q Sir, as a professional boxer, I would assume you have sports trainers and boxing trainers, right?

A Only had one trainer really. It was my father was my boxing trainer.

Q And your father has been your primary trainer off and on over the years?

A Pretty much he's been my primary trainer, you know, since I was eight.

Q Let me focus your attention on this year, 2008. For all of this year, has your father been your primary trainer?

A Yes.

Q Okay. Where does your father live?

A In -- he lives in Pomona.

Q And is he at the -- well, strike that.

Do you have any other trainers that assist your father in training you?

A Um, I wouldn't say assist, but no, not really.

He's really the trainer. Everybody has their own job. They might give advice here and there, but they're not the trainer. There is only one trainer.

Q Can you describe the -- those other jobs that you were describing these other people do?

A You might have a cut man.

Q Okay.

A Might get advice for different things. And actually my -- my bodyguard, which is -- he's a trainer in New York --

Q Okay.

A -- but -- and a bodyguard. So he gives input, too, as well.

Q And for this past -- you were training for a fight that was supposed to happen in May, right, of this year?

A Yes.

Q And during that -- in the preparation for that fight, your father was your trainer, right?

A Yes.

Q And who was your cut man?

A It was going to be Jimmy Glenn.

Q And was Mr. Glenn working regularly with you in preparation for that fight?

A No.

Q And how about your bodyguard, was he working regularly?

A He was -- he was with me, yes.

Q So he was working regularly with you in preparation for that fight?

A Yes, he was with me.

Q And what's that gentleman's name?

A Alexander Nobel.

Q Noble like N-o-b-e-l.

A Nobel, yeah.

Q And do you have any medical doctors -- strike that.

Let me ask a different question. Where is Mr. Nobel -- where was he living for 2008 in preparation for this fight?

A He lives in New York, but when he was -- he was in camp with me in Big Bear.

Q Okay. So in preparation for the fight you were going to have in May of 2008, you were training in Big Bear?

A Yes.

Q And you were living at the Big Bear home?

A Yes, I was staying in the Big Bear home.

Q And where were you training at? Was there a specific sports facility or boxing gym you were using up

there?

A It's a house that I -- basically the house I built, I put a gym in that house. So . . .

Q Okay. And when did you begin preparing for that fight that was to happen in May of 2008?

A May -- I believe March. March, April, May, yeah. Maybe March.

Q And were you in training continuously from March of 2008 up until --

A Actually, it might have been late March, early April. Yeah.

Q Okay. And were you in training pretty much continuously from that time period you just described up until the fight was cancelled?

A Yes.

Q And that fight was cancelled in mid May sometimes.

A Maybe two weeks before the fight, yeah.

Q So you were living and training in Big Bear, California during that time?

A Yes.

Q Let me ask you about any other professionals you may work with and for your career. Do you have a medical doctor that you regularly see?

A I really don't have a doctor -- any medical

person I regularly see, no. But I have a lot of -- I have doctor friends. You know, but nobody -- not -- nobody, you know.

Q So you don't have a primary care physician?

A No. I kind of --

MR. BURSTEIN: Just answer the questions.

THE WITNESS: No.

BY MR. LABAR:

Q Okay. And do you -- last time you went to the doctor for any kind of medical treatment, where was that doctor located?

A That had to be Dr. Gluckman, who was just a boxing doctor.

Q And where did you see him?

A In San Pedro.

Q Okay. That's where I'm from.

All right. And do you have -- what do you recall when that occurred?

A What did you say again?

Q Do you recall when that occurred?

A Had to be when they signed the fight. So March maybe.

Q March 2008?

A Yeah.

Q Do you have a dentist?

A No, I don't really have a dentist.

Q Do you recall the last time you went to a dentist?

A Last time I went to the dentist was in Big Bear.

Q Do you recall when that was?

A The last fight. So whenever the last fight was. Not this fight, but the last one.

Q Right.

A So whenever that was.

Q So 2007?

A 2007 probably.

Q Do you have -- do you work with any chiropractors or any people in that field?

A No.

Q Okay. What about professional massage therapists or anything like that?

A I don't have a -- well, actually, I have -- well, for one fight I had a massage therapist, and he was out of San Diego.

Q And was that for this fight that was just cancelled or a prior one?

A A prior one.

Q Okay. When you're in training for a bout, in preparation for a bout, do you keep any kind of training

log where you log what was happening on that given day?

A No, I don't really keep a training log, no.

Q Do you know if any of your -- if your father or any of your associates keep training logs so they can chart your progress?

A We don't -- well, we watch films.

Q Okay. Other than the home gym that you have in Big Bear, where else do you train at?

A As far as boxing is concerned?

Q Yeah.

A I trained in New York and Long Island for a period of time. I also trained at a gym in Las Vegas. Couple of gyms actually. Basically Big Bear. When I'm in -- when I'm in California, I train -- most of my training is in Big Bear. I don't train -- you said training outside. I just left with Texas. I trained there for a couple of weeks or a week. When I'm in Houston, Texas, I'll train, picking up fighters and stuff. So I'll train wherever -- wherever I'm at.

Q And which gyms do you train at when you're in the Las Vegas area?

A Pound For Pound, a boxing gym that's right by my house. The other gym -- I can't think of the name of, but Kevin Kelly actually is a boxer and I train at his gym. We'll work out together a lot. So . . .

Q Okay. And when you're in -- sorry. Did you finish your answer?

A Go ahead.

Q When you're in La Verne, California, are there any gyms there that you train at?

A No, there is no gyms in La Verne.

Q And do you have a home gym in La Verne?

A No.

Q Let me ask you: Have you ever voted in an election?

A It's been a long time.

Q Do you recall the last time you voted?

Don't feel bad. I'm guilty of this myself.

MR. BURSTEIN: You know, you both should be ashamed of yourselves. It's disgraceful.

THE WITNESS: I don't think I -- my mother forced me to vote probably when I got out of high school, but I'm not sure I voted after that.

BY MR. LABAR:

Q Okay. And when you voted --

A Probably 20 years old probably.

Q Okay.

A 18 years ago.

Q When you voted at that time, was that in California?

A That was in California.

Q Okay.

A Pomona.

Q How many cell phones do you use?

A I have -- I have one that I use.

Q Is that a -- what Area Code is that number?

A 702.

Q Do you have -- when was the last time you had a cell phone with a California number?

A It's been a while. Maybe 2005 or something like that.

Q Okay. But you maintain home phones in your California residences?

A Yeah. The same number.

Q As everyone knows, you're a famous and well renown professional boxer, but let me ask you about other business activities you're engaged in. Do you have any businesses that you are operating or a partner in?

A I'm a partner in Golden Boy Promotions.

Q And that's Mr. De La Hoya's company?

A Yeah.

MR. BURSTEIN: Object to the form. It's also his company.

MR. LABAR: That's right. Correction.

Q It's your and Mr. De La Hoya's company?

A Me, De La Hoya and Bernard Hopkins.
Q Okay.
A Yeah.
Q And is Golden Boy -- they mostly do their business in California; is that right? I mean strike that.
A No.
Q Let me ask a better question.
Their offices are in California; is that right?
A Yes.
Q And they're in Los Angeles?
A Yes.
Q And do you work out of those offices from time to time?
A No.
Q Have you ever worked in those offices?
A Never.
Q Okay. And what role do you play with Golden Boy?
A Recruiting fighters.
Q So I would imagine that's a job that's nationwide in scope?
A I'm pretty much everywhere.
Q Other than Golden Boy, are you involved in any other companies? You mentioned one early, your own Sugar

Shane Productions; is that right?

A Well, Sugar Shane, Inc. that was a company that was formed by me for -- I was going to -- before I went with Golden Boy, I was going to try to manage and promote fighters.

Q And so is Sugar Shane, Inc. is that still in operation or has it sort of been subsumed by your work in Golden Boy?

A No. It's still in operation.

Q Okay. What about a company called Mosley and Mosley Real Estate, have you ever heard that before?

A Yes.

Q What is that?

A That's my father's company.

Q Okay. And were you involved in that company at all?

A Mosley and Mosley, no. I wasn't involved in that company.

Q So other that Sugar Shane, Inc. and Golden Boy, are you involved in any other businesses?

A No. My other businesses was Pound For -- Pound For Pound.

Q What was Pound For Pound?

A That was -- that was actually promotional and the Sugar Shane was the management company.

Q Did Pound For Pound have offices?

A No.

Q Okay. Did you run that business out of your home?

A That would be out of my home, yeah.

Q And that would have been out of La Verne, California?

A No.

Q Where would it have been?

A That -- well, it really wouldn't have been La Verne or anyplace. It was -- it was just a company that was set up. So it wasn't ran like out of La Verne or -- actually, it's a Nevada Corp. so . . .

Q So it would be run out of wherever you happened to be --

A Right.

Q -- at the time?

A Yeah.

Q Okay. What states are you licensed to box in?

A Most of the time, I box in Nevada, but Nevada, I think -- am I licensed in California? I'm not even licensed in California right now. I'm thinking from -- I mean New York. So I know actually right now actually New York and Nevada. That's the two -- yeah. That would be the two. Because I haven't fought in California for a

while.

MR. BURSTEIN: Just answer the questions.

THE WITNESS: Oh.

BY MR. LABAR:

Q Okay. Let me ask you about where you've been spending time recently. For the year 2008, correct me if I'm wrong, I think you told me that since late March 2008 till approximately mid May, you were training in Big Bear; is that right?

A Yes.

Q Okay. And where were you in January and February and early March of 2008? Where were you spending your time?

A Um, that I don't know -- where was I in January? I was in California. I was in Nevada. I'm trying to figure out. I was in Arizona, too.

Q Okay. Can you give me an estimate of how much time you were spending in California during that period?

A I couldn't tell you. Maybe two, three weeks. I don't know.

Q Okay. So of the first three months of 2008, you spent approximately two to three weeks in California?

A The first what? Say it again.

Q The first three months of 2008, you spent approximately two to three weeks in California; is that

correct?

A Approximately, yeah.

Q And how much time did you spend in Arizona?

A Not long. Maybe two, three days.

Q And the rest of the time you spent in Nevada?

A Nevada, I spend about -- I don't know, like two, three weeks in Nevada. I go back and forth so I'm always hopping around. There was a fight in Arizona that I was out there with, and there was a fight in Nevada and I stay out there for weeks at a time for promotional stuff, fights. I don't know.

Q About how many times do you think you went back and forth from California and Nevada in the first three months of the year?

A I couldn't tell you. I go back -- back and forth a lot.

Q Would you say -- can you give me an estimate? Was it more than ten times?

A It could be about that. About ten, yeah.

