Kim O. Dincel, Esq. (SBN 131563)
Long & Levit LLP
465 California Street 5th Floor
San Francisco, California 94104
Tel (415) 397-2222 Fax (415) 397-6392
E-mail kdincel@longlevit.com

JUDD BURSTEIN, P.C.
Judd Burstein (JB-9585; admitted *pro hac vice*)
Jeremy M. Attie (JA-0561; admitted *pro hac vice*)
1790 Broadway, Suite 1501
New York, New York 10019
Tel (212) 974-2400 Fax (212) 974-2944
E-mail jburstein@burlaw.com
E-mail jattie@burlaw.com

*Attorneys for Plaintiff,*
SHANE D. MOSLEY, SR.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHANE D. MOSLEY, SR.,<br><br>  *Plaintiff,*<br><br>vs.<br><br>VICTOR CONTE,<br><br>  *Defendant.* | 08-Civ-1777 (JSW)<br><br>DECLARATION OF JUDD BURSTEIN IN SUPPORT OF PLAINTIFF SHANE D. MOSLEY, SR.'S MOTION FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927<br><br>Date: December 26, 2008<br>Time: 9:00 a.m.<br>Courtroom: 2, 17th Floor<br><br>Hon. Jeffrey S. White |

1.      I am an attorney duly admitted to practice law before the Courts of the State of New York.  Pursuant to the Court's Order, filed on April 7, 2008, I have been admitted to practice law in this Court on a *pro hac vice* basis for the purpose of representing Plaintiff Shane D. Mosley, Sr. ("Mosley" or "Plaintiff") in the present action.

2.      I submit this Declaration in support of Mosley's September 2, 2008 motion, pursuant to 18 U.S.C. § 1927, for sanctions against Defendant Victor Conte's ("Conte" or "Defendant") counsel.

3.      The purposes of this Declaration are twofold: (a) to place relevant exhibits before the Court; and (b) to provide relevant factual background information.

### Exhibits

4.      Exhibit A hereto is a true and complete copy of the Court's Order, entered on April 7, 2008, granting my *pro hac vice* admission to this Court in connection with this litigation.

5.      Exhibit B hereto is a true and accurate copy of the Complaint, dated April 2, 2008, filed in this action, with accompanying exhibit.

6.      Exhibit C hereto is a true and accurate copy of Defendant's motion to strike the Complaint, dated May 30, 2008.

7.      Exhibit D hereto is a true and accurate copy of Mosley's opposition to Conte's motion to strike, dated June 16, 2008.

8.      Exhibit E hereto is a true and accurate copy of Defendant's reply, dated June 30, 2008.

9.      Exhibit F hereto is a true and accurate copy of the transcript from the deposition of Shane D. Mosley on July 9, 2008 ("Mosley Deposition" or "Mosley Depo.").

10.     Exhibit G hereto is a true and accurate copy of Mosley's driver's license.

11.     Exhibit H hereto is a true and accurate copy of the July 18, 2008 e-mail and accompanying letter and enclosures.

12.     Exhibit I hereto is a true and accurate copy of an e-mail, dated July 30, 2008, from myself to Ivo Labar, Esq.

13.     Exhibit J hereto is a true and accurate copy of the Complaint filed in New York State Supreme Court, New York County, dated August 5, 2008, with accompanying exhibit.

14.     Exhibit K hereto is a true and accurate copy of the Docket Sheet in this action.

15.     Exhibit L hereto is a true and accurate copy of an insurance policy for Skyhorse Publishing, Inc., dated June 11, 2008.

### Relevant Statement of Facts

16.     Plaintiff commenced this diversity action for defamation on April 2, 2008. *See* Exhibit B.

17.     On May 30, 2008, Defendant filed a motion to strike the Complaint pursuant to Cal. Code Civ. Pro. § 425.16. *See* Exhibit C.

18.     On June 16, 2008, Plaintiff responded to the motion and sought, pursuant to § 425.16(c), the costs and attorneys' fees associated with opposing Conte's frivolous motion. *See* Exhibit D. On June 30, 2008, Defendant submitted reply papers. *See* Exhibit E. This motion was not decided by the Court prior to the dismissal of this case.

19.     During the briefing of Defendant's motion to strike, the parties engaged in jurisdictional discovery culminating in a deposition of Plaintiff on July 9, 2008.

20.     Mosley is not licensed to box in California; rather, he is only licensed to box in Nevada and New York. *See* Exhibit F at p. 39:19-25. It should be noted that Mosley is in the process of securing a license to box in California because of a rare fight scheduled to take place in California this month.

21.     On July 18, 2008, Defendant's counsel sent me an e-mail attaching a letter enclosing a draft motion to dismiss the case for lack of diversity jurisdiction. *See* Exhibit H.

22.    Shortly after receipt of the letter, Defendant provided me with a copy of an insurance policy which added Defendant as an additional insured on the policy of the publisher of Defendant's anticipated book.    That policy revealed that the publisher is a New York company.    Accordingly, based upon the fact that the false statements upon which this action is founded were made in connection with efforts to publicize Conte's book, I determined that Mosley could secure jurisdiction over Conte in New York pursuant to N.Y. C.P.L.R. 302(a)(1). *See Dibella v. Hopkins*, 187 F.Supp.2d 192, 197-98 (S.D.N.Y. 2002).

23.    Significantly, I advised counsel for Defendant that I was going to dismiss this action and re-file against Defendant because of this new insurance information. *See* Exhibit I.

24.    Accordingly, on August 5, 2008, Plaintiff voluntarily dismissed this action, pursuant to Fed. R. Civ. P. 41(a), and simultaneously commenced a new action in New York (the "New York action").    The New York action repeated all of the claims set forth in this action, as well as some additional claims based upon statements made by Defendant to his publisher in New York. *See* Exhibit J.

25.    On August 28, 2008, counsel for Defendant called me to alert me to the fact that Defendant would be filing a motion for sanctions and fees, and to suggest that Plaintiff should dismiss his case against Defendant in New York in order to avoid an award of sanctions and fees in this case.

26.    Immediately thereafter, Defendant's counsel filed a motion for sanctions and fees in the above-captioned action.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.    Executed this 3rd day of September 2008, in New York County, New York.

_____
JUDD BURSTEIN

EXHIBIT A

1  Judd Burstein
   JUDD BURSTEIN, PC
2  1790 Broadway, Suite 1501
   New York, NY 10019
3  TEL: (212) 974-2400

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  Shane D. Mosley, Sr.,              CASE No. CV081777   BZ

12                    Plaintiff,      [PROPOSED] ORDER GRANTING
                                      APPLICATION FOR ADMISSION OF
13       vs.                          ATTORNEY PRO HAC VICE

14  Victor Conte,                     Action Filed:    No Date Set

15                    Defendant.

16

17          Judd Burstein, an active member in good standing of the bars of: the United States

18  Supreme Court, the United States Tax Court, the United States Courts of Appeals for the 2nd, 3rd,

19  4th, 6th, 7th, 9th, and 10th Circuits, the United States District Court for the Eastern, Southern, and

20  Northern Districts of New York, the District of Connecticut, and the District of Columbia, whose

21  business address and telephone number is: Judd Burstein PC, 1790 Broadway, Suite 1501, New

22  York, New York, 10019, (212) 974-2400, having applied in the above-entitled action for

23  admission to practice in the Northern District of California on a *pro hac vice* basis, representing

24  Shane D. Mosley, Sr.

25          IT IS HEREBY ORDERED THAT the application is granted, subject to the terms

26  and conditions of Civil L.R. 11-3. All papers filed by the attorney must indicate appearance *pro*

27  *hac vice.* Service of papers upon and communication with co-counsel designated in the

28  application will constitute notice to the party. All future filings in this action are subject to the

LONG & LEVIT LLP
465 CALIFORNIA STREET
SUITE 500
SAN FRANCISCO
CALIFORNIA 94104
(415) 397-2222

                            1              [PROPOSED] ORDER GRANTING PRO HAC VICE
                                           APPLICATION (No. CV081777)

1  requirements contained in General Order No. 45, *Electronic Case Filing.*

2  Dated: April 4, 2008

United States Magistrate Judge

4

DOCS\S0117-001\547313.V1

IT IS SO ORDERED

Judge Bernard Zimmerman

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LONG & LEVIT LLP
465 CALIFORNIA STREET
SUITE 500
SAN FRANCISCO
CALIFORNIA 94104
(415) 397-2222

2

[PROPOSED] ORDER GRANTING PRO HAC VICE
APPLICATION (No. CV081777)

EXHIBIT B

Kim O. Dincel, Esq. (SBN 131563)
Long & Levit LLP
465 California Street 5th Floor
San Francisco, California 94104
Tel (415) 397-2222 Fax (415) 397-6392
E-mail kdincel@longlevit.com

JUDD BURSTEIN, P.C.
Judd Burstein (pending admission *pro hac vice*)
Jeremy Attie (pending admission *pro hac vice*)
1790 Broadway, Suite 1501
New York, New York 10019
Tel (212) 974-2400 Fax (212) 974-2944
E-mail jburstein@burlaw.com

*Attorneys for Plaintiff,*
SHANE D. MOSLEY, SR.

E-filing

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHANE D. MOSLEY, SR., | Case No: |
| *Plaintiff,* | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | |
| VICTOR CONTE, | 1) DEFAMATION, SLANDER<br>2) DEFAMATION, SLANDER<br>3) DEFAMATION, LIBEL<br>4) PERMANENT INJUNCTION |
| *Defendant.* | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff SHANE D. MOSLEY SR. ("Plaintiff" or "Mosley"), by his attorneys, Judd

Burstein, P.C. ("JBPC") and Long & Levit LLP, as and for his complaint against Defendant

VICTOR CONTE ("Defendant" or "Conte"), alleges as follows:

## I.

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, in that it is a civil action between citizens of different States, and involves an amount in controversy in excess of $75,000.

2.    Venue is proper in this District pursuant 28 U.S.C. § 1391(a)(1).

## II.

## INTRADISTRICT ASSIGNMENT

3.    Pursuant to Civil L.R. 3-2(c) and (d), this action arose due to actions and omissions of Defendant that took place, in substantial part, in San Francisco and/or San Mateo Counties.  Therefore, this case should be assigned to either the San Francisco Division or the Oakland Division.

## III.

## THE PARTIES

4.    Plaintiff Mosley, a legendary professional boxer, is a citizen of the State of Nevada.

5.    Defendant, a convicted felon and purveyor of illegal performance enhancing drugs and procedures, is a citizen of the State of California.

## IV.

## GENERAL ALLEGATIONS

6.    In or about July of 2003, Mosley's conditioning coach, Darryl Hudson ("Hudson"), brought Mosley to meet with Conte at Conte's business, Bay Area Laboratory Co-

operative ("Balco").  Mosley was informed by Hudson that Conte's company sold entirely legal

supplements, including some that were sold on the Internet, which would aid his training.

7.    At the meeting with Conte, samples of Mosley's blood were taken and analyzed.

Conte then recommended to Mosley a regimen of products that Mosley was told would help him

with his endurance.  At no time during this meeting did Mosley use any of the products

recommended to him.  Always extremely concerned about his health and with playing by the

rules, Mosley specifically asked Conte whether the items recommended by Conte were healthy,

legal and permitted for athletes.  Mosley was specifically told by Conte that there was nothing

wrong with following Conte's recommendations, and that all of the products recommended by

Conte were entirely legal and appropriate.

8.    In July 2005, Conte pleaded guilty to a conspiracy to distribute steroids.

9.    In October 2005, Conte was sentenced to four months imprisonment and four

months house arrest.

10.    On or about March 30, 2008, Conte began publicizing the fact that he was going

to publish a book about his life as a peddler of steroids.  As part of this publicity campaign to

maximize sales of his future book, Conte made knowingly false claims about Mosley's use of

Balco products.

**V.**

**FIRST CLAIM FOR RELIEF**

**SLANDER**

11.    Plaintiff repeats and realleges the allegations set forth above in all of the prior

Paragraphs as if fully and completely set forth herein.

12.    On or about March 29, 2008, Conte gave an interview to New York Daily News Reporters Nathanial Vinton and/or Teri Thompson, in which Defendant falsely stated that he "watched [Mosley] inject [himself] in front of me," that Mosley "knew precisely what [he was] using," and that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about the legality of the products provided by Conte, "[i]t was all explained up front and there was no deception."

13.    On March 30, 2008, an article containing Conte's false statements was published in the New York Daily News (the "March 30 Article").  A true and complete copy of the March 30 Article is annexed hereto as Exhibit A and incorporated by reference herein.

14.    The statements made by Conte set forth above in Paragraphs 12 and 13 were false.

15.    The statements set forth above in Paragraphs 12 and 13 were made by Conte with knowledge of their falsity.

16.    Conte's statements set forth above in Paragraphs 12 and 13 were unprivileged.

17.    Conte intended the statements set forth above in Paragraphs 12 and 13 to appear in the March 30 Article, and with the purpose of increasing sales of Defendant's intended book by besmirching Mosley's good name and trading on Plaintiff's fame and reputation.

18.    Conte's statements set forth above in Paragraphs 12 and 13 accuse Plaintiff of criminal conduct.

19.    Conte's statements set forth above in Paragraphs 12 and 13 tend to injure Mosley in his profession as a prize fighter, both in that they impute to Mosley a general disqualification in the respect which a professional boxer peculiarly requires, and impute traits concerning professional prize fighting that lessen Mosley's ability to earn money in that profession.

20.    The natural consequence of Conte's statements set forth above in Paragraphs 12 and 13 is to cause actual damage to Mosley.

21.    Based upon the foregoing slander, Defendant is liable to Plaintiff in an amount to be determined at trial.

22.    Conte's knowingly false statements about Mosley set forth above in Paragraphs 12 and 13 were intended as advance publicity designed to increase sales for Conte's planned book. Conte's slander was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights.  In publishing knowingly false statements about Mosley in order to increase sales of his intended book, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's rights.  Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

## VI.

### SECOND CLAIM FOR RELIEF

### SLANDER

23.    Plaintiff repeats and realleges the allegations set forth above in all of the prior Paragraphs as if fully and completely set forth herein.

24.    On or about March 29, 2008, Conte gave a telephone interview (from, on information and belief, San Francisco) to USA Today reporter A. J. Perez ("Perez"). On information and belief, Defendant made false statements to Perez which were substantially identical to the false statements detailed above in Paragraphs 12 and 13.

25.    The statements described above in Paragraph 24 were made by Conte with knowledge of their falsity.

26.     Conte's statements described above in Paragraph 24 were unprivileged.

27.     Conte intended the statements described above in Paragraph 24 to appear in USA Today with the purpose of increasing sales of Defendant's intended book by besmirching Mosley's good name and trading on Plaintiff's fame and reputation.

28.     Conte's statements described above in Paragraph 24 accuse Plaintiff of criminal conduct.

29.     Conte's statements described above in Paragraph 24 tend to injure Mosley in his profession as a prize fighter, both in that they impute to Mosley a general disqualification in the respect which a professional boxer peculiarly requires, and impute traits concerning professional prize fighting that lessen Mosley's ability to earn money in that profession.

30.     The natural consequence of Conte's statements described above in Paragraph 24 is to cause actual damage to Mosley.

31.     Based upon the foregoing slander, Defendant is liable to Plaintiff in an amount to be determined at trial.

32.     Conte's knowingly false statements about Mosley as described above in Paragraph 24 were intended as advance publicity designed to increase sales for Conte's planned book. Conte's slander was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights. In publishing knowingly false statements about Mosley in order to increase sales of his intended book, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's rights. Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

## VII.

## THIRD CLAIM FOR RELIEF

## LIBEL

33. Plaintiff repeats and realleges the allegations set forth above in all of the prior Paragraphs as if fully and completely set forth herein.

34. On information and belief, in September of 2007, Conte sent an e-mail to a reporter affiliated with SI.com in which Defendant falsely stated, in words and substance, that he had explained to Mosley that he (Conte) was providing him with illegal steroids and performance enhancing substances.

35. The statement set forth above in Paragraph 34 was made by Conte with knowledge of its falsity.

36. Conte's statement set forth above in Paragraph 34 was unprivileged.

37. On information and belief, Conte intended the statement set forth above in Paragraph 34 to appear on the SI.com website for the purpose of increasing sales of Defendant's intended book by besmirching Mosley's good name and trading on Plaintiff's fame and reputation.

38. Conte's statement set forth above in Paragraph 34 exposed Mosley to hatred, contempt, ridicule, or obloquy, and had a tendency to injure him in his occupation.

39. Conte's statement set forth above in Paragraph 34 is defamatory without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact.

40. The natural consequence of Conte's statement set forth above in Paragraph 34 is to cause actual damage to Mosley.

41.    Based upon the foregoing libel, Defendant is liable to Plaintiff in an amount to be determined at trial.

42.    On information and belief, Conte's knowingly false statements about Mosley set forth above in Paragraph 34 were intended as advance publicity designed to increase sales for Conte's planned book. Conte's libel was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights.    In publishing knowingly false statements about Mosley in order to increase sales of his intended book, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's rights.    Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

## VIII.

### FOURTH CLAIM FOR RELIEF

### PERMANENT INJUNCTION

43.    Plaintiff repeats and realleges the allegations set forth above in all of the prior Paragraphs as if fully and completely set forth herein.

44.    As explained in Exhibit A hereto, Plaintiff intends upon publishing a book in September of 2008, in which he intends to repeat the defamatory statements complained of in Paragraphs 12, 13, 24 and 34.

45.    Were Conte to publish those false statements both in the book and undoubtedly during the publicity tour that would accompany the book, Mosley would be irreparably harmed.

46.    A balancing of the equities favors Mosley.

47.     Mosley is entitled to a permanent injunction barring Conte from defaming Mosley by making, orally or in written form, any of the statements complained of in Paragraphs 12, 13, 24 and 34 above.

## IX.

## DEMAND FOR JURY TRIAL

48.     Plaintiff hereby demands a jury trial for all claims other that his claim for a permanent injunction.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.     On his First, Second, and Third Claims for Relief:

1.     Compensatory damages according to proof at trial, but in excess of $75,000.

2.     Punitive damages in an amount to be determined at trial.

B.     On his Fourth Claim for Relief:

1.     A permanent injunction barring Conte from defaming Mosley by making, orally or in written form, any of the statements complained of in Paragraphs 12, 13, 24 and 34 above.

1   C.      Costs of suit and for such other and further relief as the court deems just and proper.

2   Dated: San Francisco, California.

3

4           April 2, 2008

5                                                    LONG & LEVIT LLP

6                                                    By

7                                                    Kim O. Dincel, Esq. (SBN 131563)
                                                     465 California Street 5th Floor
8                                                    San Francisco, California 94104
                                                     Tel (415) 397-2222
9                                                    Fax (415) 397-6392
                                                     E-mail kdincel@longlevit.com

10

11                                                   JUDD BURSTEIN, P.C.
                                                     1790 Broadway, Suite 1501
12                                                   New York, New York 10019
                                                     Tel (212) 974-2400
13                                                   Fax (212) 974-2944
                                                     E-mail jburstein@burlaw.com

14

15

16

17
    DOCS\S0117-001\547292.V1
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# In face of athletes' denials, Victor Conte points to calendars

BY TERI THOMPSON IN NEW YORK AND NATHANIEL VINTON IN SAN FRANCISCO
DAILY NEWS SPORTS WRITERS

Sunday, March 30th 2008, 8:57 PM

SAN FRANCISCO - Three of the athletes who worked with Victor Conte at BALCO - boxer Shane Mosley and sprinters Kelli White and Tim Montgomery - have denied at one time or another that they knew they were taking banned or illegal substances provided by Conte.

But Conte, who says he will discuss all three in his new book, "BALCO: The Straight dope on Steroids, Barry Bonds, Marion Jones and What We Can Do To Save Sports," says they "all knew precisely what they were using.

"I taught them how to use substances, including "the clear," and inject themselves with EPO. I watched them inject themselves in front of me."

"The clear" was an undetectable steroid applied by placing drops of the yellowish liquid under the tongue with a needleless syringe; EPO is a banned performance-enhancer that is injected by needle.

Mosley, who is scheduled to fight welterweight Zab Judah on May 31 at Mandalay Bay in Las Vegas, told the Daily News in September that he inadvertently took two designer steroids - "the cream" and "the clear" - before his championship fight against Oscar De La Hoya in 2003 after he says he was misled by Conte, who disputed the claims then in an e-mail response. SI.com first reported that investigator Jeff Novitzky had said at an anti-doping conference in Colorado Springs that Mosley had used the substances.

"Those are simply lies," Conte told The News again Sunday of Mosley's statements. "It was all explained up front and there was no deception."

Conte says he has detailed doping calendars of all three athletes, including Mosley's. "I have every day and every dose," he says.

White has claimed that Conte told her he was giving her flaxseed oil and Mongomery told the BALCO grand jury that Conte assured him "the clear" was not an illegal steroid.

"Not true," Conte says.

EXHIBIT C

1  JAMES M. WAGSTAFFE (95535)
   IVO LABAR (203492)
2  **KERR & WAGSTAFFE LLP**
   100 Spear Street, Suite 1800
3  San Francisco, CA 94105-1528
   Telephone: (415) 371-8500
4  Fax: (415) 371-0500

5  Attorneys for Defendant
   VICTOR CONTE
6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10  SHANE D. MOSLEY, SR.,                  Case No. C 08-01777 JSW

11          Plaintiff,                     **NOTICE OF MOTION AND MOTION
                                           TO STRIKE COMPLAINT PURSUANT**
12     vs.                                 **TO CALIFORNIA'S ANTI-SLAPP
                                           STATUTE [C.C.P. §425.16]**
13  VICTOR CONTE,                          **STRATEGIC LAWSUIT AGAINST
                                           PUBLIC PARTICIPATION ("SLAPP");**
14          Defendant.                     **AND MEMORANDUM OF POINTS
                                           AND AUTHORITIES IN SUPPORT**
15                                         **THEREOF**

16

17                                         Hearing Date: August 22, 2008
                                           Time:  9:00 a.m.
18                                         Courtroom: 2

19                                         HON. JEFFREY S. WHITE

20

21

22

23

24

25

26

27

28

KERR
—&—
WAGSTAFFE
LLP

CASE NO. C 08-01777 JSW                           MOTION TO STRIKE COMPLAINT

1

## <u>NOTICE OF MOTION AND MOTION</u>

2    TO THE COURT AND PLAINTIFF AND ITS COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE that on August 22, 2008 at 9:00 a.m., or as soon thereafter as

4    the matter may be heard, in the Courtroom of the Honorable Jeffrey S. White, 450 Golden Gate

5    Ave., Courtroom 2, San Francisco, CA, 94102, Defendant Victor Conte, will and hereby does

6    move for an order striking Plaintiff's Complaint pursuant to California Code of Civil Procedure

7    section 425.16 on the grounds that (a) California Code of Civil Procedure section 425.16 applies

8    to the Complaint because Plaintiff's suit arises from an act in furtherance of Defendant's right to

9    petition or free speech, and thus, Plaintiff must demonstrate a reasonable probability he will

10    prevail on the merits; and (b) Plaintiff cannot demonstrate a reasonable probability on the merits.

11    The motion is based on this Notice of Motion and Motion, the Memorandum of Points

12    and Authorities in support thereof, the Declarations of James M. Wagstaffe, Ivo Labar, Victor

13    Conte, and Derryl Hudson filed herewith, the papers filed with the Court in this action, and such

14    other written or oral argument as may be presented before the motion is taken under submission

15    by the Court.

16

17    DATED: May 30, 2008                          Respectfully submitted,

18                                                 **KERR & WAGSTAFFE LLP**

19

20                                          By _____ s/James M. Wagstaffe _____
                                                 JAMES WAGSTAFFE
21
                                                 Attorneys for Defendant
22                                               VICTOR CONTE

23

24

25

26

27

28

## TABLE OF CONTENTS

*Page*

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 2

    A.    Mosley's Use of Performance Enhancing Drugs Before His 2003 Title
        Bout with Oscar de La Hoya ................................................................... 2

    B.    Mosley's Complaint ............................................................................... 4

III.  ARGUMENT ................................................................................................. 5

    A.    Mosley's Complaint is Subject to California's Anti-SLAPP Statute .................. 5

        1.    Overview of Code of Civil Procedure section 425.16 ............................. 5

        2.    Legal Standard .......................................................................... 6

        3.    The Anti-SLAPP Statute Applies Here ............................................... 7

    B.    Mosley Cannot Establish a Reasonable Probability That He Will Prevail
        on the Merits of His Defamation Claim ................................................... 10

        1.    The Allegedly Defamatory Statements Are on Their Face Non-
            Actionable Opinion .................................................................... 10

        2.    The Allegedly Defamatory Statements Are Privileged .......................... 11

        3.    Mosley Cannot Meet His Burden to Show with Clear and
            Convincing Evidence that Conte's Statements Were Made with
            Actual Malice ........................................................................... 12

        4.    Conte's Statements Are Not Defamatory Because They Are
            Substantially True ..................................................................... 15

IV.   CONCLUSION ............................................................................................ 15

1

## TABLE OF AUTHORITIES

2

*Page*

3

*Cases*

4

1-800-Contacts, Inc. v. Steinberg,
5     107 Cal. App. 4th 568 (2003) ................................................................ 10

6

Baker v. Los Angeles Herald Examiner,
    42 Cal. 3d 254 (1986) ................................................................ 10

7

Barry v. Time, Inc.,
8     584 F. Supp. 1110 (D.C. Cal. 1984) ................................................................ 13

9

Beilenson v. Superior Court,
    44 Cal. App. 4th 944 (1996) ................................................................ 13

10

Braun v. Chronicle Publishing Co.,
11     52 Cal. App. 4th 1036 (1997) ................................................................ 6

12

Carver v. Bonds,
    135 Cal. App. 4th 328 (2005) ................................................................ 15

13

Cepeda v. Cowles Magazines & Broad., Inc.,
14     392 F.2d 417 (9th Cir. 1968) ................................................................ 13

15

Christian Research Institute v. Alnor,
    148 Cal. App. 4th 71 (2007) ................................................................ 14

16

Church of Scientology v. Wollersheim,
17     42 Cal. App. 4th 628 (1996) ................................................................ 6, 7, 8

18

ComputerXpress, Inc. v. Jackson,
    93 Cal. App. 4th 993 (2001) ................................................................ 7

19

Copp v. Paxton,
20     45 Cal. App. 4th 829 (1996) ................................................................ 13

21

Damon v. Ocean Hills Journalism Club,
    85 Cal. App. 4th 468 (2000) ................................................................ 6

22

Dowling v. Zimmerman,
23     85 Cal. App. 4th 1400 (2001) ................................................................ 5, 7

24

Emde v. San Joaquin County Central Labor Council,
    23 Cal. 2d 146 (1943) ................................................................ 12

25

Equilon Enterprises v. Consumer Cause, Inc.,
26     29 Cal. 4th 53 (2002) ................................................................ 6, 10

27

Fontani v. Wells Fargo Investments, LLC,
    129 Cal. App. 4th 719 (2005) ................................................................ 6

28

Gertz v. Robert Welch, Inc.,
    418 U.S. 323 (1974) ................................................................ 12

KERR
&
WAGSTAFFE
LLP

ii

1    Global Telemedia Intern., Inc. v. Doe 1,
          132 F. Supp. 2d 1261 (C.D. Cal. 2001) ............................................ 7
2
     Gregory v. McDonnell Douglas Corp.,
3         17 Cal. 3d 596 (1976) ...................................................................... 10

4    Kibler v. Northern Inyo County Local Hosp. Dist.,
          39 Cal. 4th 192 (2006) ...................................................................... 6
5
     Lieberman v. KCOP Television, Inc.,
6         110 Cal. App. 4th 156 (2003) ........................................................ 8, 9

7    Masson v. New Yorker Magazine, Inc.,
          501 U.S. 496 (1991) .......................................................................... 15
8
     McGarry v. University of San Diego,
9         154 Cal. App. 4th 97 (2007) .............................................................. 8

10   New York Times Co. v. Sullivan,
          376 U.S. 254 (1964) .......................................................................... 14
11
     Noel v. River Hills Wilsons, Inc.,
12        113 Cal. App. 4th 1363 (2003) ........................................................ 11

13   Nygard, Inc. v. Uusi-Kertula,
          159 Cal. App. 4th 1027 (2008) .......................................................... 8
14
     Reader's Digest Assn. v Superior Court,
15        37 Cal. 3d 244 (1984) ...................................................................... 13

16   Robertson v. Rodriguez,
          36 Cal. App. 4th 347 (1995) ................................................. 6, 12, 13
17
     Saenz v. Playboy Enterprises, Inc.,
18        841 F.2d 1309 (7th Cir. 1988) .......................................................... 11

19   Seelig v. Infinity Broadcasting Corp.,
          97 Cal. App. 4th 798 (2002) ............................................................ 10
20
     Sipple v. Foundation for Nat'l Progress,
21        71 Cal. App. 4th 226 (1999) ........................................................ 5, 8

22   St. Amant v. Thompson,
          390 U.S. 727 (1968) .......................................................................... 14
23
     Tuchscher Development Enterprises, Inc. v. San Diego Unified Port District,
24        106 Cal. App. 4th 1219 (2003) ........................................................ 13

25   United States of America, ex rel. v. Lockheed Missiles & Space Co., Inc.,
          190 F.3d 963 (9th Cir. 1999) ............................................................ 6
26
     United States v. Mendenhall,
27        446 U.S. 544 (1980) ............................................................................ 9

28

1

***Statutes***

2    Cal. Civ. Code § 47 ........................................................................................................ 11

3    Cal. Code Civ. P. §  425.16 .................................................................................... passim

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2  **I.    INTRODUCTION**

3         This case arises from the well-publicized sports scandal involving professional athletes'

4  use of illegal performance enhancing drugs provided by Bay Area Laboratory Cooperative

5  ("BALCO"), a company owned by Defendant Victor Conte ("Conte"). Professional boxer,

6  Plaintiff Shane Mosley, Sr. ("Mosley"), has admitted publicly to using such drugs but claims that

7  he did not know what he was taking – and blames Conte allegedly for deceiving him. In

8  response, Conte has stated truthfully that Mosley was well aware that he was taking illegal

9  performance enhancing drugs. Rather astonishingly, Mosley has now sued Conte, alleging that

10  his statements were defamatory.

11         As will be explained in detail below, Mosley's complaint is meritless and should be

12  stricken under California's anti-SLAPP statute, California Code of Civil Procedure section

13  425.16. The anti-SLAPP statute provides a vehicle for quick disposal of meritless suits that

14  challenge public statements made on matters of public interest and other First Amendment

15  activity.  Mosley cannot even hope to meet his burden here of showing *by clear and convincing*

16  *evidence* that his suit has merit. Conte's assertion that Mosley knew he was taking performance

17  enhancing drugs is an assertion of opinion, and thus not actionable as defamation. One person

18  cannot "know" what someone else is thinking – such comments are always mere opinions and

19  beliefs. It is well established that assertions about what a public figure knew, and when he knew

20  it, are protected opinions essential to free public discussion of these important issues (indeed,

21  almost every athlete caught using these illegal drugs has claimed, at one time or another, that

22  they believed the substances were lawful – albeit unusually expensive and hard to obtain –

23  "vitamins" or "flax seed oil"). Mosley also cannot show that Conte made his statements with

24  actual malice or, for that matter, that the statements were false at all. The declarations of Conte

25  and Mosley's own trainer, Derryl Hudson ("Hudson") compellingly show that Mosley *did* know

26  what he was doing when he began using these performance enhancing drugs. Mosley's self-

27  serving, farfetched claim of ignorance is insufficient to make a contrary showing by clear and

28  convincing evidence. At bottom, Conte had a First Amendment right to present his recollection

1  of events when asked about Mosley's denials. His reasonable opinion about Mosley's state of

2  mind, and his statements on these matters of significant public concern, cannot form the basis for

3  a defamation claim under Constitutional and California law.

4  **II.   BACKGROUND**

5     A.   **MOSLEY'S USE OF PERFORMANCE ENHANCING DRUGS BEFORE HIS 2003 TITLE**
         **BOUT WITH OSCAR DE LA HOYA**

6

7        This case begins at a meeting between the parties nearly five years ago. On July 26,

8  2003, shortly before Mosley's title boxing match against Oscar De La Hoya ("De La Hoya"),

9  Mosley and trainer Hudson flew from Southern California to the Bay Area to meet with Conte.

10 (Declaration of Victor Conte ("Conte Decl."), ¶ 3; Declaration of Derryl Hudson ("Hudson

11 Decl."), ¶ 4.) After their flight landed at the Oakland airport, a limousine transported them to the

12 BALCO offices in Burlingame where Conte met with both of them. (Conte Decl., ¶ 3.) Jim

13 Valente ("Valente"), a BALCO employee, was also present. (Conte Decl., ¶ 3; Hudson Decl., ¶

14 4.)

15        Shortly after Mosley and Hudson arrived at the BALCO offices, Valente accompanied

16 them to Peninsula Health Services. (Conte Decl., ¶ 4.) At Peninsula Health Services, Mosley's

17 blood and urine samples were collected for a blood chemistry panel, complete blood count, tests

18 to measure Plaintiff's T3, T4, and TSH, and mineral and trace element analysis. (Id.) Mosley,

19 Hudson and Valente returned to the BALCO offices in Burlingame to continue their meeting

20 with Conte. (Id., ¶ 5.)

21        Conte explained the benefits of using three illegal performance enhancing drugs

22 commonly referred to as EPO, "The Clear," and "The Cream." (Conte Decl., ¶ 5, Hudson Decl.,

23 ¶ 6.) Conte explained to Mosley and Hudson that The Clear was an undetectable anabolic

24 steroid and that The Cream contained testosterone and epitestosterone, and that The Cream was

25 primarily to be used as a masking agent. (Conte Decl., ¶ 5.) With regard to EPO, he told them

26 that its purpose was to increase the production of red blood cells, and therefore, Mosley should

27 take additional dietary supplements that aid in the manufacture of red blood cells. (Id.) Conte

28 told Mosley and Hudson that in addition to assisting with red blood cell production, EPO

1    enhances oxygen uptake and utilization, which is important in a sport requiring stamina and

2    endurance, like boxing. (Id.) Conte further explained that EPO's effects would provide Mosley

3    with an advantage late in the fight with De La Hoya. (Id.)

4           In addition to explaining the purposes of the drugs, Conte instructed Mosley and Hudson

5    on how to administer them. (Conte Decl., ¶¶ 6, 8; Hudson Decl., ¶ 7.) He showed them the

6    proper procedure to draw EPO from the bottle (which was labeled as Procrit-brand EPO) with a

7    syringe, how to remove the air from the syringe by flicking it and pushing the plunger up, and

8    how to inject himself in the stomach using a more sophisticated "double-injection" technique.

9    (Conte Decl., ¶ 6.) Conte instructed Mosley to make a ½ cc subcutaneous injection into the right

10   side of his stomach and then a second ½ cc injection into his left side. (Id.) Mosley injected his

11   first doses of EPO that day in presence of Conte, Hudson, and Valente. (Id., ¶ 7; Hudson Decl.,

12   ¶ 8.) Conte also explained the use of The Clear and The Cream to Mosley and Hudson that day,

13   following which Mosley administered his first dose of The Clear under his tongue with a needle-

14   less syringe in the presence of Conte, Hudson, and Valente. (Conte Decl., ¶ 8; Hudson Decl., ¶

15   7.)

16          During the meeting, Mosley had many questions about EPO, The Clear, and The Cream,

17   which Conte answered. (Conte Decl., ¶ 9.) Conte also wrote out a "doping calendar" for Mosley

18   which listed the specific drugs for him to use each day up until just before the De La Hoya match

19   when he would taper off the use of the drugs. (Id., ¶ 10; Hudson Decl., ¶ 7.) Conte instructed

20   Mosley to use both The Clear and The Cream twice a week, and to inject EPO three days per

21   week for the first two weeks and one day per week thereafter until the week before the De La

22   Hoya match. (Conte Decl., ¶ 10.)

23          The cost of the drug program was $1,850 (i.e. $900 for the EPO, $600 for The Clear and

24   The Cream, $150 for blood work, and $200 for transportation from the airport). (Id., ¶ 11.)

25   Before Mosley and Hudson left BALCO, Mosley paid Conte a partial payment of $500, in cash.

26   Mosley later sent Conte a personal check for the balance. (Id.) Mosley, Hudson and Conte

27   agreed that Mosley and Hudson should not carry the drugs on the airplane flight back to

28   Southern California, so Conte shipped them via Federal Express to Hudson. (Id.)

KERR
&
WAGSTAFFE
LLP

3

Case No. C 08-01777 JSW                          MPA IN SUPPORT OF MOTION TO STRIKE COMPLAINT

1       Conte later received and reviewed Mosley's July 26, 2003 test results from the blood and

2  urine collection at Peninsula Health Services.  (Id., ¶ 12.)  These test results revealed that

3  Mosley's hematocrit level (i.e. the percentage of red blood cells compared to the whole blood

4  volume) was towards the low-end of the normal range of forty to fifty-three percent.  (Id.)

5  Approximately two weeks after Mosley's July 26, 2003 meeting with Conte, he had more blood

6  samples collected at the Bear Valley Family Health Center while training in Big Bear, California.

7  (Id., ¶ 13.)  Conte received and reviewed these test results which showed that Mosley's

8  hematocrit level had increased to high-end of the normal range.  (Id.)  This test result indicated

9  the drugs were having the planned effect.

10       Mosley went on to beat De La Hoya in a hotly disputed match in which numerous boxing

11  commentators noted how Mosley simply outlasted a fatigued De La Hoya in the final rounds of

12  the fight.  (Declaration of James M. Wagstaffe ("Wagstaffe Decl."), Ex. B.)

13       Mosley was later subpoenaed by the Grand Jury investigating the BALCO scandal.

14  Mosley made numerous public comments denying that he ever took any prohibited substances,

15  and later changing his story to an admission that he had inadvertently taken illegal performance

16  enhancing drugs.  (Wagstaffe Decl., Exs. A-D.)

17     **B.**   **MOSLEY'S COMPLAINT**

18       Mosley's complaint for slander and libel acknowledges that he and his trainer met with

19  Conte in July 2003.  (Complaint, ¶ 7).  At the meeting, Conte allegedly recommended certain

20  health supplements to Mosley.  (Id.)  The complaint further alleges that Conte misled Mosley

21  because Conte allegedly told his that the items were "healthy, legal and permitted for athletes."

22  (Id.)  Mosley further alleges that he was "[a]lways extremely concerned about his health and

23  playing by the rules . . ."  (Id.)  In contrast to the numerous news articles in which Mosley

24  admitted to taking banned substances, the complaint is curiously silent as to whether Mosley

25  ever took any prohibited substances.

26       The complaint further alleges that on March 29 and 30, 2008, in response to statements

27  made by Mosley, Conte gave a series of interviews in which he falsely accused Mosley of

28  "knowingly" taking illegal performance-enhancing drugs.  (Id. ¶¶ 12, 13, 24, and 34.)

1 | Specifically, Mosley contends that Conte made the following three defamatory statements in

2 | describing Mosley's admitted drug use:

3 | • Conte "watched [Mosley] inject [himself] in front of me;"

4 | • Mosley "knew precisely what [he was] using;"

5 | • "[I]t was all explained up front and there was no deception."

6 | (Id. ¶¶ 12, 24, 34.) These statements were published on web site operated by *Sports Illustrated*

7 | magazine and in the *New York Daily News*. (Id. ¶¶ 12, 34.) Conte made these statements after

8 | being approached by journalists from the New York Daily News and Sports Illustrated to

9 | respond to Mosley's false public comments that Conte deceived him about the nature of the

10 | performance enhancing drugs. (Conte Decl., ¶ 14.)

11 | Mosley's complaint seeks compensatory and punitive damages, along with a permanent

12 | injunction preventing Conte from publishing a book that, among other things, details Mosley's

13 | drug use. (Complaint at p. 9). According to Plaintiff's initial disclosures, Plaintiff seeks

14 | compensatory and punitive damages in excess of $15 million. (Wagstaffe Decl., Ex. E.)

15 | **III.    ARGUMENT**

16 | **A.    MOSLEY'S COMPLAINT IS SUBJECT TO CALIFORNIA'S ANTI-SLAPP STATUTE**

17 | **1.    Overview of Code of Civil Procedure section 425.16**

18 | In 1992, California enacted an anti-SLAPP statute, Code of Civil Procedure section

19 | 425.16, to provide a procedure for a court "to dismiss at an early stage nonmeritorious litigation

20 | meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in

21 | connection with a public issue." Sipple v. Foundation for Nat'l Progress, 71 Cal. App. 4th 226,

22 | 235 (1999). This type of nonmeritorious litigation is referred to under the acronym "SLAPP," or

23 | Strategic Lawsuit Against Public Participation. Id. In 1997, the California Legislature added a

24 | provision to section 425.16 mandating that courts "broadly" construe the anti-SLAPP statute to

25 | further the legislative goals of encouraging participation in matters of public significance and

26 | discouraging abuse of the judicial process. Cal. Code Civ. P. § 425.16(a). "California enacted

27 | section 425.16 to provide a procedural remedy to resolve such a suit expeditiously." Dowling v.

28 | Zimmerman, 85 Cal. App. 4th 1400, 1414 (2001) (internal quotation marks and citation omitted).

1   "The hallmark of a SLAPP suit is that it lacks merit, and is brought with the goals of

2   obtaining an economic advantage over a citizen party by increasing the cost of litigation to the

3   point that the citizen party's case will be weakened or abandoned, and of deterring future

4   litigation." United States of America, ex rel. v. Lockheed Missiles & Space Co., Inc., 190 F.3d

5   963, 970-971 (9th Cir. 1999). The Ninth Circuit has held that the anti-SLAPP provision

6   providing for a special motion to strike, although based on state law, applies in federal diversity

7   suits. Id. at 973.

8         2.      **Legal Standard**

9              To prevail on a motion to strike the Complaint under the anti-SLAPP statute, the

10  defendant "must make an initial *prima facie* showing that plaintiff's suit arises from an act in

11  furtherance of defendant's right of petition or free speech." Braun v. Chronicle Publishing Co.,

12  52 Cal. App. 4th 1036, 1042-43 (1997) (emphasis added). Upon such showing, the burden shifts

13  to the plaintiff who "must establish a reasonable probability he or she will prevail on the merits."

14  Damon v. Ocean Hills Journalism Club, 85 Cal. App. 4th 468, 474 (2000). In reviewing a

15  motion under section 425.16, "the trial court is required to consider the pleadings and the

16  supporting and opposing affidavits stating the facts upon which the liability or defense is based."

17  Church of Scientology v. Wollersheim, 42 Cal. App. 4th 628, 646 (1996), *disapproved on other*

18  *grounds*, Equilon Enterprises v. Consumer Cause, Inc., 29 Cal. 4th 53, 68 (2002). The court

19  must consider the pleadings and evidence of both the plaintiff and defendant in determining

20  whether the plaintiff can establish a probability of prevailing. Fontani v. Wells Fargo

21  Investments, LLC, 129 Cal. App. 4th 719, 734 (2005), *disapproved on other grounds*, Kibler v.

22  Northern Inyo County Local Hosp. Dist., 39 Cal. 4th 192, 203 (2006). This requires the court to

23  consider the defendant's evidence with a "view toward whether it defeats the plaintiff's showing

24  as a matter of law." Id. (citation omitted); see also Robertson v. Rodriguez, 36 Cal. App. 4th

25  347, 359 (1995) (recognizing that "section 425.16, by requiring scrutiny of the supporting and

26  *opposing* affidavits stating the facts upon which the liability or *defense* is based, calls upon the

27  plaintiff to meet the defendant's constitutional defenses, such as lack of actual malice")

28  (emphasis in original). Where, as here, the plaintiff is unable to provide the factual and legal

1   support for the challenged cause of action, the complaint should be stricken. Cal. Code Civ. P.

2   § 425.16(b); Dowling, 85 Cal. App. 4th at 1417.

3   **3.   The Anti-SLAPP Statute Applies Here**

4   The anti-SLAPP statute plainly encompasses Conte's statements regarding Mosley's use

5   of illegal performance enhancing drugs. Conte's statements are both written statements made in

6   a public forum in connection with an issue of public interest as well as a an exercise of his free

7   speech in connection with an issue of public interest. As such, Conte's statements arise from

8   Conte's protected activities and fall within the purview of the anti-SLAPP statute.

9              *a)   Conte's Statements Constitute a Protected Activity Because They*
                    *Were Made in a Public Forum in Connection with an Issue of*
10                  *Public Interest*

11   First, Conte's statements fall within the protection of the anti-SLAPP statute because they

12   were made in a public forum – public newspapers and websites – in connection with an issue of

13   public interest, namely, the use of illegal performance enhancing drugs by a professional athlete.

14   The anti-SLAPP statute protects "any written or oral statement or writing made in a place open

15   to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. P.

16   § 425.16 (e)(3). The statute contains no requirement that the challenged statement be broadly

17   disseminated or that it be made in a traditional public forum – any place "open to the public" is

18   sufficient. Id. A public forum is traditionally defined "as a place that is open to the public where

19   information is freely exchanged." ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1006

20   (2001) (citation omitted). The term "public interest" encompasses a wide range of interests.

21   Church of Scientology, 42 Cal. App. 4th at 650.

22   There can be no legitimate dispute that Conte's statements were made in a public forum

23   in connection with an issue of public interest. Importantly, Conte made his statements regarding

24   Mosley's use of banned substances (which were in response to Mosley's accusations) in public

25   newspapers and on web sites that are available to any member of the public. Newspapers,

26   magazines, and websites available free of charge to any member of the public are public forums

27   for purposes of the anti-SLAPP statute. Global Telemedia Intern., Inc. v. Doe 1, 132 F. Supp. 2d

28   1261, 1264 (C.D. Cal. 2001); Nygard, Inc. v. Uusi-Kertula, 159 Cal. App. 4th 1027, 1038

KERR
&
WAGSTAFFE
LLP

7

1   (2008). Hence, the "public forum" requirement of California Code of Civil Procedure section

2   425.16(e)(3) is met.

3        The media coverage of Conte's statements is also pertinent to the "in connection with an

4   issue of public interest" criterion under section 425.16(e)(3). The media coverage of Conte's

5   statements evinces the public interest in Mosley's use of banned substances. See Sipple, 71 Cal.

6   App. 4th at 238-39 (recognizing that public interest is demonstrated by media coverage); Church

7   of Scientology, 42 Cal. App. 4th at 650 (same). Indeed, it is beyond cavil that Mosley's use of

8   illegal performance enhancing drugs is a matter of public interest. Issues central to the careers of

9   high-profile sports figures are ones of public interest. In McGarry v. University of San Diego,

10  154 Cal. App. 4th 97, 109 (2007), the Court found that the termination of the head football coach

11  at the University of San Diego was a public issue for purposes of the anti-SLAPP statute. The

12  Court reached this conclusion because

13          [The termination] was important to those immediately affected by
            the change in leadership, including the players, the players'
14          parents, and the staff connected to the University football team.
            Moreover, it was of import to those who follow the team's
15          fortunes, including University's current students, University's
            alumni and boosters, potential recruits to the football team, and
16          peripheral fans of the team. Finally, the loss of a team's head
            coach is of import to competitor schools, both for its immediate
17          impact on the team's performance in the remaining contests for the
            current season and for the reverberations on recruiting players for
18          future seasons.
19

20  Id. (emphasis added). This reasoning is equally applicable here. Mosley's use of illegal

21  performance enhancing drugs is certainly of concern to the boxing community. It is of exigent

22  import to those who are part of Mosley's boxing staff, as well as regulatory bodies for the sport,

23  Mosley's sponsors and promoters, and his past and future competitors. Mosley's drug use also is

24  also a salient issue for boxing fans.

25        Mosley's use of illegal performance enhancing drugs concerns not just the boxing

26  community but the public at large. The use of controlled substances is a significant public issue.

27  In Lieberman v. KCOP Television, Inc., 110 Cal. App. 4th 156, 164-165 (2003), the Court held

28  that a doctor's improper prescription of controlled substances was a public issue within the

1  meaning of the anti-SLAPP statute. The Court found that "major societal ills" are issues of

2  public concern and that news reports concerning criminal activity serve the public interest. Id. at

3  164. Indeed, as the Court highlighted, the Supreme Court expressly noted that few problems

4  affecting public health and welfare cause greater concern than the escalating use of controlled

5  substances. Id. at 165 (citing United States v. Mendenhall, 446 U.S. 544, 561 (1980)). Based on

6  the foregoing, the Court concluded that it has "…no doubt that the unlawful dispensing of

7  controlled substances is an issue of great public interest." Id. Under the holding in Lieberman –

8  as well as common sense – Mosley's use of illegal performance enhancing drugs is a matter of

9  considerable public interest.

10       As a professional athlete, Mosley's use of illegal performance enhancing drugs plainly

11  concerns a large number of people and, as the media coverage surrounding Mosley's use of

12  banned substances indicates, has become a matter of intense public interest. Conte's statements

13  target this very public issue and were published in a public forum, and therefore are

14  encompassed within the purview of the anti-SLAPP statute.

15                    b)    *Conte's Statements Are Also a Protected Activity Because They*
                           *Were Made in Furtherance of Conte's Right to Free Speech in*
16                         *Connection with an Issue of Public Interest*

17       Second, Conte's statements are further protected by the anti-SLAPP statute because they

18  constitute an exercise of his free speech in connection with an issue of public interest. The anti-

19  SLAPP statute protects "conduct in furtherance of the exercise of the constitutional right of

20  petition or the constitutional right of free speech in connection with a public issue or an issue of

21  public interest." Cal. Code Civ. Proc. § 425.16(e)(4).

22       It is pellucid that Conte's statements meet this standard. As noted above, Mosley's use of

23  illegal performance enhancing drugs is the subject of public concern. Moreover, it cannot be

24  gainsaid that Conte has a first amendment right to communicate on such topics. The law is clear

25  that stating facts and opinions about another is conduct in furtherance of the exercise of the

26  constitutional right of free speech within the meaning of Code of Civil Procedure section

27  425.16(e)(4). Hence, Conte's opinions regarding Mosley's drug use constitutes an exercise of

28  his first amendment rights. Conte's statements thus fall within the ambit of the anti-SLAPP

1    statute as acts in furtherance of his constitutional right of free speech in connection with an issue

2    of public interest.

3        The applicability of the anti-SLAPP statute to Mosley's Complaint is pellucid.

4    Accordingly, since Conte has made a prima facie showing that the suit claim falls within the

5    ambit of the anti-SLAPP statute, the burden shifts to Mosley to establish a probability of

6    prevailing on the merits of his underlying claim.

7        **B.    MOSLEY CANNOT ESTABLISH A REASONABLE PROBABILITY THAT HE WILL
             PREVAIL ON THE MERITS OF HIS DEFAMATION CLAIM**

8

9        Once a defendant has demonstrated that the underlying complaint arose out of the

10    defendant's right of petition or free speech, which Conte has done here, the burden shifts to the

11    plaintiff to show there is a probability that the plaintiff will prevail on his claims. Cal. Code Civ.

12    P. § 425.16(b)(l); Equilon, 29 Cal. 4th at 67. In order to meet this burden, the plaintiff must offer

13    enough admissible evidence to make a prima facie showing of facts that would merit a judgment

14    in the plaintiff's favor. 1-800-Contacts, Inc. v. Steinberg, 107 Cal. App. 4th 568, 584 (2003). As

15    will be set forth below, Mosley cannot meet his burden, as a matter of law.

16        **1.    The Allegedly Defamatory Statements Are On Their Face Non-
                 Actionable Opinion**

17

18        An essential element of a defamation claim is that "the publication in question must

19    contain a false statement of fact." Gregory v. McDonnell Douglas Corp., 17 Cal. 3d 596, 600

20    (1976) (emphasis added). Opinions are not actionable, even if expressed with malice. Id. at 601.

21    To determine whether an alleged defamatory statement is one of fact or opinion, California

22    courts look to the "totality of the circumstances." Baker v. Los Angeles Herald Examiner, 42

23    Cal. 3d 254, 260 (1986). In this respect, the court must consider the nature and content of the

24    communication, taken as a whole, as well as the context in which the communication was made.

25    Seelig v. Infinity Broadcasting Corp., 97 Cal. App. 4th 798, 810-11 (2002). Whether a statement

26    is one of fact or opinion is a question of law to be decided by the court. Baker, 42 Cal. 3d at 260.

27        Here, Mosley publicly claimed that he did not know he was receiving illegal performance

28    enhancing drugs and that Conte somehow misled him into believing that he was injecting

1   nothing more than "legal supplements." (Complaint ¶ 6.) The crux of Conte's response to

2   Mosley's accusations is that Mosley <u>knew</u> what he was taking. Conte's statements as to what

3   Mosley actually knew or believed is non-actionable opinion. In <u>Saenz v. Playboy Enterprises,</u>

4   <u>Inc.</u>, 841 F.2d 1309, 1311-1312 (7th Cir. 1988), the former Secretary of the New Mexico

5   Department of Corrections brought suit against Playboy for publishing an article calling him a

6   torturer and implicating his department in the torture of suspects. The court held that an

7   assertion as to what the Secretary knew or should have known is a protected inference or

8   opinion:

9   > there are two competing readings of the allegedly libelous
10  > statements. The first, advanced by Saenz, is that he has been
    > accused of being a torturer. **The second, Morris's position, is that**
11  > **Saenz either knew or should have known about the torture and**
    > **did nothing to stop it. That latter reading is, of course, an**
12  > **inference or an opinion and is protected.**

13  <u>Id.</u> at 1318 n.3 (emphasis added).

14      The same logic applies to sports stars in the highly debated public issue of athletes' use of

15  illegal performance enhancing drugs. While Conte may opine what <u>he</u> believed Mosley knew or

16  may not have known, only Mosley, as a factual matter, is in a position to know his actual state of

17  mind. At best, Conte did nothing more than express his opinion as to the veracity of Mosley's

18  professed ignorance of what substance he was using. Indeed, under Mosley's theory, every

19  statement made in response to an accusation of wrongdoing could be transformed into a claim

20  for defamation, which clearly is not the law.

21          **2.      The Allegedly Defamatory Statements Are Privileged**

22      Mosley's defamation claims also fail under California Civil Code section 47(c), which

23  extends a conditional privilege against defamatory statements made without malice on subjects

24  of mutual interest. <u>See</u> <u>Noel v. River Hills Wilsons, Inc.</u>, 113 Cal. App. 4th 1363, 1369 (2003).

25  Section 47(c) states that" "A privileged publication or broadcast is one made: ¶ In a

26  communication, without malice, to a person interested therein, [] by one who is … requested by

27  the person interested to give the information." As the California Supreme Court has explained,

28  "greater protection is accorded one who makes a statement, in a reasonable manner and for a

1  proper purpose, to persons having a common interest with him in the subject matter of the

2  communication, when the publication is of a kind reasonably calculated to protect or further it."

3  Emde v. San Joaquin County Central Labor Council, 23 Cal. 2d 146, 154 (1943).

4      In this case, it was Mosley, not Conte, who first raised the issue of his illegal drug use.

5  Mosley attempted to justify his admitted use of performance enhancing substances, but then

6  attempted to disclaim any personal responsibility for his action by publicly blaming Conte for

7  allegedly not disclosing what those substances actually were. Unsurprisingly, the news media

8  solicited Conte for a response to Mosley's incendiary accusations. (Conte Decl., ¶ 14.) The use

9  of illegal steroids by a high-profile, professional athlete such a Mosley certainly was and is a

10  matter of interest to the public as well as news reporters. A qualified privilege attached to the

11  responses made by Conte when he responded and offered his opinion as to the correctness of

12  Mosley's claim when the reporters so inquired.

13          **3.    Mosley Cannot Meet His Burden to Show with Clear and Convincing
                    Evidence that Conte's Statements Were Made with Actual Malice**

14

15              a)    *The Applicable Standard of Review Is Clear and Convincing
                        Evidence*

16      Mosley must demonstrate by clear and convincing evidence that he will prevail on his

17  defamation claims. In determining whether the plaintiff has met its burden of proof on an anti-

18  SLAPP motion, the Court must consider the applicable burden of proof that the plaintiff must

19  carry to prevail on its underlying claim at trial. Robertson v. Rodriguez, 36 Cal. App. 4th 347,

20  358 (1995) (citation omitted) (in determining whether the plaintiff has established actual malice,

21  the court noted that it must "bear in mind the higher clear and convincing standard of proof"). A

22  public figure bringing a defamation claim must demonstrate, by clear and convincing evidence,

23  that the defendant made the allegedly false statements with actual malice. Id. at 358-359.

24      An all purpose public figure is one who has achieved such fame and notoriety that he has

25  become a public figure for all purposes and contexts. Gertz v. Robert Welch, Inc., 418 U.S. 323,

26  351 (1974). Similarly, a limited public figure is one who "...voluntarily injects himself or is

27  drawn into a particular public controversy and therefore becomes a public figure for a limited

28  range of issues." Id. As a well-known professional athlete who has placed himself at the heart

KERR
&
WAGSTAFFE
LLP

12

1   of the BALCO scandal, there is no question that Mosley is at minimum a limited public figure if

2   not an all purpose public figure.  See Cepeda v. Cowles Magazines & Broad., Inc., 392 F.2d 417,

3   419 (9th Cir. 1968) ("'Public figures' are those persons who, though not public officials, are

4   'involved in issues in which the public has a justified and important interest.'  Such figures are,

5   of course, numerous and include artists, athletes, business people, dilettantes, anyone who is

6   famous or infamous because of who he is or what he has done.  Orlando Cepeda, the principal

7   character in the instant suit, was and is a 'public figure' ... [given his] fame as an extraordinary

8   baseball player."); Barry v. Time, Inc., 584 F. Supp. 1110, 1119 (D.C. Cal. 1984) (citing

9   numerous cases) ("...a long line of cases, beginning with the Supreme Court's opinion in

10  *Butts*...have found professional and collegiate athletes and coaches to be public figures.")

11  Since Mosley is a public figure, he cannot recover unless he proves, by clear and convincing

12  evidence, that Conte made the allegedly false statements with actual malice.

13          Mosley cannot meet his burden of demonstrating by clear and convincing evidence that

14  Conte's statements were made with actual malice.  The clear and convincing standard "requires a

15  finding of *high probability*.  The evidence must be so clear as to leave no substantial doubt.  It

16  must be sufficiently strong to command the unhesitating assent of every reasonable mind." Copp

17  v. Paxton, 45 Cal. App. 4th 829, 846 (1996) (citation omitted) (emphasis added).  Only

18  admissible evidence may be presented to prove that Plaintiff has established clear and

19  convincing evidence that they will prevail on their defamation claim.  See Tuchscher

20  Development Enterprises, Inc. v. San Diego Unified Port District, 106 Cal. App. 4th 1219, 1236

21  (2003) (noting that "[s]uch evidence must be admissible").  This requires the reviewing court to

22  "independently examine the statements in issue and the circumstances under which they are

23  made against the backdrop of the entire record." Robertson, 36 Cal. App. 4th at 358.

24          Moreover, actual malice is a subjective test focusing on "the defendant's actual belief

25  concerning the truthfulness of the publication." Reader's Digest Assn. v Superior Court, 37 Cal.

26  3d 244, 257 (1984).  It may not be implied and must be proven by direct evidence. Beilenson v.

27  Superior Court, 44 Cal. App. 4th 944, 950 (1996).  To prove actual malice, Plaintiff must

28  establish that Conte knew that the statement was false or made with reckless disregard of

1   whether it was false. <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-80 (1964). Reckless

2   disregard is a high burden, requiring a high degree of awareness of probable falsity and a

3   showing that the defendant entertained serious doubts about the truth of the publication. <u>St.</u>

4   <u>Amant v. Thompson</u>, 390 U.S. 727, 731 (1968). Gross or even extreme negligence will not

5   suffice to establish actual malice. <u>Id.</u> Furthermore, as the court explained in, <u>Christian Research</u>

6   <u>Institute v. Alnor</u>, 148 Cal. App. 4th 71, 86 (2007), the court need not examine the evidence of

7   actual malice in a light most favorable to the plaintiff.

8               Accordingly, a reviewing "court is not bound to consider the
            evidence of actual malice in the light most favorable to
9           respondents or to draw all permissible inferences in favor of
            respondents . . . Independent review is applied with equal force in
10          considering whether a plaintiff has established a probability of
            demonstrating malice by clear and convincing evidence in
11          opposing an anti-SLAPP motion.

12  <u>Id.</u> (citations omitted).

13          Here, Plaintiff cannot meet his exceedingly high burden. The sum and substance of

14  Mosley's allegations is that Conte purportedly defamed him by alleging that Mosley knowingly

15  took prohibited substances. More specifically, Conte "watched [Mosley] inject [himself] in front

16  of me;" that Mosley "knew precisely what [he was] using;" and "[I]t was all explained up front

17  and there was no deception." Conte's declaration filed herewith recounts his July 26, 2006

18  meeting with Mosley and Hudson in detail. (Conte Decl., ¶¶ 2-12.) During that meeting, he

19  explained the use and benefits of illegal performance enhancing drugs to Mosley, wrote out a

20  "doping calendar" for Mosley, taught Mosley how to inject the drugs using a "double injection"

21  technique, and watched Mosley inject his first doses of the drugs. (<u>Id.</u>) Tellingly, he shipped the

22  drugs to Hudson in order to avoid detection at the airport. (<u>Id.</u> ¶ 11.) Conte is not alone in his

23  contention that Mosley knew that he was taking illegal performance enhancing drugs. Hudson,

24  Mosley's own trainer, also acknowledges that Mosley knew exactly what he was doing.

25  (Hudson Decl., ¶¶ 4-10.) In light of the foregoing, Mosley cannot overcome his burden of

26  showing by clear and convincing evidence, that Conte made his statements with actual malice.

27

28

1    **4.    Conte's Statements Are Not Defamatory Because They Are**
        **Substantially True**

2

3          Plaintiff also cannot demonstrate a likelihood of success because Conte's statements are

4    substantially true, and therefore not defamatory.  Masson v. New Yorker Magazine, Inc., 501

5    U.S. 496, 516-17 (1991) (citing California law); Carver v. Bonds, 135 Cal. App. 4th 328, 357-59

6    (2005).  California law permits the defense of "substantial truth," and thus a defendant is not

7    liable "'if the substance of the charge be proved true....'"  "Put another way, the statement is not

8    considered false unless it 'would have a different effect on the mind of the reader from that

9    which the ... truth would have produced.'"  Masson, 501 U.S. at 516-517, (1991).  As discussed

10   above, the declarations of Conte and Hudson forcefully demonstrate that Mosley was well aware

11   of the fact that he was consuming illegal performance enhancing drugs, thus vitiating Mosley's

12   claims of defamation.

13   **IV.    CONCLUSION**

14          It is beyond dispute that Mosley's suit arises directly from Conte's exercise of free

15   speech, and accordingly falls within the ambit of California's anti-SLAPP statute.  The burden,

16   therefore, shifts to Mosley to demonstrate that he will prevail on his claims.  Plaintiff cannot do

17   so because the evidence cogently shows that Mosley knew he was cheating.  For the foregoing

18   reasons, Plaintiff's Complaint should be stricken.

19   DATED: May 30, 2008                    Respectfully submitted,

20                                          **KERR & WAGSTAFFE LLP**

21

22                                          By ____s/James M. Wagstaffe_____
                                               JAMES WAGSTAFFE
23                                             IVO LABAR

24                                             Attorneys for Defendant
25                                             VICTOR CONTE

26

27

28

EXHIBIT D

1  LONG & LEVIT LLP
Kim O. Dincel, Esq. (SBN 131563)
2  465 California Street 5th Floor
San Francisco, California 94104
3  Tel (415) 397-2222 Fax (415) 397-6392
E-mail: kdincel@longlevit.com
4
JUDD BURSTEIN, P.C.
5  Judd Burstein, Esq. (JB-9585; admitted *pro hac vice*)
Jeremy M. Attie, Esq. (JA-0561; admitted *pro hac vice*)
6  1790 Broadway, Suite 1501
New York, New York 10019
7  Tel (212) 974-2400 Fax (212) 974-2944
E-mail: jburstein@burlaw.com
8  E-mail: jattie@burlaw.com

9  *Attorneys for Plaintiff,*
SHANE D. MOSLEY, SR.

10

11                    UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14  SHANE D. MOSLEY, SR.,          )    08-Civ-1777 (JSW)
                                   )
15            *Plaintiff,*          )    MEMORANDUM OF POINTS AND
                                   )    AUTHORITIES IN OPPOSITION TO
16        vs.                      )    DEFENDANT'S MOTION TO STRIKE THE
                                   )    COMPLAINT PURSUANT TO CAL. CODE
17  VICTOR CONTE,                  )    CIV. PROC. § 425.16 AND CROSS MOTION
                                   )    PURSUANT TO CAL. CODE CIV. PROC. §
18            *Defendant.*          )    425.16(c) FOR ATTORNEY FEES AND
                                   )    COSTS ASSOCIATED WITH RESPONDING
19                                 )    TO DEFENDANT'S MOTION
                                   )
20                                 )    Date:      August 22, 2008
                                   )    Time:      9:00 a.m.
21                                 )    Courtroom: 2, 17th Floor
                                   )
22                                 )    Hon. Jeffrey S. White
                                   )
23                                 )
                                   )
24  ─────────────────────────────

25

26

27

28  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE COMPLAINT
    PURSUANT TO CAL. CODE CIV. PROC. § 425.16 — CASE NO. C 08-Civ-1777 (JSW)

ORIGINAL

1

## SUMMARY OF THE ARGUMENT

2   Plaintiff Shane D. Mosley, Sr. ("Plaintiff" or "Mosley") and defendant Victor Conte

3   ("Conte") have submitted declarations that are utterly at odds with one another, *i.e.* there are clear

4   questions of material fact for the jury to decide. Mosley avers, *inter alia*, that he was never advised

5   by Conte that he was being given illegal or banned performance enhancing drugs. Conte, on the

6   other hand, has stated publicly that Mosley's assertions are "lies." Conte has stated that Mosley

7   "knew precisely what [he was] using," because "[i]t was all explained up front and there was no

8   deception." *See* Complaint at ¶ 12, citing Exhibit A thereto.

9   Conte argues that the statements at issue are non-actionable opinion. However, this argument

10   fails to meet the "opinion" test set forth in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990).

11   Conte's public statements are factual in nature and are provably false. As demonstrated by Conte's

12   declaration, Conte clearly asserts that at the meeting with Mosley, he claims to have "explained the

13   benefits of using three **illegal** performance enhancing drugs...." Conte Decl. at ¶ 5 (emphasis

14   supplied).[1] Hence, as set forth in Mosley's Declaration, the "facts" upon which Conte bases his

15   alleged opinion are incorrect, and thus, the statements still imply a false assertion of fact. Simply

16   couching such statements in terms of opinion does not dispel the false claims upon which they are

17   based. *See Overstock.com, Inc.*, 151 Cal. App. 4th at 704.

18   If the jury credits testimony from Mosley consistent with his Declaration, it will necessarily

19   find that Conte's statements to the press about Mosley were made with actual malice as they were

20   false and Conte knew such statements were false. *See Christian Research Institute v. Alnor*, 148 Cal.

21   App. 4th 71 (Cal. App. 4th Dist. 2007).

22   Therefore Conte's motion should be denied in its entirety and the Court should award

23   Plaintiff the costs and attorneys' fees incurred in defending this frivolous motion.

24   _____

25   [1]     Based upon the sworn factual claims and the allegations of his Complaint, Mosley
    has established a *prima facie* case of libel and slander. Notably, even considering the higher burden
26   at trial with respect to being a public figure, **a declaration provided in opposition to an Anti-**
    **SLAPP motion has been deemed sufficient to establish *prima facie* evidence of actual malice.**
27   *See Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal.App.4th 688, 61 Cal.Rptr.3d 29 (Cal.
28   App. 1st Dist. 2007).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

I.    INTRODUCTION ........................................................ 1

II.   PRELIMINARY STATEMENT AND BRIEF STATEMENT OF FACTS ........... 1

III.  RELEVANT PROCEDURAL BACKGROUND .............................. 3

IV.   ARGUMENT ............................................................ 4

      A.   STANDARD OF REVIEW ......................................... 4

      B.   MOSLEY HAS ESTABLISHED A
           *PRIMA FACIE* CASE OF DEFAMATION .......................... 5

           1.   Mosley Has Proven Falsity ................................ 6

           2.   Plaintiff's Allegations and Supporting Declaration Readily Support a
                Finding of Actual Malice .................................. 8

           3.   Conte's Statements Do Not Constitute Mere Opinion .............. 10

           4.   Conte's Statements Are Not Privileged ........................ 13

           5.   Conte's Truth Defense is Inapplicable Here ...................... 14

V.    MOSLEY IS ENTITLED TO ATTORNEYS' FEES .......................... 14

VI.   CONCLUSION .......................................................... 15

i

# TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Baker v. L.A. Herald Exam'r,*
42 Cal. 3d 254 (Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Beilenson v. Superior Court,*
44 Cal. App. 4th 944 (Cal. App. 2d Dist. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brown v. Kelly Broadcasting Co.,*
48 Cal. 3d 711, 771 P.2d 406 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*California Back Specialists Medical Group v. Rand,*
160 Cal. App. 4th 1032 (Cal App. 2d Dist. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Christian Research Institute v. Alnor,*
148 Cal. App. 4th 71 (Cal. App. 4th Dist. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Copp v. Paxton,*
45 Cal. App. 4th 829 (Cal. App. 1st Dist. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*DiBella v. Hopkins,*
285 F.Supp.2d 394 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Frank Johnson v. Hertz Local Edition Corp.,*
No. C 03-44439,
2004 U.S. Dist. LEXIS 22929 (N.D. Cal. Nov. 2, 2004) (Jenkins, D.J.) . . . . . . . . . . . 11

*Gregory v. McDonnell Douglas Corp.,*
17 Cal. 3d 596 (Cal. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kaelin v. Globe Com. Corp.,*
162 F.3d 1036 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kashian v. Harriman,*
98 Cal. App. 4th 892 (Cal. App. 5th Dist. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lundquist v. Reusser,*
7 Cal. 4th 1193 (Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lutge v. Eskanos & Adler, P.C.,*
No. C 06-07128,
2007 U.S. Dist. LEXIS 81212 (N.D.Cal. Oct. 17, 2007) (White, D.J.) . . . . . . . . . . . . . . 5

*Milkovich v. Lorain Journal Co.,*
497 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ii

*Noel v. River Hills Wilsons, Inc.,*
    113 Cal. App. 4th 1363 (Cal. App. 4th Dist. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Overstock.com, Inc. v. Gradient Analytics, Inc.,*
    151 Cal.App.4th 688, 61 Cal.Rptr.3d 29 (Cal. App. 1st Dist. 2007) . . . . . . . . . . . 5, 7, 11

*Reader's Digest Ass'n v. Superior Court,*
    37 Cal. 3d 244 (Cal. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Robertson v. Rodriguez,*
    36 Cal. App. 4th 347 (Cal. App. 2d Dist. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rogers v. Home Shopping Network, Inc.,*
    57 F. Supp. 2d 973 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ruiz v. Harbor View Community Assn.,*
    134 Cal. App. 4th 1456 (Cal. App. 4th Dist. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Saenz v. Playboy Enters., Inc.,*
    841 F.2d 1309 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sagan v. Apple Computer,*
    874 F. Supp. 1072 (C.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Seelig v. Infinity Broad. Corp.,*
    97 Cal. App. 4th 798 (Cal. App. 1st Dist. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Silverstein v. E360insight, LLC,*
    No. CV 07-2853, 2008 U.S. Dist. LEXIS 36858 (C.D. Cal. May 5, 2008) . . . . . . . . . . . 4

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tuchscher Devel. Enters., Inc. v. San Diego Unified Port Dist.,*
    106 Cal. App. 4th 1219 (Cal. App. 4th Dist. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*U.S. ex rel Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATUTES AND OTHER AUTHORITIES

Cal. Code Civ. Proc. § 128.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Cal. Code Civ. Proc. § 425.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cal. Civ. Code § 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Civ. Code, § 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Civ. Code § 47(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1  **I.      INTRODUCTION**

2          Plaintiff Shane D. Mosley, Sr. ("Mosley" or "Plaintiff") respectfully submits this

3  Memorandum of Points and Authorities: (i) in opposition to Defendant Victor Conte's ("Defendant"

4  or "Conte") motion to strike the complaint pursuant to Cal. Code Civ. Proc. § 425.16 ("Anti-

5  SLAPP" or "§ 425.16"); (ii) pursuant to § 425.16(c), seeking the costs and attorneys' fees associated

6  with opposing Conte's frivolous motion; with (iii) such other and further relief as this Court deems

7  just and proper.

8  **II.     PRELIMINARY STATEMENT AND BRIEF STATEMENT OF FACTS**[1]

9          In the Complaint, dated April 2, 2008 (the "Complaint"), Mosley, a legendary professional

10 boxer, asserts that he has been defamed on multiple occasions by Conte, the infamous principal of

11 the Bay Area Laboratory Co-operative ("BALCO"), through knowingly false statements that Mosley

12 intentionally took illegal performance enhancing drugs. *See* Exhibit B, a true and accurate copy of

13 the Complaint.

14         As demonstrated *infra*, resolving the merits of an Anti-SLAPP motion involves a two-part

15 analysis: (i) whether the challenged cause of action arises from protected activity; and (ii) whether

16 the plaintiff can establish a *prima facie* showing of facts, that if proven, would support a judgment

17 in his favor. Mosley concedes the first prong of the analysis due to clear First Amendment concerns.

18 Thus, the focus turns to whether Mosley can make such a *prima facie* showing. The evidence

19 submitted herewith clearly shows that Mosley has met this burden.

20         This is a classic case of "he said - he said." Both Mosley and Conte have submitted

21 declarations that are utterly at odds with one another, *i.e.*, there are clear questions of material fact

22 for the jury to decide. Mosley avers, *inter alia*, that he was never advised by Conte that he was being

23 given illegal or banned performance enhancing drugs. Moreover, Mosley states that he "was assured

24 by both Hudson and Conte that everything that Conte was recommending was legal, healthy, and not

---

26         [1]      Due to the page limitations for this motion, Mosley respectfully refers the Court to

27 the Complaint and the accompanying Declaration of Judd Burstein, dated June 16, 2008 ("Burstein
   Decl.") and Declaration of Mosley, dated June 13, 2008 ("Mosley Decl."), for a complete recitation

28 of the relevant facts. All Exhibits referenced herein are annexed to the Burstein Decl.

1  in any way barred by the rules of [his] sport." Mosley Decl. at ¶ 14. Conte, on the other hand, has

2  stated publicly that Mosley's assertions are "lies." Conte has stated that Mosley "knew precisely

3  what [he was] using," and that, notwithstanding Mosley's prior public claim that Conte had misled

4  Mosley about the legality of the products provided by Conte, "[i]t was all explained up front and

5  there was no deception." *See* Complaint at ¶ 12, citing Exhibit A thereto.

6       Conte's main argument supporting his position that Mosley's claims fail as a matter of law

7  is that Conte's defamatory statements are mere opinion. Here, however, Conte's public statements

8  are factual in nature (*i.e.* Conte knew Mosley was aware that the drugs were illegal and banned,

9  **because** Conte informed Mosley that such was the case) and are provably false if the jury were to

10  credit Mosley's factual position as set forth in the Mosley Declaration. Accordingly, such statements

11  cannot be deemed to state a mere opinion.

12       Conte's own Declaration in support of his Anti-Slapp motion describes the issue at the center

13  of this case. He claims that in late July 2003, Mosley met with him at his office at BALCO. *See*

14  Conte's Declaration, dated May 30, 2008 ("Conte Decl.") at ¶¶ 3-5. At the meeting, Conte claims

15  to have "explained the benefits of using three **illegal** performance enhancing drugs.... Specifically,

16  [Conte claims that he] explained to Mr. Mosley and Mr. Hudson that The Clear was an undetectable

17  anabolic steroid and that The Cream contained testosterone and epitestosterone...." (emphasis

18  supplied). *Id.* at ¶ 5. Conte also claims to have shipped the illegal drugs via FEDEX to Hudson, so

19  as to "not carry the drugs on the airplane." *Id.* at ¶ 11.

20       Conte further admits to making all "the statements that are the subject of this action...."

21  Conte Decl. at ¶ 14. This latter statement is of crucial importance in debunking Conte's claim that

22  the public statements he made were expressions of mere opinion about what Mosley may or may not

23  have known. Rather, this portion of Conte's Declaration makes it crystal clear that when he told the

24  media that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about the

25  legality of the products provided by Conte, "[i]t was all explained up front and there was no

26  deception" (Complaint at ¶ 12, citing Exhibit A thereto), he was in fact making the purportedly

27  factual assertion that he had told Mosley that he was providing him with illegal drugs.

28

1    Conte also submits a declaration of Derryl Hudson ("Hudson"), Mosley's ex-trainer with

2    whom Mosley is currently embroiled in litigation.[2]  Hudson's declaration, dated May 21, 2008

3    (Hudson Decl.), states, *inter alia,* that in late July 2003, Mosley and Hudson went to Conte's office

4    at BALCO.  *See* Hudson Decl. at ¶ 4.  At the meeting, Conte "explained to Mr. Mosley the benefits

5    and risks of using banned performance enhancing substances." *See Id.* at ¶ 5.  Hudson declares that

6    he "knows" that "Mosley was aware that the performance enhancing drugs provided to him by Mr.

7    Conte were banned drugs because [he] discussed that fact with Mr. Mosely both during and after

8    [their] visit to BALCO." *See id.* at ¶ 9.  Hudson further declares that "Mosley admitted to [him] that

9    he knew the drugs provided to him by Mr. Conte were illegal performance enhancing drugs." *Id.*[3]

10   As clearly set forth in the Mosley Declaration, Mosley categorically denies these claims. *See* Mosley

11   Decl. at ¶¶ 5-16.

12   **III.    RELEVANT PROCEDURAL BACKGROUND**

13   Mosley filed his Complaint seeking, *inter alia*, damages and a permanent injunction against

14   Conte for his past and continued defamatory statements relating to Mosley's alleged knowing use of

15   any illegal or banned substances.  At the outset of the case, Plaintiff moved for, *inter alia*, expedited

16   discovery and an expedited trial on the merits.  As part of that motion, Mosley submitted a

17   Declaration and advised Conte that he intended to submit a substantially similar Declaration in

18   opposition to any threatened Anti-SLAPP motion.  This Declaration stated that Conte: (i) never

19   advised him that he (Conte) was recommending illegal and/or banned substances, and (ii) actually

20   affirmatively told Mosley that everything he (Conte) was recommending to Mosley was legal. *See*

21   Exhibit F to Burstein Decl., Mosely's Declaration, dated May 22, 2008, at ¶¶ 4-7.  Nonetheless,

22   Conte has filed this motion despite clear issues of material fact going to the core allegations of this

23   case.  For this reason, as discussed *infra*, Mosley should be awarded attorneys' fees.

24

---

25   [2]    Hudson has brought suit against Mosley for, *inter alia*, defamation in the United
26   States District Court for the Central District of California. *See* Exhibit H.

27   [3]    Notably absent from Hudson's Decl. is any admission, confirmation, or even a
     mention of his receipt of the illegal drugs via FEDEX from Conte, and distributing same to Mosley.
28   Conte Decl. at ¶ 11.

## IV.    **ARGUMENT**

### A.    **STANDARD OF REVIEW**

The Anti-SLAPP suit provision of § 425.16 applies in federal diversity suits. *See U.S. ex rel Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999). However, when reviewing an Anti-SLAPP motion, a federal court will apply "the usual federal standards regarding discovery and the timing of motions seeking judgments on the facts." *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 982-983 (C.D. Cal. 1999). Thus, such a motion can be considered as a motion to dismiss under Rule 12(b)(6), or as a motion for summary judgment under Rule 56.

When a motion to strike is based upon alleged deficiencies in the pleadings, however, the motion must be treated as one pursuant to Rule 12(b)(6). *See Silverstein v. E360insight, LLC*, No. CV 07-2853, 2008 U.S. Dist. LEXIS 36858, *5-6 (C.D. Cal. May 5, 2008) ("If a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies.") (citation omitted).

As discovery has recently commenced and Conte has not responded to Plaintiff's multiple discovery demands, the instant motion must be deemed one made pursuant to Rule 12(b)(6). The standards for a Rule 12(b)(6) motion are well known and need not be repeated here. *See Jimenez v. JP Morgan Chase & Co.*, 2008 U.S. Dist. LEXIS 37788 (S.D. Cal. May 8, 2008), for the applicable standard.[4]

As to the substantive standards for an Anti-SLAPP motion, resolving such a motion "involves a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if it does, proceeding secondly to

---

[4]    These standards include, but are not limited to, freely granting leave to amend. *Rogers*, 57 F. Supp. 2d at 982-983. Should the Court, incorrectly we respectfully contend, grant the underlying motion, Plaintiff respectfully requests such dismissal be granted with leave to file an amended complaint to add additional and more recent defamatory statements made by Conte. *See*, e.g., Burstein Decl. at ¶ 3(c).

1    whether the plaintiff can establish a probability of prevailing on the merits." *Overstock.com, Inc.*

2    *v. Gradient Analytics, Inc.*, 151 Cal.App.4th 688, 699, 61 Cal.Rptr.3d 29, 38 (Cal. App. 1st Dist.

3    2007).

4       Mosley does not dispute that Conte's statements to the press were made in a public forum

5    or that such statements were made "in connection with an issue of public interest." § 425.16(e)(3).

6    Thus, only the second prong of the two-part analysis is at issue.

7       **B.**    **MOSLEY HAS ESTABLISHED A *PRIMA FACIE* CASE OF DEFAMATION**

8       As this Court explained in *Lutge v. Eskanos & Adler, P.C.*, No. C 06-07128, 2007 U.S. Dist.

9    LEXIS 81212, *9 (N.D.Cal. Oct. 17, 2007) (White, D.J.), "once Defendants have reached the

10    threshold showing [on an Anti-SLAPP motion], the burden shifts to [plaintiff] to establish a

11    probability of prevailing at trial." A § 425.16 motion must be denied where a "plaintiff has made

12    a *prima facie* showing of facts based on competent admissible evidence that would, if proved,

13    support a judgment in the plaintiff's favor." *Id.* at *10. As the Anti-SLAPP statute, *inter alia*, limits

14    discovery, "the plaintiff's burden of establishing a probability of prevailing is not high: [The Court

15    does] not weigh credibility, nor do[es it] evaluate the weight of the evidence. Instead, [the Court]

16    accept[s] as true all evidence favorable to the plaintiff and assess[es] the defendant's evidence only

17    to determine if it defeats the plaintiff's submission as a matter of law. Only a cause of action that

18    lacks 'even minimal merit' constitutes a SLAPP." *Overstock.com*, 151 Cal. App. 4th at 699-700

19    (internal citations omitted).

20       Furthermore, as a public figure, Mosley must establish a probability that he can produce clear

21    and convincing evidence to prove that the defamatory statements at issue were made with knowledge

22    of their falsity or with reckless disregard of their truth or falsity.[5] As with the issue of falsity, any

23    proof offered by Mosley must be assumed true for the purposes of this motion. If such proof makes

24    out a *prima facie* showing of malice, Mosley will have thereby met his burden on this motion. *Id.*

25

26

-------------------

27      [5]    *See Overstock.com, Inc.*, 151 Cal. App. 4th at 700 ("In the context of an anti-SLAPP
suit motion, the limited public figure who sues for defamation must establish a probability that he

28    or she can produce such clear and convincing evidence.").

1          1.    *Mosley Has Proven Falsity*

2      In this regard, Mosley's sworn Declaration serves as sufficient evidence to defeat Conte's

3  motion, as his Declaration states:

4      •    At the recommendation of Hudson, Mosley traveled to BALCO with Hudson and
            "met with Conte at Conte's business, BALCO, for the purpose of obtaining **legal**
5           **supplements**." Mosley Decl. at ¶¶ 5 and 8 (emphasis in original).

6      •    "This was the only trip [Mosley] ever made to BALCO and the only time [he] ever
            spoke with Mr. Conte." *Id.* at ¶ 9.
7
       •    At the meeting, Mosley "specifically asked Conte for assurances that everything that
8           he was recommending was both legal and healthy. Conte specifically gave [Mosley]
            that assurance. [Conte's] public claims to the contrary, in which he explained to me
9           that he was recommending illegal substances and procedures, **are a lie**." *Id.* at ¶ 10.
            (emphasis supplied).
10
       •    Mosley does not deny taking the products recommended to him by Conte, however,
11          he denies that "Conte ever told [him], or that [he] knew, that [he] was taking
            anything that was illegal or in any way barred by the rules of [his] sport." *Id.* at ¶ 11.
12
       •    "[A]t no time was [Mosley] ever told, by Conte or anyone associated with BALCO,
13          that these products were steroids or illegal or banned performance enhancing drugs."
            *Id.* at ¶ 12.
14
       •    "[Mosely] did not take any supplements with [him] when [they] left BALCO's
15          offices. Rather, a package was subsequently sent to Hudson, who thereafter
            administered a variety of supplements to [him]." *Id.* at ¶ 13.
16
       •    Mosley is emphatic that he "was assured by both Hudson and Conte that everything
17          that Conte was recommending was legal, healthy, and not in any way barred by the
            rules of [his] sport. Both Conte and Hudson specifically gave such assurances." *Id.*
18          at ¶ 14.

19     •    "Contrary to Hudson's declaration dated May 21, 2008, [Mosley] **never** 'admitted to
            [Mr. Hudson, or anyone for that matter,] that [Mosley] knew the drugs provided to
20          [him] by Mr. Conte were illegal performance enhancing drugs.' Nor did Hudson
            ever tell [Mosley] that such drugs were illegal or barred by the rules of [his] sport.
21          Moreover, [Mosley] never discussed with Hudson, either before [they] went to
            BALCO or after, that [they] were securing any such drugs." Mosley Decl. at ¶ 15
22          (emphasis in original), citing the Hudson Decl. at ¶ 9.

23     •    "In stark contrast to Hudson's assertions... [Mosley] ha[s] always denied that Conte
            ever told [him], or that [he] knew, that [he] was taking anything that was illegal or
24          in any way barred by the rules of [his] sport. Indeed, in January of 2004, [Mosley]
            submitted a declaration to the Nevada State Athletic Commission affirming that [he]
25          was told, *inter alia*, that the supplements were completely legal." *Id.* at ¶ 16, citing
            Exhibit A thereto, a true and accurate copy of Mosley's January 13, 2004 declaration,
26          with exhibits.

27

28

1    Based upon the above sworn factual claims and the allegations of his Complaint, Mosley has

2  established a *prima facie* case of libel and slander. Notably, even considering the higher burden at

3  trial with respect to being a public figure, **a declaration provided in opposition to an Anti-SLAPP**

4  **motion has been deemed sufficient to establish *prima facie* evidence of actual malice.** *See*

5  *Overstock.com,* 151 Cal.App.4th at 699.

6    Mosley has properly alleged that Conte made slanderous statements and has established

7  *prima facie* evidence of same by virtue of his declaration. (Cal. Civ. Code, § 46).[6] Additionally, as

8  to libel, Mosley has properly alleged that Conte wrote libelous statements and has provided *prima*

9  *facie* evidence of same by virtue of his declaration. (Cal. Civ. Code, § 45).[7] Moreover, as set forth

10  *infra,* Mosley's Declaration readily supports a finding of actual malice.

11

12

13

14

---

15    [6]    As set forth in the Complaint at ¶¶ 12, 13, and 24, Conte spoke to reporters from the
*New York Daily News* and a reporter from *USA Today* and falsely stated to the reporters that he
16  "watched [Mosley] inject [himself] in front of me," that Mosley "knew precisely what [he was]
    using," and that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about
17  the legality of the products provided by Conte, "[i]t was all explained up front and there was no
    deception." Complaint at ¶ 12, citing Exhibit A thereto. As alleged in the Complaint, these
18  statements, *inter alia*: (i) were made by Conte with knowledge of their falsity (Complaint at ¶¶ 15
19  and 25); (ii) were unprivileged (Complaint at ¶¶ 16 and 26); (iii) accuse Plaintiff of criminal conduct
    (Complaint at ¶¶ 18 and 28); and (iv) tend to injure Mosley in his profession as a prize fighter, both
20  in that they impute to Mosley a general disqualification in the respect which a professional boxer
    peculiarly requires, and impute traits concerning professional prize fighting that lessen Mosley's
21  ability to earn money in that profession and cause actual damage to Mosley (Complaint at ¶¶ 19, 20,
22  29, and 30).

23    [7]    As set forth in the Complaint at ¶ 34, "in September of 2007, Conte sent an e-mail
24  to a reporter affiliated with SI.com in which Defendant falsely stated, in words and substance, that
    he had explained to Mosley that he (Conte) was providing him with illegal steroids and performance
25  enhancing substances." Complaint at ¶ 34. As alleged in the Complaint, Conte's statement: (i) was
    made by Conte with knowledge of its falsity (Complaint at ¶ 35); (ii) was unprivileged (Complaint
26  at ¶ 36); (iii) exposed Mosley to hatred, contempt, ridicule, or obloquy, and had a tendency to injure
27  him in his occupation (Complaint at ¶ 38); (iv) is defamatory without the necessity of explanatory
    matter, such as an inducement, innuendo or other extrinsic fact (Complaint at ¶ 39); and (v) caused
28  actual damage to Mosley (Complaint at ¶ 40).

2.    *Plaintiff's Allegations and Supporting Declaration Readily Support a Finding of Actual Malice*

As to actual malice, Conte's statements to reporters clearly state that Mosley "knew precisely what [he was] using," and that, "[i]t was all explained up front and there was no deception." Complaint at ¶ 12, citing Exhibit A thereto. If the jury credits testimony from Mosley consistent with his Declaration, it will necessarily find that Conte's statements to the press about Mosley were false and that Conte knew that they were false. This is so because the alleged defamatory statements by Conte were made based upon Conte's supposed own knowledge. If his statements to the press about what he personally told Mosley were false, Conte had to have known that the statements were false because he was talking about his own conduct.

The point is made by *Christian Research Institute v. Alnor,* 148 Cal. App. 4th 71 (Cal. App. 4th Dist. 2007), a case cited by Conte. *See* Conte's MPA at page 14. In *Christian Research Institute,* the Court held that "[a] defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice.... Thus, **malice may be inferred where, for example, a story is fabricated by the defendant,** is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *Id.* at 84-85. (citations and internal quotations omitted) (emphasis supplied); *see also DiBella v. Hopkins,* 285 F.Supp.2d 394, 403 (S.D.N.Y. 2003) ("By finding that Hopkins had fabricated this story, the jury surely had a basis for concluding that Hopkins knew his statements were false. Hence, the jury's finding of malice was supported by clear and convincing evidence.").

Conte's and Hudson's assertions cannot defeat these claims as a matter of law. At most, Conte's and Hudson's declarations simply create an issue of material fact based upon conflicting evidence, which cannot serve as grounds for a motion to dismiss, or even a motion for summary judgment. *See Kaelin v. Globe Com. Corp.,* 162 F.3d 1036, 1042 (9th Cir. 1998) ("If a plaintiff can come forward with clear and convincing evidence from which a jury could find actual malice, he is entitled to a trial even if there is conflicting evidence on the issue.") (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986)).

1   Contrary to Conte's belief, a fair reading of the Complaint and Mosley's Declaration leaves

2   no doubt that Plaintiff could demonstrate actual malice on Conte's part with convincing clarity.

3   Tellingly, the authorities relied upon by Conte make this point. *See Robertson v. Rodriguez*, 36 Cal.

4   App. 4th 347, 356, n. 3 (Cal. App. 2d Dist. 1995) ("it has been held that section 425.16 does not

5   impair the right to a trial by jury because the trial court does not weigh the evidence in ruling on the

6   motion, but merely determines whether a *prima facie* showing has been made which would warrant

7   the claim going forward."), cited in Conte's MPA at pages 6, 12, and 13, and *Christian Research*

8   *Institute*, 148 Cal. App. 4th at 84 ("[A] court may not weigh competing evidence in an anti-SLAPP

9   motion. If the defendant's evidence does not demonstrate that plaintiff cannot prevail as a matter of

10  law, we consider only whether evidence favoring the plaintiff, standing alone, would sustain a

11  judgment in his or her favor."), cited in Conte's MPA at page 14.[8]

12   Conte relies on *Beilenson v. Superior Court*, 44 Cal. App. 4th 944, 953 (Cal. App. 2d Dist.

13  1996), for the proposition that Mosley must prove his case by direct evidence. *See* Conte's MPA

14  at page 13. However, this proposition is, at best, doubtful, in light of *Christian Research Institute*,

15  148 Cal. App. 4th 71, a case decided after *Beilenson, see* discussion *supra*. Moreover, Mosley has

16  met this burden by submitting a sworn Declaration that, unlike *Beilenson*, does not contain a single

17  statement made upon information and belief. ("Sybert's declaration from a former commissioner of

18  the FPPC was on information and belief. An averment on information and belief is inadmissible at

19  trial, and thus [be used to] show a probability of prevailing on the claim."). *Id.* at 952 (citation

20  omitted). Conte's reliance upon *Tuchscher Devel. Enters., Inc. v. San Diego Unified Port Dist.*, 106

21  Cal. App. 4th 1219, 1238 (Cal. App. 4th Dist. 2003), is similarly misplaced. In *Tuchscher,* the

22  declaration in opposition to the Anti-SLAPP motion was based upon, *inter alia*, hearsay and was

23  further lacking in personal knowledge. *Id.* ("Tuchscher's declaration recounting the Lennar

24

25   [8]   Moreover, the following authorities relied upon by Conte to demonstrate Mosley's
     alleged burden as to proving actual malice are all procedurally inapplicable. *See* Conte's MPA at
26  pages 13-14, citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (Case was tried to a jury);
     *St. Amant v. Thompson*, 390 U.S. 727 (1968) (Same); *Reader's Digest Ass'n v. Superior Court*, 37
27  Cal. 3d 244 (Cal. 1984) (Case was decided on summary judgment); and *Copp v. Paxton*, 45 Cal.
28  App. 4th 829 (Cal. App. 1st Dist. 1996) (Same).

1   representative's report on the contents of Lennar's computer database consists of hearsay. We further

2   reject Tuchscher's declaration to the extent it is supported only by information and belief or his mere

3   understanding of events.... And many of the statements made in Tuchscher's declaration, including

4   as to respondents' authority to involve themselves with the project and the economic boon to Lennar,

5   are argumentative, speculative and impermissible opinions, and also lack foundation and personal

6   knowledge.").

7           3.      *Conte's Statements Do Not Constitute Mere Opinion*

8           The Supreme Court examined the issue of "fact" versus "opinion" in the seminal case of

9   *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). There, the Court concluded that expressions

10  of opinion may often imply an assertion of objective fact. *Id.* at 18. The Court held that the test to

11  determine if a statement of opinion can form the basis of an action is "whether a reasonable

12  factfinder could conclude that the statements [ ] imply an assertion [of fact]." *Id.* at 21. The Court

13  used the following illustration to make its point:

14          If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge
        of facts which lead to the conclusion that Jones told an untruth. Even if the speaker
15      states the facts upon which he bases his opinion, if those facts are either incorrect or
        incomplete, or if his assessment of them is erroneous, the statement may still imply
16      a false assertion of fact. Simply couching such statements in terms of opinion does
        not dispel these implications; and the statement, "In my opinion Jones is a liar," can
17      cause as much damage to reputation as the statement, "Jones is a liar." As Judge
        Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could
18      escape liability for accusations of [defamatory conduct] simply by using, explicitly
        or implicitly, the words 'I think.'"
19

20  *Id.* at 19. (citation omitted).

21          In the Ninth Circuit, courts analyze the following conditions set forth in *Milkovich*:

22          (1) whether the defendant used figurative or hyperbolic language that would negate
        the impression that he was seriously maintaining an assertion of fact;

23          (2) whether the general tenor of the communication negated the assertion of fact; and

24          (3) whether the assertion is susceptible of being proved true or false.

25  *Sagan v. Apple Computer*, 874 F. Supp. 1072, 1075 (C.D. Cal. 1994) (citation omitted). Application

26  of this test here requires dismissal of Conte's motion.

27

28

1    **First**, Conte's language has a clear, non-hyperbolic meaning which is readily understood.

2    For example, Conte stated that Mosley "'knew precisely what [he was] using'" because "'[i]t was

3    all explained up front and there was no deception.'" Complaint at ¶ 12, citing Exhibit A thereto.

4    Quite simply, when reviewed in full context, and when read in conjunction with Conte's Decl.,

5    Conte's supposed mere opinion is unquestionably based upon his factual assertion that "[t]here is

6    no question that I informed Mr. Mosley that he was taking the three banned performance enhancing

7    drugs...." Conte Decl. ¶ 14. This assertion is at odds with Mosley's Declaration and represents the

8    exact factual assertion in dispute in this litigation. Accordingly, it is essentially absurd even to suggest

9    that Conte was not "seriously maintaining an assertion of fact." *Sagan*, 874 F. Supp. at 1075.

10    **Second**, because Conte's statements were allegedly given in response to Mosley's public

11    comments, *see* Conte's Decl. at ¶ 14, it is clear that Conte's statements were designed to make the

12    **factual** claim that Mosley's public statements about his meeting with Conte were false.[9]

13    **Third**, Conte's statements are susceptible of being proved true or false. Either Mosley was

14    told by Conte, prior to taking the banned or illegal performance enhancing drugs, that he was being

15    given banned or illegal drugs, **or** Conte never told Mosley that he was taking anything that was

16    illegal or in any way barred by the rules of Mosley's sport. *See* Mosley Decl. at ¶ 16.[10]

17    Conte's legal argument in support of his claim that he was only reporting his "opinion" that

18    Mosley "knew" he was taking banned or illegal performance enhancing drugs is baseless. The cases

19    Conte cites involved facts easily distinguishable from the facts of this case. *See* Conte's MPA at

20    page 10, citing *Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596, 603 (Cal. 1976) (The

21    statements that the "union officers, were apparently willing to sacrifice the interests of the members

22    

23    _____

24    [9]    *See Frank Johnson v. Hertz Local Edition Corp.*, No. C 03-44439, 2004 U.S. Dist.
LEXIS 22929 (N.D. Cal. Nov. 2, 2004) (Jenkins, D.J.) ("[W]here a statement of opinion is calculated

25    to induce the audience to whom [it is] addressed to conclude or understand that [it is] factual, such
a statement will be found factual in nature.") (citations and internal quotations omitted).

26    [10]    *See Overstock.com*, 151 Cal. App. 4th at 701. ("The key is not parsing whether a

27    published statement is fact or opinion, but whether a reasonable fact finder could conclude the
published statement declares or implies a provably false assertion of fact.") (internal quotations and

28    citations omitted).

1    of their union to further their own political aspirations and personal ambitions," were "cautiously

2    phrased in terms of apparency," and thus not actionable); *Baker v. L.A. Herald Exam'r*, 42 Cal. 3d

3    254, 258 (Cal. 1986) (The statements at issue involved a television review which stated **"[M]y**

4    **impression** is that the executive producer Walt Baker, who is also vice president in charge of

5    programs for Channel 9, told his writer/producer, Phil Reeder, 'We've got a hot potato here – let's

6    pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it

7    up!'") (emphasis supplied); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 810 (Cal. App.

8    1st Dist. 2002) (The statements at issue involved "several derogatory comments made concerning

9    [plaintiff] on the radio broadcast. Vinnie referred to plaintiff once as a 'local loser' and three times

10   as a 'chicken butt,' while Uzette falsely claimed that plaintiff's ex-husband had said she was a 'big

11   skank.'").

12          Additionally, Defendant erroneously relies upon *Saenz v. Playboy Enters., Inc.*, 841 F.2d

13   1309 (7th Cir. 1988), decided under New Mexico state law, for the proposition that "Conte's

14   statements as to what Mosley actually knew or believed is non-actionable opinion." (Conte's MPA,

15   page 11). Although not expressly overruled, *Saenz* was decided prior to the Supreme Court's ruling

16   in *Milkovich*. In any event, *Saenz* is inapposite because it was decided on summary judgment (not

17   on a motion to dismiss) that Saenz could not prove that *Playboy* had even intended to convey the

18   claim – that Saenz had been complicit in torture – which Sanez contended to be defamatory. Here,

19   in contrast, there can be no reasonable dispute about the fact that Conte intended to convey the

20   factual claim that he had told Mosley that he was providing Mosley with illegal substances.

21          In the end, "an opinion is actionable if it discloses all the statements of fact on which the

22   opinion is based and those statements are false." *Ruiz v. Harbor View Community Assn.*, 134 Cal.

23   App. 4th 1456, 1472 (Cal. App. 4th Dist. 2005) (Plaintiff "met his burden under the anti-SLAPP

24   statute of presenting a *prima facie* case that the factual assertions supporting the opinions were

25   demonstrably false. His July 2, 2003 letter and his declaration submitted in opposition to the

26   anti-SLAPP motion support a *prima facie* conclusion he did not conceal he was an attorney."). *Id.*

27   Here, Mosley has unquestionably offered *prima facie* evidence – which must be assumed to be true

28

1    for the purposes of this motion – identifying the factual statements upon which Conte's "opinion"

2    is based, and demonstrating that those statements are false.

3                    4.    *Conte's Statements Are Not Privileged*

4        Conte incorrectly asserts that his defamatory statements are privileged pursuant to Cal. Civ.

5    Code § 47(c). Section 47(c) states that: "A privileged publication or broadcast is one made: In a

6    communication, **without malice**, to a person interested therein...." (emphasis supplied). Under §

7    47, a statement is made with malice when "the defendant lacked reasonable grounds for belief in the

8    truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." *Noel v.*

9    *River Hills Wilsons, Inc.,* 113 Cal. App. 4th 1363, 1370 (Cal. App. 4th Dist. 2003). If a statement

10   is made with actual malice, § 47(c) is inapplicable. *See Kashian v. Harriman,* 98 Cal. App. 4th 892,

11   915 (Cal. App. 5th Dist. 2002) (citation omitted) ("[I]f malice is shown, the privilege is not merely

12   overcome; it never arises in the first instance.").

13       In this case, both parties agree that Mosley is public figure. Accordingly, and wholly apart

14   from § 47(c), Mosley has to demonstrate a *prima facie* case of malice. As such, § 47(c) is irrelevant

15   here because Mosley has to meet the identical standard by reason of his being a public figure. Since,

16   as demonstrated *supra,* he has met this burden, Conte's reliance upon § 47(c) is of no moment.

17       Furthermore, Conte cannot invoke the qualified privilege, because he has not satisfied his

18   burden of showing that the defamatory statements were made on a privileged occasion. *Lundquist*

19   *v. Reusser,* 7 Cal. 4th 1193, 1208 (Cal. 1994). That "the use of illegal steroids ... is a matter of

20   interest to the public as well as news reporters" (Conte's MPA, page 12), does not by itself give rise

21   to the privilege's protections. Rather, § 47(c) requires that the communication at issue be reasonably

22   calculated to further a public interest **and** be made between persons with a common interest.

23       Conte essentially contends that the "common interest" element of § 47(c) is met because both

24   he and the reporters with whom he spoke had a common interest in the steroid scandals generally,

25   and Mosley in particular. But if this were all that was needed, virtually any statement made to a

26   reporter would be privileged because (i) the reporter would presumably only be interested in

27   information of public concern, and (ii) both the speaker and the reporter would have the common

28   interest of relaying information to the public.

In *Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 771 P.2d 406 (1989), the Court rejected this very analysis:

> A privilege is an exception to a general rule of liability, but under defendants' view of section 47(3), the privilege would be the general rule for the news media and liability would be the exception. We believe the Legislature would have made clear its intention for such a drastic restriction on the common law of defamation....
>
> &ast; &ast; &ast;
>
> The [privilege] that is most relevant to the question before us is the common-interest privilege, which protected communications made in good faith on a subject in which the speaker and hearer shared an interest or duty. This privilege applied to a narrow range of private interests. The interest protected was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship....
>
> The legislative history of section 47(3) indicates the Legislature intended to codify the narrow common law privilege of common interest, not to create any broad news-media privilege....

48 Cal.3d at 725-27, 771 P.2d 406, 413-14.

### 5.    *Conte's Truth Defense is Inapplicable Here*

In a last ditch effort, Conte posits a legal truism – truth is an absolute defense to defamation – and then misapplies it to the facts and the procedural stage of this case. Although Conte would have the Court rely solely upon the Hudson Decl. and the Conte Decl., the above precedents make clear that Mosley's position is deemed true and that these declarations at most create an issue of fact. *See* Conte's MPA at page 15. There are two irreconcilable versions of the facts being told here, and the truth cannot be resolved as a matter of law upon the instant motion. Accordingly, any reliance upon the defense of "substantial truth" is completely at odds with the procedural posture of this case.

## V.    **MOSLEY IS ENTITLED TO ATTORNEYS' FEES**

§ 425.16(c) provides for the award of attorneys' fees to a plaintiff who successfully opposes an Anti-SLAPP motion. A plaintiff is entitled to an award of fees when the Court finds that the motion to strike is "frivolous or is solely intended to cause unnecessary delay," and the procedural provisions of § 128.5 are complied with. *California Back Specialists Medical Group v. Rand*, 160 Cal. App. 4th 1032, 1038 (Cal App. 2d Dist. 2008) (attorneys' fees award justified where plaintiff gave notice of request for attorneys' fees, defendant had opportunity to be heard, and court cited its reasons for awarding fees).

1        Cal. Code Civ. Proc. § 128.5 states in relevant part that "[e]very trial court may order a party

2   ... to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of

3   bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." A

4   frivolous motion within the meaning of this statute is one that is either "(A) totally and completely

5   without merit or (B) for the sole purpose of harassing an opposing party." *Id.*

6        As set forth above, Conte's instant motion is frivolous and "totally and completely without

7   merit." *Id.* Moreover, Conte filed this motion knowing full well that Mosley would oppose such

8   a motion with a declaration mirroring a declaration previously submitted to the Court. In that

9   Declaration Mosley stated, *inter alia,* that neither Conte, nor anyone associated with BALCO, ever

10   told him that products purchased and received from BALCO were steroids or illegal or banned

11   performance enhancing drugs. *See* Exhibit F to Burstein Decl. at ¶¶ 4-7. In light of the Mosley

12   Declaration, and for the reasons set forth *supra,* Conte has failed to establish a good-faith basis to

13   make a motion under § 425.16. Accordingly, Mosley should be awarded his attorneys' fees incurred

14   in opposing this motion. *See* the Burstein Declaration at Exhibit H for the amount of attorneys' fees

15   and costs associated with responding to this motion.

16   **VI.**   **CONCLUSION**

17        Based on the foregoing, it is respectfully requested that this Court: (i) deny Conte's motion

18   to strike the Complaint in its entirety; (ii) grant Mosley's request for the costs and attorneys' fees

19   associated with replying to this motion; with (iii) such other and further relief as this Court deems

20   just and proper.

21   Dated: New York, New York
       June 16, 2008

22

23                           JUDD BURSTEIN, P.C.

24                           By_____

25                               Judd Burstein
                        *Attorneys for Plaintiff Shane D. Mosley, Sr.*

26

27

28

EXHIBIT E

1  JAMES M. WAGSTAFFE (95535)
   Ivo LABAR (203492)
2  **KERR & WAGSTAFFE LLP**
   100 Spear Street, Suite 1800
3  San Francisco, CA 94105–1528
   Telephone: (415) 371-8500
4  Fax: (415) 371-0500

5  Attorneys for Defendant
   VICTOR CONTE
6

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10  SHANE D. MOSLEY, SR.,                    Case No. C 08-01777 JSW

11          Plaintiff,                       **REPLY MEMORANDUM IN SUPPORT
                                             OF MOTION TO STRIKE
12     vs.                                   COMPLAINT PURSUANT TO
                                             CALIFORNIA'S ANTI-SLAPP
13  VICTOR CONTE,                            STATUTE [C.C.P. § 425.16]
                                             STRATEGIC LAWSUIT AGAINST
14          Defendant.                       PUBLIC PARTICIPATION ("SLAPP");**

15

16                                           Hearing Date: August 22, 2008
                                             Time:  9:00 a.m.
17                                           Courtroom: 2

18                                           HON. JEFFREY S. WHITE

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

1

## TABLE OF CONTENTS

2
*Page*

3    I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

4    II.    ARGUMENT.......................................................................................................... 2

5         A.    Mosley Concedes That the First Prong of the Anti-SLAPP Statute is Met.......... 2

6         B.    Mosley Has Failed to Establish a Reasonable Probability that He Will
7              Prevail on the Merits of His Defamation Claim .................................................. 2

8              1.    Mosley's Declaration Is Not *Prima Facie* Evidence of the Falsity
                     of Conte's Statements to the Press............................................................. 2
9
                2.    There Is No Evidence that Conte's Statements to the Press were
10                   Made with Actual Malice........................................................................... 4

11              3.    Conte's Statements to the Press Were Opinion ......................................... 8

12              4.    Conte's Statements to the Press were Privileged....................................... 9

13              5.    The Alleged Defamatory Statements Are Substantially True................. 11

14        C.    Conte Is Entitled to Attorneys' Fees.................................................................. 12

15    III.    CONCLUSION..................................................................................................... 12
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2
*Page*

3
### *Cases*

4    Bose Corp. v. Consumers Union of U.S.,
            466 U.S. 485 (1984) ................................................................................................. 5
5
     Brown v. Kelly Broadcasting Company,
6           48 Cal. 3d 711 (1989) ......................................................................................... 10

7    California Back Specialists Group v. Rand,
            160 Cal. App. 4th 1032 (2008) ........................................................................ 12
8
     Christian Research Institute v. Alnor,
9           148 Cal. App. 4th 71 (2007) ....................................................................... 1, 5

10   Copp v. Paxton,
            45 Cal. App. 4th 829 (1996) ....................................................................... 5, 12
11
     Emde v. San Joaquin County Central Labor Council,
12          23 Cal. 2d 146 (1943). ...................................................................................... 11

13   Fox Searchlight Pictures, Inc. v. Paladino,
            89 Cal. App. 4th 294 (2001) ............................................................................. 3
14
     Haynes v. Alfred A. Knopf,
15          8 F.3d 1222 (7th Cir. 1993) .............................................................................. 11

16   Herbert v. Lando,
            441 U.S. 153 (1979) ............................................................................................. 4
17
     Institute of Athletic Motivation v. University of Ilinois,
18          114 Cal. App. 3d 1 (1981) ................................................................................ 10

19   Masson v. New Yorker Magazine, Inc.,
            501 U.S. 496 (1991) .......................................................................................... 11
20
     Milkovich v. Lorain Journal Co.,
21          497 U.S. 1 (1990) ................................................................................................. 9

22   Moyer v. Amador Valley Joint Union High School,
            225 Cal. App. 3d 720 (1990) ............................................................................. 8
23
     Naantaanbu v. Abernathy,
24          816 F. Supp. 218 (S.D.N.Y. 1993) ................................................................ 7, 8

25   New York Times Co. v. Sullivan,
            376 U.S. 254 (1964) ............................................................................................. 5
26
     Newton v. National Broadcasting Co.,
27          930 F.2d 662 (9th Cir. 1990), *cert. denied*, 502 U.S. 866 (1991) ...................... 5

28   Overstock.com, Inc. v. Gradient Analytics, Inc.,
            151 Cal. App. 4th 688 (2007) ............................................................................ 6

ii

Saenz v. Playboy Enterprises,
    841 F.2d 1309 (7th Cir. 1988) ................................................................. 1, 9

Sagan v. Apple Computer,
    874 F. Supp. 1072 (C.D. Cal. 1994) ........................................................ 8

Sanborn v. Chronicle Pub. Co.,
    18 Cal. 3d 406 (1976) ............................................................................ 9

### *Statutes*

Cal. Civ. Code § 47 ......................................................................... 1, 8, 9, 10

Cal. Code Civ. Proc. § 425.16 .......................................................... 2, 12

I.     **INTRODUCTION AND SUMMARY OF ARGUMENT**

Mosley's opposition is premised on the notion that the Court is prevented from granting Conte's motion because Mosley and Conte have differing recollections regarding the events at a single meeting that occurred more than five years ago during which Mosley admittedly used illegal performance enhancing drugs. That premise is wrong. Mosley's declaration falls far short of providing the evidence needed to support the defamation claims he has pled against Conte. Given that Mosley's declaration is the *only* evidence that Mosley has offered to establish a "reasonable probability" of prevailing on the merits of his claims for defamation, Defendant's motion to strike should be granted.

Mosley's declaration is not evidence that Conte's challenged statements to the press are provably false. For example, Mosley offers no evidence to refute Conte's assertion that he "watched [Mosley] inject [himself]" with illegal drugs. Because Mosley does not, and cannot prove that Conte's challenged statements are false, he does not have a "reasonable probability" of prevailing on his defamation claim.

Similarly, there is no evidence of actual malice. Mosley has merely produced evidence that he has a different memory of his meeting with Conte in 2003. That is not "clear and convincing" evidence that Conte was fabricating his statement to reporters in 2008 that Mosley "knew exactly what he was doing" when he was injecting steroids in front of Conte. Christian Research Institute v. Alnor, 148 Cal. App. 4th 71, 84-85 (2007).

Mosley's claims also fail because Conte's statements can only be construed as protected opinion, and not as factual assertions. Conte's statement regarding Mosley's knowledge of his drug use is not a statement that can be proven true or false because what Mosley "knew" in 2003 is entirely within Mosley's state of mind. Saenz v. Playboy Enterprises, 841 F.2d 1309, 1318 n. 3 (7th Cir. 1988).

In addition, Mosley has not demonstrated a reasonable probability of prevailing on his claims because Conte's challenged statements to the press fall squarely within the common interest privilege set forth in California Civil Code section 47(c). Cal. Civ. Code § 47(c). Finally, Conte's statements regarding Mosley are "substantially true." The gist, or sting, of

1   Conte's statements is that Mosley is a drug user who violated the rules of his sport. Mosley is an

2   admitted drug user. It simply does not matter whether he did it knowingly or not. As explained

3   in detail below, Conte's motion should be granted.

4   **II.    ARGUMENT**

5       **A.    MOSLEY CONCEDES THAT THE FIRST PRONG OF THE ANTI-SLAPP STATUTE IS
6            MET**

7           Mosley admits that Conte's statements to the press were made in a public forum and that

8   the statements were made "in connection with an issue of public interest." Cal. Code Civ. Proc.

9   § 425.16(e)(3)-(4). Accordingly, Mosley concedes that the first prong of the anti-SLAPP statute

10  is met. In light of this admission, the burden shifts to Mosley to establish a probability of

11  prevailing on the merits of his underlying claim. Cal. Code Civ. Proc. § 425.16(b)(l).

12      **B.    MOSLEY HAS FAILED TO ESTABLISH A REASONABLE PROBABILITY THAT HE
13           WILL PREVAIL ON THE MERITS OF HIS DEFAMATION CLAIM**

14          **1.    Mosley's Declaration Is Not *Prima Facie* Evidence of the Falsity of
                 Conte's Statements to the Press**

15          Mosley's declaration does not provide evidence that the statements Conte made *to the*

16  *press* about Mosley's drug use are false. Mosley wants the Court to read his declaration as

17  conflicting with Conte's. However, this motion is not resolved by determining whether or not

18  Mosley's recollection could be read to conflict in certain respects with Conte's (or for that matter

19  Hudson's). Rather, this motion must be granted unless Mosley's declaration provides evidence

20  that the three very specific statements in the complaint are provably false. Those three

21  statements are:

22      •   Conte "watched [Mosley] inject [himself] in front of me;"

23      •   Mosley "knew precisely what [he was] using;"

24      •   "[I]t was all explained up front and there was no deception."

25          (*Complaint ¶¶ 12, 24, 34.*)

26  These are the only defamatory statements that Conte is accused of making. Mosley's

27  declaration, however, is not evidence that any of the three specific public statements alleged in

28  the complaint are false, let alone were made with actual malice.

1     Mosley's declaration is more noteworthy for what it does not say rather than for what it

2    does say. Critically, ***Mosley does not deny Conte's purported defamatory statement that he***

3    ***injected himself with the Clear and EPO in front of Conte.*** Mosley also does not deny that

4    some of the drugs he injected himself with were contained in a bottle labeled "Procrit brand

5    EPO," as Conte states in his declaration (*Conte Decl. ¶ 6*). Mosley has offered no evidence

6    impugning Conte statement's that he "watched [Mosley] inject [himself] . . ." (*Complaint ¶ 12*).

7     Mosley's silence on this issue is in stark contrast to Conte's, who has unequivocally

8    testified that he witnessed Mosley inject illegal drugs. (*Declaration of Victor Conte, ¶ 7; ("Mr.*

9    *Mosley injected his first doses of EPO that day in presence of me, Mr. Hudson, and Jim Valente;*

10    *¶ 8 "Mosley then administered his first dose of the The Clear under his tongue with a needleless*

11    *syringe"*). Accordingly, there is no evidence that Conte's statement that he watched Mosley

12    "inject himself" is false. It is extremely telling that Mosley did not deny "shooting up" in front

13    of Conte, Valente and Hudson. Given that there is no dispute that Mosley "injected himself" in

14    front of Conte, Conte's motion to strike must be granted as to this allegation. Fox Searchlight

15    Pictures, Inc. v. Paladino, 89 Cal. App. 4th 294, 308 (2001) (court has discretion to strike

16    portions of causes of action).

17     Similarly, Mosley's declaration does not actually refute Conte's other alleged statements

18    that Mosley "knew precisely what [he was] using" and "[i]t was all explained up front and there

19    was no deception." Mosley's declaration does not deny that Conte told him he was being

20    provided with EPO, The Clear, and The Cream. Mosley admits to purchasing these illegal

21    products from Conte. (*Mosley Decl ¶ 12*). Mosley does not deny that Conte told him "[T]he

22    Clear was an undetectable anabolic steroid." (*Conte Decl. ¶ 5*). Mosley does not deny Conte

23    told him that The Cream was "primarily to be used as a masking agent." (*Id.*). Mosley does not

24    deny that he injected himself with The Clear with a needleless syringe. (*Id. ¶ 8*). Mosley does

25    not deny that he injected himself with drugs from a bottle labeled "Procrit EPO." (*Id. ¶ 6*).

26    Instead, Mosley's declaration merely asserts that Conte told him at the meeting in 2003 that the

27    drugs were "legal and healthy." (*Mosley Decl. ¶ 10*). That, however, is not evidence that

28    Conte's challenged statements to the press in 2008 are provably false. Conte is not accused of

1   telling the press that he told Mosley in 2003 that the drugs were illegal and unhealthy.  Conte is

2   accused of making the alleged false statements Mosley "knew precisely what he was using."

3   There is no evidence that Mosley did not know "precisely what he was doing," even if Conte told

4   him that the drugs were legal and healthy.

5        Taking Mosley's declaration at its word, it is entirely consistent that Conte could have

6   told Mosley that the drugs were legal and that Conte believed that Mosley "knew exactly what he

7   was doing."  Indeed, the undisputed evidence is that Mosley did know what he was doing:  (1)

8   Mosley made a surreptitious visit to BALCO (*Mosley Decl. ¶ 5*); (2) Mosley injected himself

9   with The Clear with a needleless syringe and injected himself with drugs from a vial labeled

10  "Procrit EPO" (*Conte Decl. ¶¶ 6-7*); (3) Mosley paid for the drugs partially in cash to avoid

11  detection (*Mosley ¶ 12; Conte ¶ 11*); and (4) Mosley had the drugs shipped to his trainer via

12  FedEx because he knew carrying the drugs on a commercial airplane could lead to him getting

13  caught.  (*Id.*).  All of these facts, which Mosley does not deny, led Conte to believe that Mosley

14  "knew" that he was taking The Clear, The Cream, and EPO.  In the face of Mosley's admissions,

15  whether Conte told Mosley that the drugs were "legal and healthy" has little relevance to Conte's

16  challenged statement that Mosley "knew precisely what he was doing."

17       **2.    There Is No Evidence that Conte's Statements to the Press were Made**
            **with Actual Malice**

18

19       There is no evidence that the alleged defamatory statements that Conte made to the press

20  in 2008 were made with actual malice.  Contrary to Mosley's unsupported assertion, it does not

21  follow that if a jury chooses to believe Mosley's version of the 2003 BALCO meeting (and

22  disbelieve the recollections of Conte and Hudson), then a jury must find that the statements that

23  Conte made to press in 2008, more than five years after the events in question, were made with

24  actual malice.

25       Mosley's *ipse dixit* argument ignores the high showing that a plaintiff must make in order

26  to make a *prima facie* showing of actual malice.  Actual malice is a *subjective* standard.  Herbert

27  v. Lando, 441 U.S. 153, 170 (1979).  The plaintiff must show that the defendant made the

28  challenged statement either "with knowledge that it was false or with reckless disregard of

1   whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). The

2   existence of actual malice is measured at the time the defamatory statement is made. Id. at 286.

3   The test is not what the defendant should have foreseen but what the defendant subjectively

4   believed. Newton v. National Broadcasting Co., 930 F.2d 662, 680 (9th Cir. 1990), cert. denied,

5   502 U.S. 866 (1991). Actual malice must be shown by clear and convincing evidence. Copp v.

6   Paxton, 45 Cal. App. 4th 829, 846 (1996) (citation omitted). The clear and convincing standard

7   "requires a finding of high probability. The evidence must be so clear as to leave no substantial

8   doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable

9   mind." Id. (emphasis added). In making the "actual malice" inquiry, the court is not bound to

10  view the evidence in the light most favorable to the defendant. Christian Research Institute v.

11  Alnor, 148 Cal. App. 4th 71, 84-85 (2007). Instead, the Court must make an independent review

12  of the evidence.[1] Id.

13      Mosley's argument that malice may be inferred when "a story is fabricated by the

14  defendant," begs the question. Here, there is no evidence that Conte's challenged 2008

15  statements to the press were fabricated. Mosley's declaration does not provide clear and

16  convincing evidence that Conte was "fabricating" his 2008 statements to the press regarding

17  Mosley's knowledge of his drug use.

18      Even if that inference could be drawn from Mosley's declaration, the Court is not bound

19  to accept the inferences that arise from Mosley's declaration in his favor. Alnor, 148 Cal. App.

20  4th at 87. Mosley ignores Alnor's instruction that even if evidence creates an inference of

21  fabrication, that inference must be "sufficiently strong to command the unhesitating assent of

22  every reasonable mind." Id. at 86. Here, Mosley's different recollection of events hardly

23  ─────────────────────

24  [1]    Mosley misleadingly cites to a portion of the Alnor decision in which the court states that
       it must consider evidence in a light most favorable to the plaintiff. (Opp. at 9). That portion of
25  the Alnor decision, however, is discussing the standard applicable to determining whether falsity
       has been shown, not actual malice. Alnor, 148 Cal. App. 4th at 84. Alnor makes it painstakingly
26  clear that, in keeping with the U.S. Supreme Court's decision in Bose Corp. v. Consumers Union
       of U.S., 466 U.S. 485, 511 (1984), "a reviewing court is not bound to consider the evidence of
27  actual malice in the light most favorable to respondents . . ." Alnor, 148 Cal. App. 4th at 85
       (citation omitted).
28

1    commands the "unhesitating assent" of "every reasonable mind" that Conte fabricated his 2008

2    comments, particularly in light of Mosley's admissions regarding his drug use.

3        Mosley's citation to Overstock.com, Inc. v. Gradient Analytics, Inc., 151 Cal. App. 4th

4    688, 699 (2007) for the proposition that a "declaration" can demonstrate actual malice is

5    irrelevant. In Overstock, the defendant, Gradient, issued a scathing report regarding the financial

6    health of Overstock, a public company. Overstock sued for defamation and alleged that third

7    parties paid Gradient to provide false, negative reports of public companies like Overstock in

8    order to profit from the resulting swings in the stock price of the company. Gradient responded

9    to the complaint with an anti-SLAPP motion. In opposition to the anti-SLAPP motion, the

10   plaintiff submitted a number of declarations, including a declaration from Overstock's president

11   and a declaration from a former employee of the defendant. The declaration from Overstock's

12   president asserted that defamatory statements were "provably false." Id. at 698. The declaration

13   from Gradient's former employee stated, in essence, that Gradient's frequently created false

14   negative reports in order to satisfy the demands of its clients, regardless of the truth of the

15   reports. Id. at 709, 710. The former employee stated "The special reports were not the product

16   of an unbiased view of the target companies. Instead, the customer paid for a report that would

17   heavily favor its negative view of the target. Nonetheless, Gradient advertised its reports as

18   independent and objective." Id. In short, the former employee's declaration provided substantial

19   evidence that Gradient knew that it was intentionally providing false information. Critically, the

20   Overstock court based its finding of a *prima facie* showing of actual malice on the declaration of

21   the former employee of the defendant, not the declaration of Overstock's president's assertion

22   that Gradient's statements were "provably false." In other words, the dispositive question is not

23   whether a declaration was submitted, but rather what the declaration actually says.

24       Here, Mosley has merely provided evidence that partially controverts Conte and

25   Hudson's recollections of their meeting at BALCO. Mosley's declaration is not evidence of

26   Conte's subjective mental state at the time he made the alleged defamatory statements to the

27   press. It is not evidence that Conte was making knowingly false statements when he responded

28   to the inquiries from the press regarding Mosley's drug use. There is no evidence that Conte's

1    alleged defamatory statements, namely, Conte "watched [Mosley] inject [himself] in front of

2    me;" Mosley "knew precisely what [he was] using;" and "it was all explained up front and there

3    was no deception," were fabricated, nor that Conte did not believe them to be true when he made

4    the statements to the press in 2008.

5         This case is more akin to the situation in Naantaanbu v. Abernathy, 816 F. Supp. 218,

6    229-30 (S.D.N.Y. 1993). Abernathy was decided under New York law which required a private

7    figure plaintiff to show that the defendant was "grossly irresponsible" in making the alleged

8    defamatory statement. Id. at 229. In order to make this showing, the Abernathy plaintiff relied

9    on her own declaration and that of her sister, which contradicted the defendant's version of event

10   of the night in question from which the defamatory statements arose. The Abernathy court found

11   that a plaintiff cannot meet their burden of showing that the defendant acted with a particular

12   state of mind simply by offering evidence providing a conflicting version of events:

13            Naantaanbuu has not provided sufficient information to
              demonstrate the possibility that Abernathy acted with some degree
14            of culpable conduct, if in fact his version of events is false . . . The
              fact of the story's falsity is not material, however, because
15            Naantaanbuu has not come forward with any evidence showing
              fault on Abernathy's part. **She has produced no evidence that**
16            **this court may properly consider on a summary judgment**
              **motion that Abernathy told anyone else a different account**
17            **that night, or published this account of events with the**
              **realization that his recollection was faulty.** Such evidence is
18            required where the applicable standard, gross irresponsibility, calls
              for a showing of fault.
19

20   Id. (emphasis added).

21        Here, as in Abernathy, Mosley must make a showing of fault. More specifically, he is

22   required to show the highest standard of fault that a plaintiff in a civil case can be made to show:

23   clear and convincing evidence of actual malice. Here, as in Abernathy, there is no evidence that

24   Conte's statements to the press, that Mosley injected himself with drugs and that he knew

25   precisely what he was doing, were knowingly false when Conte made them or that Conte made

26   the statements with the realization that his recollection was faulty. Conte has only made

27   consistent statements regarding Mosley's knowing drug use. There is no evidence that Conte

28   published his version of events with the knowledge that his recollection is faulty or that he

KERR
&
WAGSTAFFE
LLP

7

CASE NO. C 08-01777 JSW                    REPLY IN SUPPORT OF MOTION TO STRIKE COMPLAINT

1    fabricated the story. Accordingly, as in <u>Abernathy</u>, the plaintiff has failed to meet his burden of

2    proof here because there is no evidence of actual malice.

3            **3.**      **Conte's Statements to the Press Were Opinion**

4        In an acknowledgement that Conte's statements to the press are opinions rather than

5    statements of fact, Mosley tries to shift the argument by pointing to factual assertions in Conte's

6    declaration to the court. *(Opp. at 11:* "Quite simply, when reviewed in full context, **and when**

7    **read in conjunction with Conte's Decl.**, Conte's supposed mere opinion is unquestionably

8    based on his factual assertion that "there is no question that I informed Mr. Mosley that he was

9    taking the three banned performance enhancing drugs.").

10       Conte is not being sued based on the factual assertions in his declaration. The statements

11    in his declaration are absolutely privileged by litigation privilege found in California Civil Code

12    section 47(b)(2). Civ. Code § 47(b)(2) ("A privileged publication or broadcast is one made . . .

13    in any . . . judicial proceeding."). Thus, the Court should not consider any argument that the

14    court must read the defamatory statements at issue in conjunction with other factual statements

15    that Conte has made related to this motion to dismiss.

16       The statements at issue here are not the fact of whether Mosley used illegal drugs.

17    Mosley has admitted to purchasing and using the drugs at issue. There is no dispute on that

18    point. Instead, as explained above, Conte is being sued for three specific statements made to the

19    press. The first statement, that Conte "watched [Mosley] inject [himself] in front of me;" is

20    arguably a statement of fact. However, Mosley has not provided any evidence that this statement

21    is false. The other two allegedly defamatory statements, that Mosley "knew precisely what [he

22    was] using;" and "[i]t was all explained up front and there was no deception," are protected

23    opinions under the "totality of circumstances" test used in California law. <u>Moyer v. Amador</u>

24    <u>Valley Joint Union High School</u>, 225 Cal. App. 3d 720, 725 (1990) *cited with approval in* <u>Sagan</u>

25    <u>v. Apple Computer</u>, 874 F. Supp. 1072, 1075 (C.D. Cal. 1994). Under the "totality of

26    circumstances" test, the court engages in "a review of the meaning of the language in context and

27    its susceptibility to being proved true or false." <u>Moyer</u>, 225 Cal. App. 3d at 725.

28

KERR
—&—
WAGSTAFFE
LLP

8

1    Here, it is not possible to prove as true or false whether Mosley "knew," at the time he

2    was taking The Clear, The Cream and EPO, that the drugs were illegal.  Contrary to Mosley's

3    argument, the possibilities here are not constrained by whether or not Conte told Mosley that the

4    drugs were illegal.  It is equally possible that Conte told Mosley that he was taking illegal drugs

5    and that Mosley did not understand, or chose not to understand, that he was taking illegal drugs.

6    Mosley's declaration does not refute key portions of what Conte told Mosley.  While it is clearly

7    Conte's opinion that Mosley knew that he was taking illegal drugs, that does not mean that

8    Mosley actually knew, nor does it mean that Conte can prove Mosley's knowledge.

9    Mosley's efforts to distinguish the cases relied on by Conte are irrelevant because Mosley

10   does not dispute the holdings of those cases, namely, that opinions are not actionable.  In

11   particular, Mosley's effort to distinguish Saenz v. Playboy Enterprises, 841 F.2d 1309, 1318 n. 3

12   (7th Cir. 1988), fails.  It is of no consequence that Saenz was decided under New Mexico law or

13   that it was decided before Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990).  The court in

14   Saenz plainly found that statements about someone else's knowledge are protected inferences or

15   opinions and therefore not actionable.  Here, Conte's challenged statements are clearly protected

16   opinions based on what he believed Mosley's knowledge to be.  What Mosley "knew" is not a

17   statement that can be proven true or false.

18          **4.    Conte's Statements to the Press were Privileged**

19   Mosley argues that privilege found in section 47(c) does not apply to Conte because

20   Mosley has demonstrated evidence of actual malice and section 47(c) does not apply to members

21   of the news media.  Both of these arguments fail.

22   First, for the purposes of section 47(c), malice is shown by evidence of hatred or ill will

23   towards the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in

24   the truth of the publication.  Sanborn v. Chronicle Pub. Co., 18 Cal. 3d 406, 413 (1976).  As

25   shown above, Mosley has no admissible evidence of malice.  Thus, the conditional nature of the

26   section 47(c) privilege is not at issue here because Mosley has not demonstrated any evidence

27   that would support a finding of malice.

28

1        Next, the section 47(c) privilege clearly applies to the facts at bar, regardless of whether

2  or not the news media can avail itself of the privilege. Section 47(c) provides a privilege for a

3  communication to a recipient with a qualifying interest in the communication by a transmitter

4  either, first, who also has a qualifying interest in the communication (section 47(c)(1)) or,

5  second, who is related to the recipient so as to have a reason to make an "innocent"

6  communication (section 47(c)(2)) or, third, whom the recipient asked for the information (section

7  47(c)(3)). Cal. Civ. Proc. § 47(c). The last factor plainly applies here because the recipient, the

8  reporters to whom Conte spoke, asked for the information from Conte in response to Mosley's

9  claims that Conte deceived him. As Conte explains in his declaration, "I was approached by

10  journalists from the New York Daily News, USA Today, and Sports Illustrated and asked to

11  respond to Mr. Mosley's false public comments that I had deceived him about the nature of the

12  performance enhancing drugs." (*Conte Decl. ¶ 14*). Since Conte provided information to

13  reporters with whom he shared a common interest, namely, the on-going steroids sports scandal,

14  section 47(c) applies. Institute of Athletic Motivation v. University of Ilinois, 114 Cal App. 3d

15  1, 10-11 (1981) (common interest privilege applies where alleged defamation involves a well-

16  known person in a certain interest group).

17        Contrary to Mosley's assertion, Brown v. Kelly Broadcasting Company, 48 Cal. 3d 711

18  (1989) does not prevent the application of section 47(c) to this case. In Brown, the California

19  Supreme Court held that a publication or broadcast by a member of the news media to the

20  general public regarding a private person is not privileged under Civil Code section 47(c)

21  regardless of whether the communication concerns a matter of public interest. Brown stands for

22  the proposition that section 47(c) does not provide a blanket public-interest privilege for the *news*

23  *media*. That is not the issue here. The question is not whether Sports Illustrated has a section

24  47(c) privilege for republishing what Conte told its reporter, but rather whether Conte's

25  statements to the reporter were privileged. The answer to that question is clearly yes. The

26  privilege attaches to Conte's statements, not the republication of the statements by the press.

27

28

| | |
|---|---|
| 1 | **5.    The Alleged Defamatory Statements Are Substantially True** |
| 2 | Mosley asserts that his declaration creates an issue of fact as to whether Conte's version |
| 3 | of the 2003 meeting is true. Mosley is mistaken. The issue is not whether Mosley's recollection |
| 4 | of his meeting with Conte controverts Conte's recollection. Rather it is whether Conte's |
| 5 | statements regarding Mosley's drug use are substantially true. A "statement is not considered |
| 6 | false unless it 'would have a different effect on the mind of the reader from that which the ... |
| 7 | truth would have produced.'" <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 516-17 |
| 8 | (1991). |
| 9 | Under California law, a defendant need not prove the literal truth of the allegedly |
| 10 | defamatory accusation,[2] "so long as the imputation is substantially true so as to justify the 'gist' |
| 11 | or 'sting' of the remark." <u>Emde v. San Joaquin County Central Labor Council</u>, 23 Cal.2d 146, |
| 12 | 160 (1943). "The rule of substantial truth is based on a recognition that falsehoods which do |
| 13 | incremental damage to the plaintiff's reputation do not injure the only interest that the law of |
| 14 | defamation protects." <u>Haynes v. Alfred A. Knopf</u>, 8 F.3d 1222, 1228 (7th Cir. 1993). Here, the |
| 15 | "imputation" of Conte's statements is that Mosley is a drug user. That is in fact a true statement. |
| 16 | Mosley does not deny taking illegal performance enhancing drugs before his bout with Oscar De |
| 17 | La Hoya. Mosley admits that Conte provided him with EPO, The Clear, and The Cream. In |
| 18 | fact, Mosley admits to purchasing these illegal products from Conte. (*Mosley Decl ¶ 12*). |
| 19 | Mosley does not deny that he injected himself with The Clear with a needleless syringe. (*Conte* |
| 20 | *Decl. ¶ 8*). Mosley does not deny that he injected himself with drugs from a bottle labeled |
| 21 | "Procrit EPO." (*Id. ¶ 6*). Mosley merely denies that he knew what he was doing at the time he |
| 22 | was doing it. Even if one takes that incredible assertion at face value, the alleged statements that |
| 23 | Conte made regarding Mosley's drug use, do not provide a "different effect" on the mind of the |
| 24 | reader. Simply put, the sting of Conte's comments is that Mosley is a drug user who broke the |
| 25 | rules of his sport, not that he is an unwitting drug user. Given that Mosley admits to being a drug |
| 26 | |
| 27 | |
| 28 | [2]    Here, Mosley has proven the literal truth of the alleged defamatory statement that Mosley "injected himself" in Conte's presence. |

1 | user, he cannot be heard to argue that Conte's statements regarding him are not substantially

2 | true.

3 | **C.    CONTE IS ENTITLED TO ATTORNEYS' FEES**

4 |     Because this motion is well-taken, Conte is entitled to fees and expenses.  The

5 | "prevailing defendant" on a motion to strike "shall be entitled" to recover his attorneys' fees and

6 | costs. Cal. Code Civ. Proc. § 425.16(c).

7 |     Mosley's argument that he is entitled to fees has no merit.  Even if Conte's motion is

8 | denied, a prevailing plaintiff is only entitled to fees where the anti-SLAPP motion is clearly

9 | frivolous or designed to delay.  California Back Specialists Group v. Rand, 160 Cal. App. 4th

10 | 1032, 1038 (2008).  This motion is plainly not frivolous, especially in light of the fact that

11 | Mosley concedes the first prong of section 425.16(e) is met and Mosley's utter failure to produce

12 | evidence of actual malice, let alone clear and convincing evidence that is sufficiently strong to

13 | command the *"unhesitating assent of every reasonable mind."* Copp, 45 Cal. App. 4th at 846

14 | (citation omitted).

15 | **III.    CONCLUSION**

16 |     For the reasons explained above, Defendant Victor Conte respectfully requests that the

17 | Court GRANT his motion to strike Mosley's complaint pursuant to California Code of Civil

18 | Procedure section 425.16.

19 |

20 | DATED: June 30, 2008                Respectfully submitted,

21 |                            **KERR & WAGSTAFFE LLP**

22 |

23 |                     By      s/James M. Wagstaffe

                                JAMES WAGSTAFFE

24 |

25 |                              Attorneys for Defendant

                             Victor Conte

26 |

27 |

28 |

EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHANE D. MOSLEY, SR.,          )
                               )
                Plaintiff,     )
                               )
        vs.                    ) No. C 08-01777 JSW
                               )
VICTOR CONTE,                  )
                               )
                Defendant.     )
_____)

DEPOSITION OF SHANE D. MOSLEY

Wednesday, July 9, 2008

Los Angeles, California



Reported by:
PAMELA J. FELTEN
CSR No. 5189

## Page 2

<pre>
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   SHANE D. MOSLEY, SR.,      )
                                )
 5        Plaintiff,   )
                                )
 6        vs.          ) No. C 08-01777 JSW
                                )
 7   VICTOR CONTE,            )
                                )
 8        Defendant.   )
                                           )
 9   _____
10
11
12        Deposition of SHANE D. MOSLEY, taken
13        on behalf of Defendant, at 1900
14        Avenue of the Stars, Suite 2100,
15        Los Angeles, California, beginning
16        at 9:47 a.m. and ending at 10:50 a.m.
17        on Wednesday, July 9, 2008, before
18        PAMELA J. FELTEN, Certified Shorthand
19        Reporter No. 5189.
20
21
22
23
24
25
</pre>

## Page 3

<pre>
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4        JUDD BURSTEIN P.C.
          BY:  JUDD BURSTEIN
 5        Attorney at Law
          1790 Broadway
 6        Suite 1501
          New York, NY  10019
 7        (212) 974-2400
          Jburstein@burlaw.com
 8
 9
10
     For Defendant:
11
          KERR & WAGSTAFFE, LLP
12        BY:  IVO LABAR
          Attorney at Law
13        100 Spear Street
          Suite 1800
14        San Francisco, California  94105
          (415) 371-8500
15        Labar@kerrwagstaffe.com
16
17
     Also Present:
18
          DANIELLE ARTEAGA, Attorney at Law
19        DAVID MARCHIANO
20
21
22
23
24
25
</pre>

## Page 4

<pre>
 1                   INDEX
     WITNESS:                  EXAMINATION
 2
     SHANE D. MOSLEY
 3
 4
          BY MR. LABAR        5, 57, 60
 5
          BY MR. BURSTEIN      55, 58, 61
 6
 7
 8
 9              EXHIBITS
10   DEFENDANT'S                      PAGE
11   1    2005, 2006 and 2007 tax forms    49
12   2    Affidavit of Shane Mosley notarized
          on August 16, 2002               49
13
     3    DirecTV bill for service at 5212
14        Clayton Court, La Verne, California   50
15   4    Declaration of Shane D. Mosley, Sr.
          filed 5/23/2008               52
16
17
18
19
20        INFORMATION REQUESTED
21           Page  Line
22           20    16
23
24
25
</pre>

## Page 5

<pre>
 1        Los Angeles, California, Wednesday, July 9, 2008
 2             9:47 a.m. - 10:50 a.m.
 3
 4             SHANE D. MOSLEY
 5   having been first administered an oath, was examined and
 6   testified as follows:
 7
 8             EXAMINATION
 9   BY MR. LABAR:
10        Q  Good morning.  Please state and spell your name
11   for the record.
12        A  Shane Mosley.  S-h-a-n-e.  And then
13   M-o-s-l-e-y, last name.
14        Q  Have you had your deposition taken before?
15        A  Yes.
16        Q  Okay.  How many times?
17        A  That I don't know.
18        Q  Okay.  Can you give me an approximate number?
19   Less than five times?
20        A  About that many.  About four.  Four or five
21   times.
22        Q  Do you recall how long ago these other
23   depositions were?  The first one of the four?
24        A  Um, it's been a while.  Maybe 2000 -- I don't
25   know.  1999, 2000.
</pre>

2 (Pages 2 to 5)

| | Page 6 |
|---|---|
| 1 | Q  Okay. |
| 2 | A  I'm not sure. |
| 3 | Q  Was your deposition taken in 1999 in connection |
| 4 | with a lawsuit? |
| 5 | A  Um, maybe against another attorney that was -- |
| 6 | Q  Okay.  Do you know if you were suing the |
| 7 | attorney or if the attorney was suing you? |
| 8 | A  I believe the attorney was suing me. |
| 9 | Q  Okay.  And do you know what county or state |
| 10 | that lawsuit was happening in? |
| 11 | A  It might have been L.A. County. |
| 12 | Q  And do you know the name of that attorney? |
| 13 | A  Was it Wendell Wright. |
| 14 | Q  Wendell Wright? |
| 15 | A  Yeah.  Wendell Wright. |
| 16 | Q  Wright like W-r-i-g-h-t? |
| 17 | A  Yes. |
| 18 | Q  And was he your attorney at some point? |
| 19 | A  He was my attorney, yes. |
| 20 | Q  Okay.  And was that the first time you were |
| 21 | ever deposed? |
| 22 | A  Um, no.  I mean I've been to court a couple |
| 23 | more times. |
| 24 | Q  Okay.  Let me just try and focus your attention |
| 25 | on the depositions that you've had previously, then I'll |

| | Page 7 |
|---|---|
| 1 | ask you about your court appearances later.  Okay? |
| 2 | A  Uh-huh. |
| 3 | Q  That case involving Mr. Wright, you were |
| 4 | deposed in that case, correct? |
| 5 | A  I was deposed, yes. |
| 6 | Q  And was there another deposition that occurred |
| 7 | after that in a different case? |
| 8 | A  Um, I'm not sure.  I'm pretty sure there was a |
| 9 | couple of more, but I'm not sure around the time.  It's |
| 10 | been a long time ago so -- |
| 11 | Q  Sure.  Okay. |
| 12 | A  -- I don't know. |
| 13 | Q  Do you have any memory at all of the other |
| 14 | depositions you've had? |
| 15 | A  The only one I can think of was the Wendell |
| 16 | Wright one.  The other depositions they were like real |
| 17 | small -- I don't -- I can't remember, you know -- oh, |
| 18 | there was one with Patrick Ortiz or Ringside Ticket and |
| 19 | that was like 1995 maybe or -- |
| 20 | Q  Okay. |
| 21 | A  -- you know -- |
| 22 | Q  The company was called Ringside Tickets? |
| 23 | A  Uh-huh. |
| 24 | Q  And what was the other name you mentioned? |
| 25 | A  Ringside Ticket, that's on -- it was Patrick |

| | Page 8 |
|---|---|
| 1 | Ortiz.  That was -- he was the promoter.  He was my first |
| 2 | promoter. |
| 3 | Q  Patrick Ortiz? |
| 4 | A  Yeah. |
| 5 | Q  And in that case, were you being sued or were |
| 6 | you suing someone else? |
| 7 | A  I was being sued. |
| 8 | Q  And do you recall what county or state that |
| 9 | lawsuit was pending in? |
| 10 | A  I think that was -- had to be L.A. County. |
| 11 | Q  Okay.  Before I ask you about any other |
| 12 | lawsuits, I just want to make sure you understand the |
| 13 | rules of this proceeding.  You've taken an oath to tell |
| 14 | the truth.  Do you understand that? |
| 15 | A  True. |
| 16 | Q  And that's the same type of oath that you would |
| 17 | take in a court of law.  Do you understand that? |
| 18 | A  True. |
| 19 | Q  As you're doing now, please continue to give us |
| 20 | audible responses so that our court reporter can take |
| 21 | everything down accurately.  All right? |
| 22 | A  Okay. |
| 23 | Q  Thank you.  If you don't understand -- |
| 24 | A  I'm doing -- yeah, I'm doing this.  So I |
| 25 | don't -- |

| | Page 9 |
|---|---|
| 1 | Q  You're doing an excellent job.  Thank you. |
| 2 | A  Okay. |
| 3 | Q  If you don't understand my questions, please |
| 4 | tell me.  All right? |
| 5 | A  Definitely. |
| 6 | Q  Okay.  And if you respond to my question, I'll |
| 7 | assume that you understood me, heard me properly, and |
| 8 | gave me a truthful response.  All right? |
| 9 | A  True. |
| 10 | Q  Great.  If at any time you have any questions |
| 11 | about anything I'm asking you, please tell me so I can |
| 12 | clarify.  Okay? |
| 13 | A  Okay. |
| 14 | Q  Let me ask you -- go back to the topic of the |
| 15 | lawsuits that you've been involved with.  You told me |
| 16 | about a lawsuit involving a gentleman named Mr. Wendell |
| 17 | Wright and another lawsuit involving an entity called |
| 18 | Ringside Tickets and a gentleman named Patrick Ortiz. |
| 19 | A  Yes. |
| 20 | Q  Can you recall any other lawsuits that you've |
| 21 | been a party to? |
| 22 | A  No. |
| 23 | Q  Do you think there have been more and you just |
| 24 | can't remember any of the details of them or do you think |
| 25 | there haven't been any more than the two you've told me |

3 (Pages 6 to 9)

| Page 10 | Page 12 |
|---|---|
| 1   about? | 1   Mr. Conte. Okay? |
| 2    A   Those are the -- the big lawsuits that stand | 2    A   Okay. |
| 3   out, but other than that, I can't really recall. | 3    Q   Where were you born, sir? |
| 4    Q   Okay. You say those are the two big ones that | 4    A   I was born in Lynwood, California. |
| 5   you -- that stand out. Can you recall any small ones? | 5    Q   Inglewood? |
| 6    A   I mean those are -- that's really all I can | 6    A   Lynwood. |
| 7   recall at this point is those lawsuits. I mean that's | 7    Q   Lynwood. Okay. |
| 8   it. | 8      MR. BURSTEIN: Shane, try and keep your voice |
| 9    Q   So you can't remember the details or the | 9   up. |
| 10   general or the nature of any other lawsuits you've been a party | 10      THE WITNESS: Oh. I'm sorry. Yeah. |
| 11   to? | 11      MR. LABAR: Can you hear him okay? |
| 12    A   Those two I can remember some of the details of | 12      THE REPORTER: Yes. |
| 13   what happened in the lawsuits. | 13      MR. BURSTEIN: Great. Okay. |
| 14    Q   Okay. No others? | 14   BY MR. LABAR: |
| 15    A   Not to my -- to my knowledge. | 15    Q   What year were you born, sir? |
| 16    Q   Okay. Let me ask you about other testimony you | 16    A   9-7-71. |
| 17   may have given in other types of proceedings. You've | 17    Q   And where did you grow up? In Lynwood? |
| 18   testified before a Grand Jury in California, correct? | 18    A   I grew up in Pomona. |
| 19    A   Yes. | 19    Q   In Pomona. All right. And did you attend high |
| 20    Q   Have you testified before any other Grand | 20   school in Pomona? |
| 21   Juries at any time other than that one? | 21    A   Yeah. |
| 22    A   No. | 22    Q   And which high school? |
| 23    Q   Have you given any testimony to any athletic | 23    A   Pomona High. |
| 24   organizations that you may be a member of? | 24    Q   And did you graduate from Pomona High? |
| 25    A   I don't -- | 25    A   Yes. |

| Page 11 | Page 13 |
|---|---|
| 1      MR. BURSTEIN: Do you mean sworn testimony? | 1    Q   And what year was that? |
| 2      MR. LABAR: Testimony of any kind. | 2    A   '89. |
| 3      MR. BURSTEIN: Then I object on vague and | 3    Q   Okay. And after you graduated from Pomona High |
| 4   ambiguous. Because I'm not sure what testimony means, | 4   School, did you continue living in California? |
| 5   but . . . | 5    A   Yes. |
| 6      MR. LABAR: Okay. | 6    Q   Okay. And you began a career as a boxer after |
| 7      THE WITNESS: And I'm not even -- I don't -- | 7   high school; is that correct? |
| 8   BY MR. LABAR: | 8    A   No. I boxed since I was eight years old. |
| 9    Q   You don't understand my question? | 9    Q   And when did you become a professional boxer? |
| 10    A   Say it again or something. | 10    A   In '93 -- 1993. |
| 11    Q   Sure. | 11    Q   Okay. All right. And where did you live from, |
| 12    A   I don't understand. | 12   say, 1990 to 1995? What state? |
| 13    Q   Sure. I'll ask it a different way. | 13    A   Pomona. |
| 14      Have you ever given any testimony before any | 14    Q   Okay. And from 1995 to the year 2000, where |
| 15   athletic organizations, like boxing groups that you may | 15   did you live? |
| 16   be a party of -- a member of? | 16    A   The year 2000? That had to be Pomona. |
| 17    A   Not that I can think -- no. Just . . . | 17    Q   And where were you living in Pomona? |
| 18    Q   The deposition we're taking today, just so I | 18    A   Well, actually, I'm sorry. |
| 19   make sure you understand, is limited in nature. I'm just | 19    Q   Sure. |
| 20   going to be asking you questions about your domicile, in | 20    A   La Verne. |
| 21   other words, where you live and where you reside. | 21    Q   La Verne. Okay. And what year did you move |
| 22    A   Uh-huh. | 22   from Pomona to La Verne? |
| 23    Q   Do you understand that? | 23    A   I believe that was in 19- -- maybe 1997. I'm |
| 24      Okay. I'm not going to be asking you anything | 24   not sure. |
| 25   about the merits of the case that you brought against | 25    Q   And you are currently married, correct? |

**4  (Pages 10 to 13)**

| | Page 14 | | | Page 16 |
|---|---|---|---|---|

**Page 14**

1  A  Yes.
2  Q  And what's your wife's name?
3  A  Jin Mosley.
4  MR. BURSTEIN:  That's J-i-n.
5  THE WITNESS:  J-i-n.
6  BY MR. LABAR:
7  Q  And you have children, correct?
8  A  Yes.
9  Q  How many children do you have?
10  A  I have four biologically and one stepson.
11  Q  And do all your children live with your wife
12  and you?
13  A  They all live with me and, yeah, my wife.
14  Q  Okay.  And your wife lives at the address on
15  La Verne — in La Verne?
16  A  In La Verne, yes.
17  Q  Okay.  Let me ask you about some addresses that
18  I've seen on some documents.  Are you familiar with an
19  address 174 Waverly in Medford, New York?
20  A  Yes.
21  Q  What is that address?
22  A  That is the address to my CPA.
23  Q  Okay.
24  A  Well, my ex-CPA.
25  Q  Okay.  Is that gentleman's name Salvador

**Page 15**

1  Alessi?
2  A  Yes.
3  Q  All right.  And how long was he your CPA for?
4  A  Maybe a year and a half.
5  Q  So you don't have any home or other kind of --
6  type of residence in New York; is that correct?
7  A  No.
8  Q  So this 174 Waverly address is only relevant to
9  you because it was the address for your former CPA,
10  correct?
11  A  Yes.
12  Q  Okay.  Let me ask you about another address.
13  1230 or 1226 Loma Vista in Pomona, California, are you
14  familiar with that address?
15  A  I am familiar with that one, yeah.
16  Q  What was 1230 Loma Vista in Pomona?  Was that
17  your home?
18  A  That was my old home in -- yeah, my old home.
19  Q  And what was 1226 Loma Vista?
20  A  1226 was a house that I bought next door
21  because I was going to rebuild everything.  I was going
22  to rebuild both structures.
23  Q  What year did you buy the 1230 address?
24  A  It was probably -- I don't know.  1998.  Maybe
25  I can get the records.

**Page 16**

1  Q  Approximately 1998?
2  A  Probably.  I don't know.  Yeah.
3  Q  And what year did you sell it?
4  A  I must have sold it in either '99 or 2000.
5  Q  Okay.  And when you sold that -- those homes in
6  2000 -- did you sell them both in 2000?
7  A  I sold both of them, yes.
8  Q  Is that when you moved to the La Verne address?
9  A  Yes.
10  Q  And is that address 5212 Clayton Court?
11  A  Yes.
12  Q  And that's where your wife and children
13  currently live?
14  A  Yes.
15  Q  And so you owned the 5212 Clayton Court address
16  for approximately eight years or so?
17  A  About seven years.
18  Q  Seven years.  Let me ask you about another
19  possible address.  Do you actually also own a home in Big
20  Bear, California?
21  A  Yes.
22  Q  And what's the address of the home in Big Bear?
23  A  That's 715 Thrush Street.
24  Q  Thrush like the bird, T-r-h --
25  A  Thrush, T-h-r --

**Page 17**

1  Q  -u-s-h?
2  A  -u-s-h.
3  Q  Do you know the ZIP code there?
4  A  I believe it's 92315.
5  Q  Thank you.  Do you know -- is it actually in
6  the town of Big Bear or is it in one of the small
7  villages around Big Bear?
8  A  It's right by the Snow Summit.
9  Q  So that's actually in the town of Big Bear?  Do
10  you know?
11  A  I think it would be considered Big Bear Lake.
12  Q  And how long have you owned that property?
13  A  Approximately seven years.
14  Q  And do you own that property with anyone else
15  or are you the sole owner?
16  A  I'm the sole owner.
17  Q  Okay.  Let me ask you about a few other
18  addresses.
19  Are you familiar with the address 6745 Jackson
20  Junction in Las Vegas, Nevada?
21  A  Yes.
22  Q  What is that address?
23  A  That's my home address.
24  Q  Okay.
25  A  One of them.  One of my houses, I should say.

5  (Pages 14 to 17)

**Page 18**

1  Q. Okay. And how long have you owned that
2  property?
3  A. I would say 2004 maybe. Somewhere -- 2004.
4  Q. And that's a residential home?
5  A. It is, yes.
6  Q. Let me ask you about another property address.
7  3695 Calico Brook in Las Vegas, Nevada, are you familiar
8  with that address?
9  A. Yes.
10  Q. And what is that address?
11  A. That's the actual home address.
12  Q. Could you repeat that?
13  A. That is the actual home address.
14  Q. Okay. What do you mean when you say actual
15  home address?
16  A. That's where I stay most of the time, you know,
17  when I'm in Vegas. Well, I'm always in Vegas, but my --
18  you know -- in Vegas. It's the central home.
19  Q. All right. So that's obviously a different
20  physical location than the Jackson Junction address,
21  right?
22  A. Yes.
23  Q. And who lives in the Jackson Junction address
24  most of the time, if anyone?
25  A. Actually, at this point, it's been rented out.

**Page 19**

1  Q. How long has it been rented out?
2  A. Maybe a year and a half, maybe a year. Maybe
3  it was longer than that. Could be two years.
4  Q. When was the Calico Brook property purchased?
5  A. I believe in '05, I believe.
6  Q. Okay. And when you stay there, do you stay
7  there alone?
8  A. Yeah.
9  Q. And at your address at the home -- oh, I'm
10  sorry. The address in La Verne, California, is that a
11  residential home?
12  A. It is a residential, yes.
13  Q. Okay. And do you keep -- obviously your wife
14  and children are there, so you have cable television
15  there?
16  A. I do.
17  Q. And when you're there, you watch that cable
18  television sometimes?
19  A. At the house in La Verne, yes.
20  Q. And, obviously, there's gas and electric and
21  power there, right?
22  A. Yes.
23  Q. Okay. And you have a home phone there?
24  A. Yes.
25  Q. Do you receive mail there?

**Page 20**

1  A. Uh, actually, the mail -- I shouldn't
2  receive -- the mail actually goes to a different address,
3  which should be -- it used to go to 174 Waverly, but now
4  it's been transferred over to the business that we have
5  now, which is the -- the -- what's his name -- Bob Keys,
6  the money management people.
7  Q. Okay. Bob Keys is sort of a financial manager
8  for you?
9  A. Yes.
10  Q. Does his firm have a name or does he just call
11  it after himself?
12  A. His firm has a name. I'm trying to -- UBS.
13  MR. BURSTEIN: Want to leave a blank and we can
14  fill it in?
15  MR. LABAR: Sure.
16  (Information requested: _____
17  _____
18  _____.)
19  BY MR. LABAR:
20  Q. Is it UBS Warburg?
21  A. UBS is the money marketing people, but it's a
22  different money management. They knew -- they're
23  basically the same thing. They knew each other, but it's
24  a different name. Money management is Bob Keys and money
25  management corporation.

**Page 21**

1  Q. Okay. I appreciate that.
2  Where is Bob Keys' office at when you go see
3  Bob Keys?
4  A. Well, actually, I haven't went to his actual
5  office yet, but I believe it's in L.A.
6  Q. So any conversations you've had with him have
7  been over the phone so far?
8  A. Yes.
9  Q. Okay. Do you keep clothing at the La Verne
10  address?
11  A. Yes.
12  Q. Okay. And you have enough clothes there so
13  that you could stay there for some period of time?
14  A. Yes.
15  Q. Do you keep training gear for your boxing
16  regimen at the La Verne address?
17  A. I have training gear there, too, yes.
18  Q. Okay. When you're at the La Verne address, do
19  you have access to transportation?
20  A. Yes.
21  Q. Do you have your own car there?
22  A. Yes.
23  Q. What type of car do you have there?
24  A. Well, actually, the car is not registered in
25  California, but the car that I use is an Escalade EXT,

6 (Pages 18 to 21)

**Page 22**

1  which is -- which is my car basically in Vegas. It's
2  registered in Vegas. All my -- all my cars that I drive
3  are registered in Vegas.
4  Q  I appreciate that. I asked a slightly --
5  MR. BURSTEIN: Answer the question --
6  THE WITNESS: Oh.
7  MR. BURSTEIN: -- as opposed to --
8  THE WITNESS: Okay.
9  MR. BURSTEIN: Okay?
10  BY MR. LABAR:
11  Q  You might have misunderstood me. I asked a
12  slightly different question.
13  When you're at the La Verne house, do you have
14  access to a car?
15  A  Yes.
16  Q  Which car do you drive?
17  A  The Escalade. The EXT.
18  Q  And that's the Escalade EXT that you just
19  referred to that's registered in Nevada?
20  A  Yes.
21  Q  Okay. So you drive the car from Nevada to Los
22  Angeles; is that correct?
23  A  Yes.
24  Q  Okay. And you never use any other car when
25  you're at the La Verne address?

**Page 23**

1  A  That's my car. Yeah.
2  Q  Okay. So when you come back and forth from
3  Nevada and California, you always drive?
4  A  I drive, yes.
5  Q  And you never fly?
6  A  Um, very rarely.
7  Q  Okay. Do you ever use any other car other
8  than -- or have you ever used any other car other than
9  the Escalade when staying at the La Verne home?
10  A  The EVX -- EVS Escalade, which is, you know, an
11  Escalade, as well, but it's a big one.
12  Q  Is that the car that's used by your wife on a
13  day-to-day basis?
14  A  Would you say again?
15  Q  Is that the car that's used by your wife on a
16  day-to-day basis?
17  A  Actually, no.
18  Q  Okay. What car does your wife drive normally
19  on a day-to-day basis?
20  A  She actually uses the -- the 5 -- it's the
21  G-Wagon Mercedes.
22  Q  Okay. And to your knowledge, is that car
23  registered in California?
24  A  Uh, yes, I believe so.
25  Q  And do you ever drive that car?

**Page 24**

1  A  Maybe to get it washed or something, you know.
2  Q  So from time to time when you're in California
3  at the La Verne address, you may drive the G-Wagon?
4  A  Yeah.
5  Q  Okay. And do you have cars up in Big Bear, as
6  well?
7  A  No.
8  Q  Okay. And do you keep cable and satellite at
9  the Big Bear home?
10  A  Yes.
11  Q  Okay. And, obviously, you have gas and
12  electric there as well, right?
13  A  Yes.
14  Q  And you have a phone there?
15  A  Yes.
16  Q  And do you receive any mail there?
17  A  No.
18  Q  And do you keep clothing and training gear at
19  the house in Big Bear?
20  A  Yes.
21  Q  All right. Let me ask you about any personal
22  items you might keep at the house in La Verne. Other
23  than clothing, do you keep other personal items like
24  photos and things like that at the house in La Verne?
25  A  Yes.

**Page 25**

1  Q  Okay. Are your -- for example, family
2  portraits, do you have those at your house in La Verne?
3  A  Yes.
4  Q  Your wedding pictures, are those at the house
5  in La Verne?
6  A  Yes.
7  Q  What about personal financial records, do you
8  have things like that in your house in La Verne?
9  A  I believe there's some financial stuff there,
10  yes.
11  Q  Does your wife -- does your spouse work, sir?
12  A  Yes.
13  Q  Okay.
14  A  Well, she works basically for me.
15  Q  Okay.
16  A  So --
17  Q  And which business of yours does your wife work
18  for?
19  A  The boxing business.
20  Q  What is that called?
21  A  Well, my company would be Sugar Shane, Inc.
22  Q  I'll ask you more about your businesses later.
23  Does she have a title with that business?
24  A  No, not really on -- on record, but she just
25  handles the day-to-day, you know, the phone -- some of

7  (Pages 22 to 25)

| Page 26 | Page 28 |
|---|---|
| 1 the phone calls and stuff for me. | 1    MR. BURSTEIN: Could we just mark that part |
| 2    Q And she then primarily works for that business | 2 confidential. Enter into an anti-disclosure agreement. |
| 3 from La Verne; is that correct? Or Los Angeles area? | 3    (Laughter.) |
| 4    A Uh, yeah. | 4 BY MR. LABAR: |
| 5    Q And does she go to an office to do that job or | 5    Q Let me ask you. Have you ever had any arrests |
| 6 does she work from home or can you explain that for me? | 6 or convictions in the State of California? |
| 7    A She just works at the house. | 7    A No. |
| 8    Q I believe you told me you have five children; | 8    Q Sir, as a professional boxer, I would assume |
| 9 is that right? | 9 you have sports trainers and boxing trainers, right? |
| 10    A Yes. Yes. | 10    A Only had one trainer really. It was my father |
| 11    Q Can you give me their ages? | 11 was my boxing trainer. |
| 12    A My first son is 17, Shane, Jr. Norman Bell is | 12    Q And your father has been your primary trainer |
| 13 14. Najee will be seven or is seven. And Tai is six. | 13 off and on over the years? |
| 14 And Mee-Yon is four. | 14    A Pretty much he's been my primary trainer, you |
| 15    Q Okay. So of your children that are school age, | 15 know, since I was eight. |
| 16 are they all enrolled in school? | 16    Q Let me focus your attention on this year, 2008. |
| 17    A Yes. | 17 For all of this year, has your father been your primary |
| 18    Q And are they all enrolled in school in | 18 trainer? |
| 19 California? | 19    A Yes. |
| 20    A Yes. | 20    Q Okay. Where does your father live? |
| 21    Q Okay. And let me ask you about your other | 21    A In -- he lives in Pomona. |
| 22 family. Is your mother and father alive? | 22    Q And is he at the -- well, strike that. |
| 23    A Yes. | 23    Do you have any other trainers that assist your |
| 24    Q And where do they live? | 24 father in training you? |
| 25    A Pomona. | 25    A Um, I wouldn't say assist, but no, not really. |

| Page 27 | Page 29 |
|---|---|
| 1    Q And where are your -- do you have any other | 1 He's really the trainer. Everybody has their own job. |
| 2 relatives? Uncles, aunts, things like that? | 2 They might give advice here and there, but they're not |
| 3    A My sister. | 3 the trainer. There is only one trainer. |
| 4    Q Where does your sister live? | 4    Q Can you describe the -- those other jobs that |
| 5    A Pomona. | 5 you were describing these other people do? |
| 6    Q When you were married, sir, were you married in | 6    A You might have a cut man. |
| 7 California? | 7    Q Okay. |
| 8    A No. | 8    A Might get advice for different things. And |
| 9    Q Where were you married? | 9 actually my -- my bodyguard, which is -- he's a trainer |
| 10    A In Vegas. | 10 in New York -- |
| 11    Q Okay. What year was that? | 11    Q Okay. |
| 12    I'm sorry for putting you on the spot. | 12    A -- but -- and a bodyguard. So he gives input, |
| 13    MR. BURSTEIN: Better hide this thing from his | 13 too, as well. |
| 14 wife. | 14    Q And for this past -- you were training for a |
| 15    MS. ARTEAGA: More important to remember the | 15 fight that was supposed to happen in May, right, of this |
| 16 date. | 16 year? |
| 17    THE WITNESS: It was -- | 17    A Yes. |
| 18 BY MR. LABAR: | 18    Q And during that -- in the preparation for that |
| 19    Q Approximate year. | 19 fight, your father was your trainer, right? |
| 20    A It was actually after the Oscar, Fernando | 20    A Yes. |
| 21 Vargas fight when we got married. | 21    Q And who was your cut man? |
| 22    Q 2000? | 22    A It was going to be Jimmy Glenn. |
| 23    A Yeah, 2002, probably. | 23    Q And was Mr. Glenn working regularly with you in |
| 24    Q All right. | 24 preparation for that fight? |
| 25    A So . . . | 25    A No. |

8 (Pages 26 to 29)

| Page 30 |
|---|
| 1   Q And how about your bodyguard, was he working |
| 2 regularly? |
| 3   A He was -- he was with me, yes. |
| 4   Q So he was working regularly with you in |
| 5 preparation for that fight? |
| 6   A Yes, he was with me. |
| 7   Q And what's that gentleman's name? |
| 8   A Alexander Nobel. |
| 9   Q Noble like N-o-b-e-l. |
| 10   A Nobel, yeah. |
| 11   Q And do you have any medical doctors -- strike |
| 12 that. |
| 13     Let me ask a different question. Where is |
| 14 Mr. Nobel -- where was he living for 2008 in preparation |
| 15 for this fight? |
| 16   A He lives in New York, but when he was -- he was |
| 17 in camp with me in Big Bear. |
| 18   Q Okay. So in preparation for the fight you were |
| 19 going to have in May of 2008, you were training in Big |
| 20 Bear? |
| 21   A Yes. |
| 22   Q And you were living at the Big Bear home? |
| 23   A Yes, I was staying in the Big Bear home. |
| 24   Q And where were you training at? Was there a |
| 25 specific sports facility or boxing gym you were using up |

| Page 31 |
|---|
| 1 there? |
| 2   A It's a house that I -- basically the house I |
| 3 built, I put a gym in that house. So . . . |
| 4   Q Okay. And when did you begin preparing for |
| 5 that fight that was to happen in May of 2008? |
| 6   A May -- I believe March. March, April, May, |
| 7 yeah. Maybe March. |
| 8   Q And were you in training continuously from |
| 9 March of 2008 up until -- |
| 10   A Actually, it might have been late March, early |
| 11 April. Yeah. |
| 12   Q Okay. And were you in training pretty much |
| 13 continuously from that time period you just described up |
| 14 until the fight was cancelled? |
| 15   A Yes. |
| 16   Q And that fight was cancelled in mid May |
| 17 sometimes. |
| 18   A Maybe two weeks before the fight, yeah. |
| 19   Q So you were living and training in Big Bear, |
| 20 California during that time? |
| 21   A Yes. |
| 22   Q Let me ask you about any other professionals |
| 23 you may work with and for your career. Do you have a |
| 24 medical doctor that you regularly see? |
| 25   A I really don't have a doctor -- any medical |

| Page 32 |
|---|
| 1 person I regularly see, no. But I have a lot of -- I |
| 2 have doctor friends. You know, but nobody -- not -- |
| 3 nobody, you know. |
| 4   Q So you don't have a primary care physician? |
| 5   A No. I kind of -- |
| 6     MR. BURSTEIN: Just answer the questions. |
| 7     THE WITNESS: No. |
| 8 BY MR. LABAR: |
| 9   Q Okay. And do you -- last time you went to the |
| 10 doctor for any kind of medical treatment, where was that |
| 11 doctor located? |
| 12   A That had to be Dr. Gluckman, who was just a |
| 13 boxing doctor. |
| 14   Q And where did you see him? |
| 15   A In San Pedro. |
| 16   Q Okay. That's where I'm from. |
| 17     All right. And do you have -- what do you |
| 18 recall when that occurred? |
| 19   A What did you say again? |
| 20   Q Do you recall when that occurred? |
| 21   A Had to be when they signed the fight. So March |
| 22 maybe. |
| 23   Q March 2008? |
| 24   A Yeah. |
| 25   Q Do you have a dentist? |

| Page 33 |
|---|
| 1   A No, I don't really have a dentist. |
| 2   Q Do you recall the last time you went to a |
| 3 dentist? |
| 4   A Last time I went to the dentist was in Big |
| 5 Bear. |
| 6   Q Do you recall when that was? |
| 7   A The last fight. So whenever the last fight |
| 8 was. Not this fight, but the one last one. |
| 9   Q Right. |
| 10   A So whenever that was. |
| 11   Q So 2007? |
| 12   A 2007 probably. |
| 13   Q Do you have -- do you work with any |
| 14 chiropractors or any people in that field? |
| 15   A No. |
| 16   Q Okay. What about professional massage |
| 17 therapists or anything like that? |
| 18   A I don't have a -- well, actually, I have -- |
| 19 well, for one fight I had a massage therapist, and he was |
| 20 out of San Diego. |
| 21   Q And was that for this fight that was just |
| 22 cancelled or a prior one? |
| 23   A A prior one. |
| 24   Q Okay. When you're in training for a bout, in |
| 25 preparation for a bout, do you keep any kind of training |

9  (Pages 30 to 33)

## Page 34

1  log where you log what was happening on that given day?
2      A  No, I don't really keep a training log, no.
3      Q  Do you know if any of your -- if your father or
4  any of your associates keep training logs so they can
5  chart your progress?
6      A  We don't -- well, we watch films.
7      Q  Okay.  Other than the home gym that you have in
8  Big Bear, where else do you train at?
9      A  As far as boxing is concerned?
10     Q  Yeah.
11     A  I trained in New York and Long Island for a
12  period of time.  I also trained at a gym in Las Vegas.
13  Couple of gyms actually.  Basically Big Bear.  When I'm
14  in -- when I'm in California, I train -- most of my
15  training is in Big Bear.  I don't train -- you said
16  training outside.  I just left with Texas.  I trained
17  there for a couple of weeks or a week.  When I'm in
18  Houston, Texas, I'll train, picking up fighters and
19  stuff.  So I'll train wherever -- wherever I'm at.
20     Q  And which gyms do you train at when you're in
21  the Las Vegas area?
22     A  Pound For Pound, a boxing gym that's right by
23  my house.  The other gym -- I can't think of the name
24  of, but Kevin Kelly actually is a boxer and I train at
25  his gym.  We'll work out together a lot.  So . . .

## Page 35

1      Q  Okay.  And when you're in -- sorry.  Did you
2  finish your answer?
3      A  Go ahead.
4      Q  When you're in La Verne, California, are there
5  any gyms there that you train at?
6      A  No, there is no gyms in La Verne.
7      Q  And do you have a home gym in La Verne?
8      A  No.
9      Q  Let me ask you:  Have you ever voted in an
10  election?
11     A  It's been a long time.
12     Q  Do you recall the last time you voted?
13         Don't feel bad.  I'm guilty of this myself.
14         MR. BURSTEIN:  You know, you both should be
15  ashamed of yourselves.  It's disgraceful.
16         THE WITNESS:  I don't think I -- my mother
17  forced me to vote probably when I got out of high school,
18  but I'm not sure I voted after that.
19  BY MR. LABAR:
20     Q  Okay.  And when you voted --
21     A  Probably 20 years old probably.
22     Q  Okay.
23     A  18 years ago.
24     Q  When you voted at that time, was that in
25  California?

## Page 36

1      A  That was in California.
2      Q  Okay.
3      A  Pomona.
4      Q  How many cell phones do you use?
5      A  I have -- I have one that I use.
6      Q  Is that a -- what Area Code is that number?
7      A  702.
8      Q  Do you have -- when was the last time you had a
9  cell phone with a California number?
10     A  It's been a while.  Maybe 2005 or something
11  like that.
12     Q  Okay.  But you maintain home phones in your
13  California residences?
14     A  Yeah.  The same number.
15     Q  As everyone knows, you're a famous and well
16  renown professional boxer, but let me ask you about other
17  business activities you're engaged in.  Do you have any
18  businesses that you are operating or a partner in?
19     A  I'm a partner in Golden Boy Promotions.
20     Q  And that's Mr. De La Hoya's company?
21     A  Yeah.
22         MR. BURSTEIN:  Object to the form.  It's also
23  his company.
24         MR. LABAR:  That's right.  Correction.
25     Q  It's your and Mr. De La Hoya's company?

## Page 37

1      A  Me, De La Hoya and Bernard Hopkins.
2      Q  Okay.
3      A  Yeah.
4      Q  And is Golden Boy -- they mostly do their
5  business in California; is that right?  I mean strike
6  that.
7      A  No.
8      Q  Let me ask a better question.
9         Their offices are in California; is that right?
10     A  Yes.
11     Q  And they're in Los Angeles?
12     A  Yes.
13     Q  And do you work out of those offices from time
14  to time?
15     A  No.
16     Q  Have you ever worked in those offices?
17     A  Never.
18     Q  Okay.  And what role do you play with Golden
19  Boy?
20     A  Recruiting fighters.
21     Q  So I would imagine that's a job that's
22  nationwide in scope?
23     A  I'm pretty much everywhere.
24     Q  Other than Golden Boy, are you involved in any
25  other companies?  You mentioned one early, your own Sugar

10  (Pages 34 to 37)

Page 38

1  Shane Productions; is that right?
2      A  Well, Sugar Shane, Inc. that was a company that
3  was formed by me for -- I was going to -- before I went
4  with Golden Boy, I was going to try to manage and promote
5  fighters.
6      Q  And so is Sugar Shane, Inc. is that still in
7  operation or has it sort of been subsumed by your work in
8  Golden Boy?
9      A  No.  It's still in operation.
10     Q  Okay.  What about a company called Mosley and
11  Mosley Real Estate, have you ever heard that before?
12     A  Yes.
13     Q  What is that?
14     A  That's my father's company.
15     Q  Okay.  And were you involved in that company at
16  all?
17     A  Mosley and Mosley, no.  I wasn't involved in
18  that company.
19     Q  So other that Sugar Shane, Inc. and Golden Boy,
20  are you involved in any other businesses?
21     A  No.  My other businesses was Pound For -- Pound
22  For Pound.
23     Q  What was Pound For Pound?
24     A  That was -- that was actually promotional and
25  the Sugar Shane was the management company.

Page 39

1      Q  Did Pound For Pound have offices?
2      A  No.
3      Q  Okay.  Did you run that business out of your
4  home?
5      A  That would be out of my home, yeah.
6      Q  And that would have been out of La Verne,
7  California?
8      A  No.
9      Q  Where would it have been?
10     A  That -- well, it really wouldn't have been
11  La Verne or anyplace.  It was -- it was just a company
12  that was set up.  So it wasn't ran like out of La Verne
13  or -- actually, it's a Nevada Corp. so . . .
14     Q  So it would be run out of wherever you happened
15  to be --
16     A  Right.
17     Q  -- at the time?
18     A  Yeah.
19     Q  Okay.  What states are you licensed to box in?
20     A  Most of the time, I box in Nevada, but Nevada,
21  I think -- am I licensed in California?  I'm not even
22  licensed in California right now.  I'm thinking from -- I
23  mean New York.  So I know actually right now actually New
24  York and Nevada.  That's the two -- yeah.  That would be
25  the two.  Because I haven't fought in California for a

Page 40

1  while.
2          MR. BURSTEIN:  Just answer the questions.
3          THE WITNESS:  Oh.
4  BY MR. LABAR:
5      Q  Okay.  Let me ask you about where you've been
6  spending time recently.  For the year 2008, correct me if
7  I'm wrong, I think you told me that since late March 2008
8  till approximately mid May, you were training in Big
9  Bear; is that right?
10     A  Yes.
11     Q  Okay.  And where were you in January and
12  February and early March of 2008?  Where were you
13  spending your time?
14     A  Um, that I don't know -- where was I in
15  January?  I was in California.  I was in Nevada.  I'm
16  trying to figure out.  I was in Arizona, too.
17     Q  Okay.  Can you give me an estimate of how much
18  time you were spending in California during that period?
19     A  I couldn't tell you.  Maybe two, three weeks.
20  I don't know.
21     Q  Okay.  So of the first three months of 2008,
22  you spent approximately two to three weeks in California?
23     A  The first what?  Say it again.
24     Q  The first three months of 2008, you spent
25  approximately two to three weeks in California; is that

Page 41

1  correct?
2      A  Approximately, yeah.
3      Q  And how much time did you spend in Arizona?
4      A  Not long.  Maybe two, three days.
5      Q  And the rest of the time you spent in Nevada?
6      A  Nevada, I spend about -- I don't know, like
7  two, three weeks in Nevada.  I go back and forth so I'm
8  always hopping around.  There was a fight in Arizona that
9  I was out there with, and there was a fight in Nevada and
10  I stay out there for weeks at a time for promotional
11  stuff, fights.  I don't know.
12     Q  About how many times do you think you went back
13  and forth from California and Nevada in the first three
14  months of the year?
15     A  I couldn't tell you.  I go back -- back and
16  forth a lot.
17     Q  Would you say -- can you give me an estimate?
18  Was it more than ten times?
19     A  It could be about that.  About ten, yeah.
20     Q  Possibly more?
21     A  About that.  I don't know.  About ten.
22     Q  I know you were planning to have this fight in
23  late May that many of us were anxious to watch.  After
24  that fight was over, where did you plan to go?
25     A  Actually, I planned to go to New York.

## Page 42

1  Q  Did you have a vacation planned?
2  A  Yeah, kind of. We wanted to go to New York,
3  but we ended up staying in Vegas. So we're actually all
4  in Vegas right now. The whole family. So I drove back
5  here for this.
6  Q  Okay. But after your fight, did you plan on
7  returning to California to be with your family?
8  A  After the fight?
9  Q  After the fight that was planned for late May,
10  did you plan on returning to California to be with your
11  family?
12  A  Actually, we planned on going to New York, the
13  whole family.
14  Q  And at some point, does your family plan on
15  returning to California after your trip to New York?
16  A  After the summer, yeah.
17  Q  And did you attend -- intend to come back to
18  California with them?
19  A  Yeah. If there was a -- yeah. Yes.
20  Q  Let me ask you about the year 2007. How many
21  fights did you have -- professional fights did you have
22  in 2007?
23  A  Two. There may be a record.
24  Q  I'm sorry?
25  A  There might be record. I don't know. I

## Page 43

1  believe it was two, though.
2  Q  Do you recall who you fought?
3  A  Who did I fight in '07? Vargas. No. Cotto.
4  For Cotto.
5  Q  Cotto?
6  A  Cotto. Who did I fight before that? I don't
7  know.
8  Q  So you basically had two fights in 2007?
9  A  I believe so, yeah.
10  Q  And did you train for those fights in Big Bear
11  as well?
12  A  Yes.
13  Q  And do you intend to keep training for your
14  fights in Big Bear?
15  A  Big Bear is, yeah, the training spot, yeah.
16  Q  And you intend to keep seeing your family
17  obviously and your wife in California, right?
18  A  Yes.
19  Q  And you intend to keep doing business with
20  Golden Boy in California, correct?
21  A  Um, the business is in Nevada, but, yeah. We
22  do our business at the MGM, Mandalay Bay, you know. It's
23  Nevada. But mostly Nevada, but some California.
24  Q  And your children that are school age, they're
25  going to finish school in California; is that correct?

## Page 44

1  A  Only my son, the oldest son, I would like him
2  to finish school in California because he's a junior now
3  and he's going to be a senior next year. Then we plan
4  on -- well, I plan on, you know, moving them out to, you
5  know, Nevada after that.
6  Q  Is your house in La Verne currently for sale?
7  A  No.
8  Q  Was it for sale in April of 2008?
9  A  No.
10  Q  And has your house in Big Bear been for sale at
11  all this year?
12  A  No.
13  Q  And do you intend to sell your house in Big
14  Bear?
15  A  Not at the moment, no.
16  Q  And for the time being, you don't intend to
17  sell your house in La Verne either, correct?
18  A  Well, yeah. We do have plans to -- to do that
19  and we did have a realtor put it up -- well, getting
20  ready to put it up for sale I think in 2006 or '-7. It's
21  a local realtor.
22  Q  And the house did not sell?
23  A  It's kind of hard to sell a house like that.
24  Q  But it was not for sale in 2008; is that
25  correct?

## Page 45

1  A  No.
2  Q  And the current plan is to have your children
3  stay at the La Verne house with your wife until at least
4  your oldest son graduates; is that correct?
5  A  Yes. He's been in the system -- school system
6  for a long time.
7  Q  You mentioned that Mr. Alessi was your CPA for
8  about a year and a half; is that correct?
9  A  Yes.
10  Q  Who was your CPA prior to Mr. Alessi?
11  A  Actually, I didn't have a CPA prior to him.
12  Q  Who handled your financial affairs or did you
13  handle them yourself?
14  A  My mother actually helped me with them.
15  Q  Does your mother handle the filing of your tax
16  returns?
17  A  No. It was actually my auntee.
18  Q  Okay.
19  A  She did that.
20  Q  And what was auntee's name?
21  A  Travee.
22  Q  Could you spell that for me?
23  A  Travee, T-r-a-v-e-e.
24  Q  And was she a Mosley, as well?
25  A  No. Monday, M-o-n-d-- -- like Monday.

12  (Pages 42 to 45)

| Page 46 | Page 48 |
|---|---|
| 1   Q   Okay. Okay. M-o-n-d-a-y? | 1   license in your wallet, correct? |
| 2   A   Yeah. Monday. | 2   A   No. |
| 3   Q   Okay. And was she a CPA or have any kind of | 3   Q   Okay. Do you have one in your possession |
| 4   certification of any type? | 4   anywhere? Did you keep it? |
| 5   A   She was -- a certificate maybe in -- and | 5   A   No. |
| 6   generally the taxes, like that. | 6   Q   Okay. Which banks do you do your personal |
| 7   Q   Was she located in California? | 7   banking with? |
| 8   A   Yes. | 8   A   My personal banking is in Nevada. |
| 9   Q   Do you know what town? | 9   Q   What's the name of the bank? |
| 10   A   Los Angeles. | 10   A   Bank of America. |
| 11   Q   And do you recall what year she handled your | 11   Q   Okay. And when you're in California, you can |
| 12   tax returns for? | 12   use the Bank of America branches that are in California, |
| 13   A   That might have been like from '94 maybe to -- | 13   correct? |
| 14   Q   Till Mr. Alessi took over? | 14   A   Yes. |
| 15   A   Until pretty much, yeah, Alessi. | 15   Q   I asked you about some automobiles and you said |
| 16   Q   And correct me if I'm wrong, but is Mr. Keys | 16   you had some cars registered in Nevada, right? |
| 17   handling that for you now? | 17   A   Two, yes. |
| 18   A   Bob Keys is, yes. | 18   Q   And you have some cars -- or your wife has some |
| 19   Q   Have you ever had a California driver's | 19   cars registered in California that you use from time to |
| 20   license? | 20   time? |
| 21   A   Yes. | 21   A   I think only -- only one. |
| 22   Q   Do you still have one? | 22   Q   Do you own any boats? |
| 23   A   No. | 23   A   No. |
| 24   Q   And when did you give that up? | 24   Q   Helicopters? G5? Anything like that? No? |
| 25   A   I believe in 2000 -- either 2005, I believe, | 25     MR. BURSTEIN: I wish. I wouldn't have to fly |

| Page 47 | Page 49 |
|---|---|
| 1   '-4 or '-5. | 1   commercial. |
| 2   Q   And what were the circumstances of you giving | 2   BY MR. LABAR: |
| 3   that up? Did it just expire and you didn't renew it or | 3   Q   Motorcycles? |
| 4   was there some other situation? | 4   A   No. |
| 5   A   No. Because I had plans to move to -- to Vegas | 5   Q   Okay. Let me ask you what -- we'll mark as |
| 6   even back then and -- permanently. And so I got a | 6   Exhibit 1, a group Exhibit 1. I just want to ask you |
| 7   license and house and everything. | 7   about an address. |
| 8   Q   Okay. And so can you tell me right now if you | 8     (Defendant's Exhibit 1 was marked for |
| 9   have a valid California driver's license? | 9     identification by the court reporter.) |
| 10   A   No. | 10   BY MR. LABAR: |
| 11   Q   And so you don't have a California driver's | 11   Q   The court reporter has marked as group |
| 12   license in your wallet right now, for example? | 12   Exhibit 1 a document. On the first page has a Bates |
| 13   A   For example, right now I have a Nevada license | 13   stamp listing of SM23. Do you see that in the lower |
| 14   and it says -- has, you know -- | 14   right-hand corner? |
| 15     MR. BURSTEIN: Why don't you -- just answer the | 15   A   Oh, yeah. SM23, yeah. |
| 16   question. | 16   Q   I just want to ask you about the address on |
| 17     THE WITNESS: All right. | 17   this. There is an address of Shane Mosley, care of WTAS, |
| 18   BY MR. LABAR: | 18   633 West Fifth Street. Do you see that? |
| 19   Q   So no, you don't -- | 19   A   Yes. |
| 20     MR. BURSTEIN: If you want to see, you can give | 20   Q   Is that Mr. Keys' address? |
| 21   him that -- | 21   A   Yes. |
| 22     THE WITNESS: Yeah, I have it. | 22   Q   Okay. Thank you. |
| 23     MR. LABAR: No, no. That's fine. I think I | 23     Let me show you what we'll mark as Exhibit 2. |
| 24   have a copy of it. | 24     (Defendant's Exhibit 2 was marked for |
| 25   Q   But you don't have a California driver's | 25     identification by the court reporter.) |

13 (Pages 46 to 49)

## Page 50

1    BY MR. LABAR:
2       Q   And Exhibit 2 is a document that has Bates
3    stamp numbers SM46 and 47 on two pages.  Do you see that?
4       A   Uh-huh.  SM46, yeah.
5       Q   If you could turn to the second page, is that
6    your signature on the top of the page?
7       A   Uh, yes.
8       Q   Okay.  Thank you very much.  That's the only
9    questions I have about that.
10          Show you a document we'll mark as Exhibit 3.
11          (Defendant's Exhibit 3 was marked for
12          identification by the court reporter.)
13   BY MR. LABAR:
14      Q   Exhibit 3 is a document Bates stamp numbered
15   SM176.  Do you recognize this document?
16      A   That was -- that's -- let's see.
17          MR. BURSTEIN:  He's asking if you recognize it.
18          THE WITNESS:  Recognize that?  I don't
19   recognize it.
20          MR. BURSTEIN:  If you've seen it.
21          THE WITNESS:  I mean, I don't -- I don't know.
22          MR. LABAR:  Sure.  Let me help.
23      Q   This appears to be some kind of bill from
24   Direct television, satellite TV provider, correct?
25      A   Um, yeah.  DirecTV.

## Page 51

1       Q   Okay.  It shows that this service was billed to
2    your name at the Clayton Court, La Verne, California
3    address, correct?
4           MR. BURSTEIN:  Object to the characterization.
5    BY MR. LABAR:
6       Q   Is that correct, was this billed to your name
7    at the La Verne address?
8       A   Yeah.
9       Q   Okay.  And is it fair to say that you have
10   other bills in your name that go to the Clayton Court,
11   La Verne address?  For example, for water and power and
12   things like that?
13      A   Um, maybe.  I'm not sure because the CPA does
14   that.  So usually he pays the bills for me.
15          MR. BURSTEIN:  Can we go off the record for a
16   second?
17          MR. LABAR:  Sure.
18          (Discussion held off the record.)
19   BY MR. LABAR:
20      Q   This bill appears to state there's service at
21   your name -- in your name for DirecTV at the Clayton
22   Court address, correct?
23      A   Yes.
24      Q   And you have other services in your name at the
25   Clayton Court, La Verne address such as utilities, right?

## Page 52

1       A   Yes.
2           MR. LABAR:  Okay.  Let me show you what we'll
3    mark as the next exhibit in order.
4           (Defendant's Exhibit 4 was marked for
5           identification by the court reporter.)
6           (Discussion held off the record.)
7    BY MR. LABAR:
8       Q   Do you recognize Exhibit 4, sir, as a
9    declaration that you signed in this matter?
10      A   Um, I don't see a signature on here.
11      Q   Okay.
12          MR. BURSTEIN:  I'll represent that this is the
13   signature -- he did sign this.
14          THE WITNESS:  Okay.
15   BY MR. LABAR:
16      Q   Just so you know, the reason why is because
17   this is the one that went electronically to the Court and
18   we don't have real signatures on those documents.  Just
19   so you know where it's coming from.  This was a document
20   filed with the Court.  Okay?
21      A   Okay.
22      Q   Let me ask you to turn to page 3 of this
23   declaration.  In paragraph 11, you mention two companies
24   that you are involved in; is that correct?
25      A   Um, yeah.

## Page 53

1       Q   Okay.  Other than you -- that is, other than
2    you and your wife, does the Sugar Shane Incorporated have
3    any other employees?
4       A   No.
5       Q   Okay.  And other than you, does Pound For Pound
6    Promotions have any other employees?
7       A   No.
8       Q   Paragraph 14 says that, "Since at least 2005, I
9    have filed tax returns as a resident of Nevada."  Do you
10   see that?
11      A   Paragraph what again?
12      Q   Paragraph 14.
13      A   14.  Yes.
14      Q   Okay.  Do you recall exactly when you stopped
15   filing tax returns as a resident of California?
16      A   Um, I can't really recall.
17      Q   And let me ask you as of, say, April 2008, this
18   year, it was your plan and intention to have your family
19   remain in California and your son complete school in
20   California; is that right?
21      A   As of April?
22      Q   Right.
23      A   Um, I would say yeah.  We were going to stay in
24   California, but was going to leave California after the
25   fight, which was May, for a period of time.

14  (Pages 50 to 53)

## Page 54

1    Q  Right.  And you were going to return to
2  California to allow your child to finish school, right?
3    A  To finish school.
4    MR. BURSTEIN:  Object to the form of the
5  question.
6    MR. LABAR:  All right.  Thanks.  Let me just
7  check my notes here and I think we may be done.
8    MR. BURSTEIN:  I may have a couple of
9  questions.
10    MR. LABAR:  That's fine.
11    I do have a question.  Back on?
12    Q  Do you have a passport?
13    A  Yeah.
14    Q  Okay.  And is there any reason why you couldn't
15  provide a copy of that to your attorney?
16    A  Because I didn't have it.
17    Q  Okay.  Where was it located?
18    A  I don't know.  I can't -- I couldn't find it.
19  I'm still looking for it right now.
20    Q  Okay.  Thank you.
21    MR. BURSTEIN:  You better find it soon because
22  you're going to Australia.
23    THE WITNESS:  I know.  I'm going to Australia.
24  I have to get a new one.
25    MR. LABAR:  Takes a long time to get them.

## Page 55

1    I don't have any further questions.
2    MR. BURSTEIN:  I have a couple of questions.
3
4    EXAMINATION
5  BY MR. BURSTEIN:
6    Q  Where is your family residing right now?
7    A  My family is residing in California.
8    Q  Where are they physically located right now?
9    A  Oh, physically located right now?  They're in
10  Las Vegas.
11    Q  And have they been in Las Vegas since the end
12  of the school year?
13    A  Yes.
14    Q  When do you plan to have the family come back
15  to California?
16    A  When school year starts.
17    Q  Okay.  Even when the kids are in school, do you
18  spend time in Las Vegas?
19    A  Yes.
20    Q  All right.  What do you do when you're in Las
21  Vegas?  I mean is there a reason why you stay in Las
22  Vegas other than the fact that you stay at your home?
23    A  Well, a lot of times I'm in Vegas because of
24  all of the big events and fights that -- you know, part
25  of the promotion of Golden Boy, and most of the fights

## Page 56

1  are in Vegas.  So either I'm at the Mandalay Bay, the
2  MGM, Caesars Palace, or wherever.
3    Q  And what grade is your oldest son in school?
4    A  He's a junior, but he's going to be a senior
5  next year.
6    Q  And this fall he's going to be a senior?
7    A  This fall he's going to be a senior.
8    Q  All right.  And after the fall of this year, is
9  it your intention to have Nevada as your exclusive
10  residence?
11    A  It is my intention, yes, to have -- to move the
12  family to Nevada.
13    Q  And how long do you continue to fight -- do you
14  expect to continue to fight?
15    A  Um, I don't -- maybe -- not that long.  I'm not
16  sure how long, whether it be a year or two.
17    Q  Okay.  And do you -- will you be using the Big
18  Bear training facility after you retire?
19    A  I won't personally be using it.  But, like I
20  say, I have other fighters that may be using it, you
21  know.
22    Q  Okay.  And do you have plans -- what do you
23  plan to do with your California home after June of 2009?
24    A  Well, I plan to put it up for sale and move
25  into something in Vegas.

## Page 57

1    Q  Okay.
2    A  With my family.
3    Q  Okay.  And aside from -- do you spend time in
4  Las Vegas alone?
5    A  A lot of times I do.  I spend time alone.
6    Q  And where does your family spend time during
7  the holidays?  Like school vacations?
8    A  Well, they would either go to -- most of the
9  time they're in Vegas.  They'll come to Vegas to see me.
10    MR. BURSTEIN:  Okay.  I have nothing else.
11    MR. LABAR:  Just a couple questions.
12
13    FURTHER EXAMINATION
14  BY MR. LABAR:
15    Q  From time to time when your children are not in
16  school and living in La Verne, do they also come to see
17  you in Big Bear?
18    A  Actually, from time to time, but not really,
19  no.
20    Q  Okay.  And can you give me any percentage of
21  how much time you spent in California versus Nevada in
22  the year 2007?
23    A  I couldn't -- I couldn't tell you.  I mean it
24  could be equally as much because I'm in Nevada or, you
25  know, I'm all over the place.  I'm not just in California

## Page 58

1 and Nevada. I'm everywhere. Wherever the promotion
2 needs me to go, I go.
3    Q   Okay. And just one last question. Throughout
4 this time period, 2007 through 2008, you never intended
5 to remain apart from your family, right?
6    A   In 2007 and 2008?
7    Q   Right.
8    MR. BURSTEIN: Object to the form of question,
9 but you can answer.
10    THE WITNESS: Wait. Could you --
11    MR. LABAR: Sure.
12    THE WITNESS: -- say again?
13 BY MR. LABAR:
14    Q   You've never intended to remain apart from your
15 family, right?
16    A   No, I don't want to be apart from the family.
17    MR. LABAR: All right. Thank you. I have no
18 further questions.
19    MR. BURSTEIN: One more question.
20
21    FURTHER EXAMINATION
22 BY MR. BURSTEIN:
23    Q   When Mr. Labar asked you about apart from your
24 family, are you physically apart from them at times?
25    A   At -- a lot of times I'm physically apart from

## Page 59

1 them, yeah.
2    Q   So what did you understand Mr. Labar to be
3 asking you when -- whether you wanted to be apart?
4    A   Do I want to be apart -- he asked did I want to
5 be, but, you know, I don't want to be, but, you know, I
6 am sometimes.
7    Q   And also you were asked some questions -- I
8 mean I think I forgot to ask you.
9    Golden Boy's offices are in California, right?
10    A   Right.
11    Q   Do you do any work out of their offices in
12 California?
13    A   No.
14    Q   What is the kind of work that you do for Golden
15 Boy?
16    A   The kind of work that I do, I'm -- I recruit
17 fighters. That's --
18    Q   And anything else? Do you go attend events?
19    A   Oh, I attend events, yeah. I -- I recruit
20 fighters, I attend numerous events, and most of the
21 events are done in Vegas.
22    Q   And say a fight is on a Saturday night. How
23 much time do you spend in Vegas in connection with the
24 promotion of that fight during the week before?
25    A   I will spend the whole week from Monday to --

## Page 60

1 from actually Monday to Saturday and sometimes a little
2 bit longer after the fight.
3    Q   And does your son have any plans on -- your
4 oldest son have any boxing plans in his future?
5    A   He does. He's actually an amateur boxer right
6 now. He's 3 and 0. And he actually has plans of being a
7 professional fighter, yes.
8    Q   And do you plan on -- on training him?
9    A   Definitely.
10    Q   And where do you plan on training him?
11    A   I plan on training him in Las Vegas.
12    Q   And why is that?
13    A   Because that's where we'll be moving.
14    Q   All right. And is there any -- is there any
15 place in particular in Las Vegas that you'd be training
16 in?
17    A   Well, there's a gym that's next to my house in
18 Vegas and that's called the Pound For Pound gym.
19    MR. BURSTEIN: Okay. Nothing further.
20    MR. LABAR: Just one last question.
21
22    FURTHER EXAMINATION
23 BY MR. LABAR:
24    Q   Throughout the period of 2007 to 2008, did you
25 train with your son?

## Page 61

1    A   2007 to -- I didn't really train with him
2 because I was actually doing my training, but sometimes
3 he would go to -- up to Big Bear and train as much as he
4 could, and then he had to leave and go back down
5 so . . .
6    Q   And let me just ask this question again and
7 I'll try to be clearer.
8    Throughout the period of time up to -- from
9 2007 to 2008 up to the present, you've always intended to
10 remain with your family as a family unit, right?
11    A   Yes. I want to remain with my family, yes.
12    MR. LABAR: Okay. No further questions.
13    MR. BURSTEIN: I'm sorry. You raised another
14 good question.
15
16    FURTHER EXAMINATION
17 BY MR. BURSTEIN:
18    Q   After you retire, which you said is in a year
19 or two, will you still be -- do you still intend to be
20 spending months at a time at Big Bear?
21    A   After I retire, I probably wouldn't spend
22 months at a time unless -- I'll probably be more -- I'll
23 be more in Vegas, but this is for some of the fighters,
24 Golden Boy fighters, you know, that I recruited. Like --
25 like right now I have to leave to go to Australia for a

### Page 62

1  fighter that I've signed to Golden Boy and stay there for
2  maybe a couple of weeks.
3      MR. BURSTEIN: Okay. Nothing further.
4      MR. LABAR: Okay. Mr. Mosley, you've knocked
5  me out. Thank you for your time.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF CALIFORNIA   )
                         ) ss
2  COUNTY OF LOS ANGELES )
3
4      I, PAMELA J. FELTEN, a Certified Shorthand
5  Reporter, do hereby certify:
6      That prior to being examined, the witness in
7  the foregoing proceedings was by me duly sworn to
8  testify to the truth, the whole truth, and nothing
9  but the truth;
10     That said proceedings were taken before me at
11 the time and place therein set forth and were taken
12 down by me in shorthand and thereafter transcribed
13 into typewriting under my direction and supervision;
14     I further certify that I am neither counsel
15 for, nor related to, any party to said proceedings,
16 nor in anywise interested in the outcome thereof.
17     In witness whereof, I have hereunto subscribed
18 my name.
19
20 Dated: _____
21
22
23          _____
            PAMELA J. FELTEN
            CSR No. 5189
24
25

### Page 63

1
2
3
4
5
6
7      I, SHANE D. MOSLEY, do hereby declare under
8  penalty of perjury that I have read the foregoing
9  transcript; that I have made any corrections as appear
10 noted, in ink, initialed by me; that my testimony as
11 contained herein, as corrected, is true and correct.
12     EXECUTED this _____ day of _____,
13 2008, at _____, _____.
14         (City)        (State)
15
16
17
18
19          _____
            SHANE D. MOSLEY, SR.
20
21
22
23
24
25

| A | | B | |
|---|---|---|---|
| **access** (2) 21:19 22:14 | 59:3, 4 | **back** (12) 9:14 23:2 41:7,12,15,15 42:4,17 47:6 54:11 55:14 61:4 | **blank** (1) 20:13 |
| **accurately** (1) 8:21 | **appear** (1) 63:9 | | **boats** (1) 48:22 |
| **activities** (1) 36:17 | **appearances** (2) 3:1 7:1 | | **Bob** (6) 20:5,7,24 21:2,3 46:18 |
| **actual** (4) 18:11,13 18:14 21:4 | **appears** (2) 50:23 51:20 | **bad** (1) 35:13 | **bodyguard** (3) 29:9 29:12 30:1 |
| **address** (42) 14:14 14:19,21,22 15:8 15:9,12,14,23 16:8,10,15,19,22 17:19,22,23 18:6 18:8,10,11,13,15 18:20,23 19:9,10 20:2 21:10,16,18 22:25 24:3 49:7 49:16,17,20 51:3 51:7,11,22,25 | **appreciate** (2) 21:1 22:4 | **bank** (3) 48:9,10,12 | **born** (3) 12:3,4,15 |
| | **approximate** (2) 5:18 27:19 | **banking** (2) 48:7,8 | **bought** (1) 15:20 |
| | **approximately** (7) 16:1,16 17:13 40:8,22,25 41:2 | **banks** (1) 48:6 | **bout** (2) 33:24,25 |
| | | **basically** (6) 20:23 22:1 25:14 31:2 34:13 43:8 | **box** (2) 39:19,20 |
| | **April** (5) 31:6,11 44:8 53:17,21 | **basis** (3) 23:13,16 23:19 | **boxed** (1) 13:8 |
| | **area** (3) 26:3 34:21 36:6 | **Bates** (3) 49:12 50:2,14 | **boxer** (6) 13:6,9 28:8 34:24 36:16 60:5 |
| **addresses** (2) 14:17 17:18 | **Arizona** (3) 40:16 41:3,8 | **Bay** (2) 43:22 56:1 | **boxing** (10) 11:15 21:15 25:19 28:9 28:11 30:25 32:13 34:9,22 60:4 |
| **administered** (1) 5:5 | **arrests** (1) 28:5 | **Bear** (28) 16:20,22 17:6,7,9,11 24:5 24:9,19 30:17,20 30:22,23 31:19 33:5 34:8,13,15 40:9 43:10,14,15 44:10,14 56:18 57:17 61:3,20 | **Boy** (12) 36:19 37:4 37:19,24 38:4,8 38:19 43:20 55:25 59:15 61:24 62:1 |
| **advice** (2) 29:2,8 | **ARTEAGA** (2) 3:18 27:15 | | |
| **affairs** (1) 45:12 | **ashamed** (1) 35:15 | | **Boy's** (1) 59:9 |
| **Affidavit** (1) 4:12 | **aside** (1) 57:3 | | **branches** (1) 48:12 |
| **age** (2) 26:15 43:24 | **asked** (6) 22:4,11 48:15 58:23 59:4 59:7 | | **Broadway** (1) 3:5 |
| **ages** (1) 26:11 | | **began** (1) 13:6 | **Brook** (2) 18:7 19:4 |
| **ago** (3) 5:22 7:10 35:23 | **asking** (5) 9:11 11:20,24 50:17 59:3 | **beginning** (1) 2:15 | **brought** (1) 11:25 |
| **agreement** (1) 28:2 | **assist** (2) 28:23,25 | **behalf** (1) 2:13 | **built** (1) 31:3 |
| **ahead** (1) 35:3 | **associates** (1) 34:4 | **believe** (14) 6:8 13:23 17:4 19:5,5 21:5 23:24 25:9 26:8 31:6 43:1,9 46:25,25 | **BURSTEIN** (39) 3:4,4 4:5 11:1,3 12:8 12:13 14:4 20:13 22:5,7,9 27:13 28:1 32:6 35:14 36:22 40:2 47:15 47:20 48:25 50:17 50:20 51:4,15 52:12 54:4,8,21 55:2,5 57:10 58:8 58:19,22 60:19 61:13,17 62:3 |
| **Alessi** (5) 15:1 45:7,10 46:14,15 | **assume** (2) 9:7 28:8 | | |
| **Alexander** (1) 30:8 | **athletic** (2) 10:23 11:15 | | |
| **alive** (1) 26:22 | **attend** (5) 12:19 42:17 59:18,19,20 | | |
| **allow** (1) 54:2 | **attention** (2) 6:24 28:16 | **Bell** (1) 26:12 | |
| **amateur** (1) 60:5 | | **Bernard** (1) 37:1 | |
| **ambiguous** (1) 11:4 | **attorney** (11) 3:5 3:12,18 6:5,7,7,8 6:12,18,19 54:15 | **better** (3) 27:13 37:8 54:21 | |
| **America** (2) 48:10 48:12 | | **big** (32) 10:2,4 16:19,22 17:6,7,9 17:11 23:11 24:5 24:9,19 30:17,19 30:22,23 31:19 33:4 34:8,13,15 40:8 43:10,14,15 44:10,13 55:24 56:17 57:17 61:3 61:20 | **business** (11) 20:4 25:17,19,23 26:2 36:17 37:5 39:3 43:19,21,22 |
| **Angeles** (8) 1:15 2:15 5:1 22:22 26:3 37:11 46:10 64:2 | **audible** (1) 8:20 | | |
| | **August** (1) 4:12 | | |
| | **auntee** (1) 45:17 | | |
| | **auntee's** (1) 45:20 | | **businesses** (4) 25:22 36:18 38:20 38:21 |
| **answer** (6) 22:5 32:6 35:2 40:2 47:15 58:9 | **aunts** (1) 27:2 | | |
| | **Australia** (3) 54:22 54:23 61:25 | **bill** (3) 4:13 50:23 51:20 | **buy** (1) 15:23 |
| **anti-disclosure...** 28:2 | **automobiles** (1) 48:15 | **billed** (2) 51:1,6 | **C** | |
| **anxious** (1) 41:23 | | **bills** (2) 51:10,14 | **C** (2) 1:6 2:6 |
| **anyplace** (1) 39:11 | **Avenue** (1) 2:14 | **biologically** (1) 14:10 | **cable** (3) 19:14,17 24:8 |
| **anywise** (1) 64:16 | **a.m** (4) 2:16,16 5:2 5:2 | **bird** (1) 16:24 | **Caesars** (1) 56:2 |
| **apart** (8) 58:5,14 58:16,23,24,25 | | **bit** (1) 60:2 | **Calico** (2) 18:7 |

19:4
California (70) 1:2
1:15 2:2,15 3:14
4:14 5:1 10:18
12:4 13:4 15:13
16:20 19:10 21:25
23:3,23 24:2
26:19 27:7 28:6
31:20 34:14 35:4
35:25 36:1,9,13
37:5,9 39:7,21,22
39:25 40:15,18,22
40:25 41:13 42:7
42:10,15,18 43:17
43:20,23,25 44:2
46:7,19 47:9,11
47:25 48:11,12,19
51:2 53:15,19,20
53:24,24 54:2
55:7,15 56:23
57:21,25 59:9,12
64:1
call (1) 20:10
called (5) 7:22
9:17 25:20 38:10
60:18
calls (1) 26:1
camp (1) 30:17
cancelled (3) 31:14
31:16 33:22
car (17) 21:21,23
21:24,25 22:1,14
22:16,21,24 23:1
23:7,8,12,15,18
23:22,25
care (2) 32:4 49:17
career (2) 13:6
31:23
cars (5) 22:2 24:5
48:16,18,19
case (5) 7:3,4,7
8:5 11:25
cell (2) 36:4,9
central (1) 18:18
certificate (1)
46:5
certification (1)
46:4
Certified (2) 2:18
64:4
certify (2) 64:5,14
characterizatio...
51:4
chart (1) 34:5
check (1) 54:7

child (1) 54:2
children (10) 14:7
14:9,11 16:12
19:14 26:8,15
43:24 45:2 57:15
chiropractors (1)
33:14
circumstances (1)
47:2
City (1) 63:14
clarify (1) 9:12
Clayton (7) 4:14
16:10,15 51:2,10
51:21,25
clearer (1) 61:7
clothes (1) 21:12
clothing (3) 21:9
24:18,23
code (2) 17:3 36:6
come (5) 23:2 42:17
55:14 57:9,16
coming (1) 52:19
commercial (1) 49:1
companies (2) 37:25
52:23
company (12) 7:22
25:21 36:20,23,25
38:2,10,14,15,18
38:25 39:11
complete (1) 53:19
concerned (1) 34:9
confidential (1)
28:2
connection (2) 6:3
59:23
considered (1)
17:11
contained (1) 63:11
Conte (3) 1:7 2:7
12:1
continue (4) 8:19
13:4 56:13,14
continuously (2)
31:8,13
conversations (1)
21:6
convictions (1)
28:6
copy (2) 47:24
54:15
corner (1) 49:14
Corp (1) 39:13
corporation (1)
20:25
correct (26) 7:4

10:18 13:7,25
14:7 15:6,10
22:22 26:3 40:6
41:1 43:20,25
44:17,25 45:4,8
46:16 48:1,13
50:24 51:3,6,22
52:24 63:11
corrected (1) 63:11
Correction (1)
36:24
corrections (1)
63:9
Cotto (4) 43:3,4,5
43:6
counsel (1) 64:14
county (5) 6:9,11
8:8,10 64:2
couple (8) 6:22 7:9
34:13,17 54:8
55:2 57:11 62:2
court (20) 1:1 2:1
4:14 6:22 7:1
8:17,20 16:10,15
49:9,11,25 50:12
51:2,10,22,25
52:5,17,20
CPA (8) 14:22 15:3
15:9 45:7,10,11
46:3 51:13
CSR (2) 1:25 64:23
current (1) 45:2
currently (3) 13:25
16:13 44:6
cut (2) 29:6,21

_____D_____

D (9) 1:4,13 2:4,12
4:2,15 5:4 63:7
63:19
DANIELLE (1) 3:18
date (1) 27:16
Dated (1) 64:20
DAVID (1) 3:19
day (2) 34:1 63:12
days (1) 41:4
day-to-day (4)
23:13,16,19 25:25
De (3) 36:20,25
37:1
declaration (3)
4:15 52:9,23
declare (1) 63:7
Defendant (4) 1:8
2:8,13 3:10

Defendant's (5)
4:10 49:8,24
50:11 52:4
Definitely (2) 9:5
60:9
dentist (4) 32:25
33:1,3,4
deposed (3) 6:21
7:4,5
deposition (6) 1:13
2:12 5:14 6:3 7:6
11:18
depositions (4)
5:23 6:25 7:14,16
describe (1) 29:4
described (1) 31:13
describing (1) 29:5
details (3) 9:24
10:9,12
Diego (1) 33:20
different (9) 7:7
11:13 18:19 20:2
20:22,24 22:12
29:8 30:13
Direct (1) 50:24
direction (1) 64:13
DirecTV (3) 4:13
50:25 51:21
Discussion (2)
51:18 52:6
disgraceful (1)
35:15
DISTRICT (4) 1:1,2
2:1,2
doctor (6) 31:24,25
32:2,10,11,13
doctors (1) 30:11
document (6) 49:12
50:2,10,14,15
52:19
documents (2) 14:18
52:18
doing (6) 8:19,24
8:24 9:1 43:19
61:2
domicile (1) 11:20
door (1) 15:20
Dr (1) 32:12
drive (8) 22:2,16
22:21 23:3,4,18
23:25 24:3
driver's (4) 46:19
47:9,11,25
drove (1) 42:4
duly (1) 64:7

| E | F | | |
|---|---|---|---|
| **early** (3) 31:10 | **facility** (2) 30:25 | **find** (2) 54:18,21 | 11:14 34:1 |
| 37:25 40:12 | 56:18 | **fine** (2) 47:23 | **gives** (1) 29:12 |
| **eight** (3) 13:8 | **fact** (1) 55:22 | 54:10 | **giving** (1) 47:2 |
| 16:16 28:15 | **fair** (1) 51:9 | **finish** (5) 35:2 | **Glenn** (2) 29:22,23 |
| **either** (5) 16:4 | **fall** (3) 56:6,7,8 | 43:25 44:2 54:2,3 | **Gluckman** (2) 32:12 |
| 44:17 46:25 56:1 | **familiar** (5) 14:18 | **firm** (2) 20:10,12 | **go** (19) 9:14 20:3 |
| 57:8 | 15:14,15 17:19 | **first** (10) 5:5,23 | 21:2 26:5 35:3 |
| **election** (1) 35:10 | 18:7 | 6:20 8:1 26:12 | 41:7,15,24,25 |
| **electric** (2) 19:20 | **family** (22) 25:1 | 40:21,23,24 41:13 | 42:2 51:10,15 |
| 24:12 | 26:22 42:4,7,11 | 49:12 | 57:8 58:2,2 59:18 |
| **electronically** (1) | 42:13,14 43:16 | **five** (3) 5:19,20 | 61:3,4,25 |
| 52:17 | 53:18 55:6,7,14 | 26:8 | **goes** (1) 20:2 |
| **employees** (2) 53:3 | 56:12 57:2,6 58:5 | **fly** (2) 23:5 48:25 | **going** (19) 11:20,24 |
| 53:6 | 58:15,16,24 61:10 | **focus** (2) 6:24 | 15:21,21 29:22 |
| **ended** (1) 42:3 | 61:10,11 | 28:16 | 30:19 38:3,4 |
| **engaged** (1) 36:17 | **famous** (1) 36:15 | **follows** (1) 5:6 | 42:12 43:25 44:3 |
| **enrolled** (2) 26:16 | **far** (2) 21:7 34:9 | **forced** (1) 35:17 | 53:23,24 54:1,22 |
| 26:18 | **father** (8) 26:22 | **foregoing** (2) 63:8 | 54:23 56:4,6,7 |
| **Enter** (1) 28:2 | 28:10,12,17,20,24 | 64:7 | **Golden** (13) 36:19 |
| **entity** (1) 9:17 | 29:19 34:3 | **forgot** (1) 59:8 | 37:4,18,24 38:4,8 |
| **equally** (1) 57:24 | **father's** (1) 38:14 | **form** (3) 36:22 54:4 | 38:19 43:20 55:25 |
| **Escalade** (6) 21:25 | **February** (1) 40:12 | 58:8 | 59:9,14 61:24 |
| 22:17,18 23:9,10 | **feel** (1) 35:13 | **formed** (1) 38:3 | 62:1 |
| 23:11 | **FELTEN** (4) 1:24 | **former** (1) 15:9 | **good** (2) 5:10 61:14 |
| **Estate** (1) 38:11 | 2:18 64:4,23 | **forms** (1) 4:11 | **grade** (1) 56:3 |
| **estimate** (2) 40:17 | **Fernando** (1) 27:20 | **forth** (5) 23:2 41:7 | **graduate** (1) 12:24 |
| 41:17 | **field** (1) 33:14 | 41:13,16 64:11 | **graduated** (1) 13:3 |
| **events** (5) 55:24 | **Fifth** (1) 49:18 | **fought** (2) 39:25 | **graduates** (1) 45:4 |
| 59:18,19,20,21 | **fight** (32) 27:21 | 43:2 | **Grand** (2) 10:18,20 |
| **Everybody** (1) 29:1 | 29:15,19,24 30:5 | **four** (5) 5:20,20,23 | **Great** (2) 9:10 |
| **EVS** (1) 23:10 | 30:15,18 31:5,14 | 14:10 26:14 | 12:13 |
| **EVX** (1) 23:10 | 31:16,18 32:21 | **Francisco** (1) 3:14 | **grew** (1) 12:18 |
| **exactly** (1) 53:14 | 33:7,7,8,19,21 | **friends** (1) 32:2 | **group** (2) 49:6,11 |
| **EXAMINATION** (7) 4:1 | 41:8,9,22,24 42:6 | **further** (10) 55:1 | **groups** (1) 11:15 |
| 5:8 55:4 57:13 | 42:8,9 43:3,6 | 57:13 58:18,21 | **grow** (1) 12:17 |
| 58:21 60:22 61:16 | 53:25 56:13,14 | 60:19,22 61:12,16 | **guilty** (1) 35:13 |
| **examined** (2) 5:5 | 59:22,24 60:2 | 62:3 64:14 | **gym** (10) 30:25 31:3 |
| 64:6 | **fighter** (2) 60:7 | **future** (1) 60:4 | 34:7,12,22,23,25 |
| **example** (4) 25:1 | 62:1 | | 35:7 60:17,18 |
| 47:12,13 51:11 | **fighters** (8) 34:18 | G | **gyms** (4) 34:13,20 |
| **excellent** (1) 9:1 | 37:20 38:5 56:20 | **gas** (2) 19:20 24:11 | 35:5,6 |
| **exclusive** (1) 56:9 | 59:17,20 61:23,24 | **gear** (3) 21:15,17 | **G-Wagon** (2) 23:21 |
| **EXECUTED** (1) 63:12 | **fights** (8) 41:11 | 24:18 | 24:3 |
| **exhibit** (13) 49:6,6 | 42:21,21 43:8,10 | **general** (1) 10:10 | **G5** (1) 48:24 |
| 49:8,12,23,24 | 43:14 55:24,25 | **generally** (1) 46:6 | |
| 50:2,10,11,14 | **figure** (1) 40:16 | **gentleman** (2) 9:16 | H |
| 52:3,4,8 | **filed** (3) 4:15 | 9:18 | **half** (3) 15:4 19:2 |
| **EXHIBITS** (1) 4:9 | 52:20 53:9 | **gentleman's** (2) | 45:8 |
| **expect** (1) 56:14 | **filing** (2) 45:15 | 14:25 30:7 | **handle** (2) 45:13,15 |
| **expire** (1) 47:3 | 53:15 | **getting** (1) 44:19 | **handled** (2) 45:12 |
| **explain** (1) 26:6 | **fill** (1) 20:14 | **give** (9) 5:18 8:19 | 46:11 |
| **EXT** (3) 21:25 22:17 | **films** (1) 34:6 | 26:11 29:2 40:17 | **handles** (1) 25:25 |
| 22:18 | **financial** (4) 20:7 | 41:17 46:24 47:20 | **handling** (1) 46:17 |
| **ex-CPA** (1) 14:24 | 25:7,9 45:12 | 57:20 | **happen** (2) 29:15 |
| | | **given** (4) 10:17,23 | 31:5 |

happened (2) 10:13
  39:14
happening (2) 6:10
  34:1
hard (1) 44:23
hear (1) 12:11
heard (2) 9:7 38:11
held (2) 51:18 52:6
Helicopters (1)
  48:24
help (1) 50:22
helped (1) 45:14
hereunto (1) 64:17
hide (1) 27:13
high (7) 12:19,22
  12:23,24 13:3,7
  35:17
holidays (1) 57:7
home (27) 15:5,17
  15:18,18 16:19,22
  17:23 18:4,11,13
  18:15,18 19:9,11
  19:23 23:9 24:9
  26:6 30:22,23
  34:7 35:7 36:12
  39:4,5 55:22
  56:23
homes (1) 16:5
Hopkins (1) 37:1
hopping (1) 41:8
house (23) 15:20
  19:19 22:13 24:19
  24:22,24 25:2,4,8
  26:7 31:2,2,3
  34:23 44:6,10,13
  44:17,22,23 45:3
  47:7 60:17
houses (1) 17:25
Houston (1) 34:18
Hoya (1) 37:1
Hoya's (2) 36:20,25

            I
identification (4)
  49:9,25 50:12
  52:5
imagine (1) 37:21
important (1) 27:15
Incorporated (1)
  53:2
INDEX (1) 4:1
Information (2)
  4:20 20:16
Inglewood (1) 12:5
initialed (1) 63:10

ink (1) 63:10
input (1) 29:12
intend (7) 42:17
  43:13,16,19 44:13
  44:16 61:19
intended (3) 58:4
  58:14 61:9
intention (3) 53:18
  56:9,11
interested (1)
  64:16
involved (6) 9:15
  37:24 38:15,17,20
  52:24
involving (3) 7:3
  9:16,17
Island (1) 34:11
items (2) 24:22,23
IVO (1) 3:12

            J
J (4) 1:24 2:18
  64:4,23
Jackson (3) 17:19
  18:20,23
January (2) 40:11
  40:15
Jburstein@burla...
  3:7
Jimmy (1) 29:22
Jin (1) 14:3
job (4) 9:1 26:5
  29:1 37:21
jobs (1) 29:4
Jr (1) 26:12
JSW (2) 1:6 2:6
JUDD (2) 3:4,4
July (3) 1:14 2:17
  5:1
Junction (3) 17:20
  18:20,23
June (1) 56:23
junior (2) 44:2
  56:4
Juries (1) 10:21
Jury (1) 10:18
J-i-n (2) 14:4,5

            K
keep (15) 12:8
  19:13 21:9,15
  24:8,18,22,23
  33:25 34:2,4
  43:13,16,19 48:4
Kelly (1) 34:24

KERR (1) 3:11
Kevin (1) 34:24
Keys (8) 20:5,7,24
  21:2,3 46:16,18
  49:20
kids (1) 55:17
kind (11) 11:2 15:5
  32:5,10 33:25
  42:2 44:23 46:3
  50:23 59:14,16
knew (2) 20:22,23
knocked (1) 62:4
know (48) 5:17,25
  6:6,9,12 7:12,17
  7:21 15:24 16:2
  17:3,5,10 18:16
  18:18 23:10 24:1
  25:25 28:15 32:2
  32:3 34:3 35:14
  39:23 40:14,20
  41:6,11,21,22
  42:25 43:7,22
  44:4,5 46:9 47:14
  50:21 52:16,19
  54:18,23 55:24
  56:21 57:25 59:5
  59:5 61:24
knowledge (2) 10:15
  23:22
knows (1) 36:15

            L
La (40) 4:14 13:20
  13:21,22 14:15,15
  14:16 16:8 19:10
  19:19 21:9,16,18
  22:13,25 23:9
  24:3,22,24 25:2,5
  25:8 26:3 35:4,6
  35:7 36:20,25
  37:1 39:6,11,12
  44:6,17 45:3 51:2
  51:7,11,25 57:16
Labar (45) 3:12 4:4
  5:9 11:2,6,8
  12:11,14 14:6
  20:15,19 22:10
  27:18 28:4 32:8
  35:19 36:24 40:4
  47:18,23 49:2,10
  50:1,13,22 51:5
  51:17,19 52:2,7
  52:15 54:6,10,25
  57:11,14 58:11,13
  58:17,23 59:2

  60:20,23 61:12
  62:4
Labar@kerrwagst...
  3:15
Lake (1) 17:11
Las (12) 17:20 18:7
  34:12,21 55:10,11
  55:18,20,21 57:4
  60:11,15
late (4) 31:10 40:7
  41:23 42:9
Laughter (1) 28:3
law (4) 3:5,12,18
  8:17
lawsuit (5) 6:4,10
  8:9 9:16,17
lawsuits (7) 8:12
  9:15,20 10:2,7,10
  10:13
leave (4) 20:13
  53:24 61:4,25
left (1) 34:16
let's (1) 50:16
license (6) 46:20
  47:7,9,12,13 48:1
licensed (3) 39:19
  39:21,22
limited (1) 11:19
Line (1) 4:21
listing (1) 49:13
little (1) 60:1
live (9) 11:21
  13:11,15 14:11,13
  16:13 26:24 27:4
  28:20
lives (4) 14:14
  18:23 28:21 30:16
living (6) 13:4,17
  30:14,22 31:19
  57:16
LLP (1) 3:11
local (1) 44:21
located (5) 32:11
  46:7 54:17 55:8,9
location (1) 18:20
log (3) 34:1,1,2
logs (1) 34:4
Loma (3) 15:13,16
  15:19
long (14) 5:22 7:10
  15:3 17:12 18:1
  19:1 34:11 35:11
  41:4 45:6 54:25
  56:13,15,16
longer (2) 19:3

60:2
**looking (1)** 54:19
**Los (8)** 1:15 2:15
 5:1 22:21 26:3
 37:11 46:10 64:2
**lot (6)** 32:1 34:25
 41:16 55:23 57:5
 58:25
**lower (1)** 49:13
**Lynwood (4)** 12:4,6
 12:7,17
**L.A (3)** 6:11 8:10
 21:5

_____
**M**
**mail (4)** 19:25 20:1
 20:2 24:16
**maintain (1)** 36:12
**man (2)** 29:6,21
**manage (1)** 38:4
**management (5)** 20:6
 20:22,24,25 38:25
**manager (1)** 20:7
**Mandalay (2)** 43:22
 56:1
**March (9)** 31:6,6,7
 31:9,10 32:21,23
 40:7,12
**MARCHIANO (1)** 3:19
**mark (5)** 28:1 49:5
 49:23 50:10 52:3
**marked (5)** 49:8,11
 49:24 50:11 52:4
**marketing (1)** 20:21
**married (5)** 13:25
 27:6,6,9,21
**massage (2)** 33:16
 33:19
**matter (1)** 52:9
**mean (11)** 6:22 10:6
 10:7 11:1 18:14
 37:5 39:23 50:21
 55:21 57:23 59:8
**means (1)** 11:4
**Medford (1)** 14:19
**medical (4)** 30:11
 31:24,25 32:10
**Mee-Yon (1)** 26:14
**member (2)** 10:24
 11:16
**memory (1)** 7:13
**mention (1)** 52:23
**mentioned (3)** 7:24
 37:25 45:7
**Mercedes (1)** 23:21

**merits (1)** 11:25
**MGM (2)** 43:22 56:2
**mid (2)** 31:16 40:8
**misunderstood (1)**
 22:11
**moment (1)** 44:15
**Monday (5)** 45:25,25
 46:2 59:25 60:1
**money (5)** 20:6,21
 20:22,24,24
**months (5)** 40:21,24
 41:14 61:20,22
**morning (1)** 5:10
**Mosley (19)** 1:4,13
 2:4,12 4:2,12,15
 5:4,12 14:3 38:10
 38:11,17,17 45:24
 49:17 62:4 63:7
 63:19
**mother (4)** 26:22
 35:16 45:14,15
**Motorcycles (1)**
 49:3
**move (4)** 13:21 47:5
 56:11,24
**moved (1)** 16:8
**moving (2)** 44:4
 60:13
**M-o-n-d (1)** 45:25
**M-o-n-d-a-y (1)**
 46:1
**M-o-s-l-e-y (1)**
 5:13

_____
**N**
**Najee (1)** 26:13
**name (21)** 5:10,13
 6:12 7:24 14:2,25
 20:5,10,12,24
 30:7 34:23 45:20
 48:9 51:2,6,10,21
 51:21,24 64:18
**named (2)** 9:16,18
**nationwide (1)**
 37:22
**nature (2)** 10:10
 11:19
**needs (1)** 58:2
**neither (1)** 64:14
**Nevada (28)** 17:20
 18:7 22:19,21
 23:3 39:13,20,20
 39:24 40:15 41:5
 41:6,7,9,13 43:21
 43:23,23 44:5

**47:13 48:8,16
 53:9 56:9,12
 57:21,24 58:1
**never (5)** 22:24
 23:5 37:17 58:4
 58:14
**new (13)** 3:6 14:19
 15:6 29:10 30:16
 34:11 39:23,23
 41:25 42:2,12,15
 54:24
**night (1)** 59:22
**Nobel (3)** 30:8,10
 30:14
**Noble (1)** 30:9
**normally (1)** 23:18
**Norman (1)** 26:12
**NORTHERN (2)** 1:2
 2:2
**notarized (1)** 4:12
**noted (1)** 63:10
**notes (1)** 54:7
**number (4)** 5:18
 36:6,9,14
**numbered (1)** 50:14
**numbers (1)** 50:3
**numerous (1)** 59:20
**NY (1)** 3:6
**N-o-b-e-l (1)** 30:9

_____
**O**
**oath (3)** 5:5 8:13
 8:16
**object (5)** 11:3
 36:22 51:4 54:4
 58:8
**obviously (5)** 18:19
 19:13,20 24:11
 43:17
**occurred (3)** 7:6
 32:18,20
**office (3)** 21:2,5
 26:5
**offices (6)** 37:9,13
 37:16 39:11 59:9
 59:11
**oh (8)** 7:17 12:10
 19:9 22:6 40:3
 49:15 55:9 59:19
**okay (129)** 5:16,18
 6:1,6,9,20,24 7:1
 7:11,20 8:11,22
 9:2,6,12,13 10:4
 10:14,16 11:6,24
 12:1,2,7,11,13

**13:3,6,11,14,21
 14:14,17,23,25
 15:12 16:5 17:17
 17:24 18:1,14
 19:6,13,23 20:7
 21:1,9,12,18 22:8
 22:9,21,24 23:2,7
 23:18,22 24:5,8
 24:11 25:1,13,15
 26:15,21 27:11
 28:20 29:7,11
 30:18 31:4,12
 32:9,16 33:16,24
 34:7 35:1,20,22
 36:2,12 37:2,18
 38:10,15 39:3,19
 40:5,11,17,21
 42:6 45:18 46:1,1
 46:3 47:8 48:3,6
 48:11 49:5,22
 50:8 51:1,9 52:2
 52:11,14,20,21
 53:1,5,14 54:14
 54:17,20 55:17
 56:17,22 57:1,3
 57:10,20 58:3
 60:19 61:12 62:3
 62:4
**old (4)** 13:8 15:18
 15:18 35:21
**oldest (4)** 44:1
 45:4 56:3 60:4
**ones (2)** 10:4,5
**operating (1)** 36:18
**operation (2)** 38:7
 38:9
**opposed (1)** 22:7
**order (1)** 52:3
**organizations (2)**
 10:24 11:15
**Ortiz (4)** 7:18 8:1
 8:3 9:18
**Oscar (1)** 27:20
**outcome (1)** 64:16
**outside (1)** 34:16
**owned (3)** 16:15
 17:12 18:1
**owner (2)** 17:15,16

_____
**P**
**page (6)** 4:10,21
 49:12 50:5,6
 52:22
**pages (1)** 50:3
**Palace (1)** 56:2

**PAMELA (4)** 1:24
  2:18 64:4,23
**paragraph (4)** 52:23
  53:8,11,12
**part (2)** 28:1 55:24
**particular (1)**
  60:15
**partner (2)** 36:18
  36:19
**party (4)** 9:21
  10:10 11:16 64:15
**passport (1)** 54:12
**Patrick (4)** 7:18,25
  8:3 9:18
**pays (1)** 51:14
**Pedro (1)** 32:15
**penalty (1)** 63:8
**pending (1)** 8:9
**people (4)** 20:6,21
  29:5 33:14
**percentage (1)**
  57:20
**period (8)** 21:13
  31:13 34:12 40:18
  53:25 58:4 60:24
  61:8
**perjury (1)** 63:8
**permanently (1)**
  47:6
**person (1)** 32:1
**personal (5)** 24:21
  24:23 25:7 48:6,8
**personally (1)**
  56:19
**phone (6)** 19:23
  21:7 24:14 25:25
  26:1 36:9
**phones (2)** 36:4,12
**photos (1)** 24:24
**physical (1)** 18:20
**physically (4)** 55:8
  55:9 58:24,25
**physician (1)** 32:4
**picking (1)** 34:18
**pictures (1)** 25:4
**place (3)** 57:25
  60:15 64:11
**Plaintiff (3)** 1:5
  2:5 3:3
**plan (14)** 41:24
  42:6,10,14 44:3,4
  45:2 53:18 55:14
  56:23,24 60:8,10
  60:11
**planned (4)** 41:25

42:1,9,12
**planning (1)** 41:22
**plans (6)** 44:18
  47:5 56:22 60:3,4
  60:6
**play (1)** 37:18
**please (4)** 5:10
  8:19 9:3,11
**point (4)** 6:18 10:7
  18:25 42:14
**Pomona (16)** 12:18
  12:19,20,23,24
  13:3,13,16,17,22
  15:13,16 26:25
  27:5 28:21 36:3
**portraits (1)** 25:2
**possession (1)** 48:3
**possible (1)** 16:19
**Possibly (1)** 41:20
**Pound (3)** 34:22,22
  38:21,21,22,23,23
  39:1,1 53:5,5
  60:18,18
**power (2)** 19:21
  51:11
**preparation (6)**
  29:18,24 30:5,14
  30:18 33:25
**preparing (1)** 31:4
**present (2)** 3:17
  61:9
**pretty (5)** 7:8
  28:14 31:12 37:23
  46:15
**previously (1)** 6:25
**primarily (1)** 26:2
**primary (4)** 28:12
  28:14,17 32:4
**prior (5)** 33:22,23
  45:10,11 64:6
**probably (9)** 15:24
  16:2 27:23 33:12
  35:17,21,21 61:21
  61:22
**proceeding (1)** 8:13
**proceedings (4)**
  10:17 64:7,10,15
**Productions (1)**
  38:1
**professional (6)**
  13:9 28:8 33:16
  36:16 42:21 60:7
**professionals (1)**
  31:22
**progress (1)** 34:5

**promote (1)** 38:4
**promoter (2)** 8:1,2
**promotion (3)** 55:25
  58:1 59:24
**promotional (2)**
  38:24 41:10
**Promotions (2)**
  36:19 53:6
**properly (1)** 9:7
**property (5)** 17:12
  17:14 18:2,6 19:4
**provide (1)** 54:15
**provider (1)** 50:24
**purchased (1)** 19:4
**put (4)** 31:3 44:19
  44:20 56:24
**putting (1)** 27:12
**P.C (1)** 3:4

_____

**Q**

_____

**question (15)** 9:6
  11:9 22:5,12
  30:13 37:8 47:16
  54:5,11 58:3,8,19
  60:20 61:6,14
**questions (13)** 9:3
  9:10 11:20 32:6
  40:2 50:9 54:9
  55:1,2 57:11
  58:18 59:7 61:12

_____

**R**

_____

**raised (1)** 61:13
**ran (1)** 39:12
**rarely (1)** 23:6
**read (1)** 63:8
**ready (1)** 44:20
**real (3)** 7:16 38:11
  52:18
**really (13)** 10:3,6
  25:24 28:10,25
  29:1 31:25 33:1
  34:2 39:10 53:16
  57:18 61:1
**realtor (2)** 44:19
  44:21
**reason (3)** 52:16
  54:14 55:21
**rebuild (2)** 15:21
  15:22
**recall (15)** 5:22
  8:8 9:20 10:3,5,7
  32:18,20 33:2,6
  35:12 43:2 46:11
  53:14,16

**receive (3)** 19:25
  20:2 24:16
**recognize (5)** 50:15
  50:17,18,19 52:8
**record (7)** 5:11
  25:24 42:23,25
  51:15,18 52:6
**records (2)** 15:25
  25:7
**recruit (2)** 59:16
  59:19
**recruited (1)** 61:24
**Recruiting (1)**
  37:20
**referred (1)** 22:19
**regimen (1)** 21:16
**registered (7)**
  21:24 22:2,3,19
  23:23 48:16,19
**regularly (5)** 29:23
  30:2,4 31:24 32:1
**related (1)** 64:15
**relatives (1)** 27:2
**relevant (1)** 15:8
**remain (5)** 53:19
  58:5,14 61:10,11
**remember (5)** 7:17
  9:24 10:9,12
  27:15
**renew (1)** 47:3
**renown (1)** 36:16
**rented (2)** 18:25
  19:1
**repeat (1)** 18:12
**Reported (1)** 1:24
**reporter (9)** 2:19
  8:20 12:12 49:9
  49:11,25 50:12
  52:5 64:5
**represent (1)** 52:12
**requested (2)** 4:20
  20:16
**reside (1)** 11:21
**residence (2)** 15:6
  56:10
**residences (1)**
  36:13
**resident (2)** 53:9
  53:15
**residential (3)**
  18:4 19:11,12
**residing (2)** 55:6,7
**respond (1)** 9:6
**response (1)** 9:8
**responses (1)** 8:20

**rest (1)** 41:5
**retire (3)** 56:18
  61:18,21
**return (1)** 54:1
**returning (3)** 42:7
  42:10,15
**returns (4)** 45:16
  46:12 53:9,15
**right (57)** 8:21 9:4
  9:8 12:19 13:11
  15:3 17:8 18:19
  18:21 19:21 24:12
  24:21 26:9 27:24
  28:9 29:15,19
  32:17 33:9 34:22
  36:24 37:5,9 38:1
  39:16,22,23 40:9
  42:4 43:17 47:8
  47:12,13,17 48:16
  51:25 53:20,22
  54:1,2,6,19 55:6
  55:8,9,20 56:8
  58:5,7,15,17 59:9
  59:10 60:5,14
  61:10,25
**right-hand (1)**
  49:14
**Ringside (4)** 7:18
  7:22,25 9:18
**role (1)** 37:18
**rules (1)** 8:13
**run (2)** 39:3,14

**S**
**sale (6)** 44:6,8,10
  44:20,24 56:24
**Salvador (1)** 14:25
**San (3)** 3:14 32:15
  33:20
**satellite (2)** 24:8
  50:24
**Saturday (2)** 59:22
  60:1
**says (2)** 47:14 53:8
**school (21)** 12:20
  12:22 13:4,7
  26:15,16,18 35:17
  43:24,25 44:2
  45:5 53:19 54:2,3
  55:12,16,17 56:3
  57:7,16
**scope (1)** 37:22
**second (2)** 50:5
  51:16
**see (13)** 21:2 31:24

32:1,14 47:20
49:13,18 50:3,16
52:10 53:10 57:9
57:16
**seeing (1)** 43:16
**seen (2)** 14:18
  50:20
**sell (6)** 16:3,6
  44:13,17,22,23
**senior (4)** 44:3
  56:4,6,7
**service (3)** 4:13
  51:1,20
**services (1)** 51:24
**set (2)** 39:12 64:11
**seven (5)** 16:17,18
  17:13 26:13,13
**Shane (21)** 1:4,13
  2:4,12 4:2,12,15
  5:4,12 12:8 25:21
  26:12 38:1,2,6,19
  38:25 49:17 53:2
  63:7,19
**shorthand (3)** 2:18
  64:4,12
**show (3)** 49:23
  50:10 52:2
**shows (1)** 51:1
**sign (1)** 52:13
**signature (3)** 50:6
  52:10,13
**signatures (1)**
  52:18
**signed (3)** 32:21
  52:9 62:1
**sir (6)** 12:3,15
  25:11 27:6 28:8
  52:8
**sister (2)** 27:3,4
**situation (1)** 47:4
**six (1)** 26:13
**slightly (2)** 22:4
  22:12
**small (3)** 7:17 10:5
  17:6
**SM176 (1)** 50:15
**SM23 (2)** 49:13,15
**SM46 (2)** 50:3,4
**Snow (1)** 17:8
**sold (3)** 16:4,5,7
**sole (2)** 17:15,16
**son (9)** 26:12 44:1
  44:1 45:4 53:19
  56:3 60:3,4,25
**soon (1)** 54:21

**sorry (7)** 12:10
  13:18 19:10 27:12
  35:1 42:24 61:13
**sort (2)** 20:7 38:7
**Spear (1)** 3:13
**specific (1)** 30:25
**spell (2)** 5:10
  45:22
**spend (9)** 41:3,6
  55:18 57:3,5,6
  59:23,25 61:21
**spending (4)** 40:6
  40:13,18 61:20
**spent (4)** 40:22,24
  41:5 57:21
**sports (2)** 28:9
  30:25
**spot (2)** 27:12
  43:15
**spouse (1)** 25:11
**Sr (4)** 1:4 2:4 4:15
  63:19
**ss (1)** 64:1
**stamp (3)** 49:13
  50:3,14
**stand (2)** 10:2,5
**Stars (1)** 2:14
**starts (1)** 55:16
**state (8)** 5:10 6:9
  8:8 13:12 28:6
  51:20 63:14 64:1
**states (3)** 1:1 2:1
  39:19
**stay (10)** 18:16
  19:6,6 21:13
  41:10 45:3 53:23
  55:21,22 62:1
**staying (3)** 23:9
  30:23 42:3
**stepson (1)** 14:10
**stopped (1)** 53:14
**Street (3)** 3:13
  16:23 49:18
**strike (3)** 28:22
  30:11 37:5
**structures (1)**
  15:22
**stuff (4)** 25:9 26:1
  34:19 41:11
**subscribed (1)**
  64:17
**subsumed (1)** 38:7
**sued (2)** 8:5,7
**Sugar (7)** 25:21
  37:25 38:2,6,19

38:25 53:2
**suing (4)** 6:6,7,8
  8:6
**Suite (3)** 2:14 3:6
  3:13
**summer (1)** 42:16
**Summit (1)** 17:8
**supervision (1)**
  64:13
**supposed (1)** 29:15
**sure (19)** 6:2 7:8,8
  7:9,11 8:12 11:4
  11:11,13,19 13:19
  13:24 20:15 35:18
  50:22 51:13,17
  56:16 58:11
**sworn (2)** 11:1 64:7
**system (2)** 45:5,5
**S-h-a-n-e (1)** 5:12

**T**
**Tai (1)** 26:13
**take (2)** 8:17,20
**taken (2)** 2:12 5:14
  6:3 8:13 64:10,11
**Takes (1)** 54:25
**tax (5)** 4:11 45:15
  46:12 53:9,15
**taxes (1)** 46:6
**television (3)**
  19:14,18 50:24
**tell (7)** 8:13 9:4
  9:11 40:19 41:15
  47:8 57:23
**ten (3)** 41:18,19,21
**testified (3)** 5:6
  10:18,20
**testify (1)** 64:8
**testimony (7)** 10:16
  10:23 11:1,2,4,14
  63:10
**Texas (2)** 34:16,18
**Thank (8)** 8:23 9:1
  17:5 49:22 50:8
  54:20 58:17 62:5
**Thanks (1)** 54:6
**therapist (1)** 33:19
**therapists (1)**
  33:17
**thereof (1)** 64:16
**thing (2)** 20:23
  27:13
**things (5)** 24:24
  25:8 27:2 29:8
  51:12

think (16) 7:15
  8:10 9:23,24
  11:17 17:11 34:23
  35:16 39:21 40:7
  41:12 44:20 47:23
  48:21 54:7 59:8
thinking (1) 39:22
three (8) 40:19,21
  40:22,24,25 41:4
  41:7,13
Thrush (3) 16:23,24
  16:25
Ticket (2) 7:18,25
Tickets (2) 7:22
  9:18
till (2) 40:8 46:14
time (53) 6:20 7:9
  7:10 9:10 10:21
  18:16,24 21:13
  24:2,2 31:13,20
  32:9 33:2,4 34:12
  35:11,12,24 36:8
  37:13,14 39:17,20
  40:6,13,18 41:3,5
  41:10 44:16 45:6
  48:19,20 53:25
  54:25 55:18 57:3
  57:5,6,9,15,15,18
  57:18,21 58:4
  59:23 61:8,20,22
  62:5 64:11
times (10) 5:16,19
  5:21 6:23 41:12
  41:18 55:23 57:5
  58:24,25
title (1) 25:23
today (1) 11:18
told (4) 9:15,25
  26:8 40:7
top (1) 50:6
topic (1) 9:14
town (3) 17:6,9
  46:9
train (12) 34:8,14
  34:15,18,19,20,24
  35:5 43:10 60:25
  61:1,3
trained (3) 34:11
  34:12,16
trainer (10) 28:10
  28:11,12,14,18
  29:1,3,3,9,19
trainers (3) 28:9,9
  28:23
training (25) 21:15

21:17 24:18 28:24
  29:14 30:19,24
  31:8,12,19 33:24
  33:25 34:2,4,15
  34:16 40:8 43:13
  43:15 56:18 60:8
  60:10,11,15 61:2
transcribed (1)
  64:12
transcript (1) 63:9
transferred (1)
  20:4
transportation (1)
  21:19
Travee (2) 45:21,23
treatment (1) 32:10
trip (1) 42:15
true (4) 8:15,18
  9:9 63:11
truth (4) 8:14 64:8
  64:8,9
truthful (1) 9:8
try (4) 6:24 12:8
  38:4 61:7
trying (2) 20:12
  40:16
turn (2) 50:5 52:22
TV (1) 50:24
two (20) 9:25 10:4
  10:12 19:3 31:18
  39:24,25 40:19,22
  40:25 41:4,7
  42:23 43:1,8
  48:17 50:3 52:23
  56:16 61:19
type (4) 8:16 15:6
  21:23 46:4
types (1) 10:17
typewriting (1)
  64:13
T-h-r (1) 16:25
T-r-a-v-e-e (1)
  45:23
T-r-h (1) 16:24

<hr>

U

UBS (3) 20:12,20,21
Uh (4) 20:1 23:24
  26:4 50:7
Uh-huh (4) 7:2,23
  11:22 50:4
Um (15) 5:24 6:5,22
  7:8 23:6 28:25
  40:14 43:21 50:25
  51:13 52:10,25

53:16,23 56:15
Uncles (1) 27:2
understand (10)
  8:12,14,17,23 9:3
  11:9,12,19,23
  59:2
understood (1) 9:7
unit (1) 61:10
UNITED (2) 1:1 2:1
use (7) 21:25 22:24
  23:7 36:4,5 48:12
  48:19
uses (1) 23:20
usually (1) 51:14
utilities (1) 51:25
u-s-h (2) 17:1,2

<hr>

V

vacation (1) 42:1
vacations (1) 57:7
vague (1) 11:3
valid (1) 47:9
Vargas (2) 27:21
  43:3
Vegas (31) 17:20
  18:7,17,17,18
  22:1,2,3 27:10
  34:12,21 42:3,4
  47:5 55:10,11,18
  55:21,22,23 56:1
  56:25 57:4,9,9
  59:21,23 60:11,15
  60:18 61:23
Verne (37) 4:14
  13:20,21,22 14:15
  14:15,16 16:8
  19:10,19 21:9,16
  21:18 22:13,25
  23:9 24:3,22,24
  25:2,5,8 26:3
  35:4,6,7 39:6,11
  39:12 44:6,17
  45:3 51:2,7,11,25
  57:16
versus (1) 57:21
VICTOR (2) 1:7 2:7
villages (1) 17:7
Vista (3) 15:13,16
  15:19
voice (1) 12:8
vote (1) 35:17
voted (5) 35:9,12
  35:18,20,24
vs (2) 1:6 2:6

<hr>

W

WAGSTAFFE (1) 3:11
Wait (1) 58:10
wallet (2) 47:12
  48:1
want (10) 8:12
  20:13 47:20 49:6
  49:16 58:16 59:4
  59:4,5 61:11
wanted (2) 42:2
  59:3
Warburg (1) 20:20
washed (2) 24:1
wasn't (2) 38:17
  39:12
watch (3) 19:17
  34:6 41:23
water (1) 51:11
Waverly (3) 14:19
  15:8 20:3
way (1) 11:13
wedding (1) 25:4
Wednesday (3) 1:14
  2:17 5:1
week (3) 34:17
  59:24,25
weeks (8) 31:18
  34:17 40:19,22,25
  41:7,10 62:2
Wendell (5) 6:13,14
  6:15 7:15 9:16
went (7) 21:4 32:9
  33:2,4 38:3 41:12
  52:17
West (1) 49:18
we'll (6) 34:25
  49:5,23 50:10
  52:2 60:13
we're (2) 11:18
  42:3
whereof (1) 64:17
wife (15) 14:11,13
  14:14 16:12 19:13
  23:12,15,18 25:11
  25:17 27:14 43:17
  45:3 48:18 53:2
wife's (1) 14:2
wish (1) 48:25
witness (20) 4:1
  11:7 12:10 14:5
  22:6,8 27:17 32:7
  35:16 40:3 47:17
  47:22 50:18,21
  52:14 54:23 58:10
  58:12 64:6,17

**words (1)** 11:21
**work (11)** 25:11,17
  26:6 31:23 33:13
  34:25 37:13 38:7
  59:11,14,16
**worked (1)** 37:16
**working (3)** 29:23
  30:1,4
**works (3)** 25:14
  26:2,7
**wouldn't (4)** 28:25
  39:10 48:25 61:21
**Wright (7)** 6:13,14
  6:15,16 7:3,16
  9:17
**wrong (2)** 40:7
  46:16
**WTAS (1)** 49:17
**W-r-i-g-h-t (1)**
  6:16

_____ **Y** _____

**yeah (50)** 6:15 8:4
  8:24 12:10,21
  14:13 15:15,18
  16:2 19:8 23:1
  24:4 26:4 27:23
  30:10 31:7,11,18
  32:24 34:10 36:14
  36:21 37:3 39:5
  39:18,24 41:2,19
  42:2,16,19,19
  43:9,15,15,21
  44:18 46:2,15
  47:22 49:15,15
  50:4,25 51:8
  52:25 53:23 54:13
  59:1,19
**year (30)** 12:15
  13:1,14,16,21
  15:4,23 16:3 19:2
  19:2 27:11,19
  28:16,17 29:16
  40:6 41:14 42:20
  44:3,11 45:8
  46:11 53:18 55:12
  55:16 56:5,8,16
  57:22 61:18
**years (9)** 13:8
  16:16,17,18 17:13
  19:3 28:13 35:21
  35:23
**York (12)** 3:6 14:19
  15:6 29:10 30:16
  34:11 39:23,24

41:25 42:2,12,15

_____ **Z** _____

**ZIP (1)** 17:3

_____ **0** _____

**0 (1)** 60:6
**05 (1)** 19:5
**07 (1)** 43:3
**08-01777 (2)** 1:6
  2:6

_____ **1** _____

**1 (5)** 4:11 49:6,6,8
  49:12
**10:50 (2)** 2:16 5:2
**100 (1)** 3:13
**10019 (1)** 3:6
**11 (1)** 52:23
**1226 (3)** 15:13,19
  15:20
**1230 (3)** 15:13,16
  15:23
**14 (4)** 26:13 53:8
  53:12,13
**1501 (1)** 3:6
**16 (2)** 4:12,22
**17 (1)** 26:12
**174 (3)** 14:19 15:8
  20:3
**1790 (1)** 3:5
**18 (1)** 35:23
**1800 (1)** 3:13
**19 (1)** 13:23
**1900 (1)** 2:13
**1990 (1)** 13:12
**1993 (1)** 13:10
**1995 (3)** 7:19 13:12
  13:14
**1997 (1)** 13:23
**1998 (2)** 15:24 16:1
**1999 (2)** 5:25 6:3

_____ **2** _____

**2 (4)** 4:12 49:23,24
  50:2
**20 (2)** 4:22 35:21
**2000 (9)** 5:24,25
  13:14,16 16:4,6,6
  27:22 46:25
**2002 (2)** 4:12 27:23
**2004 (2)** 18:3,3
**2005 (4)** 4:11 36:10
  46:25 53:8
**2006 (2)** 4:11 44:20

**2007 (12)** 4:11
  33:11,12 42:20,22
  43:8 57:22 58:4,6
  60:24 61:1,9
**2008 (22)** 1:14 2:17
  5:1 28:16 30:14
  30:19 31:5,9
  32:23 40:6,7,12
  40:21,24 44:8,24
  53:17 58:4,6
  60:24 61:9 63:13
**2009 (1)** 56:23
**2100 (1)** 2:14
**212 (1)** 3:7

_____ **3** _____

**3 (6)** 4:13 50:10,11
  50:14 52:22 60:6
**3695 (1)** 18:7
**371-8500 (1)** 3:14

_____ **4** _____

**4 (4)** 4:15 47:1
  52:4,8
**415 (1)** 3:14
**47 (1)** 50:3
**49 (2)** 4:11,12

_____ **5** _____

**5 (3)** 4:4 23:20
  47:1
**5/23/2008 (1)** 4:15
**50 (1)** 4:14
**5189 (3)** 1:25 2:19
  64:23
**52 (1)** 4:15
**5212 (3)** 4:13 16:10
  16:15
**55 (1)** 4:5
**57 (1)** 4:4
**58 (1)** 4:5

_____ **6** _____

**60 (1)** 4:4
**61 (1)** 4:5
**633 (1)** 49:18
**6745 (1)** 17:19

_____ **7** _____

**7 (1)** 44:20
**702 (1)** 36:7
**715 (1)** 16:23

_____ **8** _____

**89 (1)** 13:2

_____ **9** _____

**9 (3)** 1:14 2:17 5:1
**9-7-71 (1)** 12:16
**9:47 (2)** 2:16 5:2
**92315 (1)** 17:4
**93 (1)** 13:10
**94 (1)** 46:13
**94105 (1)** 3:14
**974-2400 (1)** 3:7
**99 (1)** 16:4

EXHIBIT G





EXHIBIT H

**From:** Sarah Smoot [mailto:smoot@kerrwagstaffe.com]
**Sent:** Friday, July 18, 2008 1:58 PM
**To:** Judd Burstein
**Cc:** James M. Wagstaffe
**Subject:** Mosley v. Conte: E-Letter from Ivo Labar

This message contains information which may be confidential and
privileged.  Unless you are the addressee (or authorized to receive for
the addressee), you may not use, copy or disclose to anyone the message
or any information contained in the message.  If you have received the
message in error, please advise the sender by reply e-mail
@kerrwagstaffe.com, and delete the message.



KERR
&
WAGSTAFFE
L L P
ATTORNEYS

100 SPEAR STREET, SUITE 1800
SAN FRANCISCO, CALIFORNIA 94105

TELEPHONE (415) 371-8500
FACSIMILE (415) 371-0500
www.kerrwagstaffe.com

IVO LABAR
E-MAIL: labar@kerrwagstaffe.com

July 18, 2008

**VIA ELECTRONIC MAIL**

Judd Burstein
**JUDD BURSTEIN P.C.**
Email: jburstein@burlaw.com

   Re: ***Shane Mosley v. Victor Conte***
     **Case No. C 08-01777 JSW**

Dear Judd:

  I have enclosed Defendant's draft motion to dismiss for lack of subject matter jurisdiction. We are providing it to you before we file it in order to give Mr. Mosley an opportunity to voluntarily dismiss his case. If this motion is granted, it will result in a remand of both the Conte and Hudson actions. A finding that Mr. Mosley is a California citizen may also affect subsequent proceedings brought by or against Mr. Mosley.

  We intend to file the motion next week. Please give me or Jim Wagstaffe a call to discuss this issue at your convenience.

     Best Regards,

     **IVO LABAR**

IL | 34388



# DRAFT

1  JAMES M. WAGSTAFFE (95535)
   IVO LABAR (203492)
2  **KERR & WAGSTAFFE LLP**
   100 Spear Street, Suite 1800
3  San Francisco, CA 94105–1528
   Telephone: (415) 371-8500
4  Fax: (415) 371-0500

5  Attorneys for Defendant
   VICTOR CONTE
6

7

8                      **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10  SHANE D. MOSLEY, SR.,                    Case No. C 08-01777 JSW

11              Plaintiff,              **MOTION TO DISMISS FOR LACK OF
                                        SUBJECT MATTER JURISDICTION**
12      vs.                             **(FRCP 12(b)(1))**

13  VICTOR CONTE,
                                        Hearing Date: August 22, 2008
14              Defendant.              Time:  9:00 a.m.
                                        Courtroom: 2
15
                                        HON. JEFFREY S. WHITE
16

17

18

19

20

21

22

23

24

25

26

27

28

KERR
—&—
WAGSTAFFE
LLP

# DRAFT

## <u>TABLE OF CONTENTS</u>

*Page*

I.    INTRODUCTION ........................................................................................... 1

II.   LEGAL STANDARD........................................................................................ 2

III.  ARGUMENT..................................................................................................... 2

    A.    The Complete Diversity Requirement is Not Met ................................. 2

         1.    Mosley is Domiciled in California.............................................. 3

         2.    Mosley Intended to Remain in California At the Time the Lawsuit Was Filed. ......................................................................................... 6

         3.    Mosley Connections to Nevada Are Tenuous ........................... 8

IV.   CONCLUSION................................................................................................. 11

# DRAFT

**I.    INTRODUCTION**

1       This case should be dismissed for lack of subject matter jurisdiction because complete

2  diversity does not exist.  Defendant Victor Conte ("Conte") is a citizen of California.  Plaintiff

3  Shane Mosley ("Mosley") pled that he is a citizen of Nevada.  Discovery has revealed that, at the

4  time of the filing of the complaint in this action, Mosley was domiciled in California and

5  intended to remain in California.  Accordingly, Mosley and Conte are not "citizens" of different

6  states and the jurisdictional requisites of 28 U.S.C. section 1332(a) are not met.

7       Mosley is a long-time California citizen.  He was born in southern California and

8  attended school there.  Mosley resides at his family home in La Verne, California.  The utility

9  services, phone, cable, etc., are in his name.  His wife and five children also live in the La Verne

10  home.  Mosley's children attend school there.  He also keeps personal effects there, such as

11  financial records, family pictures and wedding photos.  On the day the complaint was filed, April

12  2, 2008, Mosley was living at his other home in Big Bear, California, where he spends months at

13  a time.  The Big Bear home, which he has owned for seven years, serves as his primary boxing

14  training facility.  Mosley works out there under the supervision of his Pomona-based father, who

15  serves as his primary trainer.  Mosley intends to keep using the Big Bear home as his primary

16  training facility for the foreseeable future.  As of the date of the filing of the complaint, Mosley

17  intended to remain in California with his family at least until his eldest son finished school.

18       While Mosley claims to have permanently moved to Nevada sometime in 2002-2003, his

19  connection to Nevada is far from fixed or permanent.  Mosley owns two homes in Nevada, but

20  one is a rental property.  The other is a home that Mosley stays at when he is in Nevada.  As

21  Mosley admits though, he comes to California "a lot" and he rarely stays in one residence for

22  long because his work as a boxer and promoter take him "everywhere."

23       Mosley may spend time at his house in Nevada, and he may (or may not) plan to move

24  his family there one day.  These future plans, however, do not make Nevada his domicile.  As

25  Mosley admits, at the time the complaint was filed, he intended to remain in California *with his*

26  *family*.  Because the evidence shows that Mosley is a citizen of California, complete diversity

27  does not exist under 28 U.S.C. section 1332(c).  Accordingly, this action should be dismissed.

# DRAFT

1  **II.    LEGAL STANDARD**

2       A motion to dismiss for lack of subject matter jurisdiction may be made as a "speaking

3  motion" attacking the existence of subject matter jurisdiction in fact (a "factual attack").

4  Thornhill Publishing Co., Inc. v. General Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979).

5  In a factual attack, if the defendant challenges the plaintiff's allegations of jurisdiction using

6  extrinsic evidence, the burden is then on the plaintiff to prove as a matter of fact that diversity

7  jurisdiction exists.  McNutt v. General Motors Acceptance Corp. of Indiana, Inc., 298 U.S. 178,

8  186 (1936); Bautista v. Pan American World Airlines, Inc., 828 F.2d 546, 552 (9th Cir. 1987).  A

9  preponderance of evidence standard applies.  McCann v. Newman Irrevocable Trust, 458 F.3d

10  281, 290 (3rd Cir. 2006).

11       The existence of federal jurisdiction depends on the facts as they exist when the

12  complaint is filed.  Lew v. Moss, 797 F.2d 747, 750 (9th Cir. 1986).  "Complete diversity must

13  exist at the time the lawsuit is filed.  It need not exist earlier, nor must it continue thereafter."

14  Schwarzer, Tashima & Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 2:368 (2008).

15  "This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any

16  basic course on federal civil procedure.  It measures all challenges to subject-matter jurisdiction

17  premised upon diversity of citizenship against the state of facts that existed at the time of filing--

18  whether the challenge be brought shortly after filing, after the trial, or even for the first time on

19  appeal."  Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570-571 (2004).

20  **III.    ARGUMENT**

21       **A.    THE COMPLETE DIVERSITY REQUIREMENT IS NOT MET**

22       Section 1332 authorizes original jurisdiction between "citizens of different States."  28

23  U.S.C. § 1332(a)(1).  Section 1332 requires that the parties be completely diverse.  Jones v.

24  Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1064 (5th Cir. 1992).  To establish

25  citizenship for diversity purposes, a natural person must be both a citizen of the United States

26  and a domiciliary of one particular state.  Kantor v. Wellesley Galleries, Ltd., 704 F.2d 1088,

27  1090 (9th Cir. 1983).

28

# DRAFT

1    Here, it is undisputed that Conte is a citizen of California.  Mosley alleged that he is a

2  citizen of Nevada.  However, Mosley's deposition testimony[1] and response to document requests

3  show that he should be considered a citizen of California.

### 1.    Mosley is Domiciled in California

5    Although a party may have several residences, he or she may only have one domicile.

6  Kanter v. Warner–Lambert Co., 265 F.3d 853, 857 (9th Cir. 2001).  A person's domicile is the

7  place he or she resides with the intention to remain or to which he or she intends to return.  Lew,

8  797 F.2d at 750.  "A person's domicile 'is the place where he has his true, fixed home and

9  principal establishment, and to which, whenever he is absent, he has the intention of returning."

10  Rodrigues-Diaz v. Sierra Martinez, 853 F.2d 1027, 1029 (1st. Cir. 1988), *quoting* Wright, Miller,

11  13 B FEDERAL PRACTICE & PROCEDURE § 3612, p. 526 (2nd Ed. 1984).

12    Determining domicile requires a court to look at a number of factors such as past and

13  current residence, location of spouse and family, employment, location of personal and real

14  property length of residence, voting registration, etc.  Lew, 797 F.2d 750.  No single factor is

15  controlling, and courts must balance all the evidence in its totality.  Id.

16    An analysis of these factors leads to a finding that Mosley is a California citizen.

17  Mosley has strong, fixed connections to California, where he has lived for his entire life.[2]  He

18  was born in Lynwood California.  (*Declaration of Ivo Labar ("Labar Decl. ¶") Mosley Depo. p.*

19  *7*).  He grew up in Pomona, California, and graduated high school there.  (*Labar Decl. ¶ Mosley*

20  *Depo. p. 8*).  After high school, he continued a career as a professional boxer.  He purchased two

21  homes in Pomona, and later moved to La Verne, California in 1997.  (*Labar Decl. ¶" Mosley*

22  *Depo. p. 8*).  Although his career as a boxer takes him "everywhere," he still owns the La Verne

---

24  [1]    Defendant took Mosley's deposition on July 10, 2008 for the limited purpose of inquiring
25  into subject matter jurisdiction issues.

26  [2]    Given Mosley's longstanding, permanent connections to California, there is a
presumption that California continues as his domicile.  Hawes v. Club Ecuestre El Comandante,
27  598 F.2d 698, 701 (1st Cir. 1979); Mitchell v. Unites States, 21 Wall. 350, 88 U.S. 350, 353
(1874) ("domicile once acquired is presumed to continue until it is shown to have been
28  changed.").

KERR
WAGSTAFFE
LLP

MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# DRAFT

1  home as well as a house in Big Bear, California, where he was residing at the time the complaint

2  in this action was filed. (*Labar Decl. ¶; Mosley Depo. p. 9.*)  It is presumed that the state in

3  which a person resides at any given time is also that person's domicile.  <u>District of Columbia v.</u>

4  <u>Murphy</u>, 314 U.S. 441, 455 (1941).  Neither of his homes in California were for sale at the time

5  he filed this complaint. (*Labar Decl. ¶; Mosley Depo. p. 43*)

6         There is no question Mosley's personal life is also centered in California.  Mosley's

7  spouse and children live in the La Verne home full time. (*Labar Decl. ¶; Mosley Depo. p. 9).*

8  Each of his five children are enrolled in school there. (*Labar Decl. ¶; Mosley Depo. p. 26*).

9  This crucial fact raises yet another presumption: for citizenship purposes, married people are

10  presumed to be domiciled with their wife and family.  Lew; 797 F.2d at 750; <u>see also</u> Wright,

11  Miller, Cooper, 13B FEDERAL PRACTICE & PROCEDURE § 3612 at n. 25 (2008).  In addition to his

12  spouse and children, Mosley's mother and father also live in Pomona, as does his sister and aunt.

13  (*Labar Decl. ¶; Mosley Depo. p. 26*).  Critically, Mosley's California-based father is also his

14  primary boxing trainer and has been since Mosley was eight years old. (*Labar Decl. ¶; Mosley*

15  *Depo. p. 26*).  Mosley does not explain how he permanently resides in a state apart from his

16  primary trainer.

17         Mosley keeps clothing in California as well as his boxing training gear.  When he is in

18  California he has used his wife's automobile which is registered in California. (*Labar Decl. ¶;*

19  *Mosley Depo. p. 17-20*).  At both of his homes in California, he has utility service, cable and

20  satellite television and a home phone. (*Labar Decl. ¶; Mosley Depo. p. 50-51*)  The accounts for

21  those services are in his name and receives mail there. (*Labar Decl. ¶; Mosley Depo. p. 50-51;*

22  *SM 31; SM 45; 176*).  His personal things, such as family portraits, wedding pictures, and

23  personal financial records are also kept in California. (*Labar Decl. ¶; Mosley Depo. p. 25*).

24         Mosley does his professional training at this home in Big Bear, California, where he also

25  resides.  Mosley has owned his Big Bear home for approximately seven years. (*Labar Decl. ¶;*

26  *Mosley Depo. p. 26).*  The Big Bear home has a boxing gym, and Mosley uses it to prepare for

27  his professional fights. (*Labar Decl. ¶; Mosley Depo. p. 26*)  Throughout 2007 and 2008,

28  Mosley prepared for his fights there. (*Labar Decl. ¶; Mosley Depo. p. 42*).  Again, at the time

# DRAFT

1  the lawsuit was filed, he was living and training at his Big Bear home where spends months at a

2  time. (*Labar Decl. ¶; Mosley Depo. p.* 61).

3      Mosley's other business affairs and other personal affairs are also centered in California.

4  His wife works for his promotional company Sugar Shane, Inc. out of their home in La Verne.

5  (*Labar Decl. ¶; Mosley Depo. p. 25*).  In addition, he is a partner with Oscar de La Hoya in

6  Golden Boy Enterprises, which has its principal offices in Los Angeles. (*Labar Decl. ¶; Mosley*

7  *Depo. p. 25*).  Mosley invoked the jurisdiction of the California state courts in 2003, and claimed

8  to be a resident of Los Angeles County.[3] (*Labar Decl. ¶; Mosley v. Kusher Complaint*)

9      His other business affairs (such as tax payment and money management) were handled

10  for more than a decade by his aunt, another California citizen. (*Labar Decl. ¶; Mosley Depo. p.*

11  44-45).[4]  His business affairs are currently handled by his money manager at UBS Warburg, who

12  is located in Los Angeles. (*Labar Decl. ¶; Mosley Depo. p. 14*).  Mosley banks at national banks

13  that have branches in California. (*Labar Decl. ¶; Mosley Depo. p. 48*).  Mosley uses those

14  branches when he is in California. (*Labar Decl. ¶; Mosley Depo. p. 48*).  The last time he saw a

15  medical doctor, or a dentist, was in California.[5] (*Labar Decl. ¶; Mosley Depo. p. 25*).  Mosley

16  can only recall voting one time, and that was in California. (*Labar Decl. ¶; Mosley Depo. p. 25*).

17  The center of one's business, domestic and social life is strong evidence of domicile. REST. 2ND

18  CONFLICT OF LAWS § 20 (2008).  Here, all of the facts show that Mosley's "center" was in

19  California at the time the action was commenced.  Accordingly, he should be considered a

20  California citizen.

21

22

23

24  [3]    Critically, this *after* Mosley purchased his first home in Nevada. (Declaration of Shane Mosley ¶ 9).

25  [4]    For a short time, his business affairs were handled by a certified public accountant

26  ("CPA") in New York. (*Labar Decl. ¶; Mosley Depo. p. 9*).

27  [5]    Mosley could not recall much about his medical providers, but documents provided by

28  his counsel show that 15 out of 17 of his medical providers since 2002 are located in California. (*Labar Decl. ¶; (5/28/08 Letter)*).

MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

KERR
—B—
WAGSTAFFE
LLP

# DRAFT

2. **Mosley Intended to Remain in California At the Time the Lawsuit Was Filed.**

Under the "snapshot rule," the Court must look to the facts as they exist when the complaint is filed in order to determine whether diversity exists. <u>Lew</u>, 797 F.2d 750. On the day this complaint was filed, Mosley was living and training at his Big Bear home. The fact that he was not physically present in Nevada at the time the complaint was filed should be dispositive of this issue of domicile.

Mosley admits that he spent a significant, if not the majority, of his time in 2007 and 2008 in California. (*Labar Decl. ¶; Mosley Depo. p. 48*). Although Mosley could not say with any specificity how much time he spends in California vs. Nevada, he admits to moving back and forth between California "a lot."

> Q: About how many times do you think you went back and forth from California and Nevada in the first three months of the year?
>
> A  I couldn't tell you.  I go back -- back and forth a lot.

(*Labar Decl. ¶; Mosley Depo. p. 58*).

Mosley's testimony regarding his itinerant lifestyle is hard to square with his declaration regarding his residency that he filed in this case, where he stated that he spends "much of my time" in Las Vegas. (*Declaration of Shane Mosley ¶*). Putting Mosley's poor memory regarding his whereabouts in 2008 to one side, Mosley's testimony plainly shows that he did not intend to remain apart from his family or leave California permanently at the time the complaint was filed. (*Labar Decl. ¶; Mosley Depo. p. 58*).

After his planned fight this past May in Las Vegas (that he was training for in Big Bear), Mosley intended to return to California with his family. (*Labar Decl. ¶; Mosley Depo. p.42-43*). Following his return to California, he intended to keep training in Big Bear:

> Q  And do you intend to keep training for your fights in Big Bear?
>
> A:  Big Bear is, yeah, the training spot, yeah.

MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

KERR
—&—
WAGSTAFFE
LLP

# DRAFT

1    (*Labar Decl. ¶; Mosley Depo. p.42-43*).

2           Mosley also intended to keep being with his family in La Verne, at least until his eldest

3    son finished school:

5                    Q: And you intend to keep seeing your family obviously
                     and your wife in California, right?

6                    A:  Yes.

8                    Q:  And let me ask you as of, say, April 2008, this year, it
                     was your plan and intention to have your family remain in
9                    California until your son completes school in California; is
                     that right?

10                   A: As of April?

12                   Q:  Right.

13                   A:  Um, I would say yeah.  *We were going to stay in
                     California*, but [I] was going to leave California after the
14                   fight, which was May, for a period of time.

15                   Q:  Right.  And you were going to return to California to
                     allow your child to finish school, right?

17                   A:  To finish school.

18   (*Labar Decl. ¶; Mosley Depo. p. 42-43*) (emphasis added).

19           Mosley's admission that he intended to stay in California with his family as of April 2008

20   is dispositive on the issue of intent.  Regardless of Mosley's future plans to possibly move his

21   family to Nevada full time, at the time of the filing of the complaint, he intended to keep training

22   and living with his family in California.  Under the "snapshot rule," Mosley should be deemed a

23   citizen of California.  At best, Mosley has produced evidence demonstrating that he is in the

24   process of relocating his domicile to Nevada.  That, however, is not enough.  Even if a plaintiff is

25   in the process of moving to another state, if the move was not complete when suit was filed,

26   plaintiff's domicile remains at his or her last residence.  Heinz v. Havelock, 757 F. Supp. 1076,

27   1079 (C.D. Cal. 1991) (Defendants had not yet completed planned move from California to

28

# DRAFT

1    North Carolina at the time the complaint was filed).  At the time of the filing of the complaint,

2    Mosley's present intention was to remain in California with his family.

3            **3.    Mosley Connections to Nevada Are Tenuous**

4        Mosley's evidence in support of his allegation of Nevada citizenship is weak.  While

5    Mosley owns two homes in Las Vegas, he also owns two homes in California.  (*Labar Decl.* ¶;

6    *Mosley Depo. p. 17*).  In addition, one of the Nevada homes is used as a rental property.  This

7    fact does not lend itself to a finding Nevada domicile.  The other home is used by Mosley during

8    the limited periods of time that he is in Las Vegas.  (*Labar Decl.* ¶; *Mosley Depo. p. 17-18*).

9    However, Mosley has also admitted to spending substantial amounts of time in California and

10   that his work takes him "everywhere."

11       The other evidence offered to support a Nevada domicile is equally weak.  Mosley has a

12   vehicle registered in Las Vegas, a Nevada driver's license and a Las Vegas cell phone number.[6]

13   (*Declaration of Shane Mosley*).  He has also incorporated businesses in Nevada and, since 2005,

14   paid taxes as a Nevada citizen.  This is not compelling evidence, especially in light of the

15   substantial evidence of Mosley's California presence.  Mosley, of course, uses the mobile phone

16   in California and he still maintains home phones and utility services in California.  Furthermore,

17   he drives in California when he is visiting his family and training there for months at a time.  So,

18   the registration of one of his vehicles is of little relevance.  Regardless of where his businesses

19   are incorporated, it is clear that he conducts business in California as evidenced by the fact that

20   his wife works for his company out of their La Verne, California home.  The tax issue is also not

21   dispositive because where Mosley claims to be a citizen for tax purposes begs the question.

22   California taxes all income received while a part-time California resident, and the income

23

24

25

---

26   [6]    Mosley also contends that he has not maintained any bank accounts in California for the
past five years.  However, he offers no proof of this assertion.  This factor should be given little

27   weight, given that Mosley accesses his accounts while in California.  (*Labar Decl.* ¶; *Mosley
Depo. p.*).  In any event, modern electronic banking methods should give little credence to the

28   notion that the location of bank accounts have relevance to a determination of domicile.

# DRAFT

1  received from California sources while you were a nonresident.[7]  S. Thomas, CALJUR 3D § 10,

2  Income Taxes (2008).  Mosley filed taxes in California because he considered himself a part-

3  time resident or derived income from California sources, either of which militate in favor of a

4  finding of California citizenship for diversity purposes, especially when coupled with the other

5  factors discussed above. (*Labar Decl. ¶ SM 23-27*).  It bears noting that Mosley's identifies a

6  California address (that of his L.A.-based money manager) on his 2007 federal filing.  Id.

7  Previously, he identified a New York address.  Id.

8          Courts have rejected allegations of citizenship based on the limited contacts with the new

9  jurisdiction such as those set forth by Mosley.  In Lew, 797 F.2d 747 (9th Cir. 1986), for

10  example, the defendant claimed that he had changed his domicile from California to Hong Kong

11  and that he was living "on and off" in Hong Kong at the time the action was commenced.  Id. at

12  752.  However, the defendant also testified that he was traveling throughout Asia during that

13  same time period, and that he was not accompanied by his wife or family, who continued to live

14  and work in California until after the filing of the complaint.  Id.  Under these facts, the Lew

15  court found that the defendant remained a citizen of California because he failed to show that "…

16  he was physically located in Hong Kong on November 1, 1984 when the complaint in this case

17  was filed, or (b) that he intended to remain there indefinitely." Id.

18          The court also rejected evidence similar to that offered by Mosley in Abbott v. United

19  Venture Capital, Inc., 718 F. Supp. 823, 826 (D. Nev. 1988) and Galva Foundry Co. v. Heiden,

20  924 F.2d 729, 730–731 (7th Cir. 1991).  In Abbot, the plaintiff lived primarily in California.  He

21  was treated as domiciled there even though the defendant argues that he worked in Nevada,

22  maintained a small apartment there and did not pay California state income taxes.  Similarly in

23  Galva, the defendant had a vacation home in Florida and claimed to be a citizen of that state for

24  tax purposes (defendant also had a Florida driver's license and voter registration).  Galva, 924

---

[7]      By contrast, Nevada does not have a state income tax.  The fact that Mosley has chosen
to take up residence in Nevada in an effort to minimize his tax obligations should not be
dispositive on the issue of domicile.  Galva Foundry Co. v. Heiden, 924 F2d 729, 730-731 (7th
Cir. 1991) (changing tax status not enough in itself to confer citizenship for diversity purposes
because it would be too easy to manipulate the courts' jurisdiction.)

MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# DRAFT

1    F2d at 730–731.  However, he spent the greater part of the year at his Illinois home and retained

2    church and private club memberships there.  The <u>Galva</u> court found that he was properly held to

3    be an Illinois citizen for diversity purposes.

4        Here, similar to the defendants in <u>Lew,</u> <u>Galva</u> and <u>Abbot</u>, while Mosley has some "on and

5    off" contacts with Nevada, such as part-time residence, vehicle registration and a driver's

6    license, he has failed to show that he was residing there at the time this complaint was filed and

7    that he intended to remain there indefinitely.  Mosley has not taken any meaningful affirmative

8    steps of establishing a permanent Nevada domicile at the time he filed the complaint.  He had not

9    registered to vote, sold or rented his California homes, moved his wife or children, moved his

10   training facility from Big Bear, re-located his wife's workplace from their home in California,

11   enrolled his children in a Nevada school, joined any church or civic organizations or engaged in

12   any other activities that one would expect a permanent Nevada citizen to engage in.

13   Accordingly, he should be considered a California citizen.

14       Mosley will likely argue that substantial weight should be afforded to his pronounced

15   intent to remain in Nevada indefinitely.  (*Declaration of Shane Mosley* ¶¶ ).  Mosley's self-

16   serving statement that he is a citizen of Nevada should not be given weight for three reasons.

17   First, it is a legal conclusion.  Second, it is plainly self-serving.  Courts have held that self-

18   serving declaration regarding citizenship should be viewed with skepticism when other factors

19   militate in favor of a different finding of citizenship.  "One's testimony with regard to his

20   intention is of course to be given full and fair consideration, but is subject to the infirmity of any

21   self-serving declaration, and may frequently lack persuasiveness and even be contradicted or

22   negatived by other declarations and inconsistent acts."  <u>District of Columbia v. Murphy</u>, 314

23   U.S. 441, 456 (1941).  Here, Mosley's declaration should also be given little weight because he

24   is plainly being less than candid in his declaration.  Mosley stated:  "[i]t is true that I jointly own

25   a home in La Verne, California with my wife and also own a home in Big Bear where I have

26   done some of my training."  Plainly, Mosley admitted in deposition to doing *all* of his training in

27   Big Bear during the relevant time period.  (*Labar Decl.* ¶*; Mosley Depo. p.42-43).*  Further,

28   while his declaration states that he spends "much of my time" in Las Vegas, he candidly

# DRAFT

1    admitted to spending many months in Big Bear as well as time "everywhere" else he does his

2    fighting and promoting activities. (*Labar Decl. ¶; Mosley Depo. p.42-43*).  While he could not

3    definitely say at deposition how much time he actually spent in Nevada *vis-a-vis* California, he

4    stated that it was almost an equal amount of time:

5             Q:  Okay.  And can you give me any percentage of how
     much time you spent in California versus Nevada in the

6             year 2007?

7             A: I couldn't -- I couldn't tell you.  I *mean it could be*

8             *equally as much because I'm in Nevada or, you know, I'm
     all over the place.  I'm not just in California and Nevada.*

9             *I'm everywhere.*  Wherever the promotion needs me to go, I
     go.

10

11   (*Labar Decl. ¶; Mosley Depo. p. 57*) (emphasis added).

12        In light of this testimony, his declaration that he spends "much of his time" in Las Vegas

13   is highly suspect.  Third, Mosley's spontaneous deposition testimony reveals the truth about his

14   intentions at the time the complaint was filed.  Mosley intended to remain in California with his

15   family until, at a minimum, his eldest son finished school. (*Labar Decl. ¶; Mosley Depo. p. 57*).

16   While Mosley may (or may not) intend to one day relocate to Nevada permanently, that day had

17   not arrived at the time he filed the complaint in this case.  As such, his future intentions are of no

18   consequence to the citizenship inquiry.  <u>Heinz</u>, 757 F. Supp. at 1079.  Here, Mosley's actions and

19   words demonstrate that he was a California citizen at the time of the filing of the complaint.

20   **IV.    CONCLUSION**

21        Mosley's substantial, longstanding connections to California, coupled with his

22   unequivocal testimony that he intended to remain in California at the time the complaint in this

23   case was filed, leads to the conclusion that he should be considered a California citizen for the

24   purposes of determining diversity jurisdiction.  Accordingly, complete diversity does not exist in

25   this case, and the action should be dismissed pursuant to 28 U.S.C. section 1332(a).

26

27

28

# DRAFT

1  DATED: July 18, 2008                    Respectfully submitted,

2                                          **KERR & WAGSTAFFE LLP**

3

4                              By  _____
                                    IVO LABAR
5
                                   Attorneys for Defendant
6                                  VICTOR CONTE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# EXHIBIT I

**Jeremy Attie**

| | |
|---|---|
| **From:** | Judd Burstein |
| **Sent:** | Wednesday, July 30, 2008 3:09 PM |
| **To:** | Ivo Labar |
| **Cc:** | Jeremy Attie |
| **Subject:** | Dismissal |
| **Attachments:** | Judd Burstein.vcf |



Judd Burstein.vcf
(5 KB)

Ivo, I am disposed to dismiss in light of the insurance policy.  However, I can't do it if
Shane is going to be met with public statements from Conte or press suggesting that he was
withdrawing on the merits, and that the dismissal has some substantive significance.  If
we can find a way to get around this, I will get get my client on board.

Any ideas?

1

EXHIBIT J

SUPREME COURT OF THE STATE OF NEW YORK.
COUNTY OF NEW YORK

**FILE COPY**

-------------------------------------------------------------------X

SHANE D. MOSLEY, SR.,

                         *Plaintiff,*

           – against –

VICTOR CONTE,

                         *Defendant.*

-------------------------------------------------------------------X

**SUMMONS**

Index No. 0811062З

Date Purchased:
August 5, 2008

To the above-named Defendant:

     You are hereby summoned and required to serve on plaintiff an answer to the complaint in this action within twenty days after the service of this summons, exclusive of the day of service, or within thirty days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

     The basis of the venue designated is CPLR § 509.

Dated: New York, New York
     August 5, 2008

                         Yours, etc.,

                         JUDD BURSTEIN, P.C.
                         *Attorneys for Plaintiff*

By:               _____
                       Judd Burstein
                       1790 Broadway, Suite 1501
                       New York, New York 10019
                       Tel:   (212) 974-2400

TO:   DEFENDANT VICTOR CONTE
       c/o Ivo Labar, Esq.
       Kerr & Wagstaffe LLP
       100 Spear Street, 18th Floor
       San Francisco, CA 94105

NEW YORK
COUNTY CLERK'S OFFICE

AUG 05 2008

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

SHANE D. MOSLEY, SR.,

Index No.:

*Plaintiff,*

**COMPLAINT**

– against –

**JURY TRIAL DEMANDED**

VICTOR CONTE,

*Defendant.*
-----------------------------------------------------------------X

Plaintiff Shane D. Mosley, Sr. ("Mosley" or "Plaintiff"), by his attorneys, Judd Burstein,

P.C., complaining of the Defendant Victor Conte ("Conte" or "Defendant"), alleges as follows:

### PARTIES

1.      Plaintiff Mosley, a legendary professional boxer, is a citizen of the State of Nevada.

2.      Defendant Conte, a convicted felon and purveyor of illegal performance enhancing

drugs and procedures, is a citizen of the State of California.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

3.      In or about July 2003, Mosley's conditioning coach, Darryl Hudson ("Hudson"),

brought Mosley to meet with Conte at Conte's business, Bay Area Laboratory Co-operative

("Balco").  Mosley was informed by Hudson that Conte's company sold entirely legal supplements,

including some that were sold on the Internet, which would aid his training.

4.      At the meeting with Conte, samples of Mosley's blood were taken and analyzed.

Conte then recommended to Mosley a regimen of products that Mosley was told would help him

with his endurance.  Always extremely concerned about his health and with playing by the rules,

Mosley specifically asked Conte whether the items recommended by Conte were healthy, legal and

permitted for athletes.  Mosley was specifically told by Conte that there was nothing wrong with

following Conte's recommendations, and that all of the products recommended by Conte were entirely legal and appropriate.

5.      In July 2005, Conte pleaded guilty to a conspiracy to distribute steroids.

6.      In October 2005, Conte was sentenced to four months imprisonment and four months house arrest.

7.      On information and belief, in the Spring of 2008, Conte entered into a publishing agreement with Skyhorse Publishing, Inc. ("Skyhorse"; "Publishing Agreement"), a New York based book publishing company, which is registered to do business in New York State and maintains a principal executive office at 555 Eighth Avenue, Suite 903, New York, New York 10018. Pursuant to the Publishing Agreement, Conte plans to publish a book in September 2008 about his life as a peddler of steroids ("September 2008 Book").

8.      On information and belief, Conte met with Skyhorse representatives on multiple occasions in the State of New York to negotiate the Publishing Agreement.

9.      On information and belief, both Conte and Skyhorse executed the Publishing Agreement in the State of New York.

10.      On information and belief, the Publishing Agreement contains a New York Choice of Law provision as well as a New York Forum Selection Clause.

11.      On information and belief, the Publishing Agreement contemplates performance in New York, in that Conte (i) worked with Skyhorse in drafting the September 2008 Book, as well as (ii) provided a final draft of the September 2008 Book to Skyhorse, at its New York offices.

12.      On information and belief, in an effort demonstrate to Skyhorse that the September 2008 Book would achieve a high level of sales, Conte made knowingly false claims to Skyhorse

about Mosley's use of Balco products and explained that those scandalizing claims would appear in his September 2008 Book. On information and belief, in communicating these false claims about Mosley to Skyhorse, Conte sought to both (i) induce Skyhorse into entering into the Publishing Agreement with Conte, and (ii) gain a favorable bargaining position with respect to the negotiation of the Publishing Agreement.

13.    In or about March 2008, Conte began publicizing the September 2008 Book. As part of his publicity campaign to maximize sales, Conte made knowingly false claims about Mosley's use of Balco products to Skyhorse as well as to the public at large.

### FIRST CAUSE OF ACTION

### (Libel *Per Se*)

14.    Plaintiff repeats and realleges all of the preceding paragraphs of this Complaint as if fully set forth herein.

15.    On or about March 29, 2008, Conte gave an interview to *New York Daily News* reporters Nathaniel Vinton and/or Teri Thompson, in which Defendant falsely stated that Mosley "knew precisely what [he was] using," and that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about the legality of the products provided by Conte, "[i]t was all explained up front and there was no deception."

16.    On March 30, 2008, an article containing Conte's false statements was published in the *New York Daily News* (the "March 30 Article"). A true and complete copy of the March 30 Article is annexed hereto as Exhibit A and incorporated by reference herein.

17.    The statements made by Conte set forth above in Paragraphs 15 and 16 were false.

3

18.    The statements set forth above in Paragraphs 15 and 16 were made by Conte with actual malice and knowledge of their falsity.

19.    Conte's statements set forth above in Paragraphs 15 and 16 were unprivileged.

20.    Conte intended the statements set forth above in Paragraphs 15 and 16 to appear in the March 30 Article, and with the purpose of increasing sales of Conte's September 2008 Book by besmirching Mosley's good name and trading on Plaintiff's fame and reputation.

21.    Conte's statements set forth above in Paragraphs 15 and 16 accuse Plaintiff of criminal conduct.

22.    Conte's statements set forth above in Paragraphs 15 and 16 tend to injure Mosley in his profession as a prize fighter, both in that they impute to Mosley a general disqualification in the respect which a professional boxer peculiarly requires, and impute traits concerning professional prize fighting that lessen Mosley's ability to earn money in that profession.

23.    The natural consequence of Conte's statements set forth above in Paragraphs 15 and 16 is to cause actual damage to Mosley.

24.    Based upon the foregoing libel, Defendant is liable to Plaintiff in an amount to be determined at trial.

25.    Conte's knowingly false statements about Mosley set forth above in Paragraphs 15 and 16 were intended as advance publicity designed to increase sales for Conte's September 2008 Book. Conte's libel was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights. In publishing knowingly false statements about Mosley in order to increase sales of his September 2008 Book, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's

4

rights. Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Slander *Per Se*)

26.     Plaintiff repeats and realleges all of the preceding paragraphs of this Complaint as if fully set forth herein.

27.     On information and belief, either before, during, or after Conte's contract negotiations with Skyhorse (or some combination thereof), which took place in New York, Conte provided Skyhorse with an oral synopsis of the substance of his planned September 2008 Book.

28.     On information and belief, this synopsis included Defendant falsely stating that Mosley "knew precisely what [he was] using," and that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about the legality of the products provided by Conte, "[i]t was all explained up front and there was no deception." Conte made these false claims to Skyhorse (which besmirched Mosley's good name) in an effort to demonstrate to Skyhorse that the September 2008 Book would include scandalizing content and thereby achieve a high level of sales.

29.     On information and belief, in doing so, Conte intended to (i) induce Skyhorse into entering into the Publishing Agreement with him; and (ii) gain a favorable bargaining position with respect to the negotiations of the Publishing Agreement.

30.     The false statements described above in Paragraphs 27 and 28 were made by Conte with actual malice and knowledge of their falsity.

31.     Conte's statements described above in Paragraphs 27 and 28 were unprivileged.

5

32.     Conte's statements described above in Paragraphs 27 and 28 accuse Plaintiff of criminal conduct.

33.     Conte's statements described above in Paragraphs 27 and 28 tend to injure Mosley in his profession as a prize fighter, both in that they impute to Mosley a general disqualification in the respect which a professional boxer peculiarly requires, and impute traits concerning professional prize fighting that lessen Mosley's ability to earn money in that profession.

34.     The natural consequence of Conte's statements described above in Paragraphs 27 and 28 is to cause actual damage to Mosley.

35.     Based upon the foregoing slander, Defendant is liable to Plaintiff in an amount to be determined at trial.

36.     Conte's knowingly false statements about Mosley as described above in Paragraphs 27 and 28 were intended to both (i) induce Skyhorse into entering into the Publishing Agreement with Conte, and (ii) give Conte a favorable bargaining position with respect to the negotiations of the Publishing Agreement. Conte's slander was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights. In publishing knowingly false statements about Mosley to Skyhorse, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's rights. Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

6

## THIRD CAUSE OF ACTION

### (Slander *Per Se*)

37.    Plaintiff repeats and realleges the allegations set forth above in all of the prior Paragraphs as if fully and completely set forth herein.

38.    On or about March 29, 2008, Conte gave a telephone interview (from, on information and belief, San Francisco) to *USA Today* reporter A. J. Perez ("Perez"). On information and belief, Defendant falsely stated that Mosley "knew precisely what [he was] using," and that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about the legality of the products provided by Conte, "[i]t was all explained up front and there was no deception."

39.  .  The false statements described above in Paragraph 38 were made by Conte with actual malice and knowledge of their falsity.

40.    Conte's statements described above in Paragraph 38 were unprivileged.

41.    Conte intended the statements described above in Paragraph 38 to appear in *USA Today* with the purpose of increasing sales of his September 2008 Book by besmirching Mosley's good name and trading on Plaintiff's fame and reputation.

42.    Conte's statements described above in Paragraph 38 accuse Plaintiff of criminal conduct.

43.    Conte's statements described above in Paragraph 38 tend to injure Mosley in his profession as a prize fighter, both in that they impute to Mosley a general disqualification in the respect which a professional boxer peculiarly requires, and impute traits concerning professional prize fighting that lessen Mosley's ability to earn money in that profession.

44.    The natural consequence of Conte's statements described above in Paragraph 38 is to cause actual damage to Mosley.

45.    Based upon the foregoing slander, Defendant is liable to Plaintiff in an amount to be determined at trial.

46.    Conte's knowingly false statements about Mosley as described above in Paragraph 38 were intended as advance publicity designed to increase sales for Conte's September 2008 Book. Conte's slander was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights. In publishing knowingly false statements about Mosley in order to increase sales of his September 2008 Book, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's rights. Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Libel *Per Se*)

47.    Plaintiff repeats and realleges the allegations set forth above in all of the prior Paragraphs as if fully and completely set forth herein.

48.    On information and belief, in September 2007, Conte sent an e-mail to a reporter affiliated with SI.com in which Defendant falsely stated that Mosley "knew precisely what [he was] using," and that, notwithstanding Mosley's prior public claim that Conte had misled Mosley about the legality of the products provided by Conte, "[i]t was all explained up front and there was no deception."

8

49.    The false statements set forth above in Paragraph 48 were made by Conte with actual malice and knowledge of their falsity.

50.    Conte's statements set forth above in Paragraph 48 were unprivileged.

51.    On information and belief, Conte intended the statements set forth above in Paragraph 48 to appear on the SI.com website for the purpose of increasing sales of the September 2008 Book by besmirching Mosley's good name and trading on Plaintiff's fame and reputation.

52.    Conte's statements set forth above in Paragraph 48 exposed Mosley to hatred, contempt, ridicule, or obloquy, and had a tendency to injure him in his occupation.

53.    Conte's statements set forth above in Paragraph 48 are defamatory without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact.

54.    The natural consequence of Conte's statements set forth above in Paragraph 48 is to cause actual damage to Mosley.

55.    Based upon the foregoing libel, Defendant is liable to Plaintiff in an amount to be determined at trial.

56.    On information and belief, Conte's knowingly false statements about Mosley set forth above in Paragraph 48 were intended as advance publicity designed to increase sales for Conte's September 2008 Book. Conte's libel was intended to cause injury to Mosley and was carried out by Defendant with a willful and conscious disregard for Mosley's rights. In publishing knowingly false statements about Mosley in order to increase sales of his September 2008 Book, Conte engaged in despicable conduct subjecting Mosley to cruel and unjust hardship, which was done in conscious disregard of Mosley's rights. Accordingly, Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

9

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Compensatory damages as determined at trial, but in no event less than $2,000,000;

B.    Punitive damages as determined at trial, but in no event less than $10,000,000;

C.    The reasonable costs and attorneys' fees incurred in this action; and

D.    Such other and further relief as may be deemed just and proper by this Court.

Dated: New York, New York
       August 5, 2008

JUDD BURSTEIN, P.C.
*Attorneys for Plaintiff*

By_____
    Judd Burstein
    1790 Broadway, Suite 1501
    New York, New York 10019
    (212) 974-2400

10

A

# In face of athletes' denials, Victor Conte points to calendars

BY TERI THOMPSON IN NEW YORK AND NATHANIEL VINTON IN SAN FRANCISCO
DAILY NEWS SPORTS WRITERS

Sunday, March 30th 2008, 8:57 PM

SAN FRANCISCO - Three of the athletes who worked with Victor Conte at BALCO - boxer Shane Mosley and sprinters Kelli White and Tim Montgomery - have denied at one time or another that they knew they were taking banned or illegal substances provided by Conte.

But Conte, who says he will discuss all three in his new book, "BALCO: The Straight dope on Steroids, Barry Bonds, Marion Jones and What We Can Do To Save Sports," says they "all knew precisely what they were using.

"I taught them how to use substances, including "the clear," and inject themselves with EPO. I watched them inject themselves in front of me."

"The clear" was an undetectable steroid applied by placing drops of the yellowish liquid under the tongue with a needleless syringe; EPO is a banned performance-enhancer that is injected by needle.

Mosley, who is scheduled to fight welterweight Zab Judah on May 31 at Mandalay Bay in Las Vegas, told the Daily News in September that he inadvertently took two designer steroids - "the cream" and "the clear" - before his championship fight against Oscar De La Hoya in 2003 after he says he was misled by Conte, who disputed the claims then in an e-mail response. SI.com first reported that investigator Jeff Novitzky had said at an anti-doping conference in Colorado Springs that Mosley had used the substances.

"Those are simply lies," Conte told The News again Sunday of Mosley's statements. "It was all explained up front and there was no deception."

Conte says he has detailed doping calendars of all three athletes, including Mosley's. "I have every day and every dose," he says.

White has claimed that Conte told her he was giving her flaxseed oil and Mongomery told the BALCO grand jury that Conte assured him "the clear" was not an illegal steroid.

"Not true," Conte says.

# EXHIBIT K

ADRMOP, CLOSED, E-Filing, ENE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:08-cv-01777-JSW

Mosley v. Conte
Assigned to: Hon. Jeffrey S. White
Demand: $75,000
Cause: 28:1332 Diversity-Libel,Assault,Slander

Date Filed: 04/02/2008
Date Terminated: 08/05/2008
Jury Demand: Plaintiff
Nature of Suit: 320 Assault Libel &
Slander
Jurisdiction: Diversity

**Plaintiff**

**Shane D. Mosley, Sr.**    represented by **Kim Dincel**
Long & Levit LLP
465 California Street, 5th Floor
San Francisco , CA 94104
415-397-2222
Fax: 415-397-6392
Email: kdincel@longlevit.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy Michael Attie**
Judd Burstein, P.C.
1790 Broadway
Suite 1501
New York , NY 10019
212-974-2400
Fax: 212-974-2944
Email: jattie@burlaw.com
*ATTORNEY TO BE NOTICED*

**Judd Burstein**
Judd Burstein, P.C.
1790 Broadway
Suite 1501
New York , NY 10019
212-974-2400
Fax: 212-974-2944
Email: jburstein@burlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Victor Conte**                    represented by **James Matthew Wagstaffe**
Kerr & Wagstaffe LLP
100 Spear Street, Suite 1800
San Francisco , CA 94105
(415) 371-8500
Email: wagstaffe@kerrwagstaffe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly Anne Hogan**
K&L Gates LLP
55 Second Street
Suite 1700
San Francisco , CA 94105
415-882-8200
Fax: 415-882-8220
Email: holly.hogan@klgates.com
*ATTORNEY TO BE NOTICED*

**Ivo Michael Labar**
Kerr & Wagstaffe LLP
100 Spear Street, Suite 1800
San Francisco , CA 94105
415-371-8500
Email: labar@kerrwagstaffe.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/02/2008 | 1 | COMPLAINT for Damages & Injunctive Relief & Demand for Jury Trial - [No Summons Issued] against Victor Conte, [Filing Fee: $350.00, Receipt Number 34611017719]. Filed by Plaintiff Shane D. Mosley, Sr. (tn, COURT STAFF) (Filed on 4/2/2008) (Entered: 04/03/2008) |
| 04/02/2008 | 2 | ADR SCHEDULING ORDER: Joint Case Management Statement due 7/7/2008 & Initial Case Management Conference set for 7/14/2008 at 4:00 PM.. (Attachments: #(1) BZ Standing Order). (tn, COURT STAFF) (Filed on 4/2/2008) (Additional attachment(s) added on 4/3/2008: # 2 Standing Order for All Judges) (tn, COURT STAFF). (Entered: 04/03/2008) |
| 04/02/2008 | 3 | CERTIFICATION of Interested Entities or Persons Filed by Plaintiff Shane D. Mosley, Sr. (tn, COURT STAFF) (Filed on 4/2/2008) (Entered: 04/03/2008) |
| 04/02/2008 |   | CASE DESIGNATED for Electronic Filing. (tn, COURT STAFF) (Entered: 04/03/2008) |
| 04/03/2008 | 6 | SUMMONS Issued as to Defendant Victor Conte. (tn, COURT STAFF) (Filed on 4/3/2008) (Entered: 04/07/2008) |
| 04/03/2008 | 7 | APPLICATION of Attorney Judd Burstein for Leave to Appear in Pro Hac |

| | | Vice -[Filing Fee: $210.00, Receipt Number 34611017731] Filed by Plaintiff Shane D. Mosley, Sr. (tn, COURT STAFF) (Filed on 4/3/2008) (Entered: 04/07/2008) |
|---|---|---|
| 04/03/2008 | 8 | [PROPOSED] Order Granting re 7 Application for Admission of AttorneyPro Hac Vice Submitted by Plaintiff Shane D. Mosley, Sr. (tn, COURT STAFF) (Filed on 4/3/2008) (Entered: 04/07/2008) |
| 04/03/2008 | 9 | APPLICATION of Attorney Jeremy Attie for Leave to Appear in Pro Hac Vice - [Filing Fee: $210.00, Receipt Number 34611017731] Filed by Plaintiff Shane D. Mosley, Sr. (tn, COURT STAFF) (Filed on 4/3/2008) (Entered: 04/07/2008) |
| 04/03/2008 | 10 | [PROPOSED] Order Granting re 9 Application for Admission of AttorneyPro Hac Vice Submitted by Plaintiff Shane D. Mosley, Sr. (tn, COURT STAFF) (Filed on 4/3/2008) (Entered: 04/07/2008) |
| 04/07/2008 | 4 | ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE. Signed by Judge Bernard Zimmerman on 4/7/2008. (bzsec, COURT STAFF) (Filed on 4/7/2008) (Entered: 04/07/2008) |
| 04/07/2008 | 5 | ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY PRO HAC VICE. Signed by Judge Bernard Zimmerman on 4/7/2008. (bzsec, COURT STAFF) (Filed on 4/7/2008) (Entered: 04/07/2008) |
| 04/23/2008 | 11 | STIPULATION *TO EXTEND TIME TO RESPOND TO COMPLAINT* by Victor Conte. (Labar, Ivo) (Filed on 4/23/2008) (Entered: 04/23/2008) |
| 04/23/2008 | 12 | Declination to Proceed Before a U.S. Magistrate Judge by Victor Conte. (Labar, Ivo) (Filed on 4/23/2008) (Entered: 04/23/2008) |
| 04/23/2008 | 13 | CERTIFICATE OF SERVICE by Shane D. Mosley, Sr *PROOF OF SERVICE ON SUMMONS AND COMPLAINT* (Dincel, Kim) (Filed on 4/23/2008) (Entered: 04/23/2008) |
| 04/24/2008 | 14 | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge (ls, COURT STAFF) (Filed on 4/24/2008) (Entered: 04/24/2008) |
| 04/25/2008 | 15 | ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Jeffrey S. White for all further proceedings. Magistrate Judge Bernard Zimmerman no longer assigned to the case. Signed by Executive Committee on 4/25/08. (ha, COURT STAFF) (Filed on 4/25/2008) (Entered: 04/25/2008) |
| 04/29/2008 | 16 | MOTION pursuant to Northern District of California's Civil Local Rule 7-11 to shorten the deadlines set forth in the Order Setting Initial Case Management Conference with a concomitant leave to conduct expedited discovery filed by Shane D. Mosley, Sr. Motion Hearing set for 5/5/2008 10:00 AM in Courtroom 2, 17th Floor, San Francisco. (Attie, Jeremy) (Filed on 4/29/2008) (Entered: 04/29/2008) |
| 04/29/2008 | 17 | Declaration of Judd Burstein, Esq. in Support of 16 MOTION pursuant to Northern District of California's Civil Local Rule 7-11 to shorten the deadlines set forth in the Order Setting Initial Case Management Conference with a concomitant leave to conduct expedited discovery filed byShane D. Mosley, Sr. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit |

| | | |
|---|---|---|
| | | C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F)(Related document(s) 16 ) (Attie, Jeremy) (Filed on 4/29/2008) (Entered: 04/29/2008) |
| 04/29/2008 | 18 | Brief re 16 MOTION pursuant to Northern District of California's Civil Local Rule 7-11 to shorten the deadlines set forth in the Order Setting Initial Case Management Conference with a concomitant leave to conduct expedited discovery filed byShane D. Mosley, Sr. (Related document(s) 16 ) (Attie, Jeremy) (Filed on 4/29/2008) (Entered: 04/29/2008) |
| 04/29/2008 | 19 | Proposed Order re 16 MOTION pursuant to Northern District of California's Civil Local Rule 7-11 to shorten the deadlines set forth in the Order Setting Initial Case Management Conference with a concomitant leave to conduct expedited discovery by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 4/29/2008) (Entered: 04/29/2008) |
| 05/02/2008 | 20 | *** **FILED IN ERROR. PLEASE SEE DOCKET # 23 .** *** Memorandum in Opposition re 16 MOTION pursuant to Northern District of California's Civil Local Rule 7-11 to shorten the deadlines set forth in the Order Setting Initial Case Management Conference with a concomitant leave to conduct expedited discovery filed byVictor Conte. (Labar, Ivo) (Filed on 5/2/2008) Modified on 5/5/2008 (ewn, COURT STAFF). (Entered: 05/02/2008) |
| 05/02/2008 | 21 | Declaration of Ivo Labar in Support of 20 Memorandum in Opposition, filed byVictor Conte. (Related document(s) 20 ) (Labar, Ivo) (Filed on 5/2/2008) (Entered: 05/02/2008) |
| 05/02/2008 | 22 | Proposed Order re 20 Memorandum in Opposition, by Victor Conte. (Labar, Ivo) (Filed on 5/2/2008) (Entered: 05/02/2008) |
| 05/02/2008 | 23 | Memorandum in Opposition re 16 MOTION pursuant to Northern District of California's Civil Local Rule 7-11 to shorten the deadlines set forth in the Order Setting Initial Case Management Conference with a concomitant leave to conduct expedited discovery *CORRECTION OF DOCKET NO. 20* filed byVictor Conte. (Labar, Ivo) (Filed on 5/2/2008) (Entered: 05/02/2008) |
| 05/05/2008 | 24 | INITIAL SCHEDULING CONFERENCE ORDER: Case Management Conference set for 8/15/2008 01:30 PM. Case Management Statement due by 8/8/2008.. Signed by Judge Jeffrey S. White on 5/5/08. (jjo, COURT STAFF) (Filed on 5/5/2008) (Entered: 05/05/2008) |
| 05/05/2008 | 25 | CERTIFICATE OF SERVICE by Shane D. Mosley, Sr *of Civil Standing Orders and Order Setting Case Mangement Conference and Requiring Joint Case Management Conference Statement* (Attie, Jeremy) (Filed on 5/5/2008) (Entered: 05/05/2008) |
| 05/06/2008 | 26 | ORDER by Judge Jeffrey S. White GRANTING 16 Administrative Motion to Shorten Deadlines. (jswlc2, COURT STAFF) (Filed on 5/6/2008) (Entered: 05/06/2008) |
| 05/06/2008 | | Set Deadlines/Hearings: Case Management Statement due by 5/23/2008. Case Management Conference set for 5/30/2008 01:30 PM. (hdj, COURT STAFF) (Filed on 5/6/2008) (Entered: 05/07/2008) |
| 05/16/2008 | 27 | ADR Clerks Notice re: Non-Compliance with Court Order. (tjs, COURT |

| | | STAFF) (Filed on 5/16/2008) (Entered: 05/16/2008) |
|---|---|---|
| 05/16/2008 | 28 | Memorandum in Opposition *to Motion for Expedited Trial* filed byVictor Conte. (Labar, Ivo) (Filed on 5/16/2008) (Entered: 05/16/2008) |
| 05/16/2008 | 29 | DECLARATION of Ivo Labar in Opposition to 28 Memorandum in Opposition *to Motion for Expedited Trial* filed byVictor Conte. (Related document(s) 28 ) (Labar, Ivo) (Filed on 5/16/2008) (Entered: 05/16/2008) |
| 05/16/2008 | 30 | ERRATA re 29 Declaration in Opposition *to Motion for Expedited Trial*. (Labar, Ivo) (Filed on 5/16/2008) (Entered: 05/16/2008) |
| 05/19/2008 | 31 | REPORT of Rule 26(f) Planning Meeting. (Attie, Jeremy) (Filed on 5/19/2008) (Entered: 05/19/2008) |
| 05/19/2008 | 32 | ADR Certification (ADR L.R. 3-5b) of discussion of ADR options (Attie, Jeremy) (Filed on 5/19/2008) (Entered: 05/19/2008) |
| 05/19/2008 | 33 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (Attie, Jeremy) (Filed on 5/19/2008) (Entered: 05/19/2008) |
| 05/22/2008 | 34 | *** **FILED IN ERROR. PLEASE SEE DOCKET # 35 .** *** JOINT CASE MANAGEMENT STATEMENT filed by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 5/22/2008) Modified on 5/27/2008 (ewn, COURT STAFF). (Entered: 05/22/2008) |
| 05/22/2008 | 35 | CASE MANAGEMENT STATEMENT filed by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 5/22/2008) (Entered: 05/22/2008) |
| 05/23/2008 | 36 | Declaration of Shane D. Mosley, Sr. 16 in support of Plaintiff's Motion for Expedited Trial filed byShane D. Mosley, Sr. (Attie, Jeremy) (Filed on 5/23/2008) Modified on 5/27/2008 (hdj, COURT STAFF). (Entered: 05/23/2008) |
| 05/23/2008 | 37 | Declaration of Judd Burstein 16 in support of Plaintiff's Motion for Expedited Trial filed byShane D. Mosley, Sr. (Attachments: # 1 Exhibit Exhibits A- F) (Attie, Jeremy) (Filed on 5/23/2008) Modified on 5/27/2008 (hdj, COURT STAFF). (Entered: 05/23/2008) |
| 05/23/2008 | 38 | Brief *in support of Plaintiff's Motion for Expedited Trial* filed byShane D. Mosley, Sr. (Attie, Jeremy) (Filed on 5/23/2008) (Entered: 05/23/2008) |
| 05/27/2008 | 39 | ADR Clerks Notice Setting ADR Phone Conference on 5/29/08 ast 9:30 a.m. Please take note that plaintiff's counsel initiates the call to all parties. (tjs, COURT STAFF) (Filed on 5/27/2008) (Entered: 05/27/2008) |
| 05/29/2008 | | ADR Remark: ADR Phone Conference conducted on 5/29/08 by RWS. (tjs, COURT STAFF) (Filed on 5/29/2008) (Entered: 05/30/2008) |
| 05/30/2008 | 40 | MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* filed by Victor Conte. Motion Hearing set for 8/22/2008 09:00 AM in Courtroom 2, 17th Floor, San Francisco. (Hogan, Holly) (Filed on 5/30/2008) (Entered: 05/30/2008) |

| 05/30/2008 | 41 | Declaration of James M. Wagstaffe in Support of 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* filed byVictor Conte. (Related document(s) 40 ) (Hogan, Holly) (Filed on 5/30/2008) (Entered: 05/30/2008) |
|---|---|---|
| 05/30/2008 | 42 | Declaration of Victor Conte in Support of 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* filed byVictor Conte. (Related document(s) 40 ) (Hogan, Holly) (Filed on 5/30/2008) (Entered: 05/30/2008) |
| 05/30/2008 | 43 | Declaration of DERRYL HUDSON in Support of 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* filed byVictor Conte. (Related document(s) 40 ) (Hogan, Holly) (Filed on 5/30/2008) (Entered: 05/30/2008) |
| 05/30/2008 | 44 | Proposed Order re 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* by Victor Conte. (Hogan, Holly) (Filed on 5/30/2008) (Entered: 05/30/2008) |
| 05/30/2008 | 45 | Certificate of Interested Entities by Victor Conte (Hogan, Holly) (Filed on 5/30/2008) (Entered: 05/30/2008) |
| 06/02/2008 | 46 | Minute Entry: Initial Case Management Conference held on 5/30/2008 before Judge Jeffrey S. White (Date Filed: 6/2/2008). (Court Reporter Kathy Powell.) (jjo, COURT STAFF) (Date Filed: 6/2/2008) (Entered: 06/02/2008) |
| 06/02/2008 | | CASE REFERRED to Early Neutral Evaluation (hdj, COURT STAFF) (Filed on 6/2/2008) (Entered: 06/04/2008) |
| | | |

| 06/03/2008 | 47 | ORDER SETTING BRIEFING SCHEDULE ON MOTION TO STRIKE. Signed by Judge Jeffrey S. White on 6/2/08. (jjo, COURT STAFF) (Filed on 6/3/2008) (Entered: 06/03/2008) |
| 06/05/2008 | 48 | Declination to Proceed Before a U.S. Magistrate Judge by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/5/2008) (Entered: 06/05/2008) |
| 06/05/2008 | 49 | Proposed Order *and Joint Proposed Discovery Schedule* by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/5/2008) (Entered: 06/05/2008) |
| 06/06/2008 | 50 | ORDER GRANTING 49 Joint Submission re Dates. Signed by Judge Jeffrey S. White on June 5, 2008. (jswlc2, COURT STAFF) (Filed on 6/6/2008) (Entered: 06/06/2008) |
| 06/06/2008 | 51 | NOTICE of Appearance by James Matthew Wagstaffe (Wagstaffe, James) (Filed on 6/6/2008) (Entered: 06/06/2008) |
| 06/10/2008 | 52 | JOINT CASE MANAGEMENT STATEMENT *JOINT STATEMENT RE: EXISTENCE OF DIVERSITY SUBJECT MATTER JURISDICTION* filed by Victor Conte. (Labar, Ivo) (Filed on 6/10/2008) (Entered: 06/10/2008) |
| 06/16/2008 | 53 | ADR Clerks Notice Appointing Robert M. Chilvers as ENE Evaluator. (af, COURT STAFF) (Filed on 6/16/2008) (Entered: 06/16/2008) |
| 06/16/2008 | 54 | Memorandum in Opposition re 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* filed byShane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/16/2008) (Entered: 06/16/2008) |
| 06/16/2008 | 55 | AFFIDAVIT in Opposition re 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* filed byShane D. Mosley, Sr. (Attachments: # 1 Exhibit Exhibit A)(Attie, Jeremy) (Filed on 6/16/2008) (Entered: 06/16/2008) |
| 06/16/2008 | 56 | AFFIDAVIT in Opposition re 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF by Judd Burstein* filed byShane |

| | | D. Mosley, Sr. (Attachments: # 1 Exhibit Exhibit A-E, # 2 Exhibit Exhibit F-H) (Attie, Jeremy) (Filed on 6/16/2008) (Entered: 06/16/2008) |
|---|---|---|
| 06/16/2008 | 57 | Proposed Order re 40 MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* MOTION to Strike *COMPLAINT PURSUANT TO CALIFORNIAS ANTI-SLAPP STATUTE [C.C.P. §425.16] STRATEGIC LAWSUIT AGAINST PUBLIC PARTICIPATION (SLAPP); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF* by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/16/2008) (Entered: 06/16/2008) |
| 06/16/2008 | 58 | Cross MOTION for Attorney Fees *pursuant to Cal. Civ. Code. Proc. Section 425.16(c)* filed by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/16/2008) (Entered: 06/16/2008) |
| 06/19/2008 | 59 | Proposed Order *and Amended Joint Proposed Discovery Schedule* by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/19/2008) (Entered: 06/19/2008) |
| 06/19/2008 | 60 | Proposed Order *and Amended Joint Proposed Discovery Schedule* by Shane D. Mosley, Sr. (Attie, Jeremy) (Filed on 6/19/2008) (Entered: 06/19/2008) |
| 06/20/2008 | 61 | ORDER GRANTING 60 Amended Stipulation re Schedule. Signed by Judge Jeffrey S. White on June 20, 2008. (jswlc2, COURT STAFF) (Filed on 6/20/2008) (Entered: 06/20/2008) |
| 06/20/2008 | 62 | Proposed Order *MODIFYING BRIEFING SCHEDULE ON DEFENDANT'S MOTION TO STRIKE COMPLAINT* by Victor Conte. (Labar, Ivo) (Filed on 6/20/2008) (Entered: 06/20/2008) |
| 06/20/2008 | | Set Deadlines/Hearings: Further Case Management Conference set for 4/3/2009 09:00 AM. Motion Hearing set for 4/3/2009 09:00 AM. (hdj, COURT STAFF) (Filed on 6/20/2008) (Entered: 06/23/2008) |
| 06/23/2008 | | PLEASE DISREGARD ENTRY - SEE DOCUMENT #63. (Entered: 06/23/2008) |
| 06/23/2008 | 63 | ORDER Modifying Briefing Schedule re: 40 Defendant's MOTION to Strike COMPLAINT.Defendant's Reply brief due by 6/30/2008. Signed by Judge Jeffrey S. White on 6/23/2008. (mat, COURT STAFF) (Filed on 6/23/2008). (Filed on 6/23/2008) Modified on 6/23/2008 (mat, COURT STAFF). (Entered: 06/23/2008) |
| 06/26/2008 | | ADR Remark: Counsel to notify Evaluator which attorneys should be included in the pre ENE telephone conference. Evaluator will contact those attorneys within about a week to determine schedule for telephone conference. (af, COURT STAFF) (Filed on 6/26/2008) (Entered: 06/26/2008) |
| 06/30/2008 | 64 | Reply Memorandum *in Support of Motion to Strike Complaint Persuant to California's Anti-Slapp Statute* filed byVictor Conte. (Wagstaffe, James) (Filed on 6/30/2008) (Entered: 06/30/2008) |
| 07/09/2008 | | Set/Reset Hearings: ENE Hearing set for 8/20/2008 10:00 AM., at the U.S. |

| | | District Court, 450 Golden Gate Avenue, 16th Floor, San Francisco, CA 94102. Report to ADR Reception on the 16th floor to check in and be directed to the assigned courtroom. ENE statements served on the opposing party and submitted to Evaluator no later than 5:00 p.m., Monday, 8/11/2008. (af, COURT STAFF) (Filed on 7/9/2008) (Entered: 07/09/2008) |
|---|---|---|
| 08/05/2008 | 65 | NOTICE of Voluntary Dismissal by Shane D. Mosley, Sr (Attie, Jeremy) (Filed on 8/5/2008) (Entered: 08/05/2008) |
| 08/05/2008 | 66 | NOTICE of Voluntary Dismissal *WITHOUT PREJUDICE* by Shane D. Mosley, Sr (Dincel, Kim) (Filed on 8/5/2008) (Entered: 08/05/2008) |
| 08/28/2008 | 67 | MOTION for Attorney Fees *and Sanctions* filed by Victor Conte. Motion Hearing set for 12/24/2008 09:00 AM in Courtroom 2, 17th Floor, San Francisco. (Labar, Ivo) (Filed on 8/28/2008) (Entered: 08/28/2008) |
| 08/28/2008 | 68 | Brief re 67 MOTION for Attorney Fees *and Sanctions* filed byVictor Conte. (Related document(s) 67 ) (Labar, Ivo) (Filed on 8/28/2008) (Entered: 08/28/2008) |
| 08/28/2008 | 69 | Declaration of James M. Wagstaffe in Support of 67 MOTION for Attorney Fees *and Sanctions* filed byVictor Conte. (Related document(s) 67 ) (Labar, Ivo) (Filed on 8/28/2008) (Entered: 08/28/2008) |
| 08/28/2008 | 70 | Declaration of Ivo Labar in Support of 67 MOTION for Attorney Fees *and Sanctions* filed byVictor Conte. (Attachments: # 1 Exhibit A-C, # 2 Exhibit D-M)(Related document(s) 67 ) (Labar, Ivo) (Filed on 8/28/2008) (Entered: 08/28/2008) |
| 08/29/2008 | 71 | ERRATA re 67 MOTION for Attorney Fees *and Sanctions NOTICE OF MOTION AND MOTION FOR SANCTIONS UNDER THE COURTS INHERENT AUTHORITY, OR IN THE ALTERNATIVE, ATTORNEYS FEES PURSUANT TO C.C.P. § 425.16(c)* by Victor Conte. (Labar, Ivo) (Filed on 8/29/2008) (Entered: 08/29/2008) |
| 08/29/2008 | 72 | ERRATA re 68 Brief *MEMORANDUM OF POINTS AND AUTHORIES IN SUPPORT OF MOTION FOR SANCTIONS UNDER THE COURTS INHERENT AUTHORITY, OR IN THE ALTERNATIVE, ATTORNEYS FEES PURSUANT TO C.C.P. § 425.16(c)* by Victor Conte. (Labar, Ivo) (Filed on 8/29/2008) (Entered: 08/29/2008) |
| 08/29/2008 | 73 | ERRATA re 69 Declaration in Support *DECLARATION OF JAMES WAGSTAFFE IN SUPPORT OF MOTION FOR SANCTIONS UNDER THE COURTS INHERENT AUTHORITY, OR IN THE ALTERNATIVE, ATTORNEYS FEES PURSUANT TO C.C.P. § 425.16(c)* by Victor Conte. (Labar, Ivo) (Filed on 8/29/2008) (Entered: 08/29/2008) |
| 08/29/2008 | 74 | ERRATA re 70 Declaration in Support *DECLARATION OF IVO LABAR IN SUPPORT OF MOTION FOR SANCTIONS UNDER THE COURTS INHERENT AUTHORITY, OR IN THE ALTERNATIVE, ATTORNEYS FEES PURSUANT TO C.C.P. § 425.16(c)* by Victor Conte. (Attachments: # 1 Exhibit A-C, # 2 Exhibit D, # 3 Exhibit E-N)(Labar, Ivo) (Filed on 8/29/2008) (Entered: 08/29/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/02/2008 08:02:49 | | | |
| **PACER Login:** | bf0064 | **Client Code:** | mosley/conte |
| **Description:** | Docket Report | **Search Criteria:** | 3:08-cv-01777-JSW |
| **Billable Pages:** | 6 | **Cost:** | 0.48 |

# EXHIBIT L



**OneBeacon**
PROFESSIONAL PARTNERS

☐ **OneBeacon Insurance Company**
☐ **OneBeacon Midwest Insurance Company**
☐ **Camden Fire Insurance Association**
☒ **The Employers' Fire Insurance Company**

## MEDIA ADVANTAGE POLICY®
(Defense Costs in Addition to the Limit of Liability)

**DEFENSE COSTS** AND **LOSS** SHALL BE APPLIED AGAINST THE RETENTION. THE LIMITS OF LIABILITY OF THIS POLICY ARE NOT REDUCED OR EXHAUSTED BY PAYMENT OF **DEFENSE COSTS.** VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS AND RESPONSIBILITIES.

### DECLARATIONS

All words or phrases printed in bold type, except captions, are defined in the policy.

1. **Named Insured** and Address:

   Skyhorse Publishing, Inc.
   555 Eighth Avenue, Suite 903
   New York, NY 10018

   Policy No.:   MEP-3360-08
   Renewal of:  MEP-2132-07
   Class Code:  800

2. **Scheduled Media:**

   Books published and/or disseminated by the Named Insured during the policy term including media-related matter disseminated via www.skyhorsepublishing.com

3. **Policy Term:**      From  05/08/2008      To  05/08/2009

   12:01 A.M. local time at the address of the **Named Insured** as shown above.

4. Retention:      $   25,000      Each **Occurrence**

5. Limit of Liability   **(a)** $  2,000,000      Each **Occurrence**
                        **(b)** $  2,000,000      **Policy Term** Aggregate

6. Annual Premium      $    7,548

**NOTICE**
THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

7. Policy Forms and Endorsements Effective at Issuance:

   Media Advantage Policy DOL, Additional Insured; Business Operations-Personal Injury; New York Amendatory; New York Cancellation & Nonrenewal Provisions

Date Issue:   June 11, 2008

_____
Authorized Representative

OBPP-KC-G16683  05/05

©1998 - 2005 OneBeacon Professional Partners

DOC

# CLAIMS REPORTING GUIDELINES

It is a condition of this policy that the insured shall provide prompt notification of any potentially covered claim in writing and shall forward every demand, notice or summons to:

**First Media Insurance Agency**
**A Division of OneBeacon Professional Partners**
**Attention:  Claims Administrator**
**4350 Shawnee Mission Parkway, Suite 350**
**Fairway, Kansas  66205**
**1-800-753-7545**
**913-677-2893 – Fax**
**or**
**E-mail to:  claimsreporting@firstmediainc.com**

Such notice must include particulars sufficient to identify the insured and the claimant and provide full information with respect to the date of the occurrence at issue and the circumstances giving rise to the claim.

# ADDITIONAL INSURED ENDORSEMENT

PLEASE READ THE ENTIRE POLICY TO DETERMINE YOUR RIGHTS AND RESPONSIBILITIES

This endorsement modifies insurance provided under the following:

> NEWSPAPER ADVANTAGE POLICY®
> MEDIA ADVANTAGE POLICY®
> COMMUNICATOR'S ADVANTAGE POLICY™
> ADVERTISING AGENCY LIABILITY POLICY
> ADVERTISER ADVANTAGE POLICY®

The **Named Insured** and the **Company** agree that <u>Victor Conte</u> is added to the policy as an **additional insured,** but only with respect to **claims** directly arising from the **matter** or services provided by the **Named Insured** or **subsidiary.**

As respects **claims** arising from this endorsement, SECTION III — EXCLUSIONS is amended to add the following:

> against an **insured** that is brought by or on behalf of another **insured** or any business entity that is owned, managed or operated, directly or indirectly, by an **insured**, or any parent company, **subsidiary**, successor or assignee of an **insured**, or anyone affiliated with an **insured** or such business through common and controlling interest; however, this exclusion shall not apply if such business entity is an **insured's** customer bringing the **claim** in that capacity and acting without the solicitation, assistance, participation or intervention of any **insured;**

> for or arising from allegations of direct liability (as opposed to vicarious liability) on the part of the **additional insured;**

> for or arising out of **matter** or services furnished by the **additional insured**

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

All other terms, conditions and exclusions remain unchanged.

**COMPLETE THE FOLLOWING IF NOT ATTACHED TO POLICY WHEN POLICY IS ISSUED:**

| Named Insured | | Policy Number MEP-3360-08 | |
|---|---|---|---|
| Endorsement Number 1 | Policy Expiration Date | Effective Date of Endorsement | |
| Additional or Return Premium $ _____ x _____ | | _____ Short Rate    = _____    _____ Pro Rate | _____ AP    _____ RP |
| Typing Date _____ | | | |

_____
Authorized Representative

# BUSINESS OPERATIONS — PERSONAL INJURY ENDORSEMENT
# (NEW YORK)

PLEASE READ THE ENTIRE POLICY TO DETERMINE YOUR RIGHTS AND RESPONSIBILITIES

This endorsement modifies insurance provided under the following:

NEWSPAPER ADVANTAGE POLICY®
MEDIA ADVANTAGE POLICY®
COMMUNICATOR'S ADVANTAGE POLICY™
ADVERTISING AGENCY LIABILITY POLICY
ADVERTISER ADVANTAGE POLICY®

**NOTICE**
THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

SECTION I — COVERAGE AGREEMENTS is amended to add the following:

**Business Operations — Personal Injury Liability**

The **Company** shall pay on behalf of the **insured** all **loss** in excess of the Retention and within the Limit of Liability which the **insured** is legally required to pay to third parties because of liability imposed by law or **assumed under contract** as a result of **claims** arising from an **occurrence** committed by the **insured** during the **policy term** and arising from:

1. defamation, however styled in a **claim,** involving disparagement or harm to the character, feelings or reputation of any person or organization, including libel, slander, product disparagement or trade libel;

2. invasion of or interference with the right of privacy or publicity, however styled in a **claim,** including eavesdropping, intrusion upon seclusion, false light invasion of privacy, public disclosure of private facts and misappropriation of name or likeness;

3. trespass, wrongful entry or eviction; or

4. false arrest or imprisonment, abuse of process, detention or malicious prosecution.

With respect to this endorsement SECTION II — DEFINITIONS, **Occurrence** is deleted in its entirety and replaced with the following:

**Occurrence** means:

1. the gathering, acquisition, investigation and compilation of **matter;**

2. any publication or republication of **matter;**

3. any utterance of **matter;** and

4. any online dissemination of **matter;** committed in or for the usual and ordinary business operations of the **insured.**

214162

With respect to this endorsement, SECTION II — DEFINITIONS is amended to add the following, which shall take precedence where in conflict:

**Pollutants** means any substance located anywhere in the world portraying hazardous characteristics as defined or identified on any list of hazardous substances issued by the United States Environmental Protection Agency or the Canadian Environmental Protection Act, or any relevant Federal, State, Provincial, County, Municipality or foreign counterpart thereof. **Pollutants** shall also mean, without limitation, solids, liquids, gaseous or thermal or electromagnetic irritants, or contaminants, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead, formaldehyde, bacterial contaminates, and waste (including materials to be recycled, reconditioned or reclaimed) as well as any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos, or asbestos products or any noise.

With respect to this endorsement, SECTION III — EXCLUSIONS is amended to add the following which shall take precedence where in conflict:

**AA.** for or arising out of:

1. the actual, alleged or threatened discharge, release, escape, migration, dispersal, seepage or exposure to **pollutants**; or

2. any request, direction or order that an insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **pollutants** or any voluntary decision to do so.

**BB.** for or arising out of any actual or alleged harassment or discrimination because of race, association, age, sex, sexual orientation, national origin, citizenship, ethnicity, ancestry, religion, physical or mental disability or marital or economic status.

**CC.** for or arising out of intentional acts as set forth within the policy, unless the **occurrence** alleged in such **claim**, if established, arose out of a fortuitous event.

SECTION III — EXCLUSIONS, C. is deleted in its entirety and replaced with the following and shall apply only to **claims** arising from this endorsement:

**claims** made by current or former employees, applicants for employment or any of their spouses, heirs, executors, administrators or legal representatives.

All other terms, conditions and exclusions remain unchanged.

**COMPLETE THE FOLLOWING IF NOT ATTACHED TO POLICY WHEN POLICY IS ISSUED:**

| Named Insured | | Policy Number MEP-3360-08 | |
|---|---|---|---|
| Endorsement Number 2 | Policy Expiration Date | Effective Date of Endorsement | |
| Additional or Return Premium $ _____ x _____ | | _____ Short Rate = _____ _____ Pro Rate | ___ AP ___ RP |
| Typing Date | | | |

_____
Authorized Representative

# NEW YORK AMENDATORY ENDORSEMENT
Defense Costs in Addition to the Limit of Liability

THIS ENDORSEMENT MODIFIES THE POLICY.
PLEASE READ THE POLICY CAREFULLY

**A.** SECTION I — COVERAGE AGREEMENTS, A. Communications and Personal Injury Liability, clause 17. is deleted in the Communicator's Advantage Policy™, Media Advantage Policy® and Newspaper Advantage Policy® and replaced with the following:

any legal proceeding or injunctive relief relating to spoliation of evidence arising from the innocent destruction and/or recycling of the **insured's matter.**

This change does not apply to the Advertiser Advantage Policy® or the Advertising Agency Liability Policy.

**B.** SECTION II — DEFINITIONS, **Claim** is deleted in its entirety and replaced with the following:

**Claim** means a demand or suit for money tendered to the **insured** for **loss** or equitable relief, even if any of the allegations are groundless, false or fraudulent, or a request to toll or waive any applicable statute of limitations relating to a **claim** or potential **claim. Claim** does not include an investigation or proceeding initiated by an administrative agency, including but not limited to the Federal Trade Commission or Federal Communications Commission.

**C.** SECTION II — DEFINITIONS, **Loss** is amended as follows:

This policy excludes coverage for punitive damages in accordance with the laws in the State of New York.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**D.** SECTION V — GENERAL CONDITIONS, Notice of a Claim is deleted in its entirety and replaced with the following:

**Notice of a Claim**

The **insured** shall provide notification of any potentially covered **claim** as soon as reasonably possible to the **Company** or any of its agents by forwarding all suit papers and documents.

**E.** SECTION V — GENERAL CONDITIONS is amended to add the following:

**Transfer of Duties When the Policy Limit is Used Up**

1. If the **Company** concludes that, based on occurrences, offenses, **claims** or suits which have been reported to the **Company** and to which this insurance may apply, the Limit of Liability is likely to be used up in the payment of judgments or settlements, the **Company** will notify the **insured**, in writing, to that effect.

2. When the Limit of Liability has actually been used up in the payment of judgments or settlements:

   a. the **Company** will notify the **insured**, in writing, as soon as practicable, that:

      1. the Limit of Liability has actually been used up; and

      2. the **Company's** duty to defend suits seeking damages subject to the Limit of Liability has also ended.

   b. the **Company** will initiate, and cooperate in, the transfer of control, to any **insured**, of all **claims** and suits seeking damage which are subject to the Limit of Liability and which are reported to the **Company** before that limit is used up. That **insured** must cooperate in the transfer of control of said **claims** and suits.

The **Company** agrees to take such steps, as deemed appropriate, to avoid a default in, or continue, the defense of, such suits until such transfer is completed, provided the **insured** is cooperating in completing such transfer.

The **Company** will take no action whatsoever with respect to any **claim** or suit seeking damages subject to the Limits of Liability, had it not been used up, if the **claim** or suit is reported to the **Company** after the Limit of Liability has been used up.

   c.  the **Named Insured**, and any other **insured** involved in a suit seeking damages subject to the Limit of Liability, must arrange for the defense of such suit within such time period as agreed to between the appropriate **insured** and the **Company.** Absent any such agreement, arrangements for the defense of such suit must be made as soon as practicable.

3.  The **Insured** will reimburse the **Company** for expenses it incurs in taking those steps deemed appropriate in accordance with paragraph 2.b. above.

The duty of the **insured** to reimburse the **Company** will begin on:

   a.  the date on which the Limit of Liability is used up, if notice was sent in accordance with paragraph 1. above; or

   b.  the date on which notice was sent in accordance with paragraph 2. above, if notice was not sent in accordance with paragraph 1. above.

4.  The exhaustion of the Limit of Liability by the payments of judgment or settlements and the resulting end of the **Company's** duty to defend, will not be affected by failure to comply with any of the provisions of this condition.

SECTION III — EXCLUSIONS is amended to add and shall take precedence where in conflict:

The **Company** shall not be obligated to defend or pay **loss** or **defense costs** arising from **claims**:

for or arising out of intentional acts, unless the act(s) alleged in such **claim**, if established, arose out of a fortuitous event.

> **NOTICE**
>
> THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

All other terms, conditions and exclusions remain unchanged.
**COMPLETE THE FOLLOWING IF NOT ATTACHED TO POLICY WHEN POLICY IS ISSUED:**

| Named Insured | | Policy Number MEP-3360-08 | |
|---|---|---|---|
| Endorsement Number 3 | Policy Expiration Date | Effective Date of Endorsement | |
| Additional or Return | Premium $ _____ x _____ | _____ Short Rate = _____ _____ Pro Rate | _____ AP _____ RP |
| Typing Date | | | |

_____
Authorized Representative

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW YORK CANCELLATION &
# NON-RENEWAL PROVISIONS

The following provisions are added to the CANCELLATION Condition of the policy and supersede any provisions to the contrary:

**CANCELLATION**

1. This policy may be canceled by the **Named Insured** by:

   a. Surrendering the policy to the **Company** or any of its authorized agents; or

   b. Mailing to the **Company** written notice stating when thereafter the cancellation shall be effective.

2. **Cancellation of Policies In Effect 60 Days Or Less**

   The policy may be canceled by the **Company** by mailing or delivering to the **Named Insured** written notice stating the reason for cancellation, at the mailing address shown in this policy, and his authorized agent or broker at least:

   a. 20 days before the effective date of cancellation if the policy is canceled for any reason not included in paragraph b. below.

   b. 15 days before the effective date of cancellation if the policy is canceled for any of the following reasons:

      (1) Nonpayment of premium;

      (2) Conviction of a crime arising out of acts increasing the hazard insured against;

      (3) Discovery of fraud or material misrepresentation in the obtaining of the policy or in the presentation of a claim there under;

      (4) After issuance of the policy or after the last renewal date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

      (5) Material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

      (6) Required pursuant to a determination by the Superintendent that continuation of the present premium volume of the **Company** would jeopardize the **Company's** solvency or be hazardous to the interest of the **Company's** policyholders, creditors or the public;

      (7) A determination by the Superintendent that the continuation of the policy would violate, or would place the **Company** in violation of any provision of the Insurance Code;

      (8) Revocation or suspension of the insured's license to practice his profession or, if the **insured** is a hospital, it no longer possesses a valid operating certificate under Section 2800.1a of the public health law; or

      (9) If this policy provides **EXCESS LIABILITY** insurance and one or more of the underlying policies is canceled for reasons (1)-(8) above such underlying policy is not replaced without a lapse in coverage.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

3. **Cancellation of Policies in Effect For More Than 60 Days**

If this policy has been in effect for more than 60 days, or if this policy is a renewal or continuation of a policy issued by the **Company**, the policy may be canceled by the **Company** only for any reasons listed in paragraph 2.b. above provided a written notice stating the reason for cancellation is mailed or delivered to the **Named Insured** at his address shown in this policy, and his authorized agent or broker at least 15 days before the effective date of cancellation.

4. Notice of cancellation will state the effective date of cancellation. The **policy term** will end on that date.

5. If notice is mailed, proof of mailing will be sufficient proof of notice.

6. If the **Named Insured** cancels, earned premium will be computed in accordance with the customary short rate table and procedure. If the **Company** cancels, earned premium shall be computed pro rata.

However, when the premium is advanced under a premium finance agreement, the cancellation refund will be pro rata. Under such financed policies, the **Company** will be entitled to retain a minimum earned premium of 10% of the total policy premium or $60, whichever is greater.

Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The following Condition is added:

**NON-RENEWAL**

This policy shall remain in full force and effect pursuant to the same terms, conditions and rates unless written notice is mailed or delivered by the insurer to the **Named Insured**, at the address shown in this policy, and the **insured's** authorized agent or broker, indicating the **Company's** intention:

> **NOTICE**
> THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

1. not to renew such policy;

2. to condition its renewal upon change of limits, change in type of coverage, reduction of coverage, increased deductible or self-insured retention, or addition or exclusion, or upon increased premiums in excess of ten percent (exclusive of any premium increase due to and commensurate with insured value added or increased exposure units); or

3. that the policy will not be renewed or will not be renewed upon the same terms, conditions or rates; such alternative renewal notice will advise the **insured** that a second notice shall be mailed or delivered at a later date indicating the insurer's intention as specified in subparagraph 1. or 2. of this paragraph and that coverage shall continue on the same terms, conditions and rates as the expiring policy, until the later of the expiration date or 60 days after the second notice is mailed or delivered; and such alternative renewal notice also shall advise the **insured** of the availability of loss information. The extension of coverage, under the second notice, shall not create a new annual aggregate or policy limit under this policy, except that the annual aggregate or policy limit of the expiring policy shall be increased in proportion to the policy extension.

Every notice of non-renewal mailed or delivered by the **Company** shall advise the **Named Insured** and such **insured's** authorized agent or broker of the availability of loss information. Upon written request by the **Named Insured** or such **insured's** authorized agent or broker, the **Company** shall mail or deliver loss information, covering a period of years specified by regulation or the period of time coverage has been provided by the **Company**, whichever is less, within twenty days of such request.

A non-renewal notice shall contain the specific reason or reasons for non-renewal or conditional renewal, and set forth the amount of any premium increase and nature of any other proposed changes. Such notice shall be mailed or delivered at least 60 days, or 30 days for an EXCESS LIABILITY policy, but no more than 120 days in advance of the end of the required policy period.

A notice of non-renewal shall be considered late if it is mailed less than 60 days, or 30 days for an EXCESS LIABILITY policy, prior to the policy's expiration date.

If a late non-renewal notice is mailed prior to the policy expiration, coverage shall remain in effect at the same terms and conditions, and at the lower of the current rates or the prior period's rates, for a period of 60 days, or 30 days for an EXCESS LIABILITY policy, from the date the policy is mailed.

If the late non-renewal notice is mailed on or after the expiration date, or not mailed at all, coverage shall continue for another policy period at the same terms and conditions of the expiring policy, and at the lower of the current rates or those of the expiring policy. If the **Insured** elects to replace the policy or cancels during this additional required policy period, such policy shall be canceled on a pro rata basis.

If the **Company** provides notice of non-renewal and subsequently extend the **policy term** for ninety (90) days or less, no additional notice of non-renewal will be required.

The non-renewal notice requirements shall not apply when the **Named Insured,** an agent or broker authorized by the **Named Insured,** or another insurer of the **Named Insured** has mailed or delivered written notice that the policy has been replaced or is no longer desired.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

All other terms, conditions and exclusions remain unchanged.

**COMPLETE THE FOLLOWING IF NOT ATTACHED TO POLICY WHEN POLICY IS ISSUED:**

| Named Insured | | Policy Number MEP-3360-08 | |
|---|---|---|---|
| Endorsement Number 4 | Policy Expiration Date | Effective Date of Endorsement | |
| Additional or Return    Premium $ _____ x _____ | | _____ Short Rate           = _____ | ___ AP |
| | | _____ Pro Rate | ___ RP |
| Typing Date _____ | | | |

_____
Authorized Representative

# ADDITIONAL INSURED ENDORSEMENT

### PLEASE READ THE ENTIRE POLICY TO DETERMINE YOUR RIGHTS AND RESPONSIBILITIES

This endorsement modifies insurance provided under the following:

> NEWSPAPER ADVANTAGE POLICY®
> MEDIA ADVANTAGE POLICY®
> COMMUNICATOR'S ADVANTAGE POLICY™
> ADVERTISING AGENCY LIABILITY POLICY
> ADVERTISER ADVANTAGE POLICY®

The **Named Insured** and the **Company** agree that Nathan Jandrick is added to the policy as an **additional insured**, but only with respect to **claims** directly arising from the **matter** or services provided by the **Named Insured** or **subsidiary**.

As respects **claims** arising from this endorsement, SECTION III — EXCLUSIONS is amended to add the following:

> against an **insured** that is brought by or on behalf of another **insured** or any business entity that is owned, managed or operated, directly or indirectly, by an **insured**, or any parent company, **subsidiary**, successor or assignee of an **insured**, or anyone affiliated with an **insured** or such business through common and controlling interest; however, this exclusion shall not apply if such business entity is an **insured's** customer bringing the **claim** in that capacity and acting without the solicitation, assistance, participation or intervention of any **insured**;

> for or arising from allegations of direct liability (as opposed to vicarious liability) on the part of the **additional insured**;

> for or arising out of **matter** or services furnished by the **additional insured**.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

All other terms, conditions and exclusions remain unchanged.

**COMPLETE THE FOLLOWING IF NOT ATTACHED TO POLICY WHEN POLICY IS ISSUED:**

| Named Insured Skyhorse Publishing, Inc. | | Policy Number MEP-3360-08 | |
|---|---|---|---|
| Endorsement Number 5 | Policy Expiration Date 5-8-2009 | Effective Date of Endorsement 6-4-2008 | |
| Additional or Return Premium $ N/A    x N/A | | _____ Short Rate    = N/A _____ | AP |
| | | _____ Pro Rate _____ | RP |

| Typing Date 6-11-2008 |
|---|

_T. Mr. Lauth_
Authorized Representative

OBPP-KCP-201F 05/05 (Rev. 8/05)                                                                 Page 1 of 1
©1998 - 2005 OneBeacon Professional Partners - OneBeacon Insurance Company

214162



# The Employers' Fire Insurance Company

## MEDIA ADVANTAGE POLICY®

### (Defense Costs in Addition to the Limit of Liability)

DEFENSE COSTS AND LOSS SHALL BE APPLIED AGAINST THE RETENTION. THE LIMITS OF LIABILITY OF THIS POLICY ARE NOT REDUCED OR EXHAUSTED BY PAYMENT OF DEFENSE COSTS. VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS AND RESPONSIBILITIES.

Words and phrases that appear in boldface are defined in SECTION II — DEFINITIONS of this policy.

In reliance upon the representations in the insurance application, and in consideration of the premium paid when due and subject to the Limits of Liability stated in the policy Declarations and the terms, exclusions and conditions herein, the Company and the insured agree to the following:

## SECTION I — COVERAGE AGREEMENTS

**A. Communications and Personal Injury Liability**

The **Company** shall pay on behalf of the **insured** all **loss** in excess of the retention up to the Limit of Liability which the **insured** is legally required to pay to third parties, including **loss** assumed by the **insured** or assumed under contract as a result of **claims** arising from an **occurrence** committed by the **insured** during the **policy term** in or for **scheduled media** and arising from, but not limited to:

NOTICE

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

1. defamation, however styled in a **claim**, involving disparagement or harm to the character, feelings or reputation of any person or organization, including libel, slander, product disparagement or trade libel;

2. invasion of or interference with the right of privacy or publicity, however styled in a **claim**, including eavesdropping, intrusion upon seclusion, false light invasion of privacy, public disclosure of private facts and misappropriation of name or likeness;

3. negligent or intentional infliction of emotional distress, outrage or outrageous conduct;

4. trespass or wrongful entry or eviction;

5. false arrest or imprisonment, abuse of process, detention or malicious prosecution;

6. harassment or stalking;

7. violations of the Fourth Amendment to the U.S. Constitution or other equivalent state statute preventing unreasonable searches and seizures relating to newsgathering;

8. breach of confidentiality of any oral, written or implied agreement, however styled in a **claim**, arising from the failure to maintain the confidentiality of a source or the materials furnished by a source, or from the failure to portray a source or subject in a certain manner or light;

9. infringement of copyright, plagiarism, **piracy** and misappropriation of ideas under implied contract or other misappropriation of ideas or information;

OBPP-KC-G16727 05/05 (Rev. 8/05)                                    Page 1 of 9

10. infringement or dilution of trademark, **title**, slogan, trade name, trade dress, service mark or service name;

11. unfair competition, but only when alleged in a **claim** covered under one or more of subparts 1 – 10 above;

12. deceptive trade practices or fraud, whether statutory, regulatory or at common law, but only when alleged in a **claim** covered under one or more of subparts 1 – 11 above and when the acts giving rise to such causes of action had been previously approved by the **insured's** counsel or duly authorized supervisor;

13. conspiracy, but only when alleged in a **claim** covered under one or more subparts 1 – 11 above;

14. breach of an indemnification or hold harmless agreement, but only when alleged in a **claim** covered under one or more of subparts 1 – 11 above;

15. negligent supervision of an employee, but only when alleged in a **claim** covered under one or more of subparts 1-11 above;

16. any contempt order, but only if the **insured's** counsel had previously authorized such act or omission based upon a good faith belief that the court order violated the First Amendment to the United States Constitution or any provision of a State Constitution protecting freedom of speech and press or that the act or omission was not a violation of such court order; or

17. any legal or equitable proceeding relating to spoliation of evidence arising from the innocent destruction and/or recycling of the **insured's matter.**

**B. Contextual Errors and Omissions Liability**

The **Company** shall pay on behalf of the **insured** all **loss** in excess of the Retention and within the Limit of Liability which the **insured** is legally required to pay to third parties because of liability imposed by law or **assumed under contract** as a result of **claims** arising from an **occurrence** committed by the **insured** during the **policy term** and arising from any form of negligence in the content of **matter** uttered or disseminated in **scheduled media**, including but not limited to an error, omission, misrepresentation, misstatement or misleading statement.

**C. Defense of Claims**

The **Company** shall pay on behalf of the **insured** all **defense costs** in excess of the applicable LIMITS OF LIABILITY AND RETENTION, as a result of a **claim** covered by this policy.

NOTICE
THIS POLICY FORM AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**SECTION II — DEFINITIONS**

When used in boldface in this policy including endorsements and the Declarations:

**A. Additional Insured means:**

1. an individual or entity providing **matter** or services for or on behalf of the **Named Insured** for **scheduled media** and who has been added to the policy by endorsement as an **insured**; or

2. an individual or entity added to the policy by endorsement as an **Insured** in respect to **scheduled media** furnished by the **Named Insured** to the **additional insured.**

**B. Advertising** means **advertising**, publicity, press releases or promotional materials or public appearances on behalf of the **insured** or for others, but this definition does not include one-on-one written or oral communications, or the redemption of lotteries, sweepstakes, coupons, contests or games of chance, including the over or under redemption of any of the above.

2-14162

C. **Assumed under contract** means liability assumed by the **insured** in any written, oral or implied hold harmless or indemnity agreement with any party, but only with respect to **matter** provided by the **insured** and for the types of **occurrences** covered by this policy.

D. **Bodily Injury** means bodily injury, sickness, disease, including death.

E. **Claim** means:

   1. any legal or judicial proceeding against an **insured** seeking to hold an **insured** responsible for **loss**, services or equitable relief, even if any of the allegations are groundless, false or fraudulent;

   2. any written demand or notice from any person or entity seeking to hold an **insured** responsible for **loss**, services or equitable relief, even if any of the allegations are groundless, false or fraudulent; or

   3. a request to toll or waive any applicable statute of limitations relating to a **claim** or potential **claim**.

   **Claim** does not include an investigation or proceeding initiated by an administrative or regulatory agency, including but not limited to the Federal Trade Commission or Federal Communications Commission.

F. **Company** means the insurance **Company** shown on the Declarations Page.

G. **Defense costs** means the following, when authorized and approved by the **Company**:

   1. reasonable fees to respond to a retraction or correction request;

   2. reasonable fees, costs and expenses incurred by outside counsel in investigation, defense, settlement or appeal of a **claim**; or

   3. premiums on appeal bonds or on bonds to release attachments as a result of a covered **claim** for a bond amount not exceeding the Limit of Liability, but the **Company** is not responsible for procuring such bonds.

   **Defense costs** do not include salaries, expenses or overhead of any **insured**.

H. **Independent Contractor** means an individual or business entity providing **matter** or services to the **insured** pursuant to an express or implied contract or agreement.

I. **Insured** means:

   1. the **Named Insured** and any **subsidiary**, and any person who was, is or becomes a director, officer, trustee, shareholder, principal, member, partner or employee of the **Named Insured** or any **subsidiary**, but only in respect to **claims** arising out of the course and scope of their duties as such;

   2. the estate, heirs, legal representatives or assigns of an **insured** in the event of the death, incapacity or bankruptcy of an **insured**, but only if such **claim** would be subject to coverage under the policy if made against the **insured**;

   3. the **insured's** lawful spouse, but only if the **claim** arises solely from the spouse's status as such or from the spouse's ownership interest in the **matter** giving rise to the **claim**, but only if such **claim** would be subject to coverage under the policy if made against the **insured**; or

   4. at the sole discretion of the **Named Insured**, any agent, leased or temporary employee, volunteer or **independent contractor** providing **matter** or services for **scheduled media**, including but not limited to freelancers, correspondents, photographers and stringers, but only in respect to acts committed on behalf of the **Named Insured** or **subsidiary**.

NOTICE

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

J.  **Loss** means judgment, settlement and all forms of monetary damages as a result of a **claim** covered by this policy, including actual damages, statutory damages, punitive, multiplied or exemplary damages, pre-judgment and post-judgment interest and plaintiff's attorneys' fees and costs included as part of a judgment. However, **loss** shall not include:

1.  taxes, civil or criminal fines, penalties or sanctions (other than punitive or exemplary damages), or

2.  the cost of recall, correction, reproduction, redistribution or reprinting of **matter** and related expenses incurred by the **insured, any additional insured** or any indemnitee;

With regard to punitive damages, this insurance shall apply to the fullest extent permitted by law.  Where an **insured** determines, based on written opinion of counsel, that punitive damages are insurable under any applicable law, the **Company** shall not challenge the **insured's** determination of insurability.

K.  **Matter** means any communication, regardless of its nature or form, including but not limited to **advertising,** art, creative expression, data, entertainment, film, facts, fiction, graphics, literary composition, music, news, photographs, pictures, opinions, sound recordings and video, and the use of such **matter** by others with the permission of the **Insured.**

L.  **Named Insured** means the person or organization named in Item 1 in the Declarations of the policy.

M.  **Occurrence** means:

1.  the gathering, creation, acquisition, investigation and compilation of **matter;**

2.  any broadcast, transmission, utterance, telecast, cablecast, serialization or production of **matter;**

3.  any publication or republication of **matter** or incidental publications relating thereto;

4.  any online dissemination of **matter;**

5.  **advertising** in or directly relating to **scheduled media;**

6.  the release, distribution, syndication, licensing, sale, lease or exhibition of **matter;** or

NOTICE

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

7.  an editorial decision to deny or limit access to **scheduled media** to prevent the utterance or dissemination of offensive **matter.**

**Occurrences** that take place on one or more dates during the **policy term,** or during two or more consecutive policies issued by the **Company,** involving the same or related subject, event, situation, person or class of persons, irrespective of the number of repetitions, versions or forms of said **occurrence,** shall be considered a single **occurrence.** The Limits of Liability and Retention in effect when the first **occurrence** took place shall apply.

N.  **Piracy** means the wrongful use, reprinting or reproduction of copyrighted intellectual property.

O.  **Policy term** means the period beginning with the inception date shown in the Declarations and ending with the earlier of:

1.  the date of cancellation of the policy; or

2.  the expiration date shown in the Declarations.

P.  **Property damage** means:

1.  physical harm to or destruction of tangible or intangible property, including its loss of use; or

2.  loss of use of tangible or intangible property that has not been otherwise physically harmed or destroyed.

OBPP-KC-G16727 05/05 (Rev. 8/05)                                                                Page 4 of 9

2-14162

Q. **Scheduled media** means the media entities and activities set forth in Item 2 of the Declarations or by endorsement, including any electronic, incidental, supplemental or special editions relating thereto, on the effective date of coverage or established or acquired subsequently thereto, but only if the **Named Insured** gives the **Company** written notice of the new station, publication, program, entity or system within ninety (90) days of its creation or acquisition and pays any additional premium that may be required.

R. **Subsidiary** means any entity in which the **insured** owns, directly or though one or more **subsidiaries**, more than fifty percent (50%) of the issued or outstanding voting securities.

S. **Title** means the caption or name of **matter.**

**SECTION III — EXCLUSIONS**

The **Company** shall not be obligated to defend or to pay loss:

> **NOTICE**
> THESE POLICY FORMS AND THE APPLICABLE RATES
> ARE EXEMPT FROM THE FILING REQUIREMENTS OF
> THE NEW YORK STATE INSURANCE DEPARTMENT.
> HOWEVER, SUCH FORMS AND RATES MUST MEET
> THE MINIMUM STANDARDS OF THE NEW YORK
> INSURANCE LAW AND REGULATIONS.

A. for or arising out of, actual or alleged breach of any express or implied contract, agreement or warranty or any fee, billing or charge by an **insured** or the **insured's** alleged failure to pay royalties or other payments or to account for same, but this exclusion shall not apply to liability **assumed under contract** nor for **claims** covered under SECTION I — COVERAGE AGREEMENTS, A.8;

B. for or arising out of ownership disputes relating to **matter** or services supplied to the **insured** by any past, present or future **insured**, **joint venturer** or **independent contractor;**

C. for or arising out of usual and ordinary business activities and transactions including **claims** made by current or former employees, applicants for employment or any of their spouses, heirs, executors, administrators or legal representatives that do not directly arise from the content of **matter** gathered, uttered or disseminated in or for **scheduled media;**

D. for or arising out of actual or alleged infringement of patent or inducement to infringe a patent;

E. for or arising out of actual or alleged false, fraudulent, deceptive or misleading **advertising** or for unfair competition arising there from, but only in regard to intentionally false, fraudulent, deceptive or misleading **advertising** with respect to the **insured's** own products or services;

F. for or arising out of an **insured's** actual or alleged failure to provide or render **advertising** services, including but not limited to the development, distribution, display or placement of **advertising,** but this exclusion shall not apply to **claims** directly attributable to the content of **advertising;**

G. for or arising from actual or alleged **bodily injury** or **property damage;** but this exclusion shall not apply to **bodily injury** arising exclusively from emotional distress;

H. for or arising out of actual or alleged violation of a statute, regulation or common law that prohibits antitrust activities, price fixing, price discrimination, monopolization, restraint of trade or any unfair competition or conspiracy relating to any of these causes of action;

I. for or arising out of actual or alleged violation of a statute, regulation or common law that governs the offer, sale or purchase of securities or commodities, including the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, any state "Blue Sky" law or any amendment to the foregoing;

J. for violation of a criminal statute, which shall have been determined by judge, jury or legal admission; except this exclusion shall not apply if the **insured's** counsel had previously authorized such act or omission based upon a good faith belief that the criminal statute violated the First Amendment to the United States Constitution or any provision of a State Constitution protecting freedom of speech and press or a good faith belief that the act or omission was not a violation of such criminal statute;

1. With respect to Exclusion J, no knowledge possessed by or conduct of any **insured** shall be imputed to any other **insured** for coverage purposes under the policy, and only knowledge possessed by or conduct of any officer, director, partner, general counsel or risk manager shall be imputed to the **insured**;

K. for or arising out of  the actual or alleged unauthorized collection, use or dissemination of internet user information through web cookies or other online profiling processes by or on behalf of the **insured** or for unlawful access to or invasion of any computer software, operating system or network, electronic mail or voice mail system by or on behalf of the **insured**;

L. made by ASCAP, SESAC, BMI, RIAA or other music licensing entity on their behalf or for others arising from the **insured's** failure to procure or maintain requisite licenses or payment of royalties; or

M. for or arising out of an **occurrence** which has been the subject of any notice to an **insured** of a **claim** or a potential **claim**, prior to the inception date of the policy;

N. for or arising out of the transmission or dissemination of unsolicited commercial electronic mail or facsimiles.

## SECTION IV — LIMITS OF LIABILITY AND RETENTION

### A.  Limits of Liability

The Limit of Liability set forth in Item 5(a) of the Declarations shall be the most the **Company** shall pay for **loss** resulting from an **occurrence**. The Limit of Liability set forth in Item 5(b) of the Declarations shall be the most the **Company** shall pay for all **loss** payable under this policy. The Limits of Liability apply regardless of the number of:

1. **insureds** covered under the policy;

2. **occurrences**;

3. Coverage Agreements;

4. policies issued by the **Company**;

5. persons or organizations who sustain or claim **loss**; or

6. **claims** made or suits filed.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

The **Company** shall pay **defense costs** in addition to the applicable Limit of Liability. However, if the Limit of Liability is exhausted by the payment of **loss**, all obligations of the **Company** under this policy, including its duty to pay **defense costs**, shall be completely fulfilled, and the **Company** shall have no further obligations under this policy.

### B.  Retention

The Retention identified in Item 4 of the Declarations shall be any combination of **loss** or **defense costs** first incurred and payable by or on behalf of the **insured** for each **claim**. The **Company's** Limit of Liability is in excess of the Retention set forth in the Declarations. The Retention shall not reduce the Limit of Liability and shall apply separately to each **occurrence**.

## SECTION V — GENERAL CONDITIONS

### A.  Notice of Claim

The **insured** shall provide prompt notification of any potentially covered **claim** by whatever means is most expedient and shall forward all suit papers and other documents to:

OBPP-KC-G16727 05/05 (Rev. 8/05)

Page 6 of 9

214162

First Media
A Division of One Beacon Professional Partners
Attention: Claims Administrator
1-800-753-7545
913-384-4822 — Fax

**B. Conduct of Defense and Cooperation of the Insured**

The **Company** shall retain counsel to represent the **Insured** for the defense of the **claim** and shall pay all **defense costs** incurred in the defense of the **claim** in excess of the Retention. The **Insured** may consult with the **Company** regarding the selection of defense counsel with respect to any covered **claim** or for which a defense is provided, and shall cooperate as follows:

1. the **insured** shall provide documents, information, correspondence or pleadings reasonably requested by the **Company**;

2. the **Insured** shall attend hearings, settlement conferences and trials, assist in securing and complying with discovery requests and procuring the attendance of witnesses;

3. no **insured** shall make any admissions of liability, but this shall not apply to the correction or retraction of **matter**; and

4. at the **Company's** request, the **Insured** shall assist in protecting and enforcing any right of contribution or indemnity against any third person or organization who may be liable to the **Insured**.

**C. Retraction or Correction**

The **insured** shall have sole discretion regarding the necessity or desirability of retracting or correcting matter uttered or disseminated in **scheduled media**.

NOTICE

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**D. Sources, Notes and Confidentiality**

The duty to cooperate does not require the **Insured** to disclose the identity of a confidential source or materials furnished by a source or to produce a reporter's notes, recordings, tapes, out-takes or related materials in connection with a **claim**.

**E. Settlement, Judgment and Appeal**

The **insured** may settle any **claim** if the total cost of **loss** and **defense costs** is less than the remaining Retention without prior consent from the **Company**. If, however, any combination of **loss** and **defense costs** exceeds the Retention, no offer to settle shall be made without prior consent from the **Company**, which shall not be unreasonably withheld. If the **insured** and the **Company** disagree with respect to settlement, the following provisions shall apply:

1. if the **insured** is willing to accept the judgment of a trial or appellate court, and if the **Company** disagrees, the **Company** shall have the right to continue to defend the **claim** or may appeal from the judgment. All **defense costs** and **loss** arising from any new trial or appellate action, as well as any increase in the judgment shall be paid by the **Company**. Any increase in the judgment shall not affect the Limits of Liability; or

2. if the **Company** is willing to accept a settlement offer or judgment of a trial or appellate court and the **insured** is not willing to accept such settlement offer or judgment, and if the judgment or settlement exceeds the **insured's** remaining Retention, the **Company** and the **insured** shall negotiate, mediate or submit to other means of dispute resolution as soon as practicable, with each party to bear its own expenses in connection therewith.

**F. Time of Inception, Policy Term**

This policy will begin on the effective date shown in the Declarations. The policy shall continue in force until the expiration date also shown in the Declarations, unless earlier terminated.

OBPP-KC-G16727 05/05 (Rev. 8/05)                                                                Page 7 of 9

G. **Territory**

The policy's territory is worldwide.

H. **Currency**

If judgment is rendered or settlement is made in a currency other than United States dollars, payment under this policy shall be made in United States dollars at the applicable rate of exchange on the date the final judgment is rendered or other date with the mutual consent of the **Insured** and the **Company**.

I. **Premium**

The **Named Insured** shall pay to the **Company** the premium stated in Item 6 of the Declarations. The premium may be subject to change during the **policy term** based upon additions or deletions of **scheduled media** or changes in the provisions of the policy by endorsement as agreed upon by the **Named Insured** and the **Company**.

J. **Mergers, Consolidations and Acquisitions**

This policy applies only to **scheduled media**, the insured and any additional insured in existing agreements effective date of the policy in the Declarations or by endorsement. The policy shall cover newly acquired or newly created media entities or mergers, where the **Named Insured** is the survivor that is reported to the **Company** within ninety (90) days. Newly acquired or created media entities and mergers are acceptable will be subject to underwriting approval, and payment of any additional premium that may be required.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

K. **Other Insurance**

If the **insured** has other insurance for a **claim** also covered by this policy, the insurance provided by this policy shall be excess over such other insurance, unless such other insurance was specifically issued as excess over this policy. If this policy is excess over other insurance, the **Company** will pay only its share of the amount of the **loss**, if any, that exceeds the sum of:

1. the total amount that all other insurance would pay for **loss** in the absence of this policy; and

2. the total of all Retentions and self-insured amounts under all insurance policies.

L. **Subrogation**

In the event of any payment of **loss** or **defense costs** under this policy, the **Company** shall be subrogated to all the **insured's** rights of recovery against any person or organization. The **insured** shall take whatever action is necessary to secure such rights and shall do nothing to prejudice such rights. The **Company** shall have no subrogation rights against the **insured**.

Recovered amounts shall first be applied to offset legal expenses associated with the subrogation action. The remainder shall be distributed proportionally to both the **insured** for payments made under the self-insured retention obligation and to the **Company** for any **defense costs** and **loss** associated with the **claim**.

M. **Assignment**

An assignment by any **insured** of the **insured's** rights and duties under the policy shall not bind the **Company** without its prior written consent.

N. **Action against the Company**

1. No action shall be taken against the **Company** unless there has been full compliance with all of the terms of this policy nor until **loss** has been determined by final judgment against the **insured** or by written settlement agreement between the **Named Insured**, the claimant and the **Company**.

OBPP-KC-G16727 05/05 (Rev. 8/05)                                                    Page 8 of 9

2.14162

2. Any person or organization, who has secured such final judgment or is a party to such written settlement agreement, shall be entitled to recover to the full extent of the insurance afforded by this policy.

3. No person or organization shall have any right under this policy to join the **Company** as a party to any **claim** against the **insured** to determine the **insured's** liability, nor shall the **Company** be impleaded by the **insured** or its legal representative.

**O.  Bankruptcy of Insured**

Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the **Company** of any of its obligations under the policy.

**P.  Cancellation and Non-renewal**

1. The **Named Insured** may cancel the policy at any time by mailing to First Media written notice stating when thereafter such cancellation shall be effective or by surrendering the policy to First Media. Any unearned premium will be calculated in accordance with the customary short rate table and procedure.

2. This policy may be cancelled by the **Company** by mailing to the **Named Insured**, at the address shown in the Declarations, written notice stating the reason(s) for cancellation and when, but not less than sixty (60) days thereafter, such cancellation shall be effective. Any earned premium will be calculated pro rata. If cancellation is for failure to pay premium when due, the **Company** shall give written notice when, but not less than ten (10) days thereafter, such cancellation shall be effective.

3. If the **Company** non-renews this policy, the **Named Insured** shall be mailed a notice at the address shown in the Declarations stating the reason(s) for non-renewal at least sixty (60) days prior to the end of the **policy term.**

**Q.  Authority of Named Insured**

The **Named Insured** shall be deemed the agent of all other **insureds** with respect to the terms and conditions of the policy.

**R.  Changes to the Policy**

Notice to the **Company's** agent or knowledge possessed by any such agent or by any other person shall not effect a waiver or a change in any part of this policy, nor stop the **Company** from asserting any right under this policy's terms, conditions or limitations; nor shall such terms, conditions or limitations be waived or changed except by endorsement issued to form a part of this policy and signed by the **Company's** agent.

**NOTICE**

THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**S.  State Endorsements**

State endorsements shall be added to the policy to conform to statutory requirements or to address public policy concerns of the state where the policy has been issued.

**T.  Application Representations and Severability**

The **Named Insured** represents that the particulars and statements contained in the application and all materials submitted in connection therewith are true, accurate and complete and agrees that this policy is issued in reliance on the truth of such representations, and that such representations are material to the **Company's** acceptance of this risk. No knowledge possessed by any **insured** shall be imputed to any other **insured** for risk acceptance purposes and only knowledge possessed by any officer, director, partner, counsel, risk manager or other person whose signature appears on the application shall be imputed to the **Named Insured.**

2-14162