Q Possibly more?

A About that. I don't know. About ten.

Q I know you were planning to have this fight in late May that many of us were anxious to watch. After that fight was over, where did you plan to go?

A Actually, I planned to go to New York.

Q Did you have a vacation planned?

A Yeah, kind of. We wanted to go to New York, but we ended up staying in Vegas. So we're actually all in Vegas right now. The whole family. So I drove back here for this.

Q Okay. But after your fight, did you plan on returning to California to be with your family?

A After the fight?

Q After the fight that was planned for late May, did you plan on returning to California to be with your family?

A Actually, we planned on going to New York, the whole family.

Q And at some point, does your family plan on returning to California after your trip to New York?

A After the summer, yeah.

Q And did you attend -- intend to come back to California with them?

A Yeah. If there was a -- yeah. Yes.

Q Let me ask you about the year 2007. How many fights did you have -- professional fights did you have in 2007?

A Two. There may be a record.

Q I'm sorry?

A There might be record. I don't know. I

believe it was two, though.

Q Do you recall who you fought?

A Who did I fight in '07? Vargas. No. Cotto. For Cotto.

Q Cotto?

A Cotto. Who did I fight before that? I don't know.

Q So you basically had two fights in 2007?

A I believe so, yeah.

Q And did you train for those fights in Big Bear as well?

A Yes.

Q And do you intend to keep training for your fights in Big Bear?

A Big Bear is, yeah, the training spot, yeah.

Q And you intend to keep seeing your family obviously and your wife in California, right?

A Yes.

Q And you intend to keep doing business with Golden Boy in California, correct?

A Um, the business is in Nevada, but, yeah. We do our business at the MGM, Mandalay Bay, you know. It's Nevada. But mostly Nevada, but some California.

Q And your children that are school age, they're going to finish school in California; is that correct?

A Only my son, the oldest son, I would like him to finish school in California because he's a junior now and he's going to be a senior next year. Then we plan on -- well, I plan on, you know, moving them out to, you know, Nevada after that.

Q Is your house in La Verne currently for sale?

A No.

Q Was it for sale in April of 2008?

A No.

Q And has your house in Big Bear been for sale at all this year?

A No.

Q And do you intend to sell your house in Big Bear?

A Not at the moment, no.

Q And for the time being, you don't intend to sell your house in La Verne either, correct?

A Well, yeah. We do have plans to -- to do that and we did have a realtor put it up -- well, getting ready to put it up for sale I think in 2006 or '-7. It's a local realtor.

Q And the house did not sell?

A It's kind of hard to sell a house like that.

Q But it was not for sale in 2008; is that correct?

A No.

Q And the current plan is to have your children stay at the La Verne house with your wife until at least your oldest son graduates; is that correct?

A Yes. He's been in the system -- school system for a long time.

Q You mentioned that Mr. Alessi was your CPA for about a year and a half; is that correct?

A Yes.

Q Who was your CPA prior to Mr. Alessi?

A Actually, I didn't have a CPA prior to him.

Q Who handled your financial affairs or did you handle them yourself?

A My mother actually helped me with them.

Q Does your mother handle the filing of your tax returns?

A No. It was actually my auntee.

Q Okay.

A She did that.

Q And what was auntee's name?

A Travee.

Q Could you spell that for me?

A Travee, T-r-a-v-e-e.

Q And was she a Mosley, as well?

A No. Monday, M-o-n-d- -- like Monday.

Q Okay. Okay. M-o-n-d-a-y?
A Yeah. Monday.
Q Okay. And was she a CPA or have any kind of certification of any type?
A She was -- a certificate maybe in -- and generally the taxes, like that.
Q Was she located in California?
A Yes.
Q Do you know what town?
A Los Angeles.
Q And do you recall what year she handled your tax returns for?
A That might have been like from '94 maybe to --
Q Till Mr. Alessi took over?
A Until pretty much, yeah, Alessi.
Q And correct me if I'm wrong, but is Mr. Keys handling that for you now?
A Bob Keys is, yes.
Q Have you ever had a California driver's license?
A Yes.
Q Do you still have one?
A No.
Q And when did you give that up?
A I believe in 2000 -- either 2005, I believe,

'-4 or '-5.

Q And what were the circumstances of you giving that up? Did it just expire and you didn't renew it or was there some other situation?

A No. Because I had plans to move to -- to Vegas even back then and -- permanently. And so I got a license and house and everything.

Q Okay. And so can you tell me right now if you have a valid California driver's license?

A No.

Q And so you don't have a California driver's license in your wallet right now, for example?

A For example, right now I have a Nevada license and it says -- has, you know --

MR. BURSTEIN: Why don't you -- just answer the question.

THE WITNESS: All right.

BY MR. LABAR:

Q So no, you don't --

MR. BURSTEIN: If you want to see, you can give him that --

THE WITNESS: Yeah, I have it.

MR. LABAR: No, no. That's fine. I think I have a copy of it.

Q But you don't have a California driver's

license in your wallet, correct?

A No.

Q Okay. Do you have one in your possession anywhere? Did you keep it?

A No.

Q Okay. Which banks do you do your personal banking with?

A My personal banking is in Nevada.

Q What's the name of the bank?

A Bank of America.

Q Okay. And when you're in California, you can use the Bank of America branches that are in California, correct?

A Yes.

Q I asked you about some automobiles and you said you had some cars registered in Nevada, right?

A Two, yes.

Q And you have some cars -- or your wife has some cars registered in California that you use from time to time?

A I think only -- only one.

Q Do you own any boats?

A No.

Q Helicopters? G5? Anything like that? No?

MR. BURSTEIN: I wish. I wouldn't have to fly

commercial.

BY MR. LABAR:

Q Motorcycles?

A No.

Q Okay. Let me ask you what -- we'll mark as Exhibit 1, a group Exhibit 1. I just want to ask you about an address.

(Defendant's Exhibit 1 was marked for identification by the court reporter.)

BY MR. LABAR:

Q The court reporter has marked as group Exhibit 1 a document. On the first page has a Bates stamp listing of SM23. Do you see that in the lower right-hand corner?

A Oh, yeah. SM23, yeah.

Q I just want to ask you about the address on this. There is an address of Shane Mosley, care of WTAS, 633 West Fifth Street. Do you see that?

A Yes.

Q Is that Mr. Keys' address?

A Yes.

Q Okay. Thank you.

Let me show you what we'll mark as Exhibit 2.

(Defendant's Exhibit 2 was marked for identification by the court reporter.)

BY MR. LABAR:

Q And Exhibit 2 is a document that has Bates stamp numbers SM46 and 47 on two pages. Do you see that?

A Uh-huh. SM46, yeah.

Q If you could turn to the second page, is that your signature on the top of the page?

A Uh, yes.

Q Okay. Thank you very much. That's the only questions I have about that.

Show you a document we'll mark as Exhibit 3.

(Defendant's Exhibit 3 was marked for identification by the court reporter.)

BY MR. LABAR:

Q Exhibit 3 is a document Bates stamp numbered SM176. Do you recognize this document?

A That was -- that's -- let's see.

MR. BURSTEIN: He's asking if you recognize it.

THE WITNESS: Recognize that? I don't recognize it.

MR. BURSTEIN: If you've seen it.

THE WITNESS: I mean, I don't -- I don't know.

MR. LABAR: Sure. Let me help.

Q This appears to be some kind of bill from Direct television, satellite TV provider, correct?

A Um, yeah. DirecTV.

Q Okay. It shows that this service was billed to your name at the Clayton Court, La Verne, California address, correct?

MR. BURSTEIN: Object to the characterization.

BY MR. LABAR:

Q Is that correct, was this billed to your name at the La Verne address?

A Yeah.

Q Okay. And is it fair to say that you have other bills in your name that go to the Clayton Court, La Verne address? For example, for water and power and things like that?

A Um, maybe. I'm not sure because the CPA does that. So usually he pays the bills for me.

MR. BURSTEIN: Can we go off the record for a second?

MR. LABAR: Sure.

(Discussion held off the record.)

BY MR. LABAR:

Q This bill appears to state there's service at your name -- in your name for DirecTV at the Clayton Court address, correct?

A Yes.

Q And you have other services in your name at the Clayton Court, La Verne address such as utilities, right?

A Yes.

MR. LABAR: Okay. Let me show you what we'll mark as the next exhibit in order.

(Defendant's Exhibit 4 was marked for identification by the court reporter.)

(Discussion held off the record.)

BY MR. LABAR:

Q Do you recognize Exhibit 4, sir, as a declaration that you signed in this matter?

A Um, I don't see a signature on here.

Q Okay.

MR. BURSTEIN: I'll represent that this is the signature -- he did sign this.

THE WITNESS: Okay.

BY MR. LABAR:

Q Just so you know, the reason why is because this is the one that went electronically to the Court and we don't have real signatures on those documents. Just so you know where it's coming from. This was a document filed with the Court. Okay?

A Okay.

Q Let me ask you to turn to page 3 of this declaration. In paragraph 11, you mention two companies that you are involved in; is that correct?

A Um, yeah.

Q Okay. Other than you -- that is, other than you and your wife, does the Sugar Shane Incorporated have any other employees?

A No.

Q Okay. And other than you, does Pound For Pound Promotions have any other employees?

A No.

Q Paragraph 14 says that, "Since at least 2005, I have filed tax returns as a resident of Nevada." Do you see that?

A Paragraph what again?

Q Paragraph 14.

A 14. Yes.

Q Okay. Do you recall exactly when you stopped filing tax returns as a resident of California?

A Um, I can't really recall.

Q And let me ask you as of, say, April 2008, this year, it was your plan and intention to have your family remain in California and your son complete school in California; is that right?

A As of April?

Q Right.

A Um, I would say yeah. We were going to stay in California, but was going to leave California after the fight, which was May, for a period of time.

Q Right. And you were going to return to California to allow your child to finish school, right?

A To finish school.

MR. BURSTEIN: Object to the form of the question.

MR. LABAR: All right. Thanks. Let me just check my notes here and I think we may be done.

MR. BURSTEIN: I may have a couple of questions.

MR. LABAR: That's fine.

I do have a question. Back on?

Q Do you have a passport?

A Yeah.

Q Okay. And is there any reason why you couldn't provide a copy of that to your attorney?

A Because I didn't have it.

Q Okay. Where was it located?

A I don't know. I can't -- I couldn't find it. I'm still looking for it right now.

Q Okay. Thank you.

MR. BURSTEIN: You better find it soon because you're going to Australia.

THE WITNESS: I know. I'm going to Australia. I have to get a new one.

MR. LABAR: Takes a long time to get them.

I don't have any further questions.

MR. BURSTEIN: I have a couple of questions.

EXAMINATION

BY MR. BURSTEIN:

Q Where is your family residing right now?

A My family is residing in California.

Q Where are they physically located right now?

A Oh, physically located right now? They're in Las Vegas.

Q And have they been in Las Vegas since the end of the school year?

A Yes.

Q When do you plan to have the family come back to California?

A When school year starts.

Q Okay. Even when the kids are in school, do you spend time in Las Vegas?

A Yes.

Q All right. What do you do when you're in Las Vegas? I mean is there a reason why you stay in Las Vegas other than the fact that you stay at your home?

A Well, a lot of times I'm in Vegas because of all of the big events and fights that -- you know, part of the promotion of Golden Boy, and most of the fights

are in Vegas. So either I'm at the Mandalay Bay, the MGM, Caesars Palace, or wherever.

Q And what grade is your oldest son in school?

A He's a junior, but he's going to be a senior next year.

Q And this fall he's going to be a senior?

A This fall he's going to be a senior.

Q All right. And after the fall of this year, is it your intention to have Nevada as your exclusive residence?

A It is my intention, yes, to have -- to move the family to Nevada.

Q And how long do you continue to fight -- do you expect to continue to fight?

A Um, I don't -- maybe -- not that long. I'm not sure how long, whether it be a year or two.

Q Okay. And do you -- will you be using the Big Bear training facility after you retire?

A I won't personally be using it. But, like I say, I have other fighters that may be using it, you know.

Q Okay. And do you have plans -- what do you plan to do with your California home after June of 2009?

A Well, I plan to put it up for sale and move into something in Vegas.

Q Okay.

A With my family.

Q Okay. And aside from -- do you spend time in Las Vegas alone?

A A lot of times I do. I spend time alone.

Q And where does your family spend time during the holidays? Like school vacations?

A Well, they would either go to -- most of the time they're in Vegas. They'll come to Vegas to see me.

MR. BURSTEIN: Okay. I have nothing else.

MR. LABAR: Just a couple questions.

FURTHER EXAMINATION

BY MR. LABAR:

Q From time to time when your children are not in school and living in La Verne, do they also come to see you in Big Bear?

A Actually, from time to time, but not really, no.

Q Okay. And can you give me any percentage of how much time you spent in California versus Nevada in the year 2007?

A I couldn't -- I couldn't tell you. I mean it could be equally as much because I'm in Nevada or, you know, I'm all over the place. I'm not just in California

and Nevada. I'm everywhere. Wherever the promotion needs me to go, I go.

Q Okay. And just one last question. Throughout this time period, 2007 through 2008, you never intended to remain apart from your family, right?

A In 2007 and 2008?

Q Right.

MR. BURSTEIN: Object to the form of question, but you can answer.

THE WITNESS: Wait. Could you --

MR. LABAR: Sure.

THE WITNESS: -- say again?

BY MR. LABAR:

Q You've never intended to remain apart from your family, right?

A No, I don't want to be apart from the family.

MR. LABAR: All right. Thank you. I have no further questions.

MR. BURSTEIN: One more question.

FURTHER EXAMINATION

BY MR. BURSTEIN:

Q When Mr. Labar asked you about apart from your family, are you physically apart from them at times?

A At -- a lot of times I'm physically apart from

them, yeah.

Q So what did you understand Mr. Labar to be asking you when -- whether you wanted to be apart?

A Do I want to be apart -- he asked did I want to be, but, you know, I don't want to be, but, you know, I am sometimes.

Q And also you were asked some questions -- I mean I think I forgot to ask you.

Golden Boy's offices are in California, right?

A Right.

Q Do you do any work out of their offices in California?

A No.

Q What is the kind of work that you do for Golden Boy?

A The kind of work that I do, I'm -- I recruit fighters. That's --

Q And anything else? Do you go attend events?

A Oh, I attend events, yeah. I -- I recruit fighters, I attend numerous events, and most of the events are done in Vegas.

Q And say a fight is on a Saturday night. How much time do you spend in Vegas in connection with the promotion of that fight during the week before?

A I will spend the whole week from Monday to --

from actually Monday to Saturday and sometimes a little bit longer after the fight.

Q And does your son have any plans on -- your oldest son have any boxing plans in his future?

A He does. He's actually an amateur boxer right now. He's 3 and 0. And he actually has plans of being a professional fighter, yes.

Q And do you plan on -- on training him?

A Definitely.

Q And where do you plan on training him?

A I plan on training him in Las Vegas.

Q And why is that?

A Because that's where we'll be moving.

Q All right. And is there any -- is there any place in particular in Las Vegas that you'd be training in?

A Well, there's a gym that's next to my house in Vegas and that's called the Pound For Pound gym.

MR. BURSTEIN: Okay. Nothing further.

MR. LABAR: Just one last question.

FURTHER EXAMINATION

BY MR. LABAR:

Q Throughout the period of 2007 to 2008, did you train with your son?

A 2007 to -- I didn't really train with him because I was actually doing my training, but sometimes he would go to -- up to Big Bear and train as much as he could, and then he had to leave and go back down so . . .

Q And let me just ask this question again and I'll try to be clearer.

Throughout the period of time up to -- from 2007 to 2008 up to the present, you've always intended to remain with your family as a family unit, right?

A Yes. I want to remain with my family, yes.

MR. LABAR: Okay. No further questions.

MR. BURSTEIN: I'm sorry. You raised another good question.

FURTHER EXAMINATION

BY MR. BURSTEIN:

Q After you retire, which you said is in a year or two, will you still be -- do you still intend to be spending months at a time at Big Bear?

A After I retire, I probably wouldn't spend months at a time unless -- I'll probably be more -- I'll be more in Vegas, but this is for some of the fighters, Golden Boy fighters, you know, that I recruited. Like -- like right now I have to leave to go to Australia for a

fighter that I've signed to Golden Boy and stay there for maybe a couple of weeks.

MR. BURSTEIN: Okay. Nothing further.

MR. LABAR: Okay. Mr. Mosley, you've knocked me out. Thank you for your time.

STATE OF CALIFORNIA )
) ss
COUNTY OF LOS ANGELES )

I, PAMELA J. FELTEN, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: JUL 18 2008

Pamela J. Felten
PAMELA J. FELTEN
CSR No. 5189

# EXHIBIT E

Kim O. Dincel, Esq. (SBN 131563)
Long & Levit LLP
465 California Street 5th Floor
San Francisco, California 94104
Tel (415) 397-2222 Fax (415) 397-6392
E-mail kdincel@longlevit.com

JUDD BURSTEIN, P.C.
Judd Burstein (Admitted *pro hac vice*)
1790 Broadway, Suite 1501
New York, New York 10019
Tel (212) 974-2400 Fax (212) 974-2944
E-mail jburstein@burlaw.com

*Attorneys for Plaintiff,*
SHANE D. MOSLEY, SR.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHANE D. MOSLEY, SR., *Plaintiff*, vs. VICTOR CONTE, *Defendant*. | 08-Civ-1777 (JSW)<br>**DECLARATION OF SHANE D. MOSLEY, SR.**<br>Date: May 30, 2008<br>Time: 1:30 p.m.<br>Courtroom: 2, 17th Floor<br>Hon. Jeffrey S. White |

**SHANE D. MOSLEY, SR.,** hereby declares under penalty of perjury:

1. I am the Plaintiff in this action.

2. I submit this Declaration to demonstrate why Defendant Victor Conte's ("Conte" or "Defendant") anticipated motion to dismiss the complaint has no merit. The purpose of this Declaration is to place before the Court factual information relevant to my anticipated opposition

EXHIBIT 4
5pgs
Deponent MOSLEY
Date 7-9-08 Rptr. Felten
WWW.DEPOBOOK.COM

to Defendant's motion. In addition, I explain why a prompt resolution of this case is so important to me.

THE MERITS OF MY CLAIM

3. I am a professional boxer, and I have been defamed by Defendant, the infamous principal of the Bay Area Laboratory Co-operative ("Balco"), on multiple occasions.

4. In or about July of 2003, I met with Conte at Conte's business, Balco, for the purpose of obtaining **legal** supplements to aid my training. At this meeting with Conte, samples of my blood were taken and analyzed. Conte then recommended a regimen of products that he told me would help with my endurance.

5. Further, at the meeting with Conte, I specifically asked Conte for assurances that everything that he was recommending was both legal and healthy. Conte specifically gave me that assurance. His public claims that he explained to me that he was recommending illegal substances and procedures are also a lie.

6. Significantly, I have never denied taking the products recommended to me by Conte. Indeed, I forthrightly testified about them before the Grand Jury. However, I have always denied that Conte ever told me, or that I knew, that I was taking anything that was illegal or in any way barred by the rules of my sport.

7. I purchased and received the following supplements from Balco: "the cream", "the clear", and Erythropoietin (EPO). I admitted to the Grand Jury that I had made these purchases. However, at no time was I ever told, by Conte or anyone associated with Balco, that these products were steroids or illegal or banned performance enhancing drugs. In other words, Conte never told me, in sum or substance, that the supplements provided to me by or on behalf of Conte or Balco were undetectable steroids or other banned substances that would not show up in

a drug test. To the contrary, I explicitly sought and received Conte's assurance that everything he was recommending was entirely legal and authorized for use in my sport.

MY NEVADA CITIZENSHIP

8. Conte has also claimed that I am not a citizen of Nevada. This is also not true.

9. I own two homes in Las Vegas, Nevada, the first of which was purchased in 2002 or 2003.

10. I have a Las Vegas cell phone number, which I began using well before this action began.

11. The companies I own, and through which I conduct my boxing career - Sugar Shane, Inc. and Pound for Pound Promotions, Inc. - are Nevada Corporations organized in 2001 and 2002 respectively. The principal places of business of these corporations were, until recently, New York and, prior to commencement of this action, Nevada.

12. I have not maintained bank accounts in California for at least the last five years. Rather, all of my bank accounts have been maintained in either Nevada or New York.

13. Since at least 2005, I have maintained a Nevada driver's license and all of my cars have been registered in the State of Nevada.

14. Since at least 2005, I have filed tax returns as a resident of Nevada.

15. None of my earned income from my career as a professional boxer has been earned from fights in California since June 17, 2000. Rather, since that date, I have fought in Las Vegas 11 out of 15 times, with the other bouts taking place in either New York or Indianapolis.

16. It is true that I jointly own a home in La Verne, California with my wife and also own a home in Big Bear where I have done some of my training. However, I do not live with

Case 3:08-cv-01777-JSW Document 36 Filed 05/23/2008 Page 4 of 5

my wife full time for a number of reasons, including the demands of my career, and consider Las Vegas to be my primary residence. More importantly, we have maintained the home in California because one of my children was in school at the time of my move to Nevada, and we did not want to upset his schedule. Nonetheless, virtually all of the time when the children are not in school is spent outside of California, and we ultimately do not intend to maintain a residence in California. Further, even during the school year, I spend much of my time in Las Vegas while my wife remains in California.

**THE NEED FOR A SPEEDY TRIAL**

17. I cannot begin to explain how devastating Conte's false allegations have been to me. I have been a professional athlete my entire adult life, and I believe that I have carved out an important place for myself in the sport's history. All of my life's work is at risk because of Conte's lies.

18. Further, the next phase of my economic life, after retirement from the sport in the next few years, will be based upon my career in the ring. I have a brand based upon the highest reputation for sportsmanship, and that brand is being irreparably tarnished by Conte.

Case 3:08-cv-01777-JSW Document 36 Filed 05/23/2008 Page 5 of 5

19. Worse still, if the trial of this case is not completed prior to publication of Mr. Conte's book so that I can secure an injunction, I will be forced to suffer through a likely international television and print publicity tour and an internationally published book in which Mr. Conte will further seek to destroy my reputation with his lies. If this occurs, even a subsequent victory at trial will not make me completely whole – regardless of how much of a damages award I win – because my name will have already been linked to the use of illegal drugs to such a great degree that it will not be fixable.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 22nd day of May 2008.

/S
SHANE D. MOSLEY, SR.

# EXHIBIT F

Marc T. Little, Esq. (State Bar No. 174132)
LAW OFFICES OF MARC T. LITTLE
A Professional Law Corporation
445 South Figueroa, 26th Floor
Los Angeles, California 90071
Telephone: 213/612-7754
Facsimile: 213/612-7797

Attorney for Plaintiff

FILED
LOS ANGELES SUPERIOR COURT
FEB 14 2003
JOHN A. CLARKE, CLERK
BY STEPHANIE SIANEZ, DEPUTY

Case assigned Judge James Chalfant

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

SHANE D. MOSLEY, SR., an individual,

Plaintiff,

vs.

CEDRIC KUSHNER PROMOTIONS, LTD, a New York Corporation,

Defendant.

Case No. BC290412

**COMPLAINT FOR DAMAGES**

**[ACCOUNT STATED]**

**[Amount Exceeds $25,000]**

**[Unlimited Civil Case]**

For a cause of action against Cedric Kushner Promotions, Inc., a New York Corporation ("CKP"), Shane D. Mosley, Sr., an individual ("Mosley") alleges as follows:

**GENERAL ALLEGATIONS**

1. Shane D. Mosley, Sr. is an individual residing in the County of Los Angeles, State of California.

2. Cedric Kushner Promotions, Ltd. is a New York Corporation duly organized and existing under the laws of the State of New York with its principal place of business in Southampton, State of New York.

CIT/CASE: BC290412 LEA/DEF#:
RECEIPT #: CCH459023021
DATE PAID: 02/14/03 11:46:45 AM
PAYMENT: $224.50
RECEIVED:
CHECK: 224.50
CASH:
CHANGE:
CARD:
0310

## FIRST CAUSE OF ACTION

**[Account Stated]**

3. Mosley realleges and incorporates by reference the allegations contained in paragraphs 1 through 2 above as if fully set forth herein.

4. On or about October 13, 1998, as amended by letter agreements dated August 2, 1999 and September 18, 2000, Mosley entered into a multi-fight agreement whereby he contracted with CKP to render his personal services as a professional fighter.

5. On or about October 31, 2001, Mosley and CKP entered into a Separation Agreement whereby the multi-fight agreement was terminated. However, Mosley was obligated to render his services in connection with one additional fight. That fight was "Sugar" Shane Mosley vs. Vernon Forrest which was held at Madison Square Garden in New York on January 26, 2002.

6. Mosley fulfilled his obligation under the written agreement and received compensation from the broadcast licensing fee due under the multi-fight agreement from CKP in the amount of $1,244,000.00.

7. On or about January 25, 2001, CKP agreed in writing to account and pay Mosley his 80% share of the net profits within 30 days after the fight. Revenues would be derived from foreign broadcast licensing fees, sponsorship revenue and ticket sales ("Ancillary Revenue").

8. On or about March 10, 2001, at Los Angeles, California, an account was stated in writing by and between Mosley and CKP and on such statement a balance of $660,359.30 was due to Mosley from CKP. CKP agreed to pay to Mosley said balance. [A copy of the account is attached hereto as Exhibit A and made a part hereof.]

9. On or about June 1, 2002, CKP paid Mosley $50,000.00 toward his share of the net profits.

10. Although demanded by Mosley from CKP, the agreed upon balance has not been paid in full.

11. There is now due, owing, and unpaid from CKP to Mosley the sum of $610,359.30,

together with interest thereon from and after March 10, 2001.

WHEREFORE, Mosley prays judgment as follows:

1. For the sum of $610,359.30.
2. For interest on such sum at the legal rate per year from and after March 10, 2001.
3. For attorney fees in an amount to be determined at trial.
4. For costs of suit herein incurred.
5. For such other and further relief as the court may deem proper.

Dated: February 14, 2003

LAW OFFICES OF MARC T. LITTLE, P.C.

MARC T. LITTLE, ESQ.
Attorney for Plaintiff
Shane D. Mosley, Sr.

# EXHIBIT G

Hartford O. Brown, Esq. , SBN 190507
Michael J. Riley, Esq., SBN 170006
KLINEDINST PC
777 S. Figueroa St., 47th Floor
Los Angeles, California 90017
(213) 607-2115/FAX (213) 607-2116

Attorneys for Defendants and Cross-Complainants
SHANE MOSLEY AND JIN MOSLEY

FILED
LOS ANGELES SUPERIOR COURT
JUL 07 2008
JOHN A. CLARKE, CLERK
BY D. LLOYD, DEPUTY

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

TERRIER CORP., a Colorado Corporation d/b/a PLAYGROUND WAREHOUSE,

Plaintiff,

v.

SHANE MOSLEY, an individual, JIN MOSLEY, an individual; and DOES 1 through 50, inclusive,

Defendants.

Case No. KC050549

**FIRST AMENDED CROSS-COMPLAINT OF DEFENDANT/CROSS-COMPLAINANT SHANE MOSELY**

1. **Factual Allegations Common to All Causes of Action.**
2. **Breach of Contract**
3. **Negligence**
4. **Fraudulent Misrepresentation**
5. **Money Had and Received and Unjust Enrichment**

Trial Date: July 7, 2008
Dept: R
Judge: Honorable Robert A. Dukes
Complaint Filed:

Cross-Complainants JIN MOSLEY and SHANE MOSLEY, (collectively the "Mosleys") by their attorneys, KLINEDINST PC, as and for their Cross-Complaint against Cross-Defendant TERRIER CORP., a Colorado corporation, d/b/a PLAYGROUND WAREHOUSE ("Terrier"), allege as follows:

## INTRODUCTION

1. Pursuant to Business and Professions Code Section 7031 (b), Cross-Complainants request leave to file a First Amended Cross-Complaint setting forth a Cause of Action for return

of all compensation paid to Cross-Defendants, who did not have a valid contractors license.

2. Cross-Complainant JIN MOSLEY along with her husband, Cross-Complainant SHANE MOSLEY, purchased a luxury playground set from Terrier. The Mosleys agreed to purchase the playground set upon receiving Terrier's promises to properly install and deliver it.

3. Terrier represented to the Mosleys that it could install and deliver the playground set in perfect condition and in a timely manner as the playground set was the central focus of an upcoming birthday party that the Mosleys had planned for their son.

4. Upon the installation of the playground set, Terrier caused severe damage to the Mosleys' premises through its gross negligence. Simply put, Terrier damaged the Mosleys' sprinkler system, caused severe water damage to the yard, failed to deliver in a timely manner, and failed to deliver all the materials that the Mosleys had ordered. The damage to the premises would never have happened had Terrier properly performed the installation.

5. To date, the Mosleys have not been compensated for the damages they suffered as a direct result of Terrier's negligence, fraudulent misrepresentations, and breach of contract.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

## THE PARTIES

6. Cross-Complainant JIN MOSLEY along with her husband, Cross-Complainant SHANE MOSLEY, are individuals residing in the City of La Verne, County of Los Angeles, California.

7. On information and belief, Terrier is a Colorado corporation doing business in the County of Los Angeles, California.

## FACTUAL ALLEGATIONS
## COMMON TO ALL CAUSES OF ACTION

8. On or about March 27, 2006, the Mosleys sought to purchase a playground set for their children.

9. The Mosleys inquired about and sought information from Terrier regarding various playground sets that it advertised and sold.

10. The Mosleys had certain prerequisites that needed to be met before they were willing to purchase a playground set from Terrier.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

11. Prior to purchase, the Mosleys required confirmation from Terrier that it could guarantee the following:

i. The playground set would be delivered and installed prior to Saturday, May 27, 2006, as the Mosleys had planned a birthday party for their son in their backyard on that day;

ii. Terrier would properly level the ground surrounding the playground set, as the landscape in the Mosleys'= backyard necessitated same;

iii. The installation would be done at a specific location and placed at a specific angle in the Mosleys' backyard, so as to conform with the Mosleys' homeowners association guidelines;

iv. The installation of the playground set would not interfere with the Mosleys' backyard, apart from the space needed to place the playground set, as they had invested significant time and money on the areas of the backyard not implicated in the installation of the playground set;

v. The installation of the playground set would not interfere with the Mosleys'= sprinkler system; and

vi. To the extent necessary, Terrier would remove bushes, plants, trees, and flowers which impeded the installation of the playground set and replant same in an aesthetically pleasing manner.

12. The Mosleys would not have purchased the playground set, but for Terrier's promise to guarantee performance on all items referenced in Paragraph 10 herein.

13. Accordingly, the Mosleys specifically requested assurances from Terrier that the guarantees referenced in Paragraph 10 herein would be performed by Terrier.

14. Terrier assured the Mosleys that it would:

Deliver and install the playground set significantly prior to Saturday, May 27, 2006;

2. Level the ground surrounding the playground set to the extent necessary in order to install the playground set and have it function in a safe manner;

3. Install the playground set pursuant to the Mosleys' direction, and install the playground set in a location in conformance with the Mosleys' homeowners association guidelines;

4. Install the playground set without interfering with the Mosleys' backyard, apart from the space needed to place the playground set;

5. Install the playground set without damaging the Mosleys' sprinkler system; and

6. Remove bushes, plants, trees, and flowers to install the playground set, and replant same in an aesthetically pleasing manner.

15. The Mosleys reasonably relied upon Terrier's promises, guarantees, and assurances.

16. In reliance upon Terrier's promises, guarantees, and assurances, the Mosleys entered into an agreement with Terrier to purchase the playground set and additional rubber mulch. The Mosleys and Terrier also agreed that Terrier would deliver and install same.

17. However, at the time that Terrier made the promises, guarantees, and assurances as set forth in Paragraph 13 above, Terrier knew that it could not live up to those promises, guarantees, and assurances. In short, Terrier made material, false representations to the Mosleys in order to induce them to agree to purchase the playground set.

18. Additionally, the Mosleys have learned that additional statements made by Terrier in a further effort to induce the Mosleys into purchasing the playground set were false, and, upon information and belief, were made with the specific intention of misleading the Mosleys. In particular, Terrier falsely represented to the Mosleys that John Travolta and other celebrities had recently purchased the same playground set.

19. The Mosleys reasonably relied upon these representations in agreeing to purchase the playground set from Terrier.

20. Although the Mosleys had requested immediate delivery, Terrier did not begin to

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

deliver the playground until Monday, May 22, 2006, after the Mosleys placed numerous telephone calls to Terrier demanding reassurances that the installation would be completed prior to May 27, 2006.

21. Upon delivery, Terrier began to install the playground in a manner that was directly contrary to the Mosleys' instructions, as Terrier placed it in an area of the backyard that was not in conformance with the Mosleys' homeowners association guidelines.

22. Furthermore, Terrier began installing the playground set at an incorrect angle, which also failed to comply with the Mosleys' home owners association guidelines and the parties' prior agreement.

23. The Mosleys demanded that Terrier either remove the playground set completely and accept its return, or re-install the playground set at the previously agreed upon location and angle.

24. Terrier agreed to re-install the playground set at the agreed upon location and angle.

25. However, Terrier failed to properly level the grounds surrounding the playground set, despite its prior promise, guarantee, and assurances that it would do so.

26. The Mosleys complained to Terrier that the playground was not level.

27. Although Terrier had promised, guaranteed, and assured the Mosleys that it would be able to install the playground set on a hill and level the landscape on the hill to the extent necessary for a safe installation, Terrier's employees only brought shovels to perform this work, which were insufficient to safely install the playground on a hill as it had agreed to do.

28. Because it was unable to do so, Terrier asked the Mosleys to obtain a plow truck to excavate the hill, and advised the Mosleys that they would supervise the excavation.

29. Accordingly, the Mosleys obtained a plow truck to perform the excavation work under the direct supervision of Terrier.

30. Terrier agreed to pay for this additional excavation work.

31. In the course of the installation, Terrier negligently broke one of the Mosleys' sprinkler heads in their backyard.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

32. The broken sprinkler head caused severe flooding in the yard which was foreseeable.

33. In the course of the installation, Terrier also negligently installed the playground set on top of another sprinkler head.

34. The negligent installation caused severe water damage to the Mosleys' yard and a massive amount of flooding underneath the playground set.

35. As a direct result of Terrier's gross negligence and other breaches, the Mosleys were required to hire an individual to dig under the playground set and retrieve the sprinkler, as the playground set and the yard were flooding.

36. The water damage caused by Terrier's gross negligence and other breaches forced the Mosleys to cancel the birthday party planned for their son.

37. When Terrier made the representations referenced in Paragraphs 13 and 17 above, it knew them to be false and made those representations with the intent to deceive and defraud the Mosleys, and to induce the Mosleys to act in reliance upon those representations in the manner alleged herein, or with the expectation that the Mosleys would so act.

38. At the time these representations were made by Terrier and at the time the Mosleys took the actions herein alleged, the Mosleys were justifiably ignorant of the falsity of Terrier's representations and believed them to be true. In reliance upon these representations, the Mosleys were induced to enter into the false and unconscionable agreement, and order the playground set along with the rubber mulch. Had the Mosleys known these representations to be false, they would not have taken such action. The Mosleys' reliance upon Terrier's representations was justified.

39. As a proximate result of Terrier's fraudulent conduct, the Mosleys were required to pay at least $10,000 for repairs.

40. The aforementioned conduct of Terrier amounts to intentional misrepresentations, known by Terrier to be false, and made with the intention of depriving the Mosleys of property, money, and legal rights, or otherwise causing injury to the Mosleys, and was despicable conduct that subjected the Mosleys to a cruel and unjust hardship in conscious disregard of the Mosleys'

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

rights, so as to justify an award of exemplary and punitive damages.

41. In addition to the playground set, the Mosleys purchased, inter alia, seven (7) bags of rubber mulch to cover the area around and under the playground set.

42. Terrier only delivered three (3) bags of rubber mulch, and so the Mosleys are still owed four (4) bags of rubber mulch pursuant to their agreement with Terrier.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

43. The Mosleys repeat and reallege the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

44. The Mosleys entered into a contract with Terrier on or about March 27, 2006.

45. The essential terms of the agreement called for Terrier to provide, inter alia, a playground set with wood roofs, seven (7) bags of rubber mulch, and to deliver and install the playground set prior to May 27, 2006 in the manner agreed upon between the Mosleys and Terrier.

46. Terrier breached the agreement by, inter alia, failing to satisfactorily install the playground set in the manner agreed upon between the Mosleys and Terrier, and by not providing the requisite amount of mulch.

47. The Mosleys performed all obligations to Terrier except those obligations that the Mosleys were excused from performing.

48. The Mosleys suffered damages caused by Terrier's breach of the agreement.

49. Based upon the foregoing breach of contract, Terrier is liable to the Mosleys in an amount to be determined at trial, but in no event less than $10,000.

50. The Mosleys are entitled to attorneys fees incurred in enforcing the foregoing agreement. The Mosleys have retained KLINEDINST PC, to represent their interests.

**SECOND CAUSE OF ACTION**

**NEGLIGENCE**

51. The Mosleys repeat and reallege the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

52. Terrier owed a duty to the Mosleys to exercise ordinary or reasonable care in the delivery and installation of the playground set.

53. Terrier failed to exercise ordinary or reasonable care in the installation of the playground set.

54. Terrier's failure to exercise ordinary or reasonable care in the installation of the playground set was the proximate cause of, inter alia, water damage and flooding to the Mosleys' yard.

55. Based upon the foregoing negligence, Terrier is liable to the Mosleys in an amount to be determined at trial, but in no event less than $10,000.

**THIRD CAUSE OF ACTION**

**FRAUDULENT MISREPRESENTATION**

56. The Mosleys repeat and reallege the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

57. Based upon the foregoing fraud, Terrier is liable to the Mosleys in an amount to be determined at trial, but in no event less than $10,000.

58. The Mosleys are also entitled to punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**MONEY HAD AND RECEIVED AND UNJUST ENRICHMENT**

59. Cross-Complainants incorporate the allegations of all the foregoing paragraphs by reference, as if fully set forth herein.

60. Cross-Defendant, by the actions alleged above, have collected Twenty Thousand Dollars ($20,000.00) from Cross-Complainants for installation of a structure, for which they were required to have a Contractor's License.

61. Cross-Defendants did not, and do not, have a valid contractor's license or specialty contractor's license, which is required by Business and Professions Code Section 7026.

62. As a result of Cross-Defendants violations of the Business and Professions Code, it has unjustly enriched itself at the expense of Cross-Complainants.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

63. Cross-Defendant's retention of money gained through their unlawful practice is unjust. In addition, Business and Professions Code Section 7031 (b) authorizes an action against an unlicensed contractor to "recover all compensation paid to the unlicensed contractor for performance of any act or contract."

64. Cross-Complainants are therefore entitled by statute to the return of the deposit paid to Cross-Defendant.

65. To prevent unjust enrichment, defendants should be required to identify, account for, fully refund, and provide restitution of its ill-gotten gains including interest collected to Cross-Complainants. Cross-Defendant should be ordered to refund all sums paid by Cross-Complainants to them, together with interest thereon.

WHEREFORE, the Mosleys demand judgment against Terrier as follows on all Causes of Action:

1. Compensatory damages according to proof at trial, but in no event less than $10,000;

2. Punitive damages on the Mosleys'= cause of action for fraud;

3. Attorneys fees;

4. Return of the deposit and interest thereon, pursuant to Business and Professions Code Section 7031 (b);

5. Costs of suit; and

6. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

KLINEDINST PC

DATED: July 3, 2008

By: ______________________

HARTFORD O. BROWN
MICHAEL J. RILEY
Attorneys for Defendants/Cross-Complainants
SHANE MOSLEY and JIN MOSLEY

# EXHIBIT H

JOHN M. HARMATA SBN 131668
HARMATA & ASSOCIATES, APLC
550 West "C" Street, Suite 1960
San Diego, CA 92101
Tel: (619) 233-4711
Fax: (619) 231-1389

Attorney for Plaintiff.

6008 A 91750

FILED
LOS ANGELES SUPERIOR COURT
MAY 04 2007
JOHN A. CLARKE, CLERK
BY E. LEON, DEPUTY

SUMMONS ISSUED & FILED

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

EAST DISTRICT

TERRIER CORP., a Colorado corporation dba PLAYGROUND WAREHOUSE,

Plaintiff,

v.

SHANE MOSLEY, an individual; JIN MOSLEY, an individual; and DOES 1 through 50, inclusive,

Defendants.

CASE NO: KC050549 R

**COMPLAINT FOR BREACH OF CONTRACT**

**[Amount Demanded Exceeds $10,000.00]**

CASE ASSIGNED FOR ALL PURPOSES TO JUDGE ROBERT A. DUKES DEPT. R

**I.**
**INTRODUCTORY ALLEGATIONS**

**Jurisdiction and Venue**

1. This is a complaint for money damages over $10,000 exclusive of costs and interest. This court has jurisdiction over this action and venue is proper because Defendants, and each of them, reside in the City of La Verne, County of Los Angeles, California.

2. Plaintiff is a Colorado corporation doing business in the County of Los Angeles, California.

3. Plaintiff alleges that Defendants SHANE MOSLEY and JIN MOSLEY are individuals who reside in the City of La Verne, County of Los Angeles, California.

CIT/CASE: KC050549 LEA/date
RECEIPT #: [illegible]1151190[illegible]
DATE PAID: 05/04/07 01:49:02 PM
PAYMENT: $320.00
RECEIVED:
CHECK: 320.00
CASH:
CHANGE:
CARD:
0310

HARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

Printed on Recycled Paper

/////

/////

4. Plaintiff is unaware of the true names and capacities of the defendants named herein as DOES 1 through 50 inclusive, and therefore sues them pursuant to California Code of Civil Procedure Section 474 and alleges on information and belief that each such fictitiously named defendant was legally responsible for Plaintiff's damages as alleged in this complaint.

5. Plaintiff alleges on information and belief that each of the defendants, including DOES 1 through 50 inclusive, at all pertinent times:

a. Was the employee or agent of each defendant;

b. Acted within the scope of such employment or agency with the complete knowledge, consent and authority of the defendants; and

c. Was responsible in some way for Plaintiff's damages.

6. Plaintiff alleges on information and belief that each of defendants DOES 1 through 50 inclusive at all pertinent times was the partner, joint-venturer, principal or owner of the named defendants.

## II.
## FIRST CAUSE OF ACTION

**(BREACH OF WRITTEN CONTRACT against all Defendants)**

7. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

8. On or about May 15, 2006, Defendants, and each of them, and Plaintiff reached a written agreement, whereby Defendants, and each of them, agreed to purchase a playground set, and the delivery and installation thereof, from Plaintiff. Plaintiff delivered and installed said playground set. Despite Plaintiff's demands, Defendants, and each of them, refused and failed to tender the agreed purchase price to Plaintiff for the playground set, and delivery and installation thereof, thereby breaching the agreement.

9. Plaintiff performed all things required of it by the contract except where performance

BARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

/////

/////

was prevented or excused.

10. As a legal result of this breach, Plaintiff has been damaged in an amount in excess of $45,000.00 according to proof.

11. Pursuant to the terms of said agreement, Plaintiff is entitled to attorney's fees incurred in enforcing the foregoing agreement. Plaintiff has retained Harmata & Associates, A Professional Law Corporation, to represent its interests.

## III.
## SECOND CAUSE OF ACTION

**(REASONABLE VALUE FOR GOODS OR SERVICES RENDERED against all Defendants)**

12. Plaintiff realleges and incorporates by reference paragraphs 1 through 6 inclusive as though fully set forth herein.

13. Within four years last past, on or about May 15, 2006, Defendants, and each of them, became indebted to Plaintiff for merchandise, goods and/or services rendered to Defendants, and each of them. The reasonable value of said goods and/or services is in the sum of $50,000.00 according to proof.

WHEREFORE, Plaintiff prays judgment as follows:

On the First Cause of Action for Breach of Contract:

1. For damages in excess of $45,000 in a sum according to proof;
2. For attorney fees incurred herein;
3. For costs of suit incurred herein; and
4. For such other and further relief as the court deems proper.

On the Second Cause of Action for Reasonable Value of Goods Sold or Services Rendered:

1. For damages in excess of $45,000 in a sum according to proof;
2. For attorney fees incurred herein;

HARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

Printed on Recycled Paper

/////

/////

3. For costs of suit incurred herein; and

4. For such other and further relief as the court deems proper.

HARMATA & ASSOCIATES, APLC

Dated: May 2, 2007

By: ______________________

John M. Harmata
Attorney for Plaintiff

HARMATA & ASSOCIATES
550 West "C" Street
Suite 1960
San Diego, CA 92101
(619) 233-4711

Printed on Recycled Paper

# EXHIBIT I

Hartford O. Brown, Esq., SBN 190507
**KLINEDINST PC**
777 S. Figueroa Street, 47th Floor
Los Angeles, CA 90017
Tel.: (213) 607-2115
Fax: (213) 607-2116

Attorneys for Defendants,
**SHANE MOSLEY and JIN MOSLEY**

FILED
LOS ANGELES SUPERIOR COURT
JUL 13 2007
JOHN A. CLARKE, CLERK
BY E. LEON, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

TERRIER CORP., a Colorado corporation, d/b/a PLAYGROUND WAREHOUSE,

*Plaintiff,*

- against -

SHANE MOSLEY, an individual, JIN MOSLEY, an individual; and DOES 1 through 50, inclusive,

*Defendants.*

Case Number: KC050549 R

**ANSWER TO COMPLAINT**

Judge: Honorable Robert A. Dukes
Dept: R
Complaint Filed: 5/5/07
Trial Date: TBD

COME NOW Defendants SHANE MOSLEY, an individual, and JIN MOSLEY, an individual ("Defendants") by their attorneys, KLINEDINST PC, as and for their Answer to TERRIER CORP.'s, a Colorado corporation, d/b/a PLAYGROUND WAREHOUSE ("Plaintiff") unverified Complaint, dated May 2, 2007, for Breach of Written Contract and Reasonable Value for Goods or Services Rendered (the "Complaint"), allege as follows:

1. Defendants deny the allegations contained in Paragraph One of the Complaint, except Defendants admit that they reside in the City of La Verne, County of Los Angeles, California.

2. Defendants lack sufficient information or belief to admit or deny the allegations contained in Paragraph Two of the Complaint, and deny the allegations on that ground.

3. Defendants admit the allegations contained in Paragraph Three of the Complaint.

4. Defendants lack sufficient information or belief to admit or deny the allegations contained in Paragraph Four of the Complaint, and deny the allegations on that ground.

CIT/CASE: KC050549 LEA/DEF#:
RECEIPT #: POM113190
DATE PAID: 07/13/07 01:29:20 PM
PAYMENT: $40.00
RECEIVED:
CHECK: 0310
CASH:
CHANGE: $0.00
CARD:

5. The allegations contained in Paragraph Five of the Complaint, and each of its sub-parts, in so far as they are intelligible, require a legal conclusion which is for the Court to determine, and therefore Paragraph Five requires no response from Defendants, and on that ground the allegations are denied. To the extent that a response is necessary, Defendants deny the allegations contained in Paragraph Five of the Complaint.

6. Defendants lack sufficient information or belief to admit or deny the allegations contained in Paragraph Six of the Complaint, and deny the allegations on that ground. Defendants further allege that Paragraph Six of the Complaint requires a legal conclusion which is for the Court to determine, and therefore Paragraph Six requires no response from Defendants, and on that ground the allegations are further denied.

**ANSWERING PLAINTIFF'S FIRST CAUSE OF ACTION**

**(BREACH OF WRITTEN CONTRACT against all Defendants)**

7. In response to Paragraph Seven of the Complaint, Defendants repeat and reallege the responses to all preceding Paragraphs as if fully and completely set forth herein.

8. Defendants deny the allegations contained in Paragraph Eight, except admit that Defendants agreed to purchase a playground set, and the delivery and installation thereof. Defendants further allege that Plaintiff failed to deliver the playground set in the manner that was agreed upon between the parties, and that Plaintiff damaged Defendants' property and caused further injury to Defendants through Plaintiff's gross negligence and other breaches.

9. Defendants deny the allegations contained in Paragraph Nine of the Complaint.

10. Defendants deny the allegations contained in Paragraph Ten of the Complaint.

11. Defendants deny the allegations contained in Paragraph Eleven of the Complaint.

WHEREFORE, Plaintiff's First Cause of Action for breach of Written Contract should be dismissed as against Defendants, and Defendants should be awarded reasonable attorneys' fees and costs, together with such other and further relief as this Court deems just and proper.

**ANSWERING PLAINTIFF'S SECOND CAUSE OF ACTION**

**(REASONABLE VALUE FOR GOODS OR SERVICES RENDERED against all Defendants)**

12. In response to Paragraph Twelve of the Complaint, Defendants repeat and reallege the responses to all prior Paragraphs as if fully and completely set forth herein.

13. Defendants deny the allegations contained in Paragraph Thirteen of the Complaint.

WHEREFORE, Plaintiff's Second Cause of Action for Reasonable Value for Goods or Services Rendered should be dismissed as against Defendants, and Defendants should be awarded reasonable attorneys' fees and costs, together with such other and further relief as this Court deems just and proper.

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State Cause of Action)**

As a first, separate, affirmative defense to the Complaint herein, Defendants allege that the Complaint, and each and every cause of action or purported cause of action contained therein, fails to state facts sufficient to constitute a cause of action against Defendants.

**SECOND AFFIRMATIVE DEFENSE**

**(Statute of Frauds)**

As a second, separate, affirmative defense to the Complaint herein, Defendants allege that the Statute of Frauds bars Plaintiff from recovery.

**THIRD AFFIRMATIVE DEFENSE**

**(Failure to Exercise Ordinary Care)**

As a third, separate, affirmative defense to the Complaint herein, Defendants allege that, at all times and places alleged in the Complaint, Plaintiff failed to exercise ordinary and reasonable care on its own behalf, and such negligence and carelessness was a proximate cause of some portion, up to and including the whole of, its own alleged injuries and damages, if any, and Plaintiff's recovery, therefore, should be barred or reduced according to law, up to and including the whole thereof.

///

///

///

**FOURTH AFFIRMATIVE DEFENSE**

**(Failure of Others to Exercise Reasonable Care)**

As a fourth, separate, affirmative defense to the Complaint herein, Defendants allege that, if Defendants are subjected to any liability to Plaintiff herein, it will be due in whole or in part to the acts and/or omissions of other parties or parties unknown at this time, and any recovery obtained by said Plaintiff should be barred or reduced according to law, up to and including the whole thereof.

**FIFTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate Damages)**

As a fifth, separate, affirmative defense to the Complaint herein, Defendants allege that Plaintiff has failed to mitigate its damages, if any, in connection with the matters referred to in the Complaint, which failure to mitigate bars and/or diminishes Plaintiff's recovery, if any, against Defendants.

**SIXTH AFFIRMATIVE DEFENSE**

**(Intervening Acts of Others)**

As a sixth, separate, affirmative defense to the Complaint herein, Defendants allege that the injuries and damages sustained by Plaintiff, if any, were proximately caused by the intervening and superseding actions of others, and not these answering Defendants, which intervening and superseding actions bar and/or diminish recovery, if any, against Defendants.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Prior Material Breach)**

As a seventh, separate, affirmative defense to the Complaint herein, Defendants allege that each and every contractually based cause of action set forth in the Complaint is barred as Plaintiff committed a prior material breach of the alleged written contract(s).

**EIGHTH AFFIRMATIVE DEFENSE**

**(Failure to Meet Terms and Conditions of Contract)**

As an eighth, separate, affirmative defense to the Complaint herein, Defendants allege that the terms and conditions of the alleged written contract(s) have not been met by Plaintiff.

**NINTH AFFIRMATIVE DEFENSE**

**(Fees and Costs)**

As a ninth, separate, affirmative defense to the Complaint herein, Defendants allege that the Complaint, and each purported cause of action contained therein, fails to state facts sufficient to constitute a cause of action for attorneys' fees, expert witness fees, and other litigation fees, costs and expenses as against Defendants.

**TENTH AFFIRMATIVE DEFENSE**

**(Set Off)**

As a tenth, separate, affirmative defense to the Complaint herein, Defendants allege that Plaintiff's recovery is barred and/or subject to set off by reason of its conduct.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Adhesion Contract)**

As an eleventh, separate, affirmative defense to the Complaint herein, Defendants allege that all purported contracts referred to in the Complaint by Plaintiff were adhesion contracts and, therefore, are unenforceable, void, and voidable.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Adhesion Contracts Must be Resolved Against Plaintiff)**

As a twelfth, separate, affirmative defense to the Complaint herein, Defendants allege that all purported contracts referred to in the Complaint by Plaintiff were contracts of adhesion and any ambiguities in the terms and conditions of said contracts must be resolved against Plaintiff and in favor of Defendants.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Modification of Product)**

As a thirteenth, separate, affirmative defense to the Complaint herein, Defendants allege that the injuries and damages complained of, if any there were, would be attributable merely to a post-distribution modification, alteration, or other change in some manner in the product for which Plaintiff would seek to hold Defendants legally responsible, which modification, alteration, or

change was not performed by, or participated in, or consented to, or approved by Defendants. Accordingly, Plaintiff should be barred from recovery as against Defendants.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Performance of Contract is Excused)**

As a fourteenth, separate, affirmative defense to the Complaint herein, Defendants allege that if any contract(s), obligation(s) or agreement(s) as alleged in the Complaint have been entered into, any duties of performance by Defendants are excused by reason of failure of consideration, waiver, breach of condition precedent, breach by Plaintiff, impossibility of performance, prevention by Plaintiff, frustration of purpose and/or acceptance by Plaintiff.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(Speculative Damages)**

As a fifteenth, separate, affirmative defense to the Complaint herein, Defendants are informed and believe and thereon allege that the Plaintiff's damages, if any, which these answering Defendants deny, are vague, uncertain, imaginary and speculative.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(Additional Defenses)**

As a sixteenth, separate, affirmative defense to the Complaint herein, Defendants allege that they may have additional defenses that cannot be articulated due to Plaintiff's failure to particularize its claims and due to Plaintiff's failure to provide more specific information concerning the nature of the damage claims. Defendants therefore reserve their right to assert additional defenses upon examination of documents provided, and upon discovery of further information concerning the alleged damage claims and claims for costs.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(No Good Faith Controversy)**

As a seventeenth, separate, affirmative defense to the Complaint herein, Defendants allege that the Complaint was brought without reasonable care and without a good faith belief that there was a justifiable controversy under the facts and the law, which warranted the filing of the Complaint against this answering Defendants, and that Plaintiff should therefore be responsible for all of

Defendants' necessary and reasonable defense costs, including attorneys' fees, as more particularly set forth in California Code of Civil Procedure Section 1038.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(Failure to Maintain Corporate Formalities)**

As an eighteenth, separate, affirmative defense to the Complaint, Defendants allege that Plaintiff has failed to maintain corporate formalities in its state of incorporation, California and/or other states in which Plaintiff does business, and that Plaintiff therefore does not have standing and/or capacity to maintain a defense or action against Defendants in this matter.

**NINETEENTH AFFIRMATIVE DEFENSE**

**(Waiver)**

As a nineteenth, separate, affirmative defense to the Complaint herein, Defendants allege that Plaintiff, by its own acts and omissions, has waived its rights, if any, to recover against these answering Defendants.

**TWENTIETH AFFIRMATIVE DEFENSE**

**(Right to Amend)**

As a twentieth, separate, affirmative defense to the Complaint herein, Defendants reserve the right to amend its Answer herein, including the addition of affirmative defenses after pleading and discovery in preparation for trial.

///

///

///

///

///

///

///

WHEREFORE, Defendants pray for judgment against Plaintiff as follows:

1. That Plaintiff take nothing by way of its action;

2. That Defendants be awarded attorneys' fees and costs of the suit incurred herein;

3. That in the event liability be attributed to Defendants, said liability be limited in direct proportion to the percentage of fault, if any, actually attributable to Defendants; and

4. For such other and further relief as the Court may deem proper.

**KLINEDINST PC**

Dated: July 13, 2007

By: [signature]

Hartford O. Brown, Esq.
Attorneys for Defendants
**JIN MOSLEY and SHANE MOSLEY**

# PROOF OF SERVICE

I am and was at the time of service of the papers herein, over the age of eighteen (18) years and am not a party to the action. I am employed in the County of Los Angeles, California and my business address is 777 S. Figueroa Street, Suite 4700, Los Angeles, California 90017.

On **July13, 2007**, I caused to be served the following documents:

**ANSWER TO COMPLAINT**

[ ] **VIA FACSIMILE TRANSMISSION (Code Civ. Proc. §§ 1013(e) and (f)):** From fax number (213) 607-2115 to the fax numbers listed below and/or on the attached service list. The facsimile machine I used complied with Rule 2008 and no error was reported by the machine.

[X] **VIA MAIL** – By placing a copy thereof for delivery in a separate envelope addressed to each addressee, respectively, as follows:

[xx] **BY FIRST-CLASS MAIL (Code of Civ. Proc. §§ 1013 and 1013(a))**

[ ] **BY OVERNIGHT DELIVERY (Code Civ. Proc. §§ 1013(c) and (d))**

[ ] **BY CERTIFIED RETURN RECEIPT MAIL (Code of Civ. Proc. §§ 1013 and 1013(a))**

| | |
|---|---|
| John M. Harmata, Esq.<br>HARMATA & ASSOCIATES, APLC<br>550 West "C" Street, Suite 1960<br>San Diego, CA 92101<br>Telephone: 619-233-4711/Fax: 619-231-1389 | Attorneys for Plaintiffs |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid at San Diego, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 13, 2007, at Los Angeles, California.

Chris J. Trestrail

# EXHIBIT J

SUPERIOR COUR. OF CALIFORNIA, COUNTY C. LOS ANGELES

| | |
|---|---|
| ATE: 07/07/08 | DEPT. EA R |
| ONORABLE ROBERT A. DUKES JUDGE | D. LLOYD DEPUTY CLERK |
| ONORABLE JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| .0 M. GARZA Deputy Sheriff | D. PINEDA Reporter |

9:00 am KC050549

TERRIER CORP.
VS
SHANE MOSLEY (X)
JIN MOSLEY (X)

5-4-07 AO

Plaintiff Counsel JOHN M. HARMATA (X)

Defendant Counsel MICHAEL J. RILEY (X)

**NATURE OF PROCEEDINGS:**

1. Terrier Corp. Warehouse invoice No. 00090301.
2. Terrier Corp. Warehouse invoice No. 00090530.
3. Customer Order Form bearing sales date 5-15-06.
4A. Customer Quote Forms bearing sales date 5-9-06.
4B. Customer Quote Forms bearing sales date 5-15-06.

Jin Mosley is sworn and examined by Plaintiff/Cross-Defendant pursuant to Section 776 Evidence Code.

The following Defendant/Cross-Complainant's Exhibits are marked for identification only:
102. Invoice of Jack Ramirez and Son.
103. Invoices of Marsan Turf & Irrigation Supply Inc.
104. Receipts from Home Depot.
105. Invoices from Foothill Building Materials Inc.
106. Invoices from John Deere Landscapes.

Shane Mosley is sworn and examined by Plaintiff/Cross-Defendant pursuant to Section 776 Evidence Code.

Lisa Alexander is sworn and testifies for the Plaintiff-Cross-Defendant.

Plaintiff/Cross-Defendant's Exhibits 1, 2, 3, 4A, and 4B, previously marked for identification only, are admitted in evidence.

Plaintiff/Cross-Defendant rests.

MINUTES ENTERED
07/07/08
COUNTY CLERK

# EXHIBIT K



| ACCOUNT NUMBER | DATE DUE | AMOUNT DUE |
|---|---|---|
| 21755307 | No Payment Due | No Payment Due |

**Go Green** and save

Enroll in Auto Bill Pay, email updates and paperless billing.

Get a one-time bill credit on your DIRECTV bill.

It's that simple.

Visit directv.com/gogreen

Goodbye Paper. Hello Green.

## Summary

**Statement Date:** 06/11/08
*Page 1 of 1 for:*
SHANE MOSLEY
**For Service at:**
5212 CLAYTON CT
LA VERNE, CA 91750-5919

Previous Balance
Payments
Current Charges & Fees
Adjustments & Credits
Taxes
**Credit Balance**

## Activity

| Start | End | Description | Amount |
|---|---|---|---|
| | | Previous Balance | |
| | | Payment | |
| | | **Current Charges for Service Period 06/10/08 - 07/09/08** | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/10 | 07/09 | | |
| 06/08 | | | |
| 06/10 | | | |
| | | **Fees** | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Additional Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| 06/11 | | Leased Receiver | |
| | | Sales Tax | |
| | | CREDIT BALANCE | |

**To contact us call 1-800-531-5000**

**No payment is due at this time.**
This statement is for your information only.

Watch your favorite team all season! Order **MLB EXTRA INNINGS®** today. Choose from up to 80 games per week. Just 4 payments of $49.75. Offer ends 7/13/08. Visit directv.com/mlb.

**Life is Hard, PPV is Easy!**
No driving, no lines, no hassle! Go to channels 125-199 and order with your remote, for as low as $3.99/movie. See what's on at directv.com/movies.

**Getting new neighbors?** Keep your old friends with the DIRECTV MOVERS CONNECTION™. Bring the best in TV entertainment to your new home! Call now and ask about our special offers for Movers: 877-616-MOVE

DIRECTV

| DATE DUE | ACCOUNT NUMBER | AMOUNT DUE | PAYMENT ENCLOSED |
|---|---|---|---|
| No Payment Due | | No Payment Due | |

☐ Note my change of address on reverse side.
DO NOT WRITE OTHER COMMENTS ON THIS FORM

To sign up for Auto Pay Service, See Reverse.

Do not send cash. Make check or money order payable to:

#BWNHPWR
#PBAGEECPG2#
AT 01 040676 09580B159 A**3DGT
ATTN: JULIE C LIN
633 W 5TH ST
LOS ANGELES CA 90071-2005

**DIRECTV**
**PO BOX 54000**
**LOS ANGELES CA 90054-1000**

π EXHIBIT 3
1 pg.
Deponent MOSLEY
Date 7-9-08 Rptr Felten
WWW.DEPOBOOK.COM

SM176

# EXHIBIT L

CHASE

Undeliverable Mail Only - CI
P.O. Box 260161
Baton Rouge LA 70826-0161

SHANE MOSLEY
5212 CLAYTON COURT
LA VERNE CA 91750-5919

Apr. 26 through May 26, 2007
Page 1 of 4

*To Contact Us*

*By Phone:* 1-800-836-5656
*Para Espanol:* 1-800-800-5626
*Hearing Impaired:* 1-800-582-0542
*Internet:* WWW.CHASE.COM

BEGINNING IN JUNE OF 2007, ANY CHECKS YOU SEND TO THE ADDRESS BELOW MAY BE CONVERTED INTO A ONE TIME ELECTRONIC FUNDS TRANSFER FROM THE ACCOUNT NUMBER ON YOUR CHECK. YOUR BANK ACCOUNT MAY BE DEBITED AS SOON AS THE SAME DAY WE RECEIVE YOUR PAYMENT. IF YOU HAVE ANY QUESTIONS, PLEASE CALL 800-836-5656.

## Home Equity Line of Credit Account Summary

*NO PAYMENT REQUIRED*

| | | | |
|---|---|---|---|
| Payment due date | | Beginning principal balance 04-26-07 | |
| Minimum payment due | | Principal balance as of 05-26-07 | |
| Credit limit | | | |
| Available credit | | Beginning total balance | |
| End of draw (advance) period | | Advances/debits | |
| | | Payments/credits | |
| Year to date interest paid | | Total balance as of 05-26-07 | |

**Transactions**

| *Post Date* | *Description* | *Payments/ Credits (-)* | *Advances/ Debits (+)* | *Principal Balance After Transaction* |
|---|---|---|---|---|
| 04-26-07 | Balance Forward | | | |
| 04-26-07 | | | | |
| | Daily Periodic Rat | | | |
| 05-26-07 | FINANCE CHARGE Accrued This Period | | | |
| | **Total** | | | |

CHASE PAYMENT ASSURANCE IS AN OPTIONAL PAYMENT PROTECTION PLAN THAT MAY CANCEL YOUR PAYMENT OF PRINCIPAL AND INTEREST WHILE REDUCING YOUR LOAN BALANCE IN CASE OF AN ACCIDENTAL DEATH, DISABILITY, INVOLUNTARY UNEMPLOYMENT OR LEAVE OF ABSENCE. FOR MORE INFORMATION, CALL 1-800-530-8260.

LOOKING FOR A DREAM HOME? TALK TO CHASE FIRST. WE OFFER A FULL RANGE OF MORTGAGE PRODUCTS TO MEET YOUR NEEDS. CALL US AT 866-818-7033 OR VISIT WWW.CHASE.COM/PURCHASE. SUBJECT TO CREDIT AND PROPERTY APPROVAL. NOT ALL PRODUCTS AVAILABLE IN ALL STATES.

*continues*

# EXHIBIT M



Your Account Number

SHANE D MOSLEY
5212 CLAYTON CT
LA VERNE CA 91750-5919

More phone numbers and info on back of bill

24-Hour Service and Info:

(800) 427-2200 (English)
(800) 342-4545 (Español)

A Sempra Energy utility

P.O. Box C
Monterey Park, CA 91756
www.socalgas.com

Date Mailed Jun 06, 2008

| Rate | Climate Zone | Cycle | The Gas Company's Gas Commodity Charges per therm |
|---|---|---|---|

| Billing Period From | To | Meter Number | Readings Prev | Pres | Difference =CCF | | Billing Factor = | Therms |
|---|---|---|---|---|---|---|---|---|
| | | | | | | x | | |
| | | | | | | x | | |

Next Meter Reading Date on or about: Jul 03 2008

**Summary of Charges** **Amount**

Customer Charge Days x
Baseline Therms x
Over Baseline Therms x
**Gas Charges**

State Regulatory Fee Therms x
Public Purpose Surcharge Therms x
LOS ANGELES County Users Tax
**Taxes & Fees on Gas Charges**

**Total Gas Charges Including Taxes and Fees**

**Last Payment**

Total Current Gas Charges
Previous Balance

**Total Amount**

CREDIT BALANCE
DO NOT PAY

***Special Discount*** You may be eligible for the California Alternate Rates for Energy (CARE) program. For more information and to request an application, please call 1-800-772-5050.

***Descuento Especial*** Usted podría ser elegible para el programa de Tarifas Alternativas para Energía en California (CARE). Para más información y para pedir una solicitud, por favor llame al 1-800-772-5050.

| Energy Comparison | This Year Days | Therms | Daily Average | Last Year Days | Therms | Daily Average |
|---|---|---|---|---|---|---|
| Jun | | | | | | |
| May | | | | | | |
| Apr | | | | | | |

Date Mailed
Jun 06, 2008

Please bring entire bill if payment is made in person or return stub with your payment by mail

Total Amount Due

Please Do Not Pay

Save paper & postage: Pay online at www.socalgas.com

Make Payment To:

The Gas Company
P O Box C
Mont Pk Ca 91756

SHANE D MOSLEY

633 W 5TH ST
STE 2700
LOS ANGELES CA 90071-2061

Your Account Number

EXHIBIT N

JUDD BURSTEIN, P.C.
ATTORNEYS AT LAW

JUDD BURSTEIN
PETER B. SCHALK*

MATTHEW G. DeOREO
ALEXANDER M. LEVY
JEREMY M. ATTIE

*ALSO ADMITTED IN NEW JERSEY

1790 BROADWAY
NEW YORK, NEW YORK 10019
(212) 974-2400
FAX: (212) 974-2944

May 28, 2008

**BY E-MAIL AND FEDEX**

Ivo Labar, Esq.
Kerr & Wagstaffe LLP
100 Spear Street, Suite 1800
San Francisco, California 94105

Re: *Mosley v. Conte / Case No.* 08-cv-1777 (JSW)

Dear Ivo:

Pursuant to Judd Burstein, Esq.'s Declaration, dated May 23, 2008, I am writing to provide you with the enclosed list of all of Plaintiff Shane D. Mosley Sr.'s health care providers for the period from January 1, 2002 to the present[1]. Additionally, the contact information for Mr. Mosley's former trainers is as follows: Jack Mosley, c/o Judd Burstein, P.C., 1790 Broadway, Suite 1501, New York, New York 10019, Tel. 212-974-2400 and Joe Goosen, Tel. 818-730-8885.[2]

Separately, enclosed please also find Plaintiff's Request for Production of Documents, Set Two.

Very truly yours,

Jeremy M. Attie

Enclosures
cc: Kim O. Dincel, Esq. (via e-mail)

---

[1] HIPAA Authorizations for the Health Care Providers will be provided shortly.

[2] Plaintiff reserves all rights to supplement this list if and when additional information becomes available. Furthermore, by providing this list of Health Care Providers and Trainers, Plaintiff does not waive any privilege, including the attorney-client privilege, the work product doctrine, or any right of privacy, and expressly reserves these privileges, protections and rights. Plaintiff does not in any way waive or intend to waive, but rather is preserving and intends to preserve all objections as to competency, authenticity, relevancy, materiality and admissibility and all rights to object on any grounds to the use in any subsequent proceedings of any of the information contained herein, including, but not limited to, the right to object at the trial of this or any other action.

# MEMORANDUM

**PRIVILEGED AND CONFIDENTIAL**

TO: Ivo Labar, Esq.

FROM: Jeremy Attie, Esq.

SUBJECT: *Mosley v. Conte / Case No.* 08-cv-1777 (JSW)

RE: HEALTH CARE PROVIDERS FOR SHANE D. MOSLEY, SR. FOR THE PERIOD FROM JANUARY 1, 2002 TO THE PRESENT

DATE: May 28, 2008

---

Plaintiff reserves all rights to supplement this list if and when additional information becomes available. Furthermore, by providing this list of Health Care Providers, Plaintiff does not waive any privilege, including the attorney-client privilege, the work product doctrine, or any right of privacy, and expressly reserves these privileges, protections and rights. Plaintiff does not in any way waive or intend to waive, but rather is preserving and intends to preserve all objections as to competency, authenticity, relevancy, materiality and admissibility and all rights to object on any grounds to the use in any subsequent proceedings of any of the information contained herein, including, but not limited to, the right to object at the trial of this or any other action.

**Dr. Robert Olvera**
MD Bristol Park Medical Group
1212 W 17th Street
Santa Ana, CA 92706
Tel. (714) 954-0432

**Dr. Leo Rizzi**
355 E Foothill Blvd
Pomona, CA 91767
Tel. (909) 593-6553

**Dr. Robert D Milne**
Milne Medical Center
2110 Pinto Lane
Las Vegas, NV 89106
Tel. (702) 385-1393

**Dr. Austin Moody**
3121 S Maryland Pkwy Ste 408
Las Vegas, Nevada 89109
Tel. (702) 733-8018

**Dr. James G., Williams**
202 W College
St Covina, CA 91723
Tel. (626) 966 2111

**Dr. John L Oakley**
1433 W Merced Ave #206
West Covina, 91790,
Tel. (949) 588-2190

**Dr. Robert M. Karns**
8920 Wilshire Blvd. #321
Beverly Hills, CA 90211
Tel. 310-652-8084
Fax: 310-652-2269

**Dr. Warren Line, Jr**
Otolaryngologist services

4418 Vineland Ave Ste 202
Tel. (818) 763-7366

**Dr. Steven M. Knapik**
41870 Garstin Drive, BBL
PO Box 1649,
Big Bear Lake, CA 92315
Tel. (909) 866-6501

**Dr. Terry Scott**
1111 South Grand Avenue #E
Diamond Bar, CA 91765
Tel. (909) 860-7712

**Dr. Ray Padilla**
14650 Aviation Blvd. Suite 150
Manhattan Beach, CA 90250
Tel. (310) 536-0710

**Dr. Boxer Wachler**
465 N. Roxbury Dr. Suite 902
Beverly Hills, CA. 90210
Tel. (310) 860-1900

**Dr. Margaret Goodman**
8551 W Lake Mead Blvd Ste 250
Headache Center Of Southern NV
Las Vegas, NV 89128-7649

**Dr. Sara Soulati**
633 Aerick St,
Inglewood, CA 90301-1978
Tel. (310) 412-8181

**Doctor Ghali** - has worked with or consulted with Dr. Sara Soulati - we have been unable to locate Dr. Ghali to date and will furnish you with additional information when it becomes available.

**Dr. Dan Vasile**
7777 Milliken Avenue
Rancho Cucamonga, CA 91730

**Dr. Dand**
I Care Medical Supply
500 W Big Bear Blvd
Big Bear City, CA
Tel. (909) 584-7660

**Dr. Richard S Gluckman**
1360 W 6th St Ste 350
San Pedro, CA 90732-3535
Tel. (310) 632-6